1

J67TCHAC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHANEL, INC.,

4                   Plaintiff,

5            v.                              18 CV 2253 (LLS)

6   WHAT COMES AROUND GOES AROUND,
    LLC, et al.,
7
                    Defendants.
8
    ------------------------------x
9                                           New York, N.Y.
                                            June 7, 2019
10                                          2:45 p.m.

11  Before:

12                   HON. LOUIS L. STANTON,

13                                          District Judge

14                          APPEARANCES

15  SHEPPARD, MULLIN, RICHTER & HAMPTON
         Attorneys for Plaintiff
16  BY:  THEODORE MAX
         HYO-JIN PARK
17
18  LEWIS, BRISBOIS, BISGAARD & SMITH
         Attorneys for Defendants
18  BY:  PETER SHAPIRO
19

20

21

22

23

24

25

J67TCHAC

```
1              (In robing room)
2              THE COURT:  So tell me what in the case justifies
3    requests of this scope.
4              MR. MAX:  Your Honor, in terms of the discovery
5    requests --
6              THE COURT:  That's what we're talking about, right?
7              MR. MAX:  Yes, in terms of the discovery requests,
8    request one, two and three relate to the sales of the Chanel
9    products, and because not only the claims relate to the Chanel
10   products and how they're sold, the advertising claims, but also
11   the defenses, the affirmative defenses, especially the
12   affirmative defense of the First Sale Doctrine, how they're
13   sold and the method by which those sales are made, whether it's
14   the distributor or how they're sold to public is an important
15   part of this case.
16             And if you want, your Honor --
17             THE COURT:  Well, now actually the first request is
18   rather baffling, it says, "All documents and communications
19   between any of the defendants and Chanel."
20             Doesn't Chanel have copies of all those?
21             MR. MAX:  Your Honor, we have some, but the question
22   there was to the extent that there were communications from --
23             THE COURT:  There were indications of what?
24             MR. MAX:  There have been cease and desist letters
25   sent to the defendant, but we wanted to make sure that there
```

J67TCHAC

1    were no other communications of which we were unaware.  And on

2    that request I think the parties have discussed it, and we're

3    all right on that.

4              THE COURT:  Not an issue?

5              MR. MAX:  That's not an issue.

6              THE COURT:  I see.  Which is the first one in issue?

7              MR. MAX:  I think it's the second one --

8              THE COURT:  Okay.

9              MR. MAX:  -- which relates to documents and

10   communications concerning the Chanel trademarks, Chanel and

11   Chanel-branded products.  And on that, the defendants have said

12   we got 939,000 emails, and what we have said in the meet and

13   confers was:  Is there a way we can, either by topic area or by

14   custodian, who received the documents, is there a way we can

15   narrow that scope?

16             THE COURT:  Yes, there is.

17             MR. MAX:  Because, for example, we don't want

18   confirmatory emails saying thank you for your purchase or

19   orders or things like that.  So we have said that.

20             Opposing counsel, as recent as yesterday, said that he

21   would go back to the client and try to see if they could

22   identify those categories.

23             THE COURT:  It reads, "All documents and

24   communications concerning the Chanel trademarks, Chanel and

25   Chanel-branded products."  To say that's too broad is to have

J67TCHAC

1   contempt for the use of language.  It's broad beyond

2   conception.  Under that demand they would have to produce a

3   copy of the complaint.  So it's vacated.  That's the way to

4   trim it.  That pattern runs through the questions.  And I don't

5   want hit you from ambush, but it's very rare I have seen a

6   bunch of requests drawn in this manner.

7            Which is the next?

8            MR. MAX:  Your Honor, the next would be the third

9   request, and that regards documents --

10           THE COURT:  All documents and communications

11   concerning defendants' sale of Chanel-branded products.  It

12   boggles the mind.  It goes beyond an audit of the entire

13   business.  It's vacated.

14           Next?

15           MR. MAX:  The next is request number five, and that's

16   communications between defendants and third-party vendors or

17   consumers with regards to third-party vendors.  They have

18   identified two-third party vendors, and what we have said,

19   because we have an understanding that there are at least two

20   and maybe three or four other vendors, Von Maur, Christie's,

21   Far Fetched and Amazon, who they have not identified as

22   producing documents relating to those.

23           THE COURT:  And you want all communications and

24   documents between them?

25           MR. MAX:  Yes, your Honor.

J67TCHAC

|   |   |
|---|---|
| 1 | THE COURT:  From the beginning of the world until the |
| 2 | date of the present? |
| 3 | MR. MAX:  We don't think -- your Honor, with regards |
| 4 | to those vendors, we do not believe that's a large volume of |
| 5 | documents. |
| 6 | THE COURT:  But whatever they are, you want them all? |
| 7 | MR. MAX:  Well, your Honor -- |
| 8 | THE COURT:  That's the request.  Maybe in the real |
| 9 | world you could live with less, but I'm dealing with a set of |
| 10 | demands before me, and I take it literally, and this format is |
| 11 | going to meet with this reaction routinely. |
| 12 | MR. MAX:  Your Honor, with regards to those |
| 13 | communications, what we have been focusing on in terms of the |
| 14 | meet and confers is documents relating to advertising relating |
| 15 | to -- |
| 16 | THE COURT:  How does the reader know that?  He has to |
| 17 | answer these things under oath. |
| 18 | MR. MAX:  Well, your Honor, in terms of the |
| 19 | discussions that we have had to try to narrow those -- |
| 20 | THE COURT:  I'm not interested in discussions.  You |
| 21 | drafted this document, I read its words, and I'm giving you my |
| 22 | reactions. |
| 23 | MR. MAX:  Well, your Honor, we can redraft it.  We |
| 24 | have had meet and confers on this. |
| 25 | THE COURT:  I suggest you do, but I am perfectly |

J67TCHAC

1    willing to sit here with you and do them one by one.

2         MR. MAX:  We're fine with doing that as well, your

3    Honor.  As I said, with regards to the second request, we had

4    narrowed that and we had discussed that.

5         THE COURT:  Let me explain really two things to keep

6    in mind.  I'm going to vacate them all but without prejudice to

7    a properly drafted request.

8         The format here are starts, "All documents and

9    communications," and that runs through.  That's just mindless,

10   nobody could answer that.  Notes, personal letters, things

11   whose subject and topic have nothing to do with the case, all

12   demanded, and somebody is going to have to certify we produced

13   them all.  Nobody should face that burden, and no court would

14   impose it, including the court you're sitting in.

15        Now the second point is this, you drafted these in the

16   spirit of vacuum cleaning:  Just grab them all, suck them in

17   and we'll sort them out.  That's the wrong approach, as you can

18   see.  The better approach, and I'm sure you can find lawyers

19   who will help you in this process, is to analyze what the

20   issues in the case really are, what you really need to get to

21   the necessary proof of your needs with respect to those issues,

22   and in a lawyer-like fashion draw up a question or a request

23   addressed to that.  That's the way these things should be

24   written.  It's apparent that they aren't.  That's why I have

25   the nerve to suggest it to you.

J67TCHAC

1        MR. MAX:  Your Honor, no nerve.  Unfortunately, I

2    think both parties -- and we did not make the same objections,

3    they used similar language, but we will remedy that.

4        Your Honor, with regards to -- certainly we can redo

5    the requests.  With regards to --

6        THE COURT:  You say "with regards to."  Those words in

7    themselves display a looseness of thought that is not useful in

8    litigation.  It's okay for conversation.

9        MR. MAX:  Your Honor, I was trying to get to a topic

10   that I think might make sense to discuss, and that's the

11   request 9 and 31.  And one of the issues with request 9 and 31

12   are that the defendant, with regards to those requests, is

13   objecting not just on an overbreadth issue but they're saying

14   they do not want to produce those, because that information is

15   confidential information of the company in terms of where they

16   get their products from, who is selling the products and so

17   forth.  And that issue -- obviously we can redraft the request,

18   but that issue will remain.  That's sort of been a point upon

19   which we have agreed to disagree, and we need the Court's

20   guidance.

21        THE COURT:  Tell me what you think request number 21

22   is seeking and what's it about and what is your reaction to it.

23        MR. SHAPIRO:  I think it was 9 and 31.

24        THE COURT:  Oh, 31, I was looking at 21.  Let's start

25   with 9.

J67TCHAC

1              All documents -- well, we have covered that --

2      concerning each defendant's policies, procedures and processes

3      relating to how each defendant identifies, obtains, acquires,

4      accumulates, purchases, merchandises and sells Chanel-branded

5      goods.

6              Now I've read that, I have to confess, and English is

7      my native language, I don't know what it means.  All of your

8      policies about how you do business?

9              MR. MAX:  No, your Honor.

10             THE COURT:  That's what it sounds like.

11             MR. MAX:  No, what it is focused on --

12             THE COURT:  I'm sorry, I cut you off.

13             What do you think it means and why does it bother you?

14             MR. SHAPIRO:  Well, I think we agree that it's

15     overbroad, but I think what they're really trying to focus on

16     here is what the policies and practices are of my clients with

17     regard to how they go about acquiring goods that they

18     believe -- the process by which my client goes about acquiring

19     goods that they believe are Chanel goods and authenticating

20     them so they're sure they're not selling any counterfeit

21     products.  I don't think we have a problem with that.

22             THE COURT:  You think it's addressing the counterfeit

23     problem?

24             MR. SHAPIRO:  Yes, primarily.

25             THE COURT:  I see.

J67TCHAC

1        MR. SHAPIRO:  We don't think counterfeiting really is

2   an issue in the case because there's been no allegation that

3   we're selling counterfeit goods, but authentication is a

4   legitimate issue in the case.  And so I think there's some

5   willingness to provide documents, to the extent they exist,

6   about the policies.

7        I think that the rub that we have comes into when you

8   combine it with number 31, because what they're really looking

9   for is for my client to identify the companies and the

10  individuals from which they acquire these products.

11       THE COURT:  The sources.

12       MR. SHAPIRO:  The sources.  And that's what we are

13  very sensitive about, and we believe this case is in part

14  motivated by an improper purpose, which is to ferret out who

15  those are to basically try to crush this business of selling

16  secondhand Chanel products.

17       THE COURT:  What do you see as the issues in the case?

18       MR. SHAPIRO:  Well, I think the claim is that we're

19  trying to pass ourselves off as Chanel, in effect, the primary

20  claim, even though we're not Chanel.

21       THE COURT:  That's what I understood it to be, but

22  maybe I was oversimplifying it.

23       What do you see as the claim in the case, or claims?

24       MR. MAX:  I think certainly creating that association

25  with Chanel is one of the major points.

J67TCHAC

<table>
<tbody>
<tr><td>1</td><td>THE COURT:  I think that should be relatively easy to</td></tr>
<tr><td>2</td><td>resolve.  They seem to be clinging to any error along that line</td></tr>
<tr><td>3</td><td>in their favor.</td></tr>
<tr><td>4</td><td>MR. MAX:  I think the other big issue is how the</td></tr>
<tr><td>5</td><td>products are sold and how the defendants represent themselves</td></tr>
<tr><td>6</td><td>to the public.</td></tr>
<tr><td>7</td><td>THE COURT:  What business is that of yours?</td></tr>
<tr><td>8</td><td>MR. MAX:  Well, if they're selling -- I will give you</td></tr>
<tr><td>9</td><td>an example, your Honor.  If they're selling products that are</td></tr>
<tr><td>10</td><td>not authentic Chanel products --</td></tr>
<tr><td>11</td><td>THE COURT:  What's your position?  Are they doing it</td></tr>
<tr><td>12</td><td>or not?</td></tr>
<tr><td>13</td><td>MR. MAX:  With regards to certain products, they have</td></tr>
<tr><td>14</td><td>identified products like point of sale materials, like a tray</td></tr>
<tr><td>15</td><td>that might be used at Saks Fifth Avenue, and they're</td></tr>
<tr><td>16</td><td>representing that that is a Chanel product.</td></tr>
<tr><td>17</td><td>THE COURT:  Is it not?</td></tr>
<tr><td>18</td><td>MR. MAX:  It is not a product, your Honor.</td></tr>
<tr><td>19</td><td>THE COURT:  Who made it?</td></tr>
<tr><td>20</td><td>MR. MAX:  A vendor makes it, and it's used as a point</td></tr>
<tr><td>21</td><td>of sale item.</td></tr>
<tr><td>22</td><td>THE COURT:  I see.</td></tr>
<tr><td>23</td><td>MR. MAX:  With regards to counterfeit goods, we have</td></tr>
<tr><td>24</td><td>some information, but because the defendants do not put serial</td></tr>
<tr><td>25</td><td>numbers on their website it's very difficult to make a</td></tr>
</tbody>
</table>

J67TCHAC

1   determination whether there's real or there's counterfeit.

2          And there's another issue with regards to Chanel

3   goods, and that's stolen goods.  There are a number of thefts

4   that happen around the world, and so if there were stolen

5   goods, those are the reasons, in terms of the source

6   material --

7          THE COURT:  What is your proof that they have sold

8   counterfeit Chanel products?

9          MR. MAX:  We have --

10         THE COURT:  By "counterfeit," I'm speaking in the

11  copyright law meaning of the word, which is something so like

12  that it is extremely difficult to tell it.  Under the copyright

13  law, something that Chanel made but wasn't planning to sell I

14  don't think is a counterfeit.

15         MR. MAX:  Your Honor, if they are selling something

16  that is not for sale to the public, it may not be a counterfeit

17  but it would be misrepresenting the goods to the public.

18         THE COURT:  But you're characterizing it as a

19  counterfeit.  That's the problem.

20         MR. MAX:  Certain sales we believe are counterfeit, so

21  there have been some products that we believe are counterfeit.

22  There are other goods that have been misrepresented as to what

23  the goods are, so that's more an unfair competition claim.

24         THE COURT:  Whatever it is, but it's not a

25  counterfeit.  "Counterfeit" is a word of art.

J67TCHAC

1          MR. MAX:  We did not bring a counterfeiting claim, we

2     brought unfair competition claims.  We think there might be

3     counterfeits.  We do not have that evidence.

4          But there's a line of case law, and I'm happy to give

5     your Honor cases with regards to the issue of discovery as to

6     the sources, discovery as to where the products come from.  And

7     basically those cases provide that, especially under the new

8     Federal Rules, Rule 34, that if an affirmative defense is

9     asserted with regards to the First Sale Doctrine, meaning it

10    was sold properly so now I can resell it, that that implicates

11    those questions and that that discovery is proper.

12          THE COURT:  As to the first sale.

13          MR. MAX:  No, as to how the defendant got the goods.

14    The first sale, ostensibly, if it's a genuine good, for the

15    First Sale Doctrine to work, would be that Chanel sold the

16    product.

17          THE COURT:  Yes.

18          MR. MAX:  And with a defendant and with certain

19    products -- for example, snow globes, there are snow globes

20    that have been sold by the defendants.  Chanel has snow globes

21    that are distributed to special people, but we cannot tell

22    whether those snow globes, for example, are authorized product

23    or maybe they're counterfeit or maybe they're product that was

24    stolen or went out the back of the factory, that they're

25    unauthorized goods.  If they were stolen or unauthorized goods,

1    those would mean the First Sale Doctrine would not apply.  So

2    that's why when the First Sale Doctrine is asserted, the case

3    law provides that it's fair and reasonable and relevant for the

4    defendant to provide that information.  Obviously, to the

5    extent that it's under a protective order or something like

6    that, courts have recognized that.

7              THE COURT:  And the fit between that and the language

8    of number 9 is a very poor fit indeed.  Maybe you could ask

9    questions about what you have been telling me about, but that's

10   not done in 9.

11             MR. MAX:  I think 9 is more with regard to because

12   they say we 100 percent guarantee.

13             THE COURT:  Where you are then, 31?

14             MR. MAX:  I think it's more 31.

15             THE COURT:  All documents and communications relating

16   to the sources.  I see.  That is to say, how were they found

17   and what were the negotiations of the relationship and

18   everything else, amount of business, type of business.  None of

19   this fits under your complaint.

20             MR. MAX:  Your Honor, I believe the request 31 does

21   fit.

22             THE COURT:  I'm reading it.  That's the language I

23   have in front of me, "relating to the sources."  You say I need

24   to know that to determine the application of the First Sale

25   Doctrine.

J67TCHAC

1    MR. MAX:  Well, it relates to the defense, their

2    assertion of a First Sale Defense and attacking that defense.

3    THE COURT:  Every time you or any lawyer uses the word

4    "relates" to, my ears close, because I know I won't understand

5    the rest of what he is saying.

6    MR. MAX:  Your Honor, let me rephrase then.

7    THE COURT:  Yes.

8    MR. MAX:  The first sale doctrine is an assertion that

9    there was a legal sale that predicated --

10   THE COURT:  Supposing you ask them for every document

11   for which you claim the first sale, identify the person from

12   whom you bought it.  Isn't that what you want?

13   MR. MAX:  Yes, your Honor.

14   THE COURT:  Compare that with the language of 31.

15   MR. MAX:  Well, I think the other point is to add to

16   it where they're selling a product, so their offering for sale

17   would be included, but --

18   THE COURT:  Sounds like two questions to me.

19   MR. MAX:  Maybe it is.  Maybe it's better to ask two

20   questions, your Honor.

21   THE COURT:  Would you have a valid objection to that

22   request, the way it's phrased?

23   MR. SHAPIRO:  Again, I think the concern here is that

24   this is a fishing expedition where they're trying to identify

25   who the sources are.

J67TCHAC

1          THE COURT:  The answer to that question would disclose

2      the source, but how can you get around it if you're claiming

3      first sale?

4          MR. SHAPIRO:  Well, I think that if we're able to

5      authenticate that they are legitimately Chanel products,

6      doesn't matter where we got them from, we got Chanel products,

7      we have procedures that we utilize to make sure they're not

8      stolen and they're authentic.

9          THE COURT:  If they're loose in the market they must

10     have been sold to somebody.

11         MR. SHAPIRO:  Well, it is possible that there are

12     goods out there that are stolen, but by virtue of our

13     procedures to avoid being in the business of selling stolen

14     goods, which is bad for our business, we take a lot of steps to

15     make sure we're not buying from those people who are known to

16     be out there marketing things that are stolen, suspect sources,

17     particularly from overseas, we take a lot of steps.  And it's

18     not just Chanel, my client sells a lot of different brands and

19     has a robust policy and practice to stay on the right side of

20     the law about that.  So the concern is that Chanel will use

21     this information to shut down their supply chain.

22         THE COURT:  What harm is there in knowing your

23     sources?

24         MR. SHAPIRO:  Again, I think the concern is that if

25     the client Chanel knows this, they're going to use that

J67TCHAC

1    information to try and shut down our supply chain and tell

2    these people if you keep selling to this company, we're not

3    going to like that and that's going to be problematic for our

4    relationship with you and that's going to be devastating to our

5    business.

6           THE COURT:  Yet Chanel does not sell any used products

7    themselves, so they're not competing.

8           MR. SHAPIRO:  It's not a question of competition, it's

9    a question of they may have relationships with certain

10   companies that sell to us they can then muscle and say we're

11   very unhappy that you're selling to this company and you're

12   involved in this market that we don't believe should exist, and

13   try to shut them down, and the other "or" is a lot of companies

14   like Chanel now are getting into the business saying if you

15   can't beat them, join them, and are going to be doing their own

16   efforts to market secondhand goods, that they will basically

17   use our information about who the sources are to cut us out of

18   the market.  And that would be, in my view, a misuse of the

19   legal process to do that.  So at a minimum we would want this

20   information limited to the attorneys.  If it has to be turned

21   over, it should be attorney's eyes only.

22          THE COURT:  I think I'm not going to rule on the

23   source question this afternoon.  There's more to that than the

24   mere discovery issue.  Although I may, if I ask permission, say

25   it's related, they are related.

J67TCHAC

1          MR. MAX:  Your Honor, on that point --

2          THE COURT:  I think I would like to have that question

3     about source separately argued with probably proof of what's

4     going on, the facts and the law.  It's not just a discovery

5     question, it's an important one.

6          MR. SHAPIRO:  Very good.

7          MR. MAX:  Your Honor, certainly we're happy --

8          THE COURT:  You say there are lots of cases, but I

9     haven't read them.

10         MR. MAX:  I could provide those to the Court.

11             In terms of just to respond to what Mr. Shapiro said,

12    he basically said we authenticate them, we have this process

13    and trust us.

14         THE COURT:  And they stand behind the authentication.

15         MR. MAX:  Right.

16         THE COURT:  You would think that as a business matter

17    that was a sufficient answer.

18         MR. MAX:  Well, in terms of asserting --

19         THE COURT:  In other words, they are putting

20    themselves at risk on that assertion.

21         MR. MAX:  But I think, as a part of discovery, Chanel

22    should be permitted the opportunity to get behind that in terms

23    of those policies and procedures --

24         THE COURT:  Why?

25         MR. MAX:  -- and the sources.

J67TCHAC

1        THE COURT:  Why?  If they authenticate it, why is

2   there attack of the validity of the authentication?

3        MR. MAX:  Why would there be?  Because they say they

4   authenticate it, that doesn't necessarily mean that.  And as I

5   said, your Honor, we have found some examples where, for

6   example, they identify a product as a Chanel smart phone case,

7   and that particular product was created when smart phones were

8   not in existence, so whoever did that --

9        THE COURT:  Who created it?

10        MR. MAX:  Chanel, but it was an eyeglass case, so it's

11   misidentified as to what the product is.  So for example, if

12   that's somebody who is an expert at authenticating a product,

13   they have misauthenticated it.

14        And so the whole point here, in terms of requests for

15   production 9, which goes to how do you do that

16   authentication --

17        THE COURT:  If they had called it an eyeglass case,

18   you would have no objection?

19        MR. MAX:  That's correct, your Honor, that would have

20   been accurate.  And that goes to the false advertising aspects

21   as opposed to some of the other aspects that we have been

22   talking about.

23        But also with regards to where products come from, if

24   products have been stolen or they're non-authorized goods, that

25   is -- and I'm not saying this is the case, but it happens in --

J67TCHAC

| | |
|---|---|
| 1 | THE COURT:  What does "non-authorized" mean? |
| 2 | MR. MAX:  Non-authorized would be, for example, a |
| 3 | factory that's making products and they're not approved by |
| 4 | Chanel but they're selling them out the back door, that would |
| 5 | be non-authorized.  Or non-authorized would also be a product |
| 6 | that is in a Chanel store and someone drives -- and this has |
| 7 | happened -- someone hijacks a truck and steals the product, |
| 8 | that would be unauthorized goods as well, because they're |
| 9 | stolen goods.  So those would be two examples of unauthorized |
| 10 | goods.  And so the source -- |
| 11 | THE COURT:  But even though stolen, they still would |
| 12 | be genuine Chanel products. |
| 13 | MR. MAX:  But if they have not been approved and they |
| 14 | have not been authorized because they have been stolen, like |
| 15 | going from the factory before they're approved, that would be |
| 16 | non-authorized goods. |
| 17 | THE COURT:  Genuine, but not authorized for sale. |
| 18 | MR. MAX:  It depends.  If you're stealing goods out of |
| 19 | a store, those are not authorized either.  The sale is not by |
| 20 | Chanel, it's by -- |
| 21 | THE COURT:  Is that a part of this case? |
| 22 | MR. MAX:  We don't know, your Honor, and that's why |
| 23 | I'm asking for the discovery. |
| 24 | THE COURT:  When you're asking questions to discover |
| 25 | whether you have a claim or not, you have to be very, very |

J67TCHAC

1    gentle and unobtrusive in the phrasing of those questions,

2    because otherwise it is a fishing expedition, but you're

3    fishing not for evidence of your claim, you're fishing for a

4    claim.

5            MR. MAX:  Well, your Honor, with regards to -- we do

6    know that Chanel goods have been stolen, so we do know that.

7    We have no information with regards to where their goods are

8    coming from.  And as your Honor said, if there's a

9    confidentiality order in place, there should be no problem with

10   producing information with regards to sources.

11           And the comment about --

12           THE COURT:  Confidentiality order.

13           MR. MAX:  The comment about muscling, that Chanel

14   would muscle companies, there's no basis for that either.  And

15   for example, if goods are distributed or sold by Chanel or

16   they're manufactured by Chanel and they're non-authorized, for

17   example, the factory that's making excess goods and selling

18   them out the back door, those would not be authentic goods.  I

19   could understand if that's a source of defendants' goods, that

20   would be problematic for them, and they would lose that source,

21   but that's part of discovery.

22           As I said, your Honor, there are a number of cases

23   that deal with not only this type of issue, but deal with

24   diversion issues where these issues --

25           THE COURT:  Gray market.

J67TCHAC

1        MR. MAX:  Yes, where the courts have said if First

2   Sale Doctrine is your affirmative defense, then the plaintiff

3   is permitted to check that chain, check that supply chain and

4   determine whether indeed the First Sale Doctrine applies;

5   otherwise we're taking them at their word, which is not proper

6   discovery.  And there's been no assertion of a burden here

7   other than --

8        THE COURT:  The First Sale Doctrine requires a first

9   sale, and if the things are stolen out of the factory, no sale

10   has taken place.

11        MR. MAX:  Right, so the defense would not apply.

12        THE COURT:  That's correct.

13        MR. MAX:  Correct.

14        THE COURT:  There may be ways of discovery that

15   disclose that, but it's not these ways.  We're here to discuss

16   the -- all our conversation now is cautionary towards your next

17   questions.

18        MR. MAX:  I'm not sure I'm following.

19        THE COURT:  Now we're talking about what can you do in

20   your next trawling.

21        MR. MAX:  I understood that, your Honor.  The reason I

22   was raising this --

23        THE COURT:  So in a sense it's hypothetical.

24        MR. MAX:  Well, the reason I was raising this point

25   was this was a point where they said absolutely positively we

J67TCHAC

1    will not give you that information, so it was a hard and fast,

2    not it depends on the language.  It was like there's no way

3    we're giving you any information about source, and with regards

4    to authentication, it was basically the sale.

5         THE COURT:  When that is presented in a question that

6    properly inquires into source, then I will have something

7    before me I could decide, but simply arises under a question

8    that says all communications of any nature or whatever, it

9    doesn't present that issue.  It's bad in form and it's vacated.

10         I'm not indicating any ruling on source because I

11   think it has its complexity, and frankly I have no real prior

12   experience with it, so you're writing on a fairly blank tablet

13   and I need cases of law and briefing.

14         MR. SHAPIRO:  The discussion has been very amplifying

15   nonetheless, and I think it will be helpful as we move forward.

16         THE COURT:  My instinct as an old trial lawyer is that

17   the question really turns on the need for proof that there was

18   a prior sale.  That implies some burden on you which may carry

19   with it some burden of disclosure, but I don't know enough

20   about it to rule.

21         MR. SHAPIRO:  Very well.

22         THE COURT:  Have a nice weekend.

23         MR. MAX:  Your Honor, given the discussion that we

24   have had today, and we have conferred with defendants' counsel

25   about this, we would like the Court to extend the discovery

J67TCHAC

cutoffs.

       THE COURT:  Where is the schedule?

       MR. MAX:  I can give you a copy of my schedule.

       THE COURT:  Sure.  Let's look at that and see what you need.

       Now this is December 7, last December 7.

       MR. MAX:  And the discovery cutoff runs at the end of June.

       MR. SHAPIRO:  Fact discovery.

       MR. MAX:  In talking to defense counsel, we thought extending this 120 days across the board makes sense.

       THE COURT:  The first date in this table is March 29, 2019, so we had that, and it says production of the documents by the parties should be substantially completed.

       MR. MAX:  Which discovery is not substantially completed.

       THE COURT:  It says April 1, 2019, commencement of party depositions.  What's happened along that line?  Nothing.

       MR. MAX:  That's right.

       THE COURT:  June 28, that's at our throats, completion of fact discovery, not a chance.

       MR. MAX:  That's correct, your Honor.

       THE COURT:  There's no compliance with this at all.

       MR. MAX:  Well, we have been trying to deal with these issues, and obviously, through the -- if you reviewed the

24

J67TCHAC

1    correspondence, there were a number of meet and confers, but

2    yes, that's why we need additional time, and especially with

3    preparing new discovery requests, obviously we'll need

4    additional time.

5           THE COURT:  Yes.  And furthermore, you've created an

6    atmosphere in which an ignorant observer might conclude that

7    Chanel was using the litigation to harass and over-investigate

8    a small thorn in its business side.

9           MR. MAX:  Your Honor, that is not the case.

10          THE COURT:  I would never entertain that thought, but

11   I'm saying that impression is created.

12          MR. MAX:  I apologize, because I don't think that's

13   the impression, but I understand what your Honor is saying.

14          THE COURT:  In the cool of the evening, read your

15   requests for production.

16          MR. MAX:  Your Honor, unfortunately I think the

17   requests of the other side are very similar.  We didn't bring

18   it to the Court's attention, we tried to work it out.

19          THE COURT:  Then it will appear that they're harassing

20   you.

21          MR. MAX:  Maybe it's everybody is harassing everybody

22   else.  But that being said, your Honor, in terms of that

23   approach, I mean on Chanel's part we basically have said we'll

24   produce documents, and we didn't stand fast and say -- we tried

25   to work out --

1          THE COURT:  Realize in pursuing the policy and not the

2     search for evidence in the case, the thing to do is figure out

3     what you need for trial and what you need to rebut and then go

4     for that, and that is what excites sympathy in the observer,

5     because these people are trying to defend themselves in order

6     to process that claim.

7          MR. MAX:  Certainly that's the case, this is a search

8     for truth.  And obviously with regard to, for example, the

9     source information, if you are raising an affirmative defense

10    of First Sale Doctrine but you're unwilling to explain how you

11    authenticated the goods or where they came from, that's the

12    search for truth that we want.  And we take your words and your

13    advice with regards to redrafting to heart, and we'll deal with

14    that.

15         THE COURT:  I think you obviously need time.  Of

16    course I will give it to you, but I would like to see the

17    discovery on both sides proceed in that philosophy.

18         MR. MAX:  Understood.

19         THE COURT:  Rule 1 of the Federal Rules I think says

20    that all of the rules shall be administered to obtain the just,

21    speedy, and inexpensive determination of every action.  That's

22    not just viewed or interpreted, it means they should be

23    administered that way, and so I consider that one of my

24    responsibilities.

25         MR. SHAPIRO:  Inexpensive is a hard responsibility

J67TCHAC

```
 1   these days with litigation having become so expensive.

 2              THE COURT:  No, I'm assisted by very good lawyers.

 3              Now what do you need for time?

 4              MR. SHAPIRO:  120 days is what we agreed --

 5              THE COURT:  120.

 6              MR. SHAPIRO:  -- beyond the current deadlines is what

 7   we agreed would be appropriate.

 8              THE COURT:  Four months.  Okay.  Well, I think what

 9   I'll do is enter an order saying that the defendants' requests

10   for production dated whatever are vacated and all dates in the

11   December 7 schedule are extended by four months and then state

12   what the new dates are.

13              Will that do it?

14              MR. MAX:  So long as it's vacated with leave to

15   propound --

16              THE COURT:  Without prejudice, yes.

17              MR. MAX:  Then we'll get those --

18              THE COURT:  I'm not trying to cut off inquiry, I'm

19   trying to improve it.

20              MR. MAX:  We will prepare and improve it and serve

21   them forthwith.

22              THE COURT:  Great.

23              MR. SHAPIRO:  Thank you.

24              (Adjourned)

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300