UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

CHANEL, INC.,

                    Plaintiff,

          - against -

                                        18 Civ. 2253 (LLS)

                                        OPINION & ORDER

WGACA, LLC, WHAT COMES AROUND GOES
AROUND LLC d/b/a WHAT GOES AROUND
COMES AROUND, MHW PROPERTIES, INC.,
WGACA WEB, LLC, PINES VINTAGE,
INC., VINTAGE DESIGNS LTD., WCAGA
LA, LLC, and Individuals SETH
WEISSER and GERARD MAIONE,

                    Defendants.

- - - - - - - - - - - - - - - - - - -X

     Plaintiff Chanel, Inc. ("Chanel") brings this trademark

infringement and false association action against Defendant What

Goes Around Comes Around ("WGACA") under the Lanham Act and laws

of New York. Chanel alleges that WGACA's advertising and resale

practices violate Chanel's trademarks and improperly trade off

Chanel's brand in order to create the false perception that

WGACA is affiliated with Chanel. As a result, in its Second

Amended Complaint, Chanel asserts the following claims against

WGACA: (1) Trademark Infringement under 15 U.S.C. §§ 1114(1);

(2) False Advertising under 15 U.S.C. § 1125(a)(1)(B); (3) False

Association and Endorsement under 15 U.S.C. § 1125(a)(1)(A); and

several related claims under New York General Business Law for

1

(4) Deceptive and Unfair Trade Practices and (5) False
Advertising.

Pending before the Court are the parties' cross-motions for
summary judgment. Chanel seeks partial summary judgment holding
WGACA liable for trademark infringement and false association
under the Lanham Act and dismissing WGACA's affirmative
defenses. Dkt. No. 226. WGACA cross-moves for summary judgment
dismissing all of Chanel's claims. WGACA argues, among other
things, that its use of Chanel's marks in advertising
constitutes nominative fair use and that even if its actions
infringe on Chanel's trademarks, Chanel cannot prove it was
injured. Dkt. No. 219.

For the following reasons, the Court grants in part WGACA's
cross-motion dismissing the New York Business Law claims, and
grants in part Chanel's motion, holding WGACA liable for
trademark infringement in WGACA's sales of point-of-sale items,
eleven non-Chanel handbags sold as having been authorized for
sale by the Renato Corti factory, and one CHANEL-branded handbag
with a pirated serial number.

The rest of each party's remaining claims are denied.

## BACKGROUND[1]

---

[1] The following facts, unless indicated otherwise, are
undisputed. The facts are taken from the parties' statements
pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from
evidence as to which there is no non-conclusory contrary factual

**Parties**

The CHANEL brand was established in 1909 by Coco Chanel and has grown to be an internationally recognized fashion house. Dkt. No. 252 (Defendant's Rule 56.1 Response to Plaintiff's Rule 56.1 Statement ("Def. 56.1 Reply")) ¶¶ 1-2. Chanel owns eight famous, federally registered trademarks, including CHANEL and CC (the "Chanel Marks"), as well as Coco Chanel's publicity rights. Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 4-5. The Chanel Marks date back to 1956 and cover leather goods and jewelry, among other things. To this day, Chanel remains the exclusive designer and manufacturer of luxury apparel, leather goods, and other accessories bearing the Chanel Marks. Id. ¶ 3. Chanel has never sold any CHANEL-branded goods in the secondhand market. Id. ¶ 61.

Chanel's products are manufactured in select authorized factories in France, Italy, and Spain on a "to order" basis.[2] Id. ¶¶ 16-17. Chanel provides its factories with only enough supplies to make the specific number of Chanel products that have been ordered. Id. The supplies provided include the leather, rivets, buckles, zippers, and clasps, as well as a

---

proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to their underlying evidentiary submissions.
[2] Factories do not always comply with Chanel's directives. Chanel has accused one of its factories, Bianchi & Nardi, of manufacturing bags in excess of those allotted to it. Id. ¶ 17.

CHANEL-branded label, sticker, and Authenticity Card that each bear a unique Chanel Serial Number. Id. ¶¶ 15, 20. Chanel does not authorize factory overruns and its factories are not authorized to purchase any extra components to enable them to make more handbags than those specifically ordered by Chanel. Id. ¶ 19.

Each unique Chanel Serial Number, and its corresponding Authenticity Card and label, is allocated to a specific factory. Id. ¶ 22. A Serial Number is only assigned to a CHANEL-branded product once the product has been authorized for manufacture and determined to meet Chanel's quality requirements. Id. Although each of Chanel's authorized factories keep CHANEL-branded labels, stickers, and Authenticity Cards in a secure locked area, 30,000 Chanel labels, stickers, and Authenticity Cards bearing unique Serial Numbers were stolen from the Renato Corti factory in November 2012. Id. ¶¶ 22, 41-43.

Since 1993, Chanel's internal inventory system (the "ORLI System") has been used to track the allotment of the Chanel Serial Numbers to Chanel factories and the assignment of Chanel Serial Numbers to specific CHANEL-branded products after the product has passed the factory's quality control process.[3]

---

[3] The first step of tracking the Chanel Serial Number is the creation of the Chanel Serial Number which appears on labels, stickers, and Authenticity Cards; this information is recorded in the ORLI System. The second step of tracking the Chanel

4

Id. ¶ 29. Once a Serial Number is assigned to an item, the item's type, color, characteristics, and location is entered into the ORLI System. Id. ¶ 23. The System also tracks the status of products as they progress through Chanel's distribution system and the locations where the products are ultimately sold by Chanel. Id. ¶¶ 23, 25. If Serial Numbers are stolen or missing from a Chanel factory, like those taken from the Renato Corti factory, Chanel will void them in the ORLI System. Id. ¶¶ 27, 32, 34-35, 44.

In the ORLI System, Chanel can query the Serial Number on a product it allegedly produced to determine if it actually manufactured, inspected for quality control, approved, and sold a product with that unique Serial Number. Id. ¶ 26. If Chanel did manufacture and sell a product bearing the queried Serial Number, Chanel can then use the ORLI System to determine whether the type, color, and characteristics of the alleged product correspond with those of the genuine product Chanel manufactured and sold under that Serial Number. Id.

Serial Number occurs when the Serial Number is allocated to a specific Chanel authorized factory, which is also recorded in the ORLI System. The third step of tracking occurs when the Chanel Serial Number is linked to a specific CHANEL-branded handbag or small leather goods item by the Chanel-authorized factory, which takes place only after the product has been inspected and passed Chanel's strict quality control standards and been found to meet Chanel's specifications. Id. ¶ 23.

5

WGACA is a retailer specializing in the sale of luxury secondhand clothing, bags, jewelry, and accessories. Id. ¶ 59. WGACA has sold, or offered for sale, secondhand CHANEL-branded products via its website, www.whatgoesaroundnyc.com, in its retail stores, at trunk shows or pop-up shops, and through ecommerce platforms. Id. ¶ 60. Chanel has never authorized WGACA's secondhand sale of CHANEL-branded goods. Id. ¶ 61. Nor does WGACA purchase its inventory directly from Chanel or from any Chanel retail boutique or Chanel authorized retailer. Id. ¶ 64. Instead, WGACA purchases goods from individuals and international whole-sellers, without asking for documentation of how they obtained title to the goods. Id. ¶¶ 103-04, 107.

WGACA, on its website, "guarantees the authenticity of all products sold." Id. ¶ 113. To comply with its authenticity guarantee, WGACA employs a team of in-house experts who authenticate all goods before they are sold. Id. ¶ 67. It also used to provide an authenticity letter signed by its Chief Executive Officer, Seth Weisser, for every item authenticated and sold. Id. ¶ 72.

However, WGACA does not disclose that these in-house experts have never worked for or been trained by Chanel. Id. ¶ 68. WGACA does not keep written records of the authentication process for the individual items, but it does maintain a database of the fact that the authentication process was

conducted. Id. ¶ 71. It also, since 2017, stopped publicizing on
its website the Chanel Serial Number of goods it has available
for sale. Id. ¶ 116.

In April 2020, WGACA added the disclaimer: "WHAT GOES
AROUND COMES AROUND IS NOT AN AUTHORIZED RESELLER NOR AFFILIATED
WITH ANY [sic] THE BRANDS WE SELL." Id. ¶ 124.

WGACA also advertises its products using a combination of
its marks and the marks of all of the luxury fashion houses that
it sells. Id. ¶ 112. Without Chanel's authorization, WGACA used
Chanel marks and indicia, such as Chanel artwork and images of
Chanel runway shows, in advertisements and displays featured in-
store and on its webpages, social media, and direct-to-consumer
emails. Id. ¶¶ 137-141, 143, 146, 148-149, 150-156. WGACA up
until 2017 also used the hashtag #WGACACHANEL in its social
media posts. Id. ¶ 142.

### WGACA'S Contested Conduct

Chanel charges WGACA sold allegedly non-genuine, infringing
Chanel products, and improperly used Chanel marks in its
advertising and marketing.

Chanel's claims for trademark infringement and false
association are based on WGACA's sale of four categories of
allegedly infringing CHANEL-branded products: (1) eleven non-
genuine and counterfeit CHANEL-branded handbags bearing Serial
Numbers that were assigned to and stolen from the Renato Corti

factory and which were subsequently voided in Chanel's ORLI System;[4] (2) two non-genuine and counterfeit CHANEL-branded handbags that have characteristics that do not match the ORLI System's recorded characteristics for the bags associated with those serial numbers; (3) fifty non-genuine CHANEL-branded handbags that bear serial numbers which were voided in the ORLI system during inventory audits at Chanel's factories; and (4) 779 non-genuine point-of-sale items bearing Chanel logos (i.e., counter-support items), which were never authorized for sale by Chanel, sold by Chanel or a Chanel-authorized retailer, or otherwise put into the stream of commerce by Chanel.[5] Id. ¶¶ 74-111.

---

[4] One of the bags with a voided Serial Number from the Renato Corti factory (No. 17688191) was advertised for sale on WGACA's website in 2015 (when WGACA still listed the Chanel Serial Number on its product listing page). Id. ¶ 50-51. On June 26, 2015, Chanel wrote to put WGACA on notice that it was advertising for sale a non-genuine CHANEL-branded handbag bearing a Serial Number that was never authorized for use, and informing WGACA that no genuine CHANEL-branded bag was ever manufactured or sold by Chanel with that voided Serial Number. Id. ¶ 52. The bag was sold four weeks later. Id. ¶ 54. WGACA claims that the bag was genuine and that there was a "typo or data entry error with regards how the serial number was listed on our site" and that the bag's serial number was actually 17267828. Id. ¶ 53. Chanel disputes WGACA's explanation arguing that the bag with serial number 17267828 was previously sold by WGACA on February 12, 2015. Id. ¶ 54.
[5] Point-of-sale items are "counter-support" items that Chanel provides to its boutiques and to authorized retailers to enhance the customer experience and support the sale of CHANEL-branded products. Id. ¶¶ 97-98. Examples of point-of-sale items include black acrylic (i.e., plastic) vanity trays, tissue box holders,

8

Chanel's claim for false advertising, false association, and trademark infringement based on WGACA's advertising practices is rooted in WGACA's: retail displays' prominent use of the Chanel Marks, like a giant CHANEL No.5 perfume bottle or CHANEL-branded cake, Id. ¶¶ 130-31; direct-to-consumer email advertisements that prominently displayed the Chanel Marks, frequently in WGACA's stylized font, Id. ¶ 133, 135-136; use of #WGACACHANEL in social media posts, Id. ¶ 142, 145, 147; and non-product specific advertising, like ads for general WGACA sales, with prominently featured CHANEL-branded items front and center Id. ¶¶ 134-41, 144, 146, 149. Additionally, Chanel points to WGACA's website which uses images of and quotations from Coco Chanel (at times stylized in Chanel's font), Id. ¶¶ 114, 115, and includes statements like "Buy WGACA CHANEL- 100% Authenticity Guaranteed." Id. ¶ 112.

Chanel alleges, and WGACA disputes, that WGACA's advertising practices caused actual consumer confusion in the marketplace. Chanel points to at least one Chanel customer staying at the Plaza Hotel who saw a WGACA advertising display and went to the nearby Chanel boutique and requested the discount promised in WGACA's advertisement. Id. ¶¶ 161-162. Chanel's customer service call center records have also captured

---

jewelry boxes, cotton ball holders, hand mirrors, and wastebaskets. Id.

9

similar instances of confusion on the part of several callers
Id. ¶ 163.

Chanel has never had any affiliation with WGACA. When WGACA
offered to establish one by including "somewhere on our website
that we partner with Chanel to ensure authenticity of these
items, as value added for our customer," Chanel declined the
request and expressly warned WGACA not to create "any official
or unofficial connection, partnership or association" with
Chanel, and that "under no circumstances may you state that you
are partnered with or otherwise affiliated with Chanel or create
any false impression of such a relationship." Id. ¶¶ 56 57.

## Chanel's Claims

Chanel asserts claims for (1) trademark infringement, (2)
false advertising, and (3) false association under the Lanham
Act and (4) deceptive business practices and (5) false
advertising under New York General Business Law. Chanel moves
for summary judgment only on the trademark infringement and
false association claims.

WGACA cross-moves for summary judgment dismissing all
Chanel's claims, arguing that the lawsuit is an attempt, without
any factual grounding, to gain control of the secondary market
and foreclose the resale of its goods by a reseller who claims
no connection with the fashion house.

## DISCUSSION

10

I.    **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows," based upon the admissible evidence, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if, based on the substantive law, it "might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The non-moving party, in its attempt to defeat the motion, "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248; see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) ("conclusory allegations or denials cannot by themselves create

a genuine issue of material fact where none would otherwise exist.").

District Courts are "not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 162 (2d Cir. 2006) (citation omitted). The District Court "must construe all the evidence in the light most favorable to the nonmoving party ... and draw all inferences and resolve all ambiguities in that party's favor" and against the motion. Cartier, Inc. v. Sardell Jewelry, Inc., 294 Fed. Appx. 615, 617 (2d Cir. 2008). In Lanham Act cases, summary judgment is appropriate where the undisputed evidence leads to only one conclusion, that consumer confusion is likely. Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 876 (2d Cir.1986).

## II. Lanham Act Claims

Chanel asserts against WGACA three Lanham Act claims for alleged violations of § 1114(1)(a) prohibiting trademark infringement and § 1125(a)(1) prohibiting false advertising and false association. 15 U.S.C. §§ 1114, 1125. Despite differences in the statutory language, the "same analysis applies" to claims of trademark infringement and false association. E.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006); Virgin Enterprises Ltd. V. Nawab, 335 F.3d 141,

146 (2d Cir. 2003). As such, the Court addresses those claims together before turning to review Chanel's claim for false advertising.

**A. Trademark Infringement (§ 1114(1)(a)) and False Association and Endorsement (§ 1125(a)(1)(A)) Claims**

Section 32(1) of the Lanham Act prohibits trademark infringement and imposes liability on any person who, without the consent of the registrant, uses in commerce any copy of a registered mark in connection with the sale, offering for sale, or advertising of any goods which such use is likely to cause confusion. 15 U.S.C. § 1114(1)(a).

Section 43(a) of the Lanham Act prohibits false association, which arises when any person uses in commerce, in connection with any goods,

> any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of
> origin, false or misleading description of fact, or
> false or misleading representation of fact, which is
> likely to cause confusion, or to cause mistake, or to
> deceive as to the affiliation, connection, or
> association of such person with another person, or as
> to the origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by another
> person....
> 15 U.S.C. § 1125(a)(1)(A).

To prevail on a claim of trademark infringement or false association, "a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar

mark is likely to cause consumer confusion."[6] E.g., Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3D 153, 160 (2d Cir. 2016). Consumer confusion can arise "not just as to source, but also as to sponsorship, affiliation or connection." Int'l Info. Sys. Sec. Certification Consortium, Inc., 823 F.3d at 161; see Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 502 (2d Cir. 1996) ("The central inquiry is whether there is a 'likelihood of confusion,' a 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question,' or that there may be confusion as to plaintiff's sponsorship or endorsement of the junior mark."(citation omitted)); Dall. Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d Cir.

---

[6] WGACA argues it is entitled to summary judgment dismissing Chanel's false association claim because Chanel fails to prove injury or presumed injury. That misstates the law. Claims for false association arise under Section 1125(a)(1)(A) and are analyzed according to the standard applicable to a trademark infringement claim under Section 1114(a). See, e.g., Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 390 & n.4 (2d Cir. 1995) (noting that the standard is the same for claims under §1114(1)(a) and §1125(a)(1)(A); the only difference is the former applies to registered marks and the latter unregistered). In a trademark case, even if a plaintiff cannot point to lost sales to prove injury, it may still be harmed by "a loss of control ... over how the public perceives" its goods or services. The Sports Authority, Inc. v. Prime Hosp. Corp., 89 F.3d 955, 964 (2d Cir. 1996). Accordingly, false association claims under 15 U.S.C. §1125(a)(1)(A) do not burden the plaintiff with proving injury.

1979) ("In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.")(citations omitted)).

Chanel, in its motion for partial summary judgment, asserts two claims under § 1114(1)(a) and § 1125(a)(1)(A): (a) WGACA's use of Chanel's marks and other indicia of the House of Chanel in its advertising channels and (b) its sale of 842 CHANEL-branded items (779 point-of-sale items and 63 handbags) infringes upon Chanel's trademarks and indicia and creates a false association between Chanel and WGACA. As to each claim, Chanel puts forward numerous different factual scenarios that give an impression that WGACA is infringing on the Chanel brand.

WGACA, in its cross-motion for summary judgment, does not challenge Chanel's recital directly, but in principle and at large. It moves for summary judgment of dismissal arguing that Chanel offers no evidence in support of many material facts, that there is no showing Chanel suffered injury as a consequence of false advertising or that the bags have non-genuine hardware; and argues that Chanel's infringement claim is barred by laches.

As discussed below, WGACA's motion for dismissal of Chanel's trademark infringement and false association claims is denied. Chanel's motion for summary judgment holding WGACA

liable for infringement is granted in part for the point-of-sale items, the 11 bags from the Renato Corti factory on the issue of being non-genuine, and the bag bearing the serial number 17744200.

### i.   WGACA's use of Chanel's marks and other indicia of the House of Chanel in its advertising channels

#### a. Applicable Law

To prevail in a trademark infringement or false association action, "the mere possibility of confusion is not enough. . . [A] plaintiff must prove 'a probability of confusion ... affecting numerous ordinary prudent purchasers.'"  Tiffany & Co. v. Costco Wholesale Corp, 971 F.3d 74, 84 (2d Cir. 2020) (citations omitted). To determine whether an alleged infringement is likely to cause confusion, Courts in this Circuit apply an eight-factor balancing test originally developed in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.1961). In claims where there are not two competing products, but rather the alleged infringer is using "another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services," the classic factors developed in Polaroid are adapted to include the nominative fair use factors. [7] Int'l Info. Sys. Sec.

---

[7] "The doctrine of nominative fair use allows a defendant to use a plaintiff's trademark to identify the plaintiff's

Certification Consortium, Inc., 823 at 168  ("When considering a
likelihood of confusion in nominative fair use cases, in
addition to discussing each of the Polaroid factors, courts are
to consider" the nominative fair use factors) (remanding for
reconsideration of both sets of factors when district court only
looked at nominative fair use of defendant's use in its
advertising of plaintiff's trademark).

   The District Court thus applies the Polaroid factors:

   (1) strength of the trademark; (2) similarity of the
   marks; (3) proximity of the products and their
   competitiveness with one another; (4) evidence that
   the senior user may "bridge the gap" by developing a
   product for sale in the market of the alleged
   infringer's product; (5) evidence of actual consumer
   confusion; (6) evidence that the imitative mark was
   adopted in bad faith; (7) respective quality of the
   products; and (8) sophistication of consumers in the
   relevant market.
Int'l Info. Sys. Sec. Certification Consortium, Inc., 823

at 160, and the nominative fair use factors:

   (1) whether the use of the plaintiff's mark is
   necessary to describe both the plaintiff's
   product or service and the defendant's product or
   service, that is, whether the product or service
   is not readily identifiable without use of the
   mark; (2) whether the defendant uses only so much
   of the plaintiff's mark as is necessary to
   identify the product or service; and (3) whether
   the defendant did anything that would, in

---

goods so long as there is no likelihood of confusion about
the source of the defendant's product or the mark-holder's
sponsorship or affiliation." Tiffany (NJ) Inc. v. eBay
Inc., 600 F.3d 93, 102 (2d Cir.2010).

> conjunction with the mark, suggest sponsorship or
> endorsement by the plaintiff holder, that is,
> whether the defendant's conduct or language
> reflects the true or accurate relationship
> between plaintiff's and defendant's products or
> services.

Id. (establishing "nominative fair use factors").

District courts are to apply the Polaroid factors even "where a factor is irrelevant to the facts at hand." Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 400 (2d Cir. 1995) ("[I]t is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why."). The application of these factors is not mechanical, "'but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" Id. (quoting Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2d Cir. 2013)). Importantly, "[n]o single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand. Id. (quoting Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 584 (2d Cir.1993)).

### b. Application of Facts

WGACA argues that "Chanel provides no evidence that the use of its mark, use of a different or larger font in the WGACA store and website was or is likely to cause consumer confusion." Dkt. WGACA Reply, pp. 6-7. Specifically, the parties dispute six

of the Polaroid factors, disagreeing as to the conclusiveness of: the similarity of the marks; proximity of the products and their competitiveness with one another; evidence of actual consumer confusion; evidence that the imitative mark was adopted in bad faith; respective quality of the products; and sophistication of consumers in the relevant market.

Because of the nature of the claim in which only one mark is being used, the Court finds that the similarity of the marks factor and the respective quality of the products factor are inapplicable to this case. Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 438 n.16 (S.D.N.Y. 2020) ("the similarity of the marks . . . are not as relevant where, as here, the marks used and goods sold by Defendant are indeed the same as the Plaintiff's marks and good.") (When "the marks used and goods sold by Defendant are indeed the same as the Plaintiff's marks and goods," the "respective quality of the products in question are not as relevant.").

As to the first factor, the strength of the Chanel marks, they agree that the marks are famous, which favors a finding of consumer confusion. Dkt. No. 252 (Def. 56.1 Reply) ¶ 2 ("WGACA admits the Chanel brand is famous."); Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 438 (S.D.N.Y. 2020) (finding, in relation to the first factor, that "Chanel's trademarks are incredibly well-known, recognizable, and prevalent in the luxury

fashion market"); Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 148 (2d Cir. 2003) ("Widespread consumer recognition of a mark previously used in commerce increases the likelihood that consumers will assume it identifies the previously familiar user, and therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first.").

They also agree that the fourth factor, the likelihood that the prior user will bridge the gap, is inapplicable. Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 438 n.16 (S.D.N.Y. 2020) ("[T]he evidence of bridging the gap . . are not as relevant where, as here, the marks used and goods sold by Defendant are indeed the same as the Plaintiff's marks and good.").

The Court addresses the four remaining Polaroid factors in turn.

### 1. Proximity of the products and their competitiveness with one another

When analyzing this factor, Courts look to "the nature of the products themselves and the structure of the relevant market." Vitarroz v. Borden, Inc., 644 F.2d 960, 967 (2d Cir.1981). The CHANEL-branded products offered for sale by the parties are nearly identical in nature but differ in a way (new vs. second-hand) that may be deemed material to customers. Dkt. No. 256 (Pl. Rule 56.1 Response to Defendant's Rule 56.1

20

Statement ("Pl. 56.1 Reply")) ¶ 8. Therefore, the parties dispute the extent to which their customer bases overlap as a buyer of an expensive original may or may not also buy a cheaper secondhand item. Dkt. No. 252 (Def. 56.1 Reply) ¶ 62; Dkt. No. 256 (Pl. 56.1 Reply) ¶ 8. The question of market proximity and competitiveness of the products must be left to the jury.

### 2. Evidence of actual consumer confusion

"Evidence of actual confusion may consist of anecdotal or survey evidence." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000) (citing Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987).

Chanel offers a story of how a customer viewed a WGACA advertisement featuring a CHANEL-branded handbag and believing it to be a Chanel advertisement asked for the discount to be applied at the Chanel boutique. Dkt. No. 252 (Def. 56.1 Reply) ¶ 162. It also offers multiple stories of Chanel customers contacting Chanel customer service representatives with inquiries about Chanel goods sold by WGACA. Id. ¶ 163. WGACA argues these incidents are not the consequence of any confusion as to affiliation (they are clearly known to be a Chanel product sold second-hand) but simply over whether Chanel will honor the second-hand discount. Id. ¶¶ 162-63. In either event, it is for

21

the jury to assess the effect of these customer reactions as reflecting the market perception of WGAA's advertisements.

Chanel also offers two surveys conducted by expert David Franklyn that assess a potential Chanel purchaser's level of confusion after reviewing WGACA's 2015 website. Id. ¶¶ 164-65. WGACA, on the other hand, offers the report of its expert Dr. Melissa Pittaoulis which calls into question the methodology, survey design, and sample size of the Franklyn surveys. Id. ¶ 164. Again, credibility of experts is a matter best left in the hands of the trier of fact and is inappropriate for resolution on summary judgment.

### 3. **Evidence that the imitative mark was adopted in bad faith**

"This factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991) (quotation marks omitted).

It is undisputed that WGACA was aware that use of the Chanel marks and indicia was "helpful" to driving its sales, in part because an association with Chanel was a "value add." Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 56, 158. "But that fact is not dispositive because '[p]rior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith.'" Easy Spirit, LLC v. Skechers U.S.A., Inc., 515 F. Supp.

3d 47, 74 (S.D.N.Y. 2021) (citing Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995)). The evidence is inconclusive and "this issue, like many intent issues, is best left in the hands of the trier of fact," and cannot be decided at this stage. The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 964 (2d Cir. 1996).

### 4. Sophistication of consumers in the relevant market

"Generally speaking, greater sophistication of consumers reduces the likelihood of confusion." SLY Magazine, LLC v. Weider Publications L.L.C., 529 F. Supp. 2d 425, 442 (S.D.N.Y. 2007) (quotation marks omitted). Neither party has produced any evidence directly related to the sophistication of WGACA's buyers. Therefore, "a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 390 (2d Cir. 2005).

Based on the fact that Chanel and WGACA operate in high end, luxury products, the sophistication of their customers is inferred, which minimizes the likelihood of confusion. See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 676, n.105 (S.D.N.Y. 2016), aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA, 720 F. App'x 24 (2d Cir. 2017); Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 439 (S.D.N.Y. 2020) ("[F]inally, the luxury fashion market is a

relatively sophisticated market that involves "[c]elebrities, stylists, and influencers [who] covet Chanel designs and accessories," which "command top-dollar prices.").

### 5. Nominative Fair Use Factors

The application of the Polaroid factors is not the end of the analysis. When nominative use arises, as it does in this case, courts must also take into consideration: (1) whether the use of the plaintiff's mark is necessary to describe the defendant's product; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff. Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3d 153, 168 (2d Cir. 2016).

First, neither party has presented evidence as to "whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark." Id. Even so, courts in this district have found this factor "is satisfied" when, like here, the "marks used and goods sold by Defendant are indeed the same as the Plaintiff's marks and goods." Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 438 n.4 (S.D.N.Y.

2020). This factor thus cuts against a finding of consumer confusion about the source of the product and facilitates affiliation and endorsement.

Second, there are genuine issues of material fact as to whether WGACA has used more of Chanel's marks and indicia than is necessary to identify its products. In evaluating this factor, courts are to consider "whether the alleged infringer 'step[ped] over the line into a likelihood of confusion by using the senior user's mark too prominently or too often, in terms of size, emphasis, or repetition.'" Int'l Info Sys., 823 F.3d at 168 (citations omitted); see PACCAR Inc. v. TeleScan Techs., LLC, 319 F.3d 243, 256 (6th Cir. 2003) ("Using [the plaintiff's] trademarks in its domain names, repeating the marks in the main titles of the web sites and in the wallpaper underlying the web sites, and mimicking the distinctive fonts of the marks go beyond using the marks 'as is reasonably necessary to identify' [the plaintiff's] trucks, parts, and dealers."), abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111 (2004).

WGACA argues that it uses Chanel's marks and indicia to identify the manufacturer of the products it sells, in the same way it does for all of the luxury brands it sells. Dkt. No. 222 (Weisser Dec.) ¶ 3. In support of its claim, WGACA offers into evidence a printout of the products on its website, which shows

the Chanel branded products featured in the same way as other luxury goods, like Louis Vuitton. Id., Ex. B. WGACA additionally analogizes this case to that of Chanel, Inc. v. RealReal, Inc., in which the Court found The RealReal did not step over the line when "The RealReal's website includes a 'Chanel' page briefly describing Chanel and advertising products with the Chanel Trademarks" but also included "brand-specific pages for nine other luxury fashion brands." 449 F. Supp. 3d 422, 439 (S.D.N.Y. 2020). Crucially though, unlike in this case, The RealReal court relied upon the fact that "Chanel has identified no facts suggesting that The RealReal displays CHANEL-branded goods 'more prominently than other luxury-brand goods,' . . . or that The RealReal uses Chanel marks in any other capacity than to identify Chanel products as Chanel." RealReal, Inc., 449 F. Supp. 3d at 439.

In this case, Chanel has evidence on each of those factors. For example, WGACA's welcome email to customers and Facebook cover photo features the Chanel marks. Dkt. No. 252 (Def. 56.1 Reply) ¶ 134. Its social media uses #WGACACHANEL and also features Chanel marks and indicia. Id. ¶¶ 142-43, 145, 147-48. As do its retail displays, Id. ¶¶ 130-32, and its direct-to-consumer advertisements, one of which featured the Chanel mark more prominently than WGACA's and in the WGACA stylized font, Id. ¶ 136. WGACA also used Chanel marks and indicia in general

advertisements for WGACA, Id. ¶¶ 135, 138, 140, and to advertise upcoming sales, Id. ¶¶ 137, 139, despite not advertising any specific Chanel product.

WGACA disputes Chanel's characterization that its use of the Chanel marks is either more prominent than that of any other brand or done independent of any specific Chanel product. Id. ¶ 135. There is a genuine issue whether WGACA's use of the Chanel marks exceeds what is necessary to identify Chanel products.

Third, a fact finder could conclude that WGACA does "in conjunction with the mark, suggest sponsorship or endorsement" by Chanel and has obscured the "true or accurate relationship between" the parties. Int'l Info. Sys. Sec. Certification Consortium, Inc., 823 F.3d at 168. In analyzing this factor, courts "must consider confusion regarding affiliation, sponsorship, or endorsement by the mark holder." Id. at 169.

Chanel offers as evidence of endorsement: a consumer survey conducted by Chanel's survey expert, David Franklyn, which found consumers perceived WGACA to be affiliated with Chanel based on how WGACA listed Chanel products on its website [CUF ¶ 164]; WGACA's claim on its website and in advertisements of "WGACA CHANEL- 100% Authenticity Guaranteed" and its inclusion of a letter or card of authenticity with its products. [Id. ¶¶ 112-15, 73-73]; WGACA holds yearly "Coco Chanel birthday Sale" [CUF ¶¶ 137-139]; WGACA frequently utilizes pictures or purported

quotes of Coco Chanel on social media and on its website (CUF ¶¶ 137-139).

WGACA claims that its ads do not create an affiliation between itself and Chanel because it uses the same type of ads for other luxury brands. WGACA offers no evidence of such ads. "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).

WGACA instead points to TheRealReal, where the Court found TheRealReal's actions did not create an affiliation with Chanel because its website disclosed that ""Brands identified on the Site are not involved in the authentication of the products being sold, and none of the brands sold assumes any responsibility for any products purchased from or through the website," and that "Brands sold on the Site are not partnered or affiliated with TheRealReal in any manner." Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 432 (S.D.N.Y. 2020). But WGACA's website had no similar disclosure until April 2020, after this lawsuit was brought. Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 123-25.   This factor thus favors a finding of consumer confusion.

Although the likelihood of confusion is a question of law to be determined by the court, Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 85 (2d Cir. 2020), the fact that genuine

issues of material facts are presented by the proximity of the marks, evidence of actual consumer confusion, bad faith, and whether WGACA uses only so much of Chanel's mark as is necessary to identify its' products requires denial of both parties' motions for summary judgement on claims of §§ 1114(1)(a) and 1225(a)(1)(A).

### ii.  **WGACA's sale of 842 CHANEL-branded items**

#### a. **Applicable Law**

Generally, the Lanham Act does not impose liability for "the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner" because such a sale does not inherently create consumer confusion or deceive the public. Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992). As long as the product is genuine, the mark holder has no right to control subsequent, unauthorized resales. Bel Canto Design, Ltd. v. MSS Hifi, Inc., 837 F. Supp. 2d 208, 222 (S.D.N.Y. 2011).

The same cannot be said if the sale is of non-genuine goods. Even though a seller may not be "involved in the manufacture nor the affixing of the trademark to the" contested products, the sale of non-genuine goods creates consumer confusion and is "sufficient 'use'" to establish liability under § 1114(1)(a) and § 1125(a)(1)(A) without resorting to application of the Polaroid factors. El Greco Leather Prod. Co.

v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986) ("Since we conclude that the shoes were not genuine CANDIE'S shoes, it is plain that appellant has made out a violation of § 32(1) of the Lanham Act.").

Goods are not genuine if they do not conform to the trademark holder's quality control standards, even if they were manufactured by the mark holder. El Greco Leather Prod. Co., 806 F.2d at 395 ("The mere act of ordering a product to be labeled with a trademark does not deprive its holder of the right to control the product and the trademark."). "For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." Id.; see also Polymer Tech. Corp., 37 F.3d at 78. Failure to conform with quality control standards can be established by a lack of evidence, or a showing that plaintiff never generated a record of conformity as it usually does in the course of business. See El Greco Leather Prod. Co., 806 F.2d at 395-96. In El Greco Leather Products, the Second Circuit held that shoes branded with plaintiff's trademark were non-genuine, even though they were made according to the terms of plaintiff's manufacturing agreement, because the shoes did not have a certificate of inspection, which "in this case were an integral part of appellant's effort at quality control." Id.

Nor are goods genuine "If the trademark owner did not approve the original sale." Ryan v. Volpone Stamp Co., 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000); Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("'Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner. Thus, if the trademark owner rejects the goods, the manufacturer may not use the mark in reselling the goods to others.'" (quoting Restatement (Third) of Unfair Competition § 24, comment c (1995)).

". . . or if they differ materially from the product authorized by the trademark holder for sale." Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009) (citing Original Appalachian Artworks, Inc. v. Granada Elecs., Inc., 816 F.2d 68, 73 (2d Cir. 1987)).

Chanel claims that WGACA sold four different categories of non-genuine goods: (1) items with serial numbers that were voided in Chanel's internal records; (2) point-of-sale items; (3) items with voided serial numbers from Chanel's Renato Corti factory; (4) items with pirated serial numbers. Chanel moves for summary judgment holding WGACA liable on all accounts, while WGACA's cross-motion only moves for dismissal on the first and third factual scenarios.

31

### b. Application of facts

#### 1. Inventory Voided Serial Numbers

Chanel asserts that fifty of the bags sold by WGACA are non-genuine because the serial numbers on those bags were not verified by Chanel's internal record system, ORLI, which chronicles every phase in the production cycle. Chanel argues that these serial numbers went missing before being assigned to a bag and, as a result, the ORLI system has no notation that bags with those serial numbers ever passed through the quality control procedure and were authorized for sale. As a result, CHANEL-branded handbags with these serial numbers have not been proven to be genuine.

However, the evidence tells competing stories of how Chanel conducts its quality control procedures and thus the question of whether the bags were actually subjected to them is best left for the jury. To show the bags never passed through quality control procedures, Chanel points to its internal inventory system, which has no record that bags with these serial numbers were sent to Chanel distribution centers for inspection. Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 23, 25, 29, 93 (stating that all fifty bags should have been delivered to a Chanel distribution center for inspection but there is no notation of that in the ORLI system). It also offers the testimony of Mr. Girardi, the Managing Director of Chanel's Renato Corti, who said that the

32

Renato Corti factory scanned the merchandise produced there to upload the bag's identifying information to Chanel in real time. Id. ¶ 23; Dkt. No. 239, Ex. R ("Girardi Depo.") at 53:21-55:1.

WGACA argues that not all of Chanel's bags are sent to Chanel distribution centers for inspection and consequently not all bags will be marked in Chanel's records as having gone through the quality control procedures. It points to contradictory testimony of Chanel employees regarding how quality control information is recorded in Chanel's internal records. Specifically, it contrasts the testimony of Ms. Bleys, Senior Counsel, Brand Protection for Chanel, who said the quality control information is loaded into the internal database after an inspection is done at a Chanel distribution center, Dkt. No. 126 ("Bleys Decl.") at 2-3; Dkt. No. 221, Ex. B ("Bleys Depo.") at 47:16-48:14, with that of Mr. Bravo, Director of Operations of Chanel Coordination SAS, which asserts Chanel factories perform the quality control inspection, Dkt. No. 230 ("Bravo Dec.") ¶ 15, and Mr. Girardi, Managing Director of a factory inspecting bags, corroborated Mr. Bravo's testimony and stated he was unfamiliar with Chanel's internal record system, Dkt. No. 221, Ex. J ("Girardi Depo.") at 26:17-28:21, 32:14-33:23; Dkt. No. 250, Ex. J ("Girardi Depo.") at 62:1-63:2. Clearly, the question of where these bags were inspected and

whether the inspection would have been recorded in Chanel's database is disputed and unripe for summary judgment.

Whether Chanel authorized the initial sale of the bags is also in dispute. Chanel once again points to its internal system which does not have a record of the bags being authorized for sale. Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 95-96. But the present record describing Chanel's internal system is fissured and needs to be smoothed out by the fact finder. Chanel itself offers contradicting explanations of how its internal system would record the authorization for sale of a bag that went directly from the factory quality control processes and into the market rather than first passing through a distribution center. WGACA also calls into question the reliability of Chanel's record system. Dkt. No. 269 ("Def. Opp. to Part. Summ. Judg.) at 23-24 ("Despite these yearly reviews and despite the six month normal turnaround for the manufacture of a bag (Bravo Depo., 2/11/2021, p. 134, DKT No. 221-7), a number of allotted serial numbers going back to the early 1990's were never entered into the ORLI system as having gone through the QC review, but were not identified as "missing" until, in some cases, nearly 20 years later.").

"It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." Poller v. Columbia

Broad. Sys., Inc., 368 U.S. 464, 473 (1962). Whether Chanel initially sold the bags will turn on the credibility of witnesses and reliability of the evidence; summary judgment is therefore precluded.

In relation to only this claim, WGACA also raises many affirmative defenses, laches, lack of remedy/ mootness, waiver, and estoppel, all of which lack merit. First, "[l]aches is not a defense to an action filed within the applicable statute of limitations." United States v. Mack, 295 U.S. 480, 489 (1935). Further, on the merits, the defense of laches does not apply because Chanel did not inexcusably delay taking action. It did not have actual knowledge of the alleged infringement, the sale of the bags, until litigation had already commenced in this matter. Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co., 897 F.3d 413, 419 (2d Cir. 2018) ("The laches clock begins to run when the trademark owner 'knew or should have known, not simply that [the infringer] was using the potentially offending mark, but that [it] had a provable infringement claim against [the infringer.]'"); Dkt. No. 271 ("Pl. Reply in Support of Motion for Part. Summ. Judg.") at 15 ("Given that WGACA did not sell any of the handbags bearing the Inventory Voided Serial Numbers until March 10, 2014 and Chanel did not know that WGACA sold the fifty infringing handbags until May 8, 2020, there was no unreasonable delay."). "Although the defense of laches

generally includes proof of actual knowledge by the party claimed to be barred, this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered." Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, 535 (2d Cir. 1964) (citation omitted). However, WGACA's conduct was not open—it stopped listing serial numbers on its website in 2016. Dkt. No. 252 (Def. 56.1 Reply) ¶¶ 73-75, 116, 142, 144-145, 147, 159. Therefore, Chanel's infringement claim as to the fifty bags is not barred by laches.

Second, Chanel's claim is not moot for lack of an available appropriate remedy. Chanel is seeking disgorgement of profits and an injunction, each of which is an equitable remedy. A plaintiff asserting a Lanham Act claim and seeking a profit award does not need to prove that the defendant's violation was willful. Romag Fasteners, Inc v. Fossil, Inc., 140 S. Ct. 1492, 1497 (2020) ("we do not doubt that a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate. But acknowledging that much is a far cry from insisting on the inflexible precondition to recovery Fossil advances."). Rather, the egregiousness of defendant's infringement is but one factor amongst the other principles of equity which a court must consider when determining whether plaintiff may obtain profits.

Id. at 1496; Experience Hendrix, L.L.C. v. Pitsicalis, No. 17 CIV 1927, 2020 WL 3564485, at *5 (S.D.N.Y. July 1, 2020), report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix, No. 17 CIV 1927, 2020 WL 4261818 (S.D.N.Y. July 24, 2020). Here, there are issues of fact as to WGACA's mens rea and whether it acted in reckless disregard, in willful blindness, or was simply unaware its sale was an infringement. For example, whether WGACA had evidence of, or whether it was feasible for WGACA to obtain evidence of, the ownership history of the fifty bags. It may have been reasonable for it to assume the bags' marketability. Disgorgement of profits is thus an available remedy the appropriateness of which is unripe for resolution at the summary judgment stage.

Injunctive relief may also be available to Chanel. WGACA argues that it is impossible to craft an injunction that complies with Federal Rule of Civil Procedure Rule 65(d). But many options are available, including requiring WGACA to publicize the serial numbers on the products it sells. Cf. Fendi Adele S.R.L. v. Filene's Basement, 696 F. Supp. 2d 368, 391-92 (S.D.N.Y. 2010) ("Plaintiffs are entitled to a permanent injunction prohibiting Filene's from purchasing, offering for sale, or selling any item bearing the word "Fendi" or any of the Fendi Marks without Plaintiff Fendi S.r.l.'s written permission because, among other reasons, Plaintiffs have succeeded on the

37

merits of their trademark counterfeiting and false designation of origin claims against Filene's.").

Finally, WGACA cannot hide behind the shield of waiver or estoppel.[8] WGACA claims that Chanel has waived its ability to bring an infringement claim as to the fifty bags, and further is estopped from asserting that claim, because Chanel was publicly silent and did not disclose to WGACA that serial numbers were stolen in 2012 from the Renato Corti factory. However, estoppel based upon the silence of a party "may be asserted only where the party had a legal duty to disclose the information purportedly concealed," which Chanel did not. See Babbit v. Vebeliunas, 332 F.3d 85, 93-94 (2d Cir. 2003) ("Vanda Vebeliunas' silence cannot give rise to equitable estoppel because she had no duty or opportunity to speak."). Similarly, a party only waives a right when it has "the knowledge of the existence of a right and an intention to relinquish it." Voest-

---

[8] In its Answer, WGACA also asserts the affirmative defenses of Acquiescence, Consent, and Failure to Mitigate but it does not address them in its motion for summary judgment or in its opposition to partial summary judgment. Accordingly, the Court finds WGACA has abandoned those defenses. Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014) ("{I}n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (where defendant failed to brief affirmative defenses in opposition to plaintiff's summary judgment motion, affirmative defenses deemed abandoned).

Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680,
685 (2d Cir. 1983).

On the conflicting factual record, it cannot be determined
as a matter of law whether the fifty bags were non-genuine
because they allegedly never passed through Chanel's quality
procedures and were not authorized for sale. The issues must be
tried, and Chanel's and WGACA's motions are both accordingly
denied.

### 2. **Point-of-sale items**

WGACA argues that the point-of-sale items bearing the
Chanel logo are genuine because they were authorized for
manufacture and meet the standards that Chanel set up for those
items. "The question of whether a good is genuine, however,
presupposes the initial sale was authorized," which Chanel
asserts it was not.   Liz Claiborne, Inc. v. Mademoiselle
Knitwear, Inc., 979 F. Supp. 224, 230 (S.D.N.Y. 1997). Chanel
claims that the point-of-sale items were never authorized for
sale but were instead loaned to retailers as counter décor.

WGACA offers no evidence that Chanel authorized the initial
sale of these goods. It instead hypothesizes a dispute with
suppositions. Dkt. No. 249 ("Def. Opp. to Pl. Motion for Part.
Summ. Judg.") at 14 ("It is unknown how WGACA's supplier
obtained those products. Presumably, the supplier purchased the
goods from Chanel's manufacturer (or from various authorized

retailers or others who obtained them from various sources).").
It points to Chanel's failure to offer into evidence contracts
that say the manufacturers of the goods are not permitted to
sell or give them away. Id. Speculations and attacks on the
quality of evidence are insufficient to defeat a motion for
summary judgment. Hicks v. Baines, 593 F.3d 159, 166 (2d Cir.
2010) ("[A] party may not rely on mere speculation or conjecture
as to the true nature of the facts to overcome a motion for
summary judgment."); cf. Gottlieb v. Cnty. Of Orange, 84 F.3d
511, 518 (2d Cir. 1996) ("He cannot defeat the motion by relying
on the allegations in his pleading, or on conclusory statements,
or on mere assertions that affidavits supporting the motion are
not credible.").

Chanel provides as evidence the Declaration of Laura
Moffatt to support its claim that the items were never sold by
Chanel. Moffatt says that "At all times, Chanel retains title to
the Point-of-Sale Items, and boutiques and retailers are not
permitted to sell or give them away to third parties." Dkt. No.
237 ("Moffatt Decl.") ¶ 14. Further, Chanel's retailer
agreements, as well as its internal boutique policy, also
demonstrate that Chanel's Point-of-Sale items are not products
or for sale. See, e.g., Dkt. No. 239, Ex. 109 ¶ 5.4 ("the
Retailer accepts that display materials are not for resale but

remain CHANEL's property . . . ."); Ex. 110 (same); Exhibit 110a (same); Exhibit 110d (same).

Therefore, as Chanel has established that it did not authorize the initial sale of these goods, they "cannot be considered genuine as a matter of law and infringement is established." Ryan, 107 F. Supp. 2d at 382-83.

Chanel's motion for partial summary judgment of infringement is thus granted as to this claim. As discussed above, disgorgement of profits and injunction are available remedies, the applicability of which is premature to resolve at this stage.

### 3. Voided Serial Numbers from Renato Corti

Chanel alleges two separate grounds to hold WGACA liable for trademark infringement for selling or offering to sell eleven bags with serial numbers that were stolen from Chanel's Renato Corti factory. Chanel asserts the bags were either (1) not genuine because they were not put through Chanel's quality control processes and not authorized for initial sale by Chanel and (2) "counterfeit" because the bags were not made by Chanel's authorized factories.[9] Genuine issues of material fact remain unresolved only as to the latter claim.

---

[9] It is important to observe that there is a special definition of "counterfeit" which applies to trademark and copyright law. A counterfeit is a copy which is so close that it is difficult to tell from an original. Thus, a shoe which is made in the

41

First, Chanel argues that these eleven bags are non-genuine because they are branded with serial numbers that were stolen from the Renato Corti factory before being assigned to any bag. In support, it offers declarations and testimony of its employees. Dkt. No. 252 (Def. 56.1 Reply) ¶ 44; See also Dkt. No. 229 ("Girardi Decl.") ¶¶ 6, 8-9 ((Mr. Girardi, the manager of the Corti factory, confirmed that no handbags bearing the Voided Corti Serial Numbers were ever manufactured, inspected, or approved by Renato Corti). The parties do not dispute that in response to the theft, Chanel voided the serial numbers in the ORLI system. Dkt. No. 252 (Def. 56.1 Reply) ¶ 49. The ORLI system has no record of bags with these serial numbers passing through the quality control procedures and being authorized for sale.

WGACA does not put forward any evidence that creates a genuine dispute as to whether bags with these serial numbers went through Chanel's quality control procedures or were ever initially sold by Chanel. In fact, WGACA's motion for summary judgment is silent as to liability on these grounds. Accordingly, Chanel's motion for summary judgment is granted on

---

manufacturer's factory, and meets it specifications, but is unauthorized for sale, is an infringement, but not a counterfeit. The distinction is important because the penalties for counterfeiting are far more severe than those for infringement.

the narrow grounds that WGACA infringed Chanel's marks by selling eleven non-genuine bags.

Second, Chanel asserts a claim of counterfeiting under § 1114(1)(a). Second-hand retailers, like WGACA, can be held liable for trademark infringement based on their sale of counterfeit goods because such sales constitute improper use of marks. See Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 441 (S.D.N.Y. 2020) ("Thus, '[e]ven though [The RealReal] [is] involved neither in the manufacture nor the affixing of [Chanel's] trademark to [any counterfeits], its sale of the [counterfeits] [is] sufficient 'use' for it to be liable for the results of such infringement.'" (citation omitted) (alterations in the original)).

"Where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each Polaroid factor because counterfeit marks are inherently confusing." Spin Master Ltd. v. Alan Yuan's Store, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018) (quoting Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010), aff'd in part and vacated in part, 507 Fed. Appx. 26, 32 (2d Cir. 2013) (affirming judgment but vacating district court's determination of damages award)); e.g., C=Holdings B.V. v. Asiarim Corp., 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013); Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export Inc., 486 F. Supp. 2d 286, 289 (S.D.N.Y.

2007); Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F.
Supp. 2d 448, 455 (S.D.N.Y. 2005). Rather, to find a likelihood
of confusion, a court need only determine that the items are
counterfeit and defendant sold or offered those items for sale.
See, e.g., Fendi Adele S.R.L., 696 F. Supp. 2d at 383. It is
undisputed that WGACA offered the eleven bags with voided Renato
Corti serial numbers for sale. Dkt. No. 252 (Def. 56.1 Reply) ¶¶
74-76.

Chanel establishes a prima facie case that the bags are
counterfeit. As this Court has previously told the parties, "The
definition of counterfeit is a copy, not an original." Dkt. No.
146. Evidence that there are discrepancies between a company's
internal product-identification information and the actual
characteristics of the contested goods is sufficient to
establish a prima facie case that the goods were not
manufactured by the trademark holder and thus are counterfeit.
See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse
Corp., 689 F. Supp. 2d 585, 597 (S.D.N.Y. 2010), amended on
reconsideration (Mar. 23, 2010) (numerous deviations, including
improper coding, inferior materials, and improper hardware,
between genuine Fendi products and the contested goods is prima
facie evidence there are counterfeit products); Gucci Am., Inc.
v. Exclusive Imports Int'l, No. 99 CIV. 11490, 2007 WL 840128,
at *5 (S.D.N.Y. Mar. 19, 2007), vacated on other grounds, No.

44

CIV. A. 99-11490, 2007 WL 2892668 (S.D.N.Y. Oct. 2, 2007)
("Because Gucci records identifying information about each
genuine watch that it produces and sells, these discrepancies
are very strong indicators that the watches are counterfeit.").

Chanel's proffered evidence is of this very nature. Its
internal product information shows no bags with these serial
numbers were ever produced. Dkt. No. 252 (Def. 56.1 Reply) ¶¶
74-75. Therefore, there will always be a discrepancy between the
internal system and the characteristics of any tangible bag.
Additionally, for two of the bags, Chanel offers the declaration
of Joseph Bravo, which says that the shape of the label and
stitching of the leather on both bags, as well as the zipper
pull on one bag, did not conform to Chanel's standards. Id. ¶¶
77-78.

WGACA does not dispute that the serial numbers were stolen[10]
but argues that the bags could have stolen serial numbers and
still have been made in Chanel factories. It proffers evidence
that one of Chanel's employees, who reviewed the two bags to

---

[10] WGACA does dispute one of the bags' association with a Corti
Serial Number. It instead offers photographic evidence that the
bag has a different serial number and argues that the connection
with the Corti serial number was the result of a data entry.
Chanel disputes that the bag could be associated with this
corrected number and offers evidence from WGACA's website that a
different bag associated with the corrected serial number was
sold months previously.  This is a matter of genuine fact to be
resolved be a jury.

determine their authenticity, could not specifically identify
any issues, even declaring that the bag's zipper "looks like the
type we use." Dkt. No. 221, Ex. D ("Hahn Depo.") at 15:10-15:21.
Additionally, WGACA points to the fact that the hardware on the
bags has not been deemed to be inauthentic, which is significant
because, in the words of Chanel's outside counsel, "in the vast
majority" of counterfeiting cases, "we can tell that they are
counterfeits because the metal bits are not original." Dkt. No.
221, Ex. I ("Pier Luigi Roncaglia Depo.", Ex. I at 100:2-101:18.

Based on the evidence offered by the parties, a reasonable
jury could find either way as to whether the bags were
manufactured by Chanel (thus genuine and not counterfeit) or
elsewhere (and thus infringing counterfeits). Accordingly, both
parties' motions are denied as to counterfeiting.

### 4. Items with pirated serial numbers

Finally, Chanel asserts that two handbags sold by WGACA
were non-genuine and counterfeit because, according to Chanel's
records, the characteristics of bags with those serial numbers
were different from the characteristics of the bags WGACA sold.

For the bag bearing Serial Number 10218184, there is a
genuine dispute as to when the bag was manufactured and thus
whether it is non-genuine and counterfeit. Chanel submits
evidence from the ORLI System and its other records that show
that the bag was sold for the first time by Chanel in 2005 and

thus could not have been repaired in 2004, as WGACA claims. Dkt. No. 252 (Def. 56.1 Reply) ¶ 82-84. Whereas, WGACA offers testimony of Ms. Li, its authenticator in Japan, that the bag came with a "repair sticker" and had a serial number with "a typo mistake of that one digit," which disguised the fact that the bag was manufactured in the 1990s. Dkt. No. 250, Ex. G at 158, 162.

As for the bag bearing the serial number 17744200, it is undisputed that the bag sold by WGACA was a "Chanel Clear Vinyl Boy 9" whereas the ORLI system listed it as a Chanel red leather sac bowling (bowling bag). Dkt. No. 252 (Def. 56.1 Reply) ¶ 82-85-86. A bag is non-genuine when, as here, its characteristics "differ materially from the product authorized by the trademark holder for sale." Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009). Chanel's motion for partial summary judgment on its claim of trademark infringement is accordingly granted with respect to Serial Number 17744200 but denied with respect to Number 10218184.

## B. Trademark Counterfeiting (§ 1114(1)(b))

In its Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment, Chanel for the first time clarifies that it seeks summary judgement on "trademark counterfeiting under §1114(1)(b), §1116(d) and §1117(b)-(e) based on the sale of 13 counterfeit CHANEL-branded handbags." Dkt. No. 271 (Pl.

Reply in Support of Summ. Judg.) at 1 n.1. In its Second Amended Complaint, Chanel's first claim for relief had only generally asserted trademark infringement under 15 U.S.C. §1114(1).

Section 1114(1)(b) of the Lanham Act imposes civil liability on any person who, without authorization,

> reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(b).

WGACA, relying on the testimony of its CEO, Seth Weisser, claims that it "purchases the luxury bags it re-sells from a variety of sources." Dkt. No. 256 (Pl. 56.1 Reply) ¶ 3. Chanel disputes this testimony on the basis that "WGACA has not produced documentation of the purchase of the CHANEL-branded products and items by WGACA." Id. However, Chanel produces no direct evidence contradicting that testimony, and fails to create a genuine dispute about whether WGACA itself produced the bags. Lacking such evidence, there is no genuine issue of material fact suggesting trademark counterfeiting under section 32(1)(b). Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 435 n.13 (S.D.N.Y. 2020) ("[B]ecause Plaintiff does not allege that Defendant itself actually produced the counterfeit goods at

issue—indeed, the First Amended Complaint specifically alleges that Defendant offers goods for sale that it obtains from third parties, (FAC ¶ 36)—Plaintiff cannot sustain a trademark counterfeiting claim under section 32(1)(b).").

Accordingly, because Chanel's cause of action cites 15 U.S.C. § 1114(1) generally, the Court dismisses these claims of counterfeiting but allows them to proceed on claims of infringement under section 1114(1)(a).

## C. False Advertising (§ 1125(a)(1)(B)) Claim

WGACA moves for summary judgment dismissing Chanel's claim for false advertising for failing to adequately allege injury.

### i. Applicable Law

The Lanham Act prohibits any person from using in commerce, in connection with any goods,

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ....

15 U.S.C. § 1125(a)(1)(B). "To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." Church &

Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d
48, 65 (2d Cir. 2016).

If the claim is one of "'comparative false advertising,'"
in other words it is based on a "'misleading comparison to a
specific competing product,'" then injury will be presumed.
Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 259 (2d Cir.
2014) (quoting McNeilab, Inc. v. American Home Prods. Corp., 848
F.2d 34, 38 (2d Cir. 1988)). The Second Circuit has extended the
presumption of injury to apply to cases in which the consumers
can "undoubtedly understand [the] derogatory statement, . . . as
referring to [the plaintiff]," even though the advertising does
not identify plaintiff by name, because the market consisted of
only two players. Time Warner Cable, Inc. v. DIRECTV, Inc., 497
F.3d 144, 162 (2d Cir. 2007). Thus the presumption applies when
"a plaintiff has met its burden of proving deliberate deception
in the context of a two-player market." Merck Eprova AG v.
Gnosis S.p.A., 760 F.3d 247, 260-61 (2d Cir. 2014). The
presumption does not apply when "a misleading advertisement does
not make comparative claims about a direct competitor."[11]

---

[11] Chanel urges extending the presumption of injury and applying
it to this case because WGACA explicitly used the Chanel marks
in its false advertisements and the parties have overlapping
consumer bases. Unlike in Merk and Time Warner, the market here
consists of more than two players. Other resellers could be
injured because they are placed at a competitive disadvantage by
the allegedly false advertising. See Merck Eprova AG, 760 F.3d
at 259 ("In the first type of case (i.e., non-comparative

Dependable Sales & Serv., Inc. v. TrueCar, Inc., 394 F. Supp. 3d 368, 374 (S.D.N.Y. 2019); Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 696 (2d Cir.1994) ("our circuit has expressly disfavored presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any competitor's products.").

If a claim is based on "'misleading, non-comparative commercials which touted the benefits of the products advertised but made no direct reference to any competitor's product,'" McNeilab, Inc., 848 F.2d at 38, then "some indication of actual injury and causation would be necessary in order to ensure that a plaintiff's injury is not speculative," Merck Eprova AG, 760 F.3d at 259. As to the injury required, a plaintiff must incur an injury to a commercial interest in reputation or sales which is proximately caused by the violations of the statute. Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118, 131-132, 134 (2014) (Plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that

advertising), the injury 'accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other.' In those types of cases, 'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." (citation omitted)).

occurs when deception of consumers causes them to withhold trade from the plaintiff.").

## ii.  **Application of Facts**

As it is undisputed that Chanel and WGACA are not direct competitors, the presumption of injury will not apply. Dkt. No. 252 (Def. 56.1 Reply) ¶ 62. WGACA thus argues that summary judgement is appropriate because Chanel's evidence of injury—the testimony of expert witness Dr. Andreas, who concedes that he made no effort to calculate any injury or losses to Chanel, but only calculated WGACA's profits- is insufficient.

WGACA's characterization of the record is incomplete. Chanel has created a genuine issue of material fact as to whether it suffered reputational injury due to WGACA's false advertisement of counterfeit, infringing, and repaired CHANEL-branded products as genuine and unaltered and its false advertisement of CHANEL-branded point of sale items as genuine products originally made and sold by Chanel. Dkt. No. 252 (Def. 56.1 Reply) ¶ 156. It offers the testimony of Joyce Green, Chanel's General Manager of Fashion, who stated WGACA's false advertisements cause reputational harm to Chanel due to the risk that a consumer buys a CHANEL-branded item from WGACA and "has an experience … with a quality of product that is not up to the standard of Chanel," which damages what that customer (who could

be a current or potential future Chanel customer) thinks of Chanel and its products. Dkt. No. 256 (Pl. 56.1 Reply) ¶ 9.

Which witness to believe is appropriately left for the jury to decide. Accordingly, WGACA's motion for summary judgment dismissing the false advertising claim is denied.

### iii. State Law Claims

Chanel's final two claims are for deceptive business practices under Section 349 of the New York General Business Law ("NYGBL") and false advertising under Section 350 of the NYGBL.

The statutes' standard for recovery is the same. Moreover, the elements for alleging deceptive business practices and false advertising under the General Business Law are similar to Lanham Act claims, except that the state statute's threshold for liability "is actually higher, as there must be 'specific and substantial injury to the public interest over and above the ordinary trademark infringement.'" Weight Watchers Int'l, Inc. v. Noom, Inc., 403 F. Supp. 3d 361, 381 (S.D.N.Y. 2019); Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 446 (S.D.N.Y. 2020); RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp., No. 14 CV 6294, 2015 WL 5008762, at \*4 (S.D.N.Y. Aug. 24, 2015) (quoting Gucci America, Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003); Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2002). Substantial injury to the public includes dangers to

public health and safety. See RCA Trademark Mgmt. S.A.S., 2015
WL 5008762, at *4 ("Courts have generally held that the type of
injury needed to sustain a trademark violation under these
provisions is limited to one that would trigger Federal Trade
Commission intervention under 15 U.S.C. § 45, such as potential
danger to the public health or safety.").

Chanel has not demonstrated that this dispute involves
injury to the public interest over and above ordinary trademark
infringement. Here, the public at large is not affected. See
Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 448
(S.D.N.Y. 2020) ("This is especially true given that The
RealReal participates in the luxury fashion market, where
products that 'command top-dollar prices' are produced in
'limited number' and are not generally accessible to the public
at large."). Chanel has offered no evidence of injury beyond
that suffered by Chanel and a select group of individuals who
end up purchasing a counterfeit product. Evidence of that nature
is commensurate with that offered in ordinary trademark
infringement cases.

Accordingly, WGACA's motion in granted dismissing the state
law claims.

## CONCLUSION

WGACA's motion for summary judgment dismissing Chanel's
claims is DENIED, except as to Chanel's Fourth and Fifth Claims

for Relief for respective violations of N.Y. GEN. BUS. LAW § 349 (Deceptive Trade Practices) and § 350 (False Advertising) for which summary judgment is GRANTED and the claims are dismissed.

Chanel's partial motion for summary judgment on liability on its First and Third Claims for, respectively, Trademark Infringement and False Association is DENIED except as to WGACA's liability for sale of non-genuine CHANEL-branded point-of-sale items, of eleven non-genuine CHANEL-branded handbags with serial numbers that were stolen from the Renato Corti factory, and of one non-genuine and counterfeit handbag with the serial number 17744200. As to those, judgment is granted to Chanel.

All WGACA's affirmative defenses are dismissed, with the question of whether disgorgement of profits is an appropriate remedy being reserved for trial.

The Clerk is directed to close out Dkt. Nos. 219, 224, 225, and 226.

So Ordered.

Dated:   New York, New York
         March **2 8**, 2022

                                    _Louis L. Stanton_
                                    LOUIS L. STANTON
                                    U.S.D.J.