# EXHIBIT B

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, New York 10112-0015
212.653.8700 main
212.653.8701 fax
www.sheppardmullin.com

Dylan J. Price
310.228.2264 direct
dprice@sheppardmullin.com

February 16, 2021

**By ECF**
The Honorable Louis L. Stanton
U.S. Senior District Judge
U.S. District Court - Southern District of New York
500 Pearl Street
New York, NY 10007-1312

> **Re:  Chanel, Inc. v. WGACA, LLC, et al., 18-cv-02253 (LLS)**

Dear Judge Stanton:

We represent plaintiff Chanel, Inc. ("Chanel") and write, pursuant to FRCP 37(a), Local Civil Rule 37.2, and Your Honor's Individual Rule 2.A, to request that the Court compel the What Goes Around Comes Around LLC Defendants (collectively "Defendants") to:  (1) serve amended discovery responses; (2) produce the documents and data sought in Chanel's prior motion to compel; and (3) produce 30(b)(6) witnesses that are knowledgeable regarding Chanel's designated topics.

1. **Defendants Should be Compelled to Serve Amended Reponses to Chanel's Requests for Production Set No. 11, Requests for Admission Set No. 3, and Interrogatories Set No. 2.**

**RFP Nos. 236-241[1]:**   These requests seek documents supporting several speculative hypotheticals and claims posited by Defendants' counsel during depositions – namely, that: (1) the 2012 theft of boxes containing 30,000 Chanel authenticity cards from the Renato Corti factory, as detailed in an Italian Police Report and a Certified Criminal Complaint,[2] did not actually occur; (2) the Italian Police Report and Certified Criminal Complaint are not authentic; (3) even if the theft did occur, the counterfeit bags sold by Defendants bearing the stolen cards were nonetheless made in an authorized Chanel factory (including, without limitation, the Bianchi & Nardi factory); and (4) the 51 infringing bags sold by Defendants, which according to Chanel's records were not manufactured by Chanel (let alone the subject of an authorized first sale), were, in fact, purportedly inspected for quality and approved for sale by Chanel.

Defendants' response to each RFP promised the production of responsive documents. However, no responsive documents have been produced, and WGACA's Frank Bober (who has been in charge of overseeing this litigation and the production of documents on behalf of WGACA) confirmed in his 30(b)(6) deposition that Defendants do ***not*** have any non-privileged, responsive

---

[1]   Responses to Request for Production Set No. 11 are attached as Exhibit 1.

[2]   Attached as Exhibits 2 and 3.

# SheppardMullin

The Honorable Louis L. Stanton
February 16, 2021
Page 2

documents.[3]  (Ex. 4 ("Bober Depo.") at 210:2-216:1.)[4]  On February 4, 2021,Chanel requested a meet and confer with Defendants regarding these contradictory positions.  To date, Chanel has not received a substantive response.  Either way, Defendants simply cannot have their cake and eat it too.  If Defendants have documents supporting their speculative theories as their responses currently claim, they must produce them.  If they do not, they must serve amended responses correctly stating that they do not have responsive documents.

**RFA Nos. 52, 92, 116-128, and 129-141[5]:**  These requests seek admissions to narrow the issues in dispute in this case and otherwise confirm the non-existence of documents supporting Defendants' defenses – namely, that: (1) Defendants sold certain of the Chanel-branded bags bearing the Chanel serial numbers, as identified in the summary chart of Chanel-branded products produced by Defendants in this action; (2) Defendants do not maintain records regarding their authentication of any particular Chanel-branded item; (3) Defendants do not have evidence that the Chanel-branded bags sold by Defendants were sold by a Chanel-authorized factory; and (4) certain bags sold by Defendants feature trademarks that are substantially indistinguishable from close copies of the Chanel trademarks.

Defendants' denied each RFA.  However, Mr. Bober and other witnesses have repeatedly *admitted*  these points.  (*See e.g.*, Bober Depo. at 92:9-17; 226:17-227:1; 228:11-229:2.)  On February 4, 2021, Chanel also requested a meet and confer with Defendants regarding these contradictory positions, but has similarly not received a substantive response.

Defendants' refusal to admit basic facts concerning their sale of Chanel-branded items is particularly alarming given that Defendants have refused to produce the documents underlying their sales of Chanel-branded items.  As the Court may recall, Defendants produced a summary chart containing certain, limited information about their purchase and sale of Chanel-branded items, and argued that, because they produced the summary chart, the should not have to produce any of the underlying contemporaneous backup documentation.[6]  To the extent that Defendants are now disclaiming the veracity of the summary information they produced, they must be ordered

---

[3]     Excerpts from Mr. Bober's 30(b)(6) deposition transcript are attached as Exhibit 4.

[4]     Mr. Bober claimed that they had privileged documents supporting these various claims.  Of course, such documents would only be relevant if Defendants decide to waive attorney-client privilege and produce them, if so Mr. Bober must be compelled to sit for a further deposition regarding these new documents.

[5]     Responses to Request for Admission Set No. 3 are attached as Exhibit 5.

[6]     In opposing Chanel's request that the Court compel the production of their sales records, Defendants represented to the Court that their summary chart provided Chanel with a "virtual roadmap" of all of its sales.  [Dkt. No. 111-3 at ¶ 7.]

**SheppardMullin**

The Honorable Louis L. Stanton
February 16, 2021
Page 3

to produce the underlying backup documentation. If they are not disclaiming the veracity of the summary information, they must serve an amended response admitting that they sold the items as indicated by the information on the summary chart. Similarly, if Defendants have records regarding their authentication of the items identified by Chanel pursuant to the May 5 Discovery Protocol or evidence that those items were sold in a Chanel-authorized factory, they must produce them. If they do not, they must serve an amended response admitting that they do not have any records or evidence. Finally, Defendants simply cannot deny that the marks on the bags identified by Chanel under the May 5 Discovery Protocol feature trademarks that are substantially indistinguishable from close copies of the Chanel trademarks. Chanel understands that Defendants claim that the bags in question are genuine Chanel-branded bags. However, that is neither here nor there for purposes of Chanel's request. Defendants must still admit that the bags contain trademarks that are substantially indistinguishable from the Chanel trademarks. This issue should not be in dispute.

**RFA Nos. 83-89:** These requests seek admissions to narrow the issues in dispute in this case regarding the various ways Defendants sought to misleadingly associate themselves with Chanel in their advertising. Specifically, Chanel requested that Defendants admit that their advertising and/or website: (1) referenced, featured, and allegedly quoted Chanel's eponymous founder Coco Chanel; (2) featured images of past Chanel runway shows; (3) used stylized Chanel trademarks; (4) used historical Chanel advertisements to advertise their products; (5) used Chanel-branded products that Defendants do not offer for sale; and (6) displayed other items bearing the Chanel trademarks that were not for sale (and are not even Chanel-branded products or items). Rather than admit these requests, Defendants objected on the grounds that they are irrelevant or vague. Defendants' objections are meritless. The various ways Defendants sought to profit from the Chanel image and brand to sell their products is highly-relevant to and Chanel's requests are all straightforward and readily understandable. Again, these usages are not in dispute and Defendants must serve amended responses admitting the requests.

**RFA No. 93:** This requests seek an admission that the summary chart of Chanel-branded product sales does not record all of the characteristics Defendants reviewed to authenticate any particular Chanel-branded item. Countless witnesses have admitted that it does not. Defendants cannot evade admitting this request by objecting that common English words and phrases are vague. Defendants should be ordered to serve an amended response admitting this request.

**RFA Nos. 95, 97, 99, and 101:** Defendants base their claim that the Chanel-branded items they sell are authentic entirely on the supposed strength of their authentication process. Thus, the training and skill of their authenticators will be an important issue at trial. As a result, Chanel sought simple admissions that Defendants' various authenticators have received no formal training. Defendant – again claiming an inability to understand the meaning of Chanel's requests – refused to admit the requests as asked. As before, Defendants' objections are without merit. Defendants must serve amended responses admitting these requests.

**Sheppard**Mullin

The Honorable Louis L. Stanton
February 16, 2021
Page 4

**ROG Nos. 7-9[7]:**  In these interrogatories, Chanel asks that Defendants detail: (a) the number of Chanel-branded items they offered for sale by product and quarter; (b) their gross revenue from the sale of Chanel-branded items; and (c) all costs and deductions from said gross revenue.  Defendants responded to these interrogatories by directing Chanel to their previously produced financials, their summary chart of Chanel-branded product sales and their net-profit analysis.  However, the data contained in these documents is not current.  Their financials and net-profit analysis end with 2019 and their summary chart stops in March 2020.  Thus, Defendants' citation to those documents is not an appropriate response to these interrogatories.  Defendants cannot pause this action at the end of 2019.  Defendants must serve amended responses detailing their sales, revenue and costs data from 2019 to the present (and, in fact, must supplement their responses as this case continues).

2. **Defendants' 30(b)(6) Depositions Further Confirm the Existence, Relevancy and Importance of Several Documents Sought in Chanel's January 15, 2021 Letter Motion To Compel.**

On January 15, 2021, Chanel filed a letter motion to compel seeking the production of several categories of documents. [Dkt. No. 183.]  Chanel's motion is currently pending.  However, in further support of that letter motion, Chanel would like to highlight the recent testimony of Defendants' 30(b)(6) witnesses, which further confirms the existence, relevancy and importance of the documents sought by Chanel.[8]

**Financial Documents.**  Chanel's motion seeks to compel production of a complete set of Defendants' financials, noting that Defendants have not produced any financial information for 2020, did not produce a breakdown for the cost of goods sold or operating expenses for 2018, and produced only spotty financial information for 2019.  Defendants' Rule 30(b)(6) witness on Chanel's financial-related topics was Marcos Rosado.  At his deposition, Mr. Rosado confirmed – contrary to what Defendants previously claimed – that Defendants have monthly financial statements for 2018 to the present that they have not produced, and that he utilized those in preparing his net profits analysis.[9]  (Ex. 7 ("Rosado Depo.") at 66:11-68:15; 115:7-116:7.) Defendants must produce these monthly statements.

---

[7]     Responses to Interrogatories Set No. 2 are attached as Exhibit 6.

[8]     Chanel is not narrowing the categories of documents sought in its previous letter motion by way of this letter motion; rather, it is merely highlighting new testimony relevant to its prior request.

[9]     Excerpts from the rough transcript of Mr. Rosado's 30(b)(6) deposition are attached as Exhibit 7.

**SheppardMullin**

The Honorable Louis L. Stanton
February 16, 2021
Page 5

Separately, Mr. Rosado's net profits analysis claims a deduction for the amount of taxes paid by Defendants' members, and relies on the sales and cost information in the summary chart of Chanel-branded product sales. (*Id.* at 104:9-106:23; 134:16-135:12.) Thus, Chanel additionally requests that this Court compel production of: (1) an updated summary chart of Chanel-branded product sales to be supplemented as this case proceeds; and (2) the tax returns for Defendants' members from 2014 to the present. Mr. Rosado has admitted that these documents form part of his net-profits analysis and thus Defendants should be compelled to produce these documents.

**Reports Regarding the Effectiveness of Advertising:** Chanel's letter motion also seeks to compel the production of documents and data related to the effectiveness of Defendants' advertising. As noted in Chanel's motion, this information is highly relevant to Chanel's false advertising claims. Defendants have refused without basis to produce this documentation. While Chanel's prior motion focused on Google analytics information based on the testimony of Defendants' prior employee Shannon Parker, Mr. Rosado's deposition confirms that Defendants additionally have internal reports that contain financial information regarding advertising expenditures as well as traffic information from their website, among other things. (Rosado Depo. at 138:8-140:11.) This documentation must also be produced.

**The Etsy Sunglasses Documentation.** Chanel moved to compel production of documents related to Defendants' alleged return and/or refund of four pairs of Chanel-branded sunglasses Defendants' purchased from Etsy. Specifically, Defendants produced emails detailing that they had purchased counterfeit sunglasses, were unable to return them, and thus requested a refund from their credit card company. However, Chanel pointed out that Defendants sold what appeared to be the exact same pair of one of those sunglasses shortly thereafter. Chanel moved to compel documents supporting Defendants' claims that the sunglasses sold were not the same pair purchased from Etsy. Defendants refused to produce any documentation. However, at the deposition of WGACA's Ambria Mische, Ms. Mische testified that she had located the counterfeit sunglasses in Defendants' warehouse and that according to Defendants' records the pair sold by Defendants was purchased on eBay, not Etsy[10]. (Ex. 8 ("Mische Depo.") at 20:12-21:5; 191:10-20; 194:21-195:19; 197:5-19.) Chanel requested that documentation be produced substantiating those claims, but Defendants have yet to do so. Thus, Chanel requests that Defendants be compelled to produce this documentation to further narrow the issues in this case.

3. **Defendants Should be Compelled to Produce Rule 30(b)(6) Witnesses With Knowledge Regarding the Designated Topics.**

Chanel requests an order compelling Defendants to produce their Rule 30(b)(6) witnesses for further testimony. As the Court is aware from Chanel's prior motion concerning the length of Mr. Bober's Rule 30(b)(6) deposition, Mr. Bober was designated for over 50 testimony topics. He was deposed one day for approximately 5.5 hours (the deposition was suspended due to technical

---

[10]    Excerpts from Ms. Mische's 30(b)(6) deposition transcript are attached as Exhibit 8.

**SheppardMullin**

The Honorable Louis L. Stanton
February 16, 2021
Page 6

difficulties that significantly impacted the flow of the deposition), and he was then deposed a second day for approximately 8 hours. Chanel was not finished with the designated topics, but Defendants refused to permit Mr. Bober to continue being questioned. Thus, at the outset, Mr. Bober should be ordered to return for his deposition to finish his Rule 30(b)(6) deposition for the various reasons stated in Chanel's prior motion regarding Mr. Bober's testimony. [*See* Dkt. No. 188.]

In addition, all three of Defendants' Rule 30(b)(6) witnesses lacked knowledge regarding several of the Rule 30(b)(6) topics for which they were designated and failed to adequately inform themselves prior to their depositions. They testified that they were not the person at WGACA with the most knowledge regarding certain topics, lacked knowledge altogether regarding other topics, and that they (specifically Ms. Mische and Mr. Bober) did very little to prepare for their depositions. (*See generally* Bober Depo. at 11:18-14:21; 43:2-43:23; 50:1-50:12; 54:7-16; 82:18-83:5; 115:22-117:1; 159:11-160:14; 162:10-22; 165:18-173:6; Rosado Depo. at 122:10-124:16; 134:12-15; 144:25-147:21; 150:14-153:23; and Mische Depo. at 23:7-27:9; 28:4-15; 38:2- 38:19; 90:8-17; 128:6-131:2; 164:11-165:6; 167:4-168:16; 269:3-271:12.)

In particular, Defendants' Rule 30(b)(6) witnesses all lacked knowledge regarding the company's operations, practices, policies, and financials from the time before they were employed by Defendants. Chanel has alleged wrongdoing and damages dating back to at least 2014, while each of the witnesses became employed by Defendants several years later – Mr. Bober in 2017, Ms. Mische in 2016, and Mr. Rosado in 2017. (Rosado Depo. at 9:17-23; and Mische Depo. at 24:3-6.) While Chanel would not expect them to have personal knowledge related to periods prior to their employment, as Defendants' designated witnesses, they were required to prepare for their depositions and obtain such knowledge. The deponents testified that other employees of Defendants would have such knowledge, such as employees and owners Seth Weisser and Michelle Sassaman, but that they failed to speak with those employees (or any other employees) prior to their depositions. (Rosado Depo. at 68:16-73:15; 73:4-15; Mische Depo. at 23:24-27:9; Bober Depo. 12:19-13:23; 23:11-25:1; 46:10-14; 165:18-166:3.) Defendants cannot designate more recent employees to avoid having to provide testimony regarding earlier events.

Mr. Bober also lacked knowledge regarding his designated topics to the extent they touched on departments outside of his current scope of consultancy work for Defendants. For example, Mr. Bober lacked sufficient information regarding Defendants' advertising, sourcing, and wholesale operations. (Bober Depo. at 32:16-33:4; 43:2-43:23; 50:1-50:12; 54:7-16; 69:20- 70:5; 82:18-83:5; 115:22-117:1; 159:11-160:14; 162:10-22; 267:13-268:17; 314:5-314:25; 319:6-319:19; 364:2-365:15; 478:4-478:25; 481:2-22; 483:23-486:11; 489:24-490:3; 518:20-519:4; 525:20-25; 532:15-534:11.) Given Chanel's false advertising claims, information regarding why Defendants utilized certain advertising practices, how effective those practices were, and their

**Sheppard**Mullin

The Honorable Louis L. Stanton
February 16, 2021
Page 7

involvement in the advertising of their wholesale partners are all highly relevant.[11] Yet, Mr. Bober could provide little to no detail regarding Defendants decision to utilize Chanel trademarks in the manner detailed in the documents produced in this case to date or Defendants' use of Google analytics and other data sources to track their effectiveness.[12] Chanel has also alleged that Defendants have sold counterfeit and infringing products making Defendants' official policies and procedures for sourcing such items highly relevant. Yet, Mr. Bober was unable to respond to questions concerning those matters, stating that Mr. Weisser was better informed. Finally, as some 75% of Defendants' business is now wholesale, the evolution and stressors involved in that business are highly relevant. Yet, again, Mr. Bober repeatedly testified (as cited above) that this was an area for Mr. Weisser.[13]

Finally, Mr. Rosado lacked knowledge regarding the preparation of the summary chart of Chanel-branded product sales, and Defendants' advertising expenditures and revenues. (Rosado Depo. at 122:10-124:16; 134:12-15.) As Defendants are relying on the summary chart to establish their sales of Chanel-branded products and costs related thereto (*id.* at 134:16-135:12), Mr. Rosado was required to become knowledgeable regarding its preparation, but failed to do so. Mr. Rosado readily admitted that Ms. Mische was more knowledgeable regarding Defendants' tracking of revenues related to advertising. (Rosado Depo. at 144:25-147:21; 150:14-153:23.)

---

[11] For example, one of Defendants wholesale partners (Dillard's) advertised its selection of Chanel-branded items sourced by Defendants with a giant CC emblem. (*See* Exhibit 9 hereto.) Was WGACA responsible for that advertisement or was Dillard's? Defendants have failed to produce their agreement with Dillard's which might shed light on the question. And, while Mr. Bober testified that no agreement exists, internal emails produced by Defendants suggest otherwise *see* Exhibit 10 hereto), and Chanel reasserts its January 15, 2021 request that the Court compel Defendants to produce their wholesale agreements and relevant communications. Either way, Mr. Bober was required to have been prepared to testify as to these issues and he was not.

[12] As noted above, Defendants are steadfastly refusing to produce this data Chanel reasserts its January 15, 2021 request that the Court compel Defendants to produce it. Either way, Mr. Bober or another witness must be prepared to testify about how they utilize Google analytics etc. to track the effectiveness of advertising. Mr. Rosado testified that Ms. Mische would be the most knowledgeable regarding this topic, as well as online advertising generally, but, interestingly, Ms. Mische was not designated for that topic. (Rosado Depo.at 144:25-147:21; 150:14-153:23.)

[13] Ms. Mische was co-designated on some topics –related to Defendants' authentication of Chanel-branded goods and their repair of Chanel-branded goods – however whenever those topics involved questions regarding the wholesale business, she similarly stated she lacked knowledge and that Mr. Weisser was the proper deponent. (Mische Depo. at 128:6-131:2; 164:11-165:6; 167:4-168:16.)

**Sheppard**Mullin

The Honorable Louis L. Stanton
February 16, 2021
Page 8

In sum, as detailed in the excerpts of the deposition transcripts attached hereto, Defendants' Rule 30(b)(6) witnesses did not prepare for their depositions, but, instead, relied solely upon their own personal knowledge to provide testimony on behalf of Defendants.  That is not acceptable. Chanel is entitled to **Defendants'** knowledge regarding the designated topics, not just the designated individual's knowledge.  Thus, Defendants must be compelled to either produce witnesses with personal knowledge of the company's operations, practices, policies, and financials for the time periods and topics that the current designees lacked knowledge of, or produce their same designated witnesses for another session of their 30(b)(6) depositions after they have become knowledgeable regarding those time periods and topics.  In particular, Ms. Mische should be re-designated as Defendants' person most knowledgeable regarding Defendants' online and email advertising, and Defendants' tracking of the effectiveness of said advertising, as it is clear from Mr. Rosado's deposition that she would be the proper designee.[14]

\*        \*        \*        \*

For the reasons stated above, Chanel respectfully requests that the Court compel Defendants to serve amended responses, and to produce the documentation and witnesses detailed above.

Respectfully submitted,

*/s/ Dylan J. Price*

Dylan J. Price

DJP: br
cc:      All Counsel of Record

---

[14]      Chanel will also need to depose Defendants' witnesses regarding any additional documents produced upon a ruling from the Court on Chanel's motion to compel.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CHANEL, INC.,

                         Plaintiff,                         Case No. 18-cv-2253(LLS)

          v.

WGACA, LLC, WHAT COMES AROUND GOES
AROUND LLC d/b/a WHAT GOES AROUND
COMES AROUND, MHW PROPERTIES, INC.,
WGACA WEB, LLC, PINES VINTAGE, INC.,
VINTAGE DESIGNS LTD., WGACA LA, INC.,

                         Defendants.
-------------------------------------------------------------------X

| | |
|---|---|
| PROPOUNDING PARTY: | PLAINTIFF CHANEL, INC. |
| RESPONDING PARTIES: | DEFENDANTS WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC D/B/A WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC. WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., AND WCAGA LA, LLC |
| SET NO.: | ELEVENTH |
| NUMBERS: | 236-243 |

## DEFENDANTS' RESPONSES TO PLAINTIFF'S ELEVENTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

**PLEASE TAKE NOTICE**, that pursuant to Rule 34 of the Federal Rules of Civil Procedure,

Defendants respond to the Plaintiff's Eleventh Set of Requests for Production of Documents set forth

below, in writing, within the time allotted under said Rules.

## <u>GENERAL OBJECTIONS</u>

1.     Defendants object to the Definitions and Instructions in Plaintiff's Request to the

extent they seek to impose any requirements to provide discovery inconsistent with, and/or not

required by, the Federal Rules of Civil Procedure or this Court's Local Civil Rules.

4850-3157-6021.1

2. Defendants reserve the right to supplement and/or amend these responses up to and through trial.

3. Defendants object to Plaintiff's Request to the extent it calls for the production of privileged, confidential, proprietary and/or personal information concerning individuals and entities that are not parties to this action.

4. Each of these general objections is incorporated by reference into the following responses.

## RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 236:**

Produce documents supporting or suggesting that the 2012 theft at the Renato Corti factory referenced in the police report attached as Exhibit A did not occur.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 236:**

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 237:**

Produce documents supporting or suggesting that the twelve items detailed in the Second Amended Certification of Robin Gruber attached as Exhibit B were made in a factory which made genuine Chanel products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 237:**

4850-3157-6021.1

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 238:**

Produce documents supporting or suggesting that the first eleven items detailed in the Second Amended Certification of Robin Gruber attached as Exhibit B were made in the Bianchi and Nardi factory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 238:**

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 239:**

Produce documents supporting or suggesting that Chanel inspected the quality of and approved the sale of the fifty-one items detailed in Paragraph 10 of the Declaration of Jennifer Bleys attached as Exhibit C.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 239:**

4850-3157-6021.1

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 240:**

Produce documents supporting or suggesting that the police report attached as Exhibit A is fake or nonauthentic.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 240:**

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 241:**

Produce documents supporting or suggesting that the complaint attached as Exhibit D is fake or non-authentic or was not filed.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 241:**

To the extent that documents responsive to this Request have been already produced, Defendants object on the grounds that this Request is duplicative. Defendants further object as this Request seeks documents already in Plaintiff's possession, custody or control.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will produce non-privileged documents that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 242:**

Produce purchase orders, invoices and other documentation evidencing Defendants' purchase of CHANEL-branded snow globes, trays, tissue box covers, note pads, fatices, hand mirrors and other point of sale or promotional CHANEL-branded items.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 242:**

Defendants object on the grounds that this Request is duplicative of RFP Nos. 208, 209. Defendants object on the grounds that it seeks information not relevant to and/or not proportional to the needs of the case and calls for information beyond Plaintiff's allegations and/or claims in the Second Amended Complaint. As addressed in response to prior Requests, Defendants object to the extent that this Request seeks the discovery of trade secrets or other confidential, highly competitive, commercially sensitive and/or proprietary information the disclosure of which would adversely impact Defendants' business interests.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Pursuant to the Court's May 5, 2020 order, WGACA already produced documents that it plans to use or refer to at trial. Defendants agreed to produce documents, under AEO basis, that are sufficient to identify the source of certain Chanel-branded items (e.g., counter-support items and promotional gifts) as a compromise. Defendants will not make further production of documents relating to the source.

**REQUEST FOR PRODUCTION NO. 243:**

4850-3157-6021.1

Produce documents, including, but not limited to, data from the native Instagram application, Google analytics and/or Bitly, evidencing the number of persons that clicked on or otherwise took action with respect to Defendants' email blasts, social media posts and other online advertisements that included the Chanel Trademarks or CHANEL-branded products or items.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 243:**

Defendants object on the grounds that the documents requested herein are not proportional to the needs of the case. Defendants further object on the grounds that this Request is duplicative of RFP Nos. 127, 128, 200.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Request, Defendants respond as follows:

Defendants will not produce documents responsive to this request.

Dated: January 25, 2021

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: /s/ Daniel C. DeCarlo
Peter T. Shapiro, Esq.
Daniel C. DeCarlo, Esq.
Thomas S. Kiddé, Esq.
Jean M. Kim, Esq.
*Attorneys for Defendants WGACA, LLC, What Comes Around Goes Around LLC d/b/a What Goes Around Comes Around, MHW Properties, Inc., WGACA Web, LLC, Pines Vintage, Inc., Vintage Designs Ltd., WGACA LA, Inc.*
77 Water Street, Suite 2100
New York, New York 10005
212-232-1300

4850-3157-6021.1

TO:    Theodore C. Max, Esq.
tmax@sheppardmullin.com
Dylan Price, Esq.
dprice@sheppardmullin.com
Hyo Jin Paik, Esq.
hpaik@sheppardmullin.com
Jill Pietrini, Esq.
jprietrini@sheppardmullin.com
Bridget Russell, Esq.
brussell@sheppardmullin.com

4850-3157-6021.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2021, the foregoing document, Defendants' Responses to Plaintiff's Eleventh Set of Requests for Production of Documents was served by email upon the following party and participant:

Sheppard, Mullin, Richter & Hampton LLP
> *Attorneys for Plaintiff*
> 30 Rockefeller Plaza
> New York, New York 10112
> 212-653-8700
> Theodore C. Max, Esq.
> tmax@sheppardmullin.com
> Dylan Price, Esq.
> dprice@sheppardmullin.com
> Hyo Jin Paik, Esq.
> hpaik@sheppardmullin.com
> Jill Pietrini, Esq.
> jprietrini@sheppardmullin.com
> Bridget Russell, Esq.
> brussell@sheppardmullin.com

I certify that the foregoing statements made by me are true.  I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

/s/ Jean Kim
Jean Kim

4850-3157-6021.1

# EXHIBIT 2



# QUESTURA di MILANO
## COMMISSARIATO P.S. PORTA TICINESE
### UFFICIO DENUNCE
Via Tabacchi, 6 - 20136 MILANO
☎ 028330181 – 📠 0283301841



Modello Ottico nr.

**OGGETTO**: Verbale di Denuncia resa orale per: **Furto in ditta.** -----------------------------------

Resa da: **GIRARDI Claudio Marcello**, sesso M , nato a Buenos Aires (ARGENTINA ) il 28/07/1958, residente a Latisana (UD) in via Tempio nr.3, cittadino italiano, tel.3355368144; identificato a mezzo di carta di identità Nr.AR03824449 rilasciato da comune di Latisana (UD) in data 09.05.2009. -------------------------------------------------------------

Il 29/11/2012 alle ore **13.20** in Milano, nei locali dell'Ufficio di Polizia di cui in intestazione, innanzi a me sottoscritto Ufficiale di P.G. Sov. FARAONE Giuseppe , --- è presente la persona in oggetto indicata la quale per ogni effetto di Legge denuncia quanto segue: -------------------------------
"premetto di essere l'amministatore delegato della ditta Renato Corti s.p.a., con sede in Milano, via Ettore Ponti nr.49, P.I. 06248980960. ----------------------------------------------------------
In data 28.11.2012, personale dipendente, chideva regolarmente in tutte kle sue parti il capannone nr.7, ubicato nella stessa via Ettore onti al civico 53. -------------------------------------------
Alle ore 02.32, odierne presso la Centrale dell'Istituto di Vigilanza IVRI, perveniva allarme d'intrusione nel suddetto capannone. Di conseguenza, alle ore 02.44, una pattuglia del suddetto Istituto denominata Alfa 12, interveniva e constatava che ignoti avevano forzato la porta d'ingresso del capannone, quindi una volta all'interno avevano scardinato la porta di una stanza adibita a deposito, ove era custodito un carrello a rete chiuso da un lucchetto contenente del materiale che a seguito di inventario veniva identificato in nr.60 scatole numerate dal 23353 al 23412, contenenti nr.30.000 (trentamila ) certificati di autenticità dal nr.17686401 al 17716400, del marchio " CHANNEL " . A seguito di quanto accertato, su richiesta dello stesso personale dell'IVRI, giungevano sul posto un dipendente dell'azienda, tale CARINI Paolo e la Volante Barona 1° turno, i cui operatori, procedevano agli accertamenti di rito e di conseguenza ad invitare la persona delegata a presentare relaiva denuncai presso questo Commissariato di P.S.. dopo un accurato inventario.---
E' utile rappresentare, che nel capannone erano custodite numerose borse, dello stesso marchio, già imballate, che non sono state minimamante toccate, facendo supporre che il furto era mirato. ------
Segnalo, che il parcheggio interno è munito di impianto di videoregistrazione, le cui riprese sono state trasferite su supporto DVD. che consegno -------------------------------------------
Faccio presente, che dalle registrazioni, si può notare che per allontanarsi, gli ignoti hanno usato un furgone bianco. non di proprietà dell'azienda che rapresento. che ha varcato l'uscita dal cancello prospiciente la via Binda.-----------------------------------------------------------------
Aggiungo, che in data 26.11.2012. alle ore 08.45. ignoti. hanno tentato di sportare un camion della ditta Fratelli Casati s.a.s., con sede operativa in Origgio (MI) via per Cantalupo nr.31, che aveva appena carievato pelletteria dalla nostra azienda. denuncia sporta presso il Comando Stazione Carabinieri di Caronno Pertusella (MI) in data 26.11.2012 dal signor BORIGIA Santino.----------".
Domanda: è assicurato per questo tipo di eventi ? --------------------------------------------------
Risposta: si. con la compagnia di Assicurazioni AXA. ----------------------------------------------

EXHIBIT
**34**
A. Hahn
09/30   SW

CHANEL0012161

*rilascia copia del presente verbale alla persona in oggetto indicata per usi consentiti dalla
legge, significando che **NON** sostituisce eventuali documenti in esso elencati e che, in caso di
ritrovamento degli stessi da parte del proprietario, ne deve essere denunciato il ritrovamento.------
Letto, confermato e sottoscritto in data ora e luogo di cui sopra.-----------------------------------------*

**Denunciante**                                                **L'Ufficiale di P.G.**

CHANEL0012162

[emblem]

# MILAN POLICE HEADQUARTERS
## PORTA TICINESE STATE POLICE DEPARTMENT
### REPORT DESK
*Via Tabacchi, 6 – 20136 MILAN*
*Phone 028330181 – Fax 0283301841*

Report Number:

**SUBJECT**: Oral Report of: **Theft at place of business**.

Given by: **Claudio Marcello GIRARDI**, sex M, born in Buenos Aires (ARGENTINA) on 07/28/1958, resident of Latisana (UD) at Via Tempio no. 3, Italian citizen, telephone 3355368144; identified by identity card no. AR03824449 issued by the municipality of Latisana (UD) on 05/09/2009.

On 11/29/2012 at **1:20 PM** in Milan, at the premises of the Police Office indicated above, before me, the undersigned Police Superintendent Giuseppe FARAONE, the person indicated above was present, and, for all purposes of law, reported the following:
"let me first say that I am the CEO of the company Renato Corti S.p.A. with office in Milan, Via Ettore Ponti no. 49, VAT No. 06248980960.
On 11/28/2012, employed staff, [chideva] regularly throughout warehouse no. 7, located at the same address, Via Ettore Ponti, street number 53.
At 2:32 AM today, at the central office of the alarm company Istituto di vigilanza e sorveglianza I.V.R.I. S.p.A., an alarm went off indicating an intrusion at the aforementioned warehouse. As a consequence, at 2:44 AM, a patrol of the aforementioned company, called Alpha 12, intervened and noted that unknown persons had forced the entry door of the warehouse, and once inside, had removed the door of a storage room from its hinges. In the storage room, there was a mesh cart, closed with a padlock, containing material which, according to the inventory, was identified as 60 boxes numbered from 23353 to 23412, containing 30,000 (thirty thousand) certificates of authenticity from no. 17686401 to 17716400, of the "CHANNEL" brand. After this was determined, upon request of the IVRI staff, a company employee named Paolo CARINI arrived at the site, and the [Volante Barona] 1st shift, whose workers proceeded to make the proper ascertainments and consequently urged the delegated person to make the report at this State Police Station, after a precise inventory.
I should say that that the warehouse contained numerous bags of the same brand, already packaged, which were not touched in the least, leading us to believe that the theft was targeted.
I report that the internal parking lot has a video recording system, whose content has been transferred to DVD, which I hereby deliver.
I hereby state, that from the recordings, it can be seen that, to get away, the unknown persons used a white van, not owned by the company I represent, which exited through the gate overlooking Via Binda.
I add that on 11/26/2012 at 8:45 AM, unknown persons attempted to remove a truck owned by the company Fratelli Casati S.A.S., with operational office in Origgio (MI), Via per Cantalupo no. 31, which had just been loaded with leather goods from our company, a report filed at the Carabinieri Command Station at Caronno Pertusella (MI) on 11/26/2012 by Mr. Santino BORIGIA."
<u>Question</u>: is it insured for this type of event?
<u>Response</u>: yes, with the insurance company AXA.

[signature]                                          [signature]

CHANEL0012367

*issues [sic] a copy of this report to the person indicated above for uses allowed by law, meaning that it does **NOT** replace any documents listed therein and that, if these are found by the owner, the finding must be reported.*

Read, confirmed, and signed on today's date and at the place indicated above.

|  |  |
|---|---|
| **Reporter** | **State Police Official** |
| [signature] | [signature] |

[stamp:]
MILAN POLICE
STATION [illegible]
Porta Ticinese

CHANEL0012368



City of New York, State of New York, County of New York

I, Jodeci Guzman, hereby certify that the document **"Police Report for theft at place of business in English"** is, to the best of my knowledge and belief, a true and accurate translation from Italian into English.

Jodeci Guzman
(Currently situated in the County of New York)

Sworn to before me remotely this
September 14, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

CHANEL0012369

# EXHIBIT 3

Compagnia di Milano Porta Magenta
Nucleo Operativo

## ATTO DI DENUNCIA

Il presente atto è composto di
n _45_ pagine con numerazione
progressiva dal n. _1_ al _45_ di
COPIA CONFORME ALL'ORIGINALE
Milano _20/01/2021_

IL COMANDANTE
(Cap.) Giovanni Sarnacchiaro

**Ricorre**

L'avv. prof. Pier Luigi Roncaglia, nella sua qualità di procuratore generale alle liti (**doc. 1**) e difensore della società **Chanel** (Société par actions simplifiée) con sede in Avenue Charles de Gaulle, 135, Neuilly Sur Seine Cedex (Francia)

per

esporre

**1.** La Chanel (Société par actions simplifiée) (d'ora in poi per semplicità "Chanel") è in assoluto una delle firme più rinomate e prestigiose nel panorama della moda internazionale.

Altrettanto famosi e conosciuti sono i segni distintivi utilizzati e registrati da Chanel per contraddistinguere i suoi prodotti. Tra di essi, ai fini del caso che ci occupa, assumono rilevanza i celebri marchi "Chanel" e "Monogramma Chanel" – segno quest'ultimo costituito dalle due lettere "C" poste schiena contro schiena ed intersecate tra loro – utilizzati per identificare l'intera produzione della *maison* francese e oggetto di numerose registrazioni internazionali (**docc. 2-4**), tutte aventi efficacia in Italia, per un'ampia gamma di prodotti tra cui *"borse e articoli di pelletteria"*.

**2.** Per fabbricare i suoi prestigiosi prodotti – e in particolare, per quanto qui interessa, gli articoli di pelletteria – Chanel si avvale di alcune selezionate società a cui commissiona la produzione dei suoi manufatti che vengono realizzati dietro precise indicazioni tecniche ed in base al *know how* fornito dalla casa francese.

Si tratta di imprese che devono garantire un assoluto livello di qualità e professionalità e che agiscono in veste di "fabbricanti per conto". In altre

Confidential
CTL-_E-0001719

CHANEL0014213

parole, esse producono soltanto quegli articoli che Chanel gli commissiona per poi consegnarli, esclusivamente, alla società francese o ai soggetti facenti parte della sua rete distributiva. Le imprese in questione, non sono pertanto licenziatarie del marchio "Chanel", ossia non possono vendere i prodotti realizzati per Chanel a terzi corrispondendo alla società francese delle *royalties* sui fatturati, come accade in un normale contratto di licenza, ma, come dicevamo, producono l'articolo che deve poi essere consegnato a Chanel.

Al fine di arginare il fenomeno della contraffazione, Chanel adotta vari accorgimenti: assieme ai segreti aziendali su come realizzare un prodotto Chanel originale, essa consegna ai propri "fabbricanti per conto" alcuni accessori per garantire l'autenticità dei prodotti.

In particolare, per quanto riguarda le borse, la società francese è solita consegnare al "fabbricante per conto" alcuni **certificati di autenticità**, c.d. "*cartes d'authenticité*" (**doc. 5**), della forma e delle dimensioni di una carta di credito, che recano impresso i marchi "Chanel" e "Monogramma Chanel" un numero di serie che deve corrispondere a quello apposto internamente al manufatto su una **targhetta**, c.d. "*confirm*" o "*etiquettes*" (**doc. 6**), anch'essa fornita da Chanel ai propri fabbricanti.

Queste carte di autenticità e la corrispondente targhetta da inserire all'interno della borsa sono consegnate da una filiale della Chanel, la Chanel Coordination, al fabbricante autorizzato **con l'espresso divieto di consegnarle a terzi**. Le carte di autenticità, le targhette ed i numeri di serie permettono a Chanel di risalire con certezza al fabbricante del prodotto dato che, come abbiamo detto, la società francese si avvale di più di un'impresa per la fabbricazione dei suoi articoli di pelletteria.

2

Confidential
CTL-_E-0001719

CHANEL0014214

Ovviamente la proprietà di questi certificati di autenticità e delle relative **targhette rimane esclusivamente della Chanel.**

Come si può capire, sia le carte di autenticità, sia le targhette sono estremamente ambite dai contraffattori poiché, una volta posizionate all'interno di borse false, ma di ottima fattura, rendono estremamente difficile per chiunque accorgersi della loro contraffazione e consentono ai contraffattori stessi di mettere in commercio questi prodotti **al medesimo prezzo di quelli originali** sia sul mercato nazionale, sia in particolare su quello asiatico e statunitense, dando luogo ad un fiorente e ramificato traffico internazionale di articoli falsi.

**3.** Tra i "fabbricanti per conto" autorizzati di Chanel in Italia, c'è anche la ditta **Renato Corti S.p.A.** (di seguito "Corti"), con sede in Milano, via Ettore Ponti 49 (**doc. 7**), specializzata nella produzione di articoli di pelletteria

Ebbene, Chanel ha recentemente appreso che il 29 novembre 2012 la ditta Corti ha subito un **furto di ben 30.000 (trentamila) carte di autenticità** originali da parte di soggetti allo stato ignoti.

Come risulta dal verbale di denuncia (**doc. 8**) presentato alla Questura di Milano il giorno stesso del furto dal signor Girardi Claudio Marcello, amministratore delegato della Corti, sono state trafugate 60 scatole (numerate dal 23353 al 23412) contenenti i suddetti certificati di autenticità (i cui codici numerici andavano dal n. 17686401 al n. 17716400) che si trovavano nel capannone della ditta, situato al civico 7 della stessa via Ettore Ponti.

Al di là dell'enorme numero di carte rubate, stupisce la modalità con cui il furto è stato portato a termine. Il 29 novembre scorso, infatti, l'allarme di intrusione della ditta Corti è suonato alle 2.32 del mattino e la pattuglia di

3



3

Confidential
CTL-_E-0001719

CHANEL0014215

servizio dell'istituto di Vigilanza IVRI, cui l'allarme era collegato, è giunta sul posto alle 2.44, ossia **appena 12 minuti dopo**.

Ebbene proprio in questi 12 minuti gli autori del furto sono riusciti a forzare la porta d'ingresso del capannone della ditta, a scardinare la porta d'accesso del deposito interno dove si trovava un carrello chiuso con un lucchetto che custodiva il materiale rubato e, una volta rotto il lucchetto, a trafugare la merce di cui sopra riuscendo a fuggire prima dell'arrivo della pattuglia.

E' francamente sorprendente che gli autori del furto siano riusciti nella loro impresa in un lasso di tempo così breve, così come stupisce che le numerose borse già confezionate con il marchio "Chanel" presenti all'interno del capannone siano state del tutto ignorate nonostante il loro indubbio valore commerciale. Si tratta evidentemente di persone che conoscevano alla perfezione i locali della ditta Corti e che hanno agito con il preciso intento di trafugare esclusivamente le carte di autenticità.

Per quanto non vi sia la certezza di un collegamento con questo grave episodio, si segnala anche che tre giorni prima dei fatti di cui si è detto, precisamente il 26 novembre 2012, si è verificato un tentativo di furto ai danni di un camion della ditta Fratelli Casati S.a.s., avente sede in Origgio (Milano), via Cantalupo 31, che aveva appena caricato articoli di pelletteria della ditta Corti.

4. Poiché, come si è detto, **Chanel** fornisce alla ditta Corti le carte di autenticità e le targhette da apporre all'interno delle borse che restano di esclusiva proprietà della *maison* francese, è evidente che essa sia **il principale soggetto danneggiato dal furto**.

Nei confronti di coloro che hanno portato a termine il furto in questione dovrà pertanto essere configurato il **reato di cui all'art. 624 c.p.** che punisce



4

Confidential

CTL-_E-0001719

CHANEL0014216

*"chiunque si impossessa della cosa mobile altrui, sottraendola a chi la detiene, al fine di trarne profitto per sé o per altri"*, aggravato secondo la previsione di cui all'art. 61, nn. 2) e 7) c.p., essendo assai verosimile che, per la stessa natura di ciò che è stato rubato – carte di autenticità – *"il furto sia avvenuto per eseguirne un altro, ovvero per conseguire o assicurare a sé o ad altri il prodotto o il profitto o il prezzo di un altro reato"* (ossia, come vedremo immediatamente, del reato di ricettazione e di contraffazione) ed essendo certo che il furto *"abbia cagionato alla persona offesa dal reato un danno patrimoniale di rilevante entità"*. Oltre alle aggravanti comuni previste dall'art. 61 c.p., dovrà essere contestata ai responsabili che saranno individuati anche l'aggravante prevista dall'art. 625 n. 2) c.p., poiché chi si è introdotto nel capannone della ditta Corti, come abbiamo visto, lo ha fatto usando *"violenza sulle cose"*, ossia forzando sia la porta di ingresso, sia quella del deposito interno, sia infine il lucchetto che chiudeva il carrello dentro cui erano contenute le carte di autenticità.

Nei confronti invece dei soggetti che comunque riceveranno le carte di autenticità rubate, è evidente che dovrà configurarsi il reato di **ricettazione di cui all'art. 648 c.p.**.

Infine, nell'ipotesi in cui venisse accertato nel corso delle indagini che, come è presumibile, le carte di autenticità rubate saranno inserite all'interno di borse Chanel contraffatte allo scopo di immetterle in commercio spacciandole per originali, dovrà essere contestato nei confronti dei produttori delle borse in questione il **reato di cui all'art 473 c.p.** che punisce chi *"contraffà o altera marchi o segni distintivi, nazionali o esteri, di prodotti industriali"*, mentre nei confronti di chi detiene tali prodotti per farne commercio dovrà configurarsi il

5



Confidential

CTL-_E-0001719

CHANEL0014217

reato di cui all'art. 474 c.p. che punisce "*chiunque introduce nel territorio dello stato (...) detiene per la vendita, pone in vendita o mette altrimenti in circolazione*" articoli contraffatti.

Nel caso di specie, semmai, vi è da sottolineare **la necessità di contestare questi ultimi delitti nella loro forma aggravata**, non essendovi alcun dubbio sul fatto che ricorra in questa ipotesi la circostanza aggravante di cui all'art. **474-*ter* c.p.**. Da quanto sin qui descritto, sembra infatti che ci si trovi difronte ad un'organizzazione dedita alla produzione e commercializzazione, anche a livello internazionale, di prodotti Chanel contraffatti di pregevole fattura. Ogni particolare non è lasciato al caso. I soggetti coinvolti nei fatti descritti sono stati in grado di portare a termine, in soli 12 minuti e quindi con straordinaria destrezza, un furto di ben 30.000 carte di autenticità che, di per sé, già significa la possibilità di reperire altrettante borse Chanel contraffatte di ottima fattura. Le carte di autenticità in questione, infatti, non hanno alcun mercato e la loro esistenza trova una sua giustificazione solo nell'impiego delle stesse all'interno delle borse contraffatte Chanel. E' pertanto evidente che, con particolare riferimento alla produzione di borse che ospiteranno queste carte di autenticità, siano coinvolti soggetti che conoscono e applicano, almeno in parte, le tecniche produttive della *maison*, magari utilizzando materiali conformi ed accorgimenti tipici della produzione Chanel. **L'effetto ingannatorio sarà pertanto massimo proprio per la presenza all'interno dei prodotti così realizzati di carte originali.**

In questo modo non è da escludere che, attraverso l'allestimento di mezzi e di attività ben organizzate, il mercato di alta fascia possa essere invaso da prodotti capaci di ingenerare confusione non solo in capo al singolo consumatore, ma



6

Confidential
CTL-_E-0001719

CHANEL0014218

anche con riguardo al commerciante o all'operatore professionale del settore.

E se si pensa al numero di carte di autenticità originali Chanel che sono state rubate alla ditta Corti e del prezzo medio a cui anche un prodotto contraffatto di alta fascia può essere venduto, ci si rende conto con immediatezza dell'importanza che questo caso riveste, del danno potenziale subito dalla *maison* francese, nell'ordine di **alcune decine di milioni di euro**, e pertanto della assoluta necessità che su questo episodio venga fatta luce al più presto.

\* \* \*

Per tutto quanto esposto, il sottoscritto, nella propria qualità, nel denunciare quanto precede, manifesta la volontà che si proceda penalmente in ordine a tutti i fatti pregressi descritti che risulteranno reati e che si riterrà di rubricare a carico dei responsabili che saranno individuati e

### chiede

1) che si proceda **con la massima urgenza** nei confronti dei responsabili che saranno eventualmente individuati dei reati di cui agli artt. 624, nella forma aggravata prevista dagli artt. 61 n. 2) e 7) e 625 n. 2), 648, 473 e 474 questi ultimi aggravati ai sensi dell'art. 474 *ter* c.p., e degli eventuali altri reati che l'autorità procedente riterrà opportuno configurare, o che emergeranno nel corso delle indagini.

Con richiesta di essere convocati per offrire ogni opportuno contributo per le indagini preliminari ai sensi e per gli effetti degli artt. 348 e 362 c.p.p. anche per consentire alla persona offesa di esercitare tutti i diritti e le facoltà riservatele dal codice di procedura penale.

Con riserva di costituzione di parte civile nei tempi e nei modi previsti dal codice di procedura penale e **con dichiarazione della persona offesa di volere**

7



Confidential
CTL-_E-0001719

CHANEL0014219

essere informata circa l'eventuale richiesta di archiviazione a norma dell'art. 408 c.p.p., nonché dell'eventuale richiesta di proroga delle indagini ai sensi dell'art. 406, terzo comma c.p.p. a mezzo comunicazione da inoltrarsi all'**avv. Gabriele Lazzeretti del foro di Firenze** con studio **in Firenze, corso Tintori 25, fax 055-2633800, che viene sin da ora nominato difensore della persona offesa dal reato.**

Si delega al deposito della presente denuncia, l'avv. Gabriele Lazzeretti, del foro di Firenze o ogni altra persona da lui designata.

Si producono i seguenti documenti:

1) procura;

2) registrazione internazionale n. 201151;

3) registrazione internazionale n. 426432;

4) registrazione internazionale n. 517325;

5) esemplare di una carta di autenticità originale Chanel;

6) esemplare di una targhetta originale Chanel;

7) visura camerale Renato Corti S.p.A.;

8) verbale di denuncia.

Firenze, 11 dicembre 2012

avv. prof. Pier Luigi Roncaglia

8



Confidential
CTL-_E-0001719

CHANEL0014220

# COMPLAINT

[stamp:]
**COPY**

**The Complainant**

Attorney Professor Pier Luigi Roncaglia, in his role as general attorney for the litigants (**doc. 1**) and attorney for the company **Chanel** (Société par actions simplifiée), with registered office at Avenue Charles de Gaulle, 135, Neuilly Sur Seine Cedex (France), appeared in order to

report

1. Chanel (Société par actions simplifiée) (hereinafter "Chanel") is absolutely one of the most renowned and prestigious companies on the international fashion scene.

Also famous and well-known are the distinctive signs used and registered by Chanel to distinguish its products. Among them, for the purposes of this case, the famous "Chanel" and "Chanel Monogram" marks assume importance – the latter sign constituted by two letter "C"s placed back to back and intersecting – used to identify the entire production of the French *maison* and subject of numerous international registrations (**docs. 2-4**), all with efficacy in Italy, for a broad range of products including "*leather purses and articles*".

2. To manufacture its prestigious products – in particular, for the aspect that interests us today, leather articles – Chanel makes use of certain selected companies which it commissions to produce its products, which are made using precise technical instructions, based on the know-how provided by the French house. These are companies that must guarantee an absolute level quality and professionalism and who act in the role of "proxy manufacturers". In other



**EXHIBIT**
Defendants' 89a
11/30/2020     LM

CHANEL0012612

words, they produce only the articles that Chanel commissions them to deliver, exclusively, to the French company or to subjects who are part of the distribution network. The companies in question are not therefore licensees of the "Chanel" brand, that is, they cannot sell the products created for Chanel to third parties, paying the French company the *royalties* on invoices, as happens in a normal licensing contract, but, as we said, they produce articles that must then be delivered to Chanel.

In order to contain the phenomenon of counterfeiting, Chanel uses various tricks: together with company secrets on how to manufacture an original Chanel product, it delivers to its" proxy manufacturers" some accessories to guarantee authenticity of the products.

In particular, with regard to purses, the French company usually delivers to the "proxy manufacturers" some **certificates of authenticity**, in French "*cartes d'authenticité*" (**doc. 5**), in the form and the dimensions of a credit card, embossed with the "Chanel" and "Chanel Monogram" marks [and] a serial number that must correspond to the one placed inside the manufactured products on a **tag** "the "*confirm*" or "*etiquettes*" (**doc. 6**), also provided by Chanel to its manufacturers.

These authenticity cards and the corresponding tag to be inserted inside the purse are delivered by a subsidiary of Chanel, Chanel Coordination, to the authorized manufacturer, **with the express prohibition of delivering them to third parties**. The authenticity cards, the tags, and the serial numbers allow Chanel to trace the product to the manufacturer with certainty since, as we have said, the French company uses more than one company to manufacture its leather articles.

2

CHANEL0012613

**Obviously, Chanel has exclusive ownership of these authenticity certificates and the tags**. Understandably, both the authenticity cards and the tags are extremely coveted by counterfeiters since, once placed inside a purse that is false but extremely well-made, it makes it extremely difficult for anyone to become aware of their counterfeiting and allows counterfeiters to market these products **at the same price as the originals**, both on the national market and, in particular, in Asia and the US, giving rise to vibrant and extensive international trafficking of false articles.

**3.** Among the "proxy manufacturers" authorized by Chanel in Italy, there is the company **Renato Corti S.p.A.** (hereinafter "Corti"), with registered office in Milan, Via Ettore Ponti 49 (**doc. 7**), specializing in the production of leather articles.

Chanel recently learned that on November 29, 2012, the Corti company **was robbed of 30,000 (thirty thousand) original authenticity cards** by subjects currently unknown.

As can be seen in the complaint (**doc. 8**) submitted to the Police Department of Milan, on the day of the robbery, Mr. Claudio Marcello Girardi, CEO of Corti, was robbed of 60 boxes (numbered from 23353 to 23412), containing the aforesaid authenticity certificates (whose numeric codes ran from 17686401 to 17716400), which were found in the company warehouse, located at Via Ettore Ponti, 7.

Beyond the enormous number of cards stolen, the method by which the theft was carried out is mind-boggling. On November 29, in fact, the intruder alarm at the Corti company sounded at 2:32 AM, and the security

3

CHANEL0012614

patrols of the company Istituto di vigilanza [e sorveglianza] I.V.R.I. S.p.A., to which the alarm was connected, arrived on the scene at 2:44 AM, **just 12 minutes later**.

It was precisely in these 12 minutes that the thieves were able to force open the door of the company warehouse, remove the access door to the internal storage from its hinges, find the cart locked with a padlock that protected the stolen material and, once the lock was broken, to steal the goods listed above, successfully fleeing before the patrol arrived.

It is frankly surprising that the criminals succeeded in their task in such a brief period of time, it is also incredible that the numerous purses already packaged with the "Chanel" brand present inside the warehouse were all ignored, despite their undeniable commercial value. These, evidently, are people who were perfectly familiar with the premises of the Corti company and acted with precise intent to exclusively steal the authenticity cards.

Although there is no certainty about a connection with this serious episode, we also report that three days prior to these events, specifically on November 26, 2012, there was an attempted robbery of a truck owned by the company Fratelli Casati S.a.s., with registered office in Origgio (Milan), Via Cantalupo 31, which had just been loaded with leather articles from the Corti company.

**4.** Since, as has been said, **Chanel** provides the Corti company with the authenticity cards and the tags to affix inside the purses, which remain the exclusive property of the French *maison*, it is clear that it is **the principal subject damaged by the events.**

Those who carried out the event in question must therefore be charged with the **crime under Art. 624 of the Italian Penal Code**, which punishes

4

CHANEL0012615

*"anyone possessing the movable property of another, removing it from the person who holds it, in order to profit from it for themselves or for others"*, aggravated according to the provisions of Art. 61, nos. 2) and 7) of the Italian Penal Code, it being rather likely that, due to the nature of what was stolen – authenticity cards – *"the theft took place in order to carry out another, that is, to carry out or ensure for oneself or others a product or profit or price of another crime"* (that is, as can immediately be seen, the crime of fencing and counterfeiting) and being certain that the theft *"caused the victim of the crime significant financial damage"*. In addition to the aggravating circumstances set out by Art. 61 of the Italian Penal Code, the responsible parties who will be identified must also be charged with the aggravating circumstances set out by Art. 625 no. 2) of the Italian Penal Code, since the person who entered the warehouse of the Corti company, as we have seen, did it using *"violence to property"*, that is, forcing open the entrance door and the internal storage door, and finally, the lock that closes the cart that contained the authenticity cards.

On the other hand, with regard to the subjects who will in any case receive the stolen authenticity cards, it is clear that they must be charged with the crime of fencing under **Art. 648 of the Italian Penal Code.**

Finally, if it is ascertained during the investigations that, as is presumable, the stolen authenticity cards will be inserted into counterfeit Chanel purses for the purpose of selling them as originals, the manufacturers of these purses must be charged with the **crime under Art. 473 of the Italian Penal Code,** which punishes those who *"counterfeit or alter brands or distinctive marks, national or foreign, of industrial products"*, while those who hold such products in order to sell them must be charged with

5

CHANEL0012616

the **crime under Art. 474 of the Italian Penal Code**, which punishes "*anyone who introduces into the territory of the state (...) holds for sale, places for sale, or otherwise puts into circulation*" counterfeited articles.

In this case, if anything, it is necessary to highlight **the need to charge these latter crimes in their [most severe] form**, there being no doubt about the fact that, in this case, the aggravating circumstance under **Art. 474-*ter* of the Italian Legal Code** applies. From everything described heretofore, in fact, it seems that we are dealing with an organization dedicated to the production and sale, including internationally, of counterfeited Chanel products, with considerable turnover. No detail was left to chance. The subjects involved in the events described were capable of completing, in just 12 minutes and therefore with extraordinary dexterity, a theft of more than 30,000 authenticity cards which, in itself, already indicates the possibility of finding counterfeit Chanel purses of excellent [quality].

The authenticity cards in question, in fact, have no market, and their existence is justified only in their use inside of counterfeit Chanel bags. It is therefore evident that, with particular reference to the production of purses that contain these authenticity cards, we are dealing with subjects who know and apply, at least partially, the production techniques of the *maison*, perhaps using materials that are in compliance and the accessories typical of its production. **The deceptive effects will therefore be maximum, precisely because of the presence of the original cards inside the product made in this manner**.

In this way, it should not be ruled out that, through the preparation of resources and well-organized activities, the high-level market can be invaded by products capable of causing confusion, not only for the individual consumer, but

6

CHANEL0012617

also with regard to marketers or professional industry operators.

And if we think of the number of original Chanel authenticity cards that have been stolen from the Corti company and the average price at which even one counterfeited products of high quality can be sold, we become aware of the immediate importance of this case, as regards the potential damage suffered by the French *maison*, in the order of **some tens of millions of euros**, and therefore, the absolute necessity that this episode be brought to light as soon as possible.

<p style="text-align:center">***</p>

Now therefore, the undersigned, in his role, in reporting the above, expresses the desire to proceed criminally so that all the above events described will become crimes, and to charge those responsible, who will be identified, and

<p style="text-align:center">**asks**</p>

1) to proceed **with maximum urgency** against those responsible, who will be eventually identified, for the crimes under Arts. 624, in the [most severe] form set out by Arts. 61, no. 2) and 7), and 625 no. 2), 648, 473, 474, the latter exacerbated under Art. 474 *ter* of the Italian Penal Code, and any other crimes that the authority for the proceeding deems appropriate to charge, or that emerge during investigations.

With the request to be convened to offer any appropriate contribution for the preliminary investigations under and for purposes of Arts. 348 and 362 of the Italian Code of Criminal Procedure, to also allow the offended party to exercise all the rights and faculties reserved by the Code of Criminal Procedure.

Reserving the right to sue in civil court in the future, using the methods set out by the Italian Code of Criminal Procedure and with the **declaration of the offended party that they want to**

7

CHANEL0012618

**be informed regarding any request for dismissal under Art. 408 of the Italian Code of Criminal Procedure**, as well as any request for extension of the investigations under Article 406, paragraph three of the Italian Code of Criminal Procedure, through communication to be sent to **Attorney Gabriele Lazzeretti of the Court of Florence,** with registered office in **Florence, Corso Tintori 25, fax 055-2633800, who is henceforth appointed defender of the victim of the crime.**

The filing of this complaint is delegated to Attorney Gabriele Lazzeretti, of the Court of Florence, or any other person designated by him.

The following documents are produced:

1) power of attorney;

2) international registration no. 201151;

3) international registration no. 426432;

4) international registration no. 517325;

5) example of an original Chanel authenticity card;

6) example of an original Chanel tag;

7) Chamber of Commerce search for Renato Corti S.p.A.;

8) complaint.

Florence, December 11, 2012

_____

Attorney Prof. Pier Luigi Roncaglia

l:\legale\atti penali\denunce\chanel_corti_plr_cpi1255_dic12.doc

8

CHANEL0012619



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Corti Complaint**" is, to the best of my knowledge and belief, a true and accurate translation from Italian into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
November 5, 2020

Signature, Notary Public
(Currently situated in the County of New York)

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

CHANEL0012620

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

CHANEL, INC.,                            :   CIVIL ACTION
                                         :      Number
        Plaintiff,                       :   18-cv-2253-LLS
                                         :
        vs.                              :
                                         :
WGACA, LLC, WHAT COMES AROUND,           :
GOES AROUND LLC d/b/a WHAT GOES          :
AROUND COMES AROUND, MHW                 :
PROPERTIES, INC., WGACA WEB, LLC,        :
PINES VINTAGE, INC., VINTAGE             :
DESIGNS LTD., and WGAGA LA, LLC,         :
                                         :
        Defendants.                      :

- - - - - - - - - - - - - - - - - - - x

          Veritext Virtual Zoom Videotaped
deposition of FRANK BOBER, taken on Wednesday,
January 27, 2021, held at 52 Bob White Drive,
Water Mill, New York 11976, commencing at
10:06 a.m., before Jamie I. Moskowitz, a Certified
Court Reporter and Certified Livenote Reporter.

Page 2

A P P E A R A N C E S:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
BY:  DYLAN J. PRICE, ESQUIRE
1901 Avenue of the Stars - Suite 1600
Los Angeles, California 90067-6017
310.228.3700
dprice@sheppardmullin.com
Counsel for the Plaintiff

LEWIS BRISBOIS BISGAARD & SMITH LLP
BY:  THOMAS S. KIDDÉ, ESQUIRE
633 W. 5th Street - Suite 4000
Los Angeles, California 90071
213.250.1800
thomas.kidde@lewisbrisbois.com
Counsel for the Defendants
WGACA LLC, et al

ALSO PRESENT:
STEVE MOLINA
Paralegal for Sheppard, Mullin, Richter & Hampton

LEGAL VIDEOGRAPHER
Jeffrey Menton

Page 3

                    E X H I B I T S

  EXHIBIT NUMBER      DESCRIPTION                    PAGE

  Exhibit 1155      Plaintiff Chanel Inc.'s             9
                    Amended Notice of Deposition
                    of Frank Bober Pursuant to
                    Federal Rules of Civil
                    Procedure 30(b)(6)

  Exhibit 1156      47,000-product Spreadsheet         73

  Exhibit 1157      WGACA Spreadsheet                  141
                    Point of Sale
  Exhibit 1158      Document entitled                  190
                    Authenticity Guaranteed

  Exhibit 1159      Defendants' Responses to           209
                    Plaintiff's Eleventh Set of
                    Requests for Production of
                    Documents
  Exhibit 1160      Plaintiff's Eleventh Set of        217
                    Requests for Production of
                    Documents to Defendants

REQUEST PAGE

INSTRUCTIONS NOT TO ANSWER:

Page    Line

138     4

204     20

205     11

206     24


REQUEST FOR PRODUCTION OF DOCUMENTS:


Page    Line                    Description


58      5           Amazon Agreement


STIPULATIONS:

Page    Line

None

QUESTIONS MARKED:

Page    Line

None

Page 5

TABLE OF CONTENTS

Frank Bober

Examination

By Mr. Price........................Page 7

Reporter Certificate...............Page 233

Notice to Read and Sign...........Page 232

Index of Exhibits.................Page 3

Page 6

THE VIDEOGRAPHER: Good morning. We're going on the video record at approximately 10:06 a.m. on Wednesday, January the 27th, 2021. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is video Media Disk 1 of the video-recorded deposition of Frank Bober, the designated 30(b)(6) representative of WGACA, LLC, et al.

The caption of this case is Chanel Inc. versus WGACA, LLC, et al filed in the United States District Court Southern District of New York. This is case number 18-CV-2253.

This deposition is being taken by attorney Dylan Price from the law firm of Sheppard, Mullin, Richter & Hampton, LLP, counsel for the plaintiff. This deposition is being held remotely.

My name is Jeff Menton, I am the certified legal videographer. The court reporter is Jamie Moskowitz and we are both from Veritext New York.

All counsel consent to this remote

video arrangement and waive any objections to this manner of reporting. Counsel will now state their appearances and affiliation for the record beginning with the noticing attorney, and please also note and state your acceptance of the court reporter swearing in the witness remotely and this remote video arrangement. Please proceed.

MR. PRICE: Yes, Dylan John Price for Sheppard Mullin for the plaintiff Chanel, Inc. And plaintiff consents to the taking of this deposition remotely.

MR. KIDDÉ: Thomas Kiddé of Lewis Brisbois Bisgaard & Smith for the defendants and the witness, and we consent to the deposition being done remotely.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear the witness in.

FRANK BOBER, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PRICE:

Q       Good morning, Mr. Bober. You had your deposition previously taken in this case, right?

Q        Okay.  So I just want to draw your attention, you can peruse that, but it's going to be Topics 1 through 8, 10 and 11.  So why don't you read those Subjects of Testimony and let me know when you're done.

Again it's 1 through 8, 10 and 11.

A        I have previously read them all.

Q        Okay.  So do you understand that you've been designated as -- as WGACA -- WGACA defendants rule 30(b)(6) designee on these topics that I just mentioned, Topics 1 through 8, 10 and 11?

A        I do.

Q        And are you prepared to testify to the best of the WGACA defendants' ability, as to Topics 1 through 8, 10 and 11?

A        I am.

Q        Okay.  What, if anything, did you do to prepare to give deposition testimony on the topics that we just mentioned?

A        I looked at the -- pretty much the -- this is pretty much a repeat of my earlier deposition, so I just refreshed my memory looking at mostly emails back and forth, and some of the documents like the 47,000-item spreadsheet, and some

of the documents related to the Fross Zelnick communication, like that.

Q        So apart from the back-and-forth email correspondence, the 47,000-items spreadsheet and the Fross Zelnick -- it was the cease and desist letter correspondence, correct, you were talking about?

A        And various emails related thereto.

Q        Okay.  So you reviewed those documents.  Any other documents that you recall that you reviewed in preparation of your deposition today?

A        I think I looked at a few of the exhibits.  I don't remember which ones but I'm pretty sure I looked at the exhibits.

Q        Did you read any of the prior deposition testimony that was given in this case by any employee or former employee of WGACA?

A        No.

Q        Did you speak with any current or former employees at WGACA in preparation for your deposition today?

A        No.

Q        Apart from the documents that have been produced in this action, prior deposition testimony, the spreadsheet, the things that you

briefly had mentioned, did you look at any additional documentation or data or information that WGACA has in preparation of your deposition?

A        No.

Q        So everything that you looked at in preparation of your deposition has been produced in this case; is that correct?

A        Yes.

Q        Did you do anything to investigate WGACA's practices as they existed prior to you joining the company?

A        Prior to me joining the company?

Q        Let me -- let me rephrase that.

Apart from the documents that you testified that you looked at, right, because I understand the Fross Zelnick might have been predating you joining the company.  So, apart from that information, did you do any investigation as to what WGACA's practices or policies were prior to you joining the company?

A        No.  And I looked at a couple of the financials prior to me joining the company but that's all.

Q        Okay.  So you would add some financials to that list of documents that you

reviewed, the 47,000, the Fross Zelnick and the email correspondence, right?

A        Correct.

Q        Did you review your prior deposition testimony in this case at all since you -- since the last time you were deposed?

A        No.

Q        Did you review any of the pleadings that have been filed in this case?

A        Ever?

Q        In preparation of your deposition today?

A        No.

Q        Okay.

A        No.

Q        And how long did you spend preparing for depositions?  I guess it sounds like it involves the review of the documents you mentioned; about how long did you spend preparing for your testimony today?

A        Maybe an hour or two.

Q        And if you had to estimate the amount -- I know you mentioned some categories of documents, if you asked me how many documents you looked at in preparation of your deposition today,

first started in 1993?  Was it just secondhand?

A           It was always resale.

Q           Always resale.

            At any time, did WGACA have its own line of accessories or clothing or fashion?

A           I believe it did.

Q           And was that in the early period that we're talking about?

A           Yeah, I think so.  Early -- early 2000s, I think.

Q           All right.  And do you know what -- I refer to it as the fashion line, not in the industry so I don't know the correct parlance; but what do you understand WGACA was making?  What was part of its fashion line?

A           I'm not sure of that.  I don't know. I wasn't there, I don't know.

Q           Did you know, was it clothing or was it the handbags, do you --

A           I think it was apparel.

Q           Apparel, okay.  Thank you.

            And was the apparel side of WGACA's business, was that -- how did that compare to its secondhand business in terms of, you know, percentage of revenues?

A        I don't know.

Q        Whom at WGACA would know that question -- the answer to that question, I'm sorry.

A        Seth, Seth Weisser.

Q        And you didn't talk with Seth prior to this deposition, right?

A        I've talked with Seth prior to this deposition.

Q        You didn't talk with Seth in preparation for this deposition, right?

A        Correct.

Q        So you don't have -- as you sit here today, you don't have any knowledge as to whether the fashion line was the core of WGACA's business at that time, right?

KIDDÉ:  Objection, it's vague.

THE WITNESS:  I wouldn't -- not know how to answer that.  I don't know the core of the business.  What I know about the business is that its core business was always and they are known for retail.

BY MR. PRICE:

Q        But, again, you didn't do anything to investigate the company prior to you joining it, correct?

A        Correct.

Q        So when -- when then did WGACA first start offering Chanel-branded products for sale?

A        I think that 2012 or 2013, something like that.  I mean, I think -- that's incorrect.  I think they offered Chanel-branded product in apparel probably almost from the time they began the business.

I think that the handbag and the jewelry business became important starting in 2013, 2014.

Q        So I think you said -- from the start you said that Chanel-branded apparel might have been important to them.

Do you think at the very beginning, in terms of the secondhand or the Chanel-branded items, it was apparel that was the focus of WGACA's business at the beginning?

A        Well, that was the focus of their business, apparel and accessories.  I don't know what the breakdown was because I wasn't there.

Q        Okay.  And when it first started selling Chanel-branded products, whether it was apparel or accessories, in these early years, was it selling other brands as well or was it only selling

think I used branch off. So they started to emphasize that side of the business.

Q What did they do to start to emphasize that side of the business?

A As I said, they obtained more merchandise and then they sold more merchandise. They fulfilled what they thought was demand.

Q And what did -- what did WGACA do to obtain more merchandise, what steps did it put into place?

COURT REPORTER: What steps?

BY MR. PRICE:

Q Did it put into place?

A They sought out suppliers of resale -- luxury resale merchandise.

Q And were these new suppliers that WGACA had previously not been, like, sourcing from?

A I'm not sure of the answer to that but might be.

Q Who would -- who would know the answer to that?

A Seth Weisser.

Q Were there any type of, you know, internal memos or documents that would reflect this effort in 2014 -- 2013, 2014 to locate new sources

Page 43

testimony.

Q    Okay.  And so WGACA has a wholesale side of its business, you testified to that, right?

A    Correct.

Q    And that is referring, and I think you reference in this article, is the Retail Partners division; is that right?

A    Correct.

Q    When did WGACA start its wholesale business?

A    I think also in the 2012 -- the luxury retail accessories that started to scale, as you characterize it, and I agree with that, 2012, 2013.

Q    And who made the decision to move into the wholesale market?

A    Seth Weisser.

Q    Were there any discussions or board discussions or communications about the decision to move into wholesale?

A    I wasn't there.

Q    Seth would be the person to ask that question?

A    I would ask him that question.

Q    All right.  Why did WGACA decide to move into the wholesale business?

Case 1:18-cv-02253-LLS Document 280-24 Filed 02/26/22 Page 60 of 254

THE WITNESS:  I think that they were not as focused on expanding the customer base as -- from a kind of demographic point of view, but rather just more customers.

BY MR. PRICE:

Q        Okay.  And what is -- what does that answer, what are you basing that on?

A        My knowledge, my working knowledge of being inside the company.

Q        But, again, you haven't had any conversations with any employees or former employees at WGACA about its decisions to move into wholesale, right?

A        No.

Q        I mean, whether you reference Exhibit 1001 or not, can you give me an estimate of the percentage of WGACA's revenues that came from its wholesale business?

And, I guess, let's start with the initial time period when -- when it moved into wholesale in the 2012, '13 period?

A        I think I've answered that question.

Q        Well, I think you gave me retail --

KIDDÉ:  Asked and answered, he did get asked that question.

Q        Okay.  How many wholesale, I guess, accounts or if you want to call them retail partners, how many retail partners does WGACA currently have?

A        Maybe again, just off the top of my head, maybe a dozen.

Q        And at any point that you recall, did WGACA have more than a dozen?

A        I don't recall.

Q        Who would be the best person to speak to for details of what WGACA sold?

A        Seth Weisser.

Q        Do you know who WGACA's -- do you know who WGACA's largest wholesale --

COURT REPORTER:  I'm sorry, repeat that, Dylan.

BY MR. PRICE:

Q        Do you know who WGACA's largest wholesale partner is?

A        I do.

Q        And who is that?

A        Dillard's department store.

COURT REPORTER:  Dillard's?

THE WITNESS:  Dillard's.

COURT REPORTER:  Dillard's.

Q        WGACA's also -- has ShopHop been a retail wholesale client of WGACA's?

A        Yes.

Q        And is ShopHop currently a retail client -- a wholesale client to WGACA?

A        I believe they are.

Q        Where, in terms of the range, would you put ShopHop in the top five?

A        I can't answer that, I'm not sure. They're up there.  I don't know exactly where.

Q        Do you have an estimate of the amount of revenue that ShopHop accounts were?

A        I don't know off the top of my head.

Q        Again, I think you said Ambria would be the person to answer these or was it Seth?

A        Seth would be the right one.

Q        And what about eBay:  Is eBay considered one of WGACA's retail partners?

A        No.

Q        Does WGACA have any type of relationship with eBay?

A        I think we had -- I think we had some kind of a promotion with them.  I don't remember the specifics.  And it ended.  We don't have an ongoing wholesale relationship with eBay.  I think it was

be?

A       I think we see the web customer as more price sensitive than the retail customer.

Q       Any other differences that WGACA has perceived to be a retail and website customers?

A       No.

Q       And did WGACA do anything to track its customer demographics?

A       To the extent that we used Google Analytics, there might be some tracking going on of what they provide that we keep records of.  And in the stores, not really.

Q       All right, so WGACA has never done any type of like consumer surveys that you sometimes see on a website that asks for demographic information?

A       Correct.

Q       And it's never done, you know, a hard-copy survey like that in its retail locations?

A       Correct.

Q       Does WGACA track the geographic location of its customers?

A       Again, that would be more associated with the website and what we would get out of our -- the Google Analytics.

Q       So explain to me, as someone that

Case 1:18-cv-02253-LLS Document 280 Filed 02/26/21 Page 204 of 254

doesn't know anything about Google Analytics, can you explain to me what the Google Analytics program is and how it helps with the website?

A    You and I are alike, Dylan, we both don't know.

Q    Who would be the best --

A    Google Analytics, I feel very confident in saying that, after that, I'm with you.

Q    I feel like that's a buzz word people drop around.

A    I'm not using it as a buzz word, I know we have it.

Q    And who would be the best person at WGACA to ask about the Google Analytics program?

A    Ambria.

Q    Ambria, okay.

Does WGACA do anything to track how many customers are repeat customers?

A    The same answer, in the website we would.  I think there is some tracking at the stores too for repeat customers.  There is a customer database with the sales force and CRM, so we have customer data through sales force, and we would have that information.

Q    For example, then, you know, if

question pending.

THE WITNESS: There's a question pending, what are you talking about? You had a question pending, I answered it and that was my answer. Please don't strike that.

MR. PRICE: Again, move to strike as nonresponsive.

BY MR. PRICE:

Q        Can you identify any information on this spreadsheet that WGACA believes is not accurate?

A        No.

Q        And if a product is listed on this chart, that means -- can mean a variety of things but it means, at least, the item was purchased by WGACA and the item was sold by WGACA; is that right?

A        Yes.

Q        How many Chanel-brand items does WGACA purchase on average on a monthly basis?

A        I don't know.

Q        Do you have an estimation?

A        No.

Q        Who would be the best person to ask that question?

A        Seth.

Q    If I ask the same question but on a yearly basis, would Seth be the person that would be best qualified to answer that?

A    Yes.  And Ambria, she could answer that question, too.

Q    Are there any Chanel-branded items that were purchased by WGACA that would not be on this chart?  Let me clarify that.

I realize the chart was produced at a certain time and it doesn't pick up transactions that -- I assume it doesn't pick up transactions that haven't occurred at the time, so let's put those aside, those transactions.

But -- so, for instance, this chart doesn't have the unsold inventory that WGACA had in its possession at the time the chart was produced, right?

A    Correct.

Q    So that would be one category of purchased by WGACA but not on the chart, correct?

A    Correct.

Q    Do you have any estimation of how many Chanel-branded items WGACA currently has in inventory but that have not been sold?

A    No.

A          I think it's against the law, we don't break the law.

Q          And I think you said it wasn't -- you said that it was an unwritten policy that WGACA has?

A          I'm not sure if that's part of the authentication dynamic, I'm not sure of that.  I know that if we were aware that something was stolen we wouldn't buy it.

Q          What about goods that were not authorized to be sold to the public, does WGACA have any type of policies regarding those types of goods?

A          It's all based on a --

KIDDÉ:  Objection, it's vague.

MR. PRICE:  I'm sorry, Tom, go ahead.

KIDDÉ:  I just said objection, it's vague.

THE WITNESS:  I mean, we -- we -- ask the question again.

BY MR. PRICE:

Q          Yeah.  What about a policy regarding items that were not authorized to be sold to the public, does WGACA have any type of policies regarding the acquisition of those types of goods?

A          We wouldn't have any knowledge of that.  If it's out in the secondary marketplace and

Q        So you don't -- you don't know, do you, whether after this spreadsheet was created, whether any instructions were given to any of WGACA's buyers based on the information in the spreadsheet?

A        Correct, I don't know.

Q        Does WGACA have any guidelines as to who its buyers may buy from?

A        No --

KIDDÉ:  Objection --

COURT REPORTER:  I'm sorry, Tom.

KIDDÉ:  Oh, just objection, it's vague.

COURT REPORTER:  And that answer again, please.

THE WITNESS:  Not that I know of.

COURT REPORTER:  If you could try and pause two seconds after the question so I can get Mr. Kiddé's objection in before you answer. Thank you.

BY MR. PRICE:

Q        Who at WGACA would know the answer to whether there are any guidelines as to who its buyers may or may not buy from?

A        Seth or Ambria.

Q        Does WGACA maintain any type of list of sources that had been, you know, for lack of a better term, blacklisted as in you shouldn't buy from these sources?

A        We might.  I don't know the answer to that.

Q        Who would be the person that would know the answer?

A        Seth and Ambria.

Q        All right, so we talked about policies, guidelines, approaches, you know, whatever you want to call them with regards to WGACA's sourcing of Chanel-branded products.

Now I want to talk about the procedure, the buying procedure that WGACA has.

Can you walk me through the process of how WGACA's buyers go about producing Chanel-branded items?

KIDDÉ:  Objection, it's vague.

THE WITNESS:  I'm not really equipped to discuss the step-by-step procedure.  The secondary market, there are numbers of ways to obtain merchandise and, again, it has to do with availability and authentication.

But I'm not equipped to talk about a

Case 1:18-cv-02253-SLS Document 280-4 Filed 05/26/22 Page 70 of 254

step-by-step process.

BY MR. PRICE:

Q        Mr. Bober, you were designated as the person most knowledgeable or WGACA's corporate designee on the procedures relating to the authentication, so you're the only person I have to ask this question.

MR. KIDDÉ:  Actually, the last two -- Dylan, if you're talking about 3A that's both Ambria and Mr. Bober.

MR. PRICE:  I'm talking about 2B.

MR. KIDDÉ:  That's the acquisition, you said authentication that's why I was checking.

MR. PRICE:  I'm sorry if I misspoke.

BY MR. PRICE:

Q        You're my witness here as to the acquisition policy, I can't ask anyone else.

Did you take any steps to -- to get acquainted as to what WGACA's acquisition procedures are in preparation of this deposition?

A        Well, I think that -- I'm looking at 2B, that's what you're looking at?

Q        Yes.

A        Let me read it for a second.

although -- and I would have to also say this includes things that weren't included on that list like snow globes and that type of thing.

A     Yeah, well, because maybe we either didn't sell it or have the records at that time, because that was only what was sold.

Q     Okay.  So, again, my question is:  You know, this was not the only time that WGACA purchased items from PetiteLuxury?

A     I suspect it wasn't.

Q     How did WGACA first come into contact with PetiteLuxury?

A     I don't know.

Q     Who would know that?

A     Seth.

Q     Has WGACA ever had -- strike that.

Other than the invoice and the transmission of this invoice, has WGACA ever had any written communications with HOI TING Lee or anyone at PetiteLuxury about the items that it was purchasing from it?

A     I don't know.

Q     I'm sorry, was that I don't know?

A     I don't know.

Q     Who would know the answer to that

question?

A        Seth or Ambria.

Q        So if you spoke with Seth or Ambria you could learn the answer to that question, right?

A        Whether they would have had other communication with PetiteLuxury?

Q        Yeah, whether there are any other written communications with PetiteLuxury.

A        What's the question?

Q        If you spoke with Ambria or Seth, you could learn the answer to that question, right?

                 MR. KIDDÉ:  Objection, calls for speculation.

                 THE WITNESS:  I imagine I could.

BY MR. PRICE:

Q        WGACA never made any attempt to determine where PetiteLuxury was sourcing the products listed on Exhibit 1032, right?

A        I would agree with that.

Q        You would?

A        I would agree.

Q        Okay.  And WGACA never made any attempt to determine whether these items were obtained by lawful means, right?

A        Not that I know of.

Page 162

these were items that were Chanel items that were out in the public domain.

Q    Again, you're saying Chanel products out in the public domain, that's not my question.

My question is:  Did WGACA ever take any steps to determine whether Chanel had sold, given these items away, or authorized these items to be distributed to the public?

A    No.

Q    Okay, thank you.

Prior to the filing of this lawsuit, did WGACA have any internal discussions about whether it should be selling these types of items that are reflected on Exhibit 1032?

A    I don't know.

Q    And who would know the answer to that question?

A    Whether there was internal discussions?

Q    Yeah, correct.

A    I think Seth would know the answer to that.

Q    And prior to the filing of this lawsuit, did Chanel -- I'm sorry, strike that.

Prior to the filing of this lawsuit,

THE WITNESS: Toshiki with a T as in Tom.

COURT REPORTER: Oh, okay, thank you.

BY MR. PRICE:

Q    And do you know Mr. Toshiki's last name?

A    Kawashima.

Q    And he had a son, is it Taka?

A    Taka, T-a-k-a.

Q    Thank you.

So was -- do you know whether Mr. -- I'm just going to use their first name because they have the same last names.

Do you know when Toshiki and Taka joined WGACA?

A    I think it's around -- again, I think I'm pretty close, around 2012, 2013.

Q    From 2012 or 2013 up until September 2016, Toshiki and Taka were the ones that were authenticating Chanel-branded items; is that right?

A    I would say so, yes.

Q    And they were located in Japan?

A    Correct.

Q    Did WGACA have anyone in the United

States that had --

A       I believe they did, but I don't know who that was.

Q       Who could I ask that -- I think Ms. Mische is designated on this category.

A       I think Seth would be the right one because he's been there the entire time.  It might have been Ms. Rubin, Paige Rubin.  I's not sure when she joined the company, you have that.  But she was definitely capable of authenticating.

Q       Okay.  So we have from 2012, '13 to 2016 Toshiki and Taka in Japan, and you think someone in the United States that might have been Paige Rubin, correct?

A       Correct.

Q       What about the period of time prior to Toshiki and Taka coming on board in 2012?  Who at WGACA was handling all the authentications of Chanel-branded goods at that time?

A       The business was much smaller, so I would say that the -- that it's probably Seth himself and maybe some -- possible some store personnel at that time.

Q       Okay.  So Seth and/or people acting at the direction of Seth?

A          Right.

Q          Have you seen any documentation that would reflect that or is that what you are, you know, assuming based on your understanding of the company?

A          I have not seen any documentation.

Q          Do you know what training -- and this is again the pre-2012 time period, do you know what training Seth, Mr. Weisser, had in the authentication of Chanel-branded items?

A          No.

Q          And I take it the people -- you don't know what training the people that might have been working with him had, right?

A          I don't know.

Q          Okay, so shifting focus then, going back -- I guess going back to the 2012 period when Toshiki and Taka joined, do you know at the time -- well I should ask, did they join and immediately start authenticating product?

A          Well, at the time they started immediately buying product and the only way you could buy product was to authenticate it.  So buying and authenticating, that's what happened, and that would have happened right away.

Q        So -- so -- I appreciate that.

So did they have a dual purpose, they were both buyers and authenticators?

A        Correct.

Q        So prior to Ms. Li -- prior to Sun Li joining in September 2016, WGACA did not have a designated authenticator position who the only thing that that person did was authenticate; is that right?

A        I believe that's correct.

Q        And what training did Toshiki and Taka have in the authentication of Chanel-branded goods when they joined WGACA in the 2012-2013 time period?

A        Toshiki is a -- I think he's a little over 60 years old, so he's had significant experience in the luxury resale market.  That was his training.

Q        And what significant experience in the retail market did he have?

A        He worked for a company that we ended up -- that we were buying from, Seth was buying from, and then we -- we hired him to start up WGACA Japan.

And he had -- as I said, he's 60 or 61 now so he was in his 50s, and he had years and years

of experience in luxury resale.

Q      So I get that he had experience in luxury resale, do you know what specific experience he had in authenticating Chanel-branded items?

A      I don't know.

Q      And who would know that?

A      Seth and I --

COURT REPORTER:  I'm sorry?

THE WITNESS:  Seth hired him, so Seth must know.

COURT REPORTER:  Thank you.

BY MR. PRICE:

Q      And is Toshiki still with the company?

A      Yes.

Q      What is his role, currently?

A      He's president of WGACA Japan.

Q      Okay.  Is WGACA Japan a separate entity?

A      It's a wholly-owned subsidiary.

Q      Got it.

So other than his work experience, his prior work experience, are you aware of any training that Mr. Toshiki -- I'm sorry -- Toshiki received specific to the authentication of Chanel-branded items?

A    No.

Q    So -- and then you mentioned he had a son Taka, right?

A    Correct.

Q    Do you -- do you know how old Taka was when he joined the company with his father in 2012, 2013?

A    No.

Q    Do you know how old Taka is now?

A    No.

Q    Do you know what experience Taka had in the authentication of Chanel-branded items when he joined the company in 2012, 2013?

A    No.

Q    But he was -- when he joined, he immediately started buying and in that process, your testimony is authenticating Chanel-branded items, right?

A    I think so, under Toshiki's tutelage.

Q    Okay, so it -- was there a hierarchy there, Toshiki was the primary buyer and Taka was the secondary buyer, is that how it worked?

A    Yup.

Q    Did WGACA Japan have any other buyers at the time?

A        They might have, I don't know.  I don't know, they might have.

Q        Okay.  Toshiki and Taka --

A        The company grew and as it -- with more demand they weren't able to satisfy the demand just with the two of them.  So the company grew and I suspect that there were other buyers.

Q        And is that the reason why -- why Sun Li was ultimately hired, because there was so much demand or so much product that they concentrated on buying, and Sun Li was brought in to do the authenticating?

A        Uh-huh.  Yes.

Q        Okay.  Did Toshiki or Taka receive any training from WGACA when they joined in 2012 or 2013 on the authentication of Chanel-branded items?

A        I don't know the answer to that.  I mean, I suspect that there was lots of communication between Seth and Toshiki, but I can't answer that there was specific training.

Q        And have you seen -- you said you suspect there's not documentation or communications, have you actually seen any such communications?

A        I have not.

Q        And is the authentication process, for

lack of a better word, that was taking place under Toshiki and Taka, did that differ in any way than the process that Sun Li and Devyn Shaughnessy testified that WGACA performed?

A       I don't know the answer to that.

Q       I would assume that Toshiki is probably the best person to ask that question.

A       In terms of --

Q       Of the process that -- how they went about authenticating?

A       I think that they -- well, I don't want to speculate.  Yeah, you want to ask Toshiki, you can ask him.

Q       I'd rather just ask you but I can't.

A       No, I -- I -- I, again, I don't want to guess.  You know, I think the authentication process, he's obviously an expert.  So the rest of it, in terms of whether, you know, you're asking me a very specific question:  Do I know if there was any difference between the authentication when Sun Li came on board or Devyn and what Toshiki and Taka did, the answer is:  I don't know.

Q       Okay.  And when you say Toshiki is obviously an expert, you're basing that on the fact that you believe that he had work experience in the

secondary market before coming to Chanel, right?

A      Yeah, many years.

Q      But you don't know what training or experience Mr. Toshiki had specific to the authentication of Chanel-branded items?

A      That's correct.

Q      So -- okay, so Sun Li, she joins in September 2016, and she takes over responsibility for the authentication that Toshiki and Taka were previously doing, right?

A      I believe so.

Q      And Ms. Li testified that she received some sort of training for about a month period while she was in Japan prior to moving to the United States.  You don't have to agree with me, I'm just telling you that was her testimony.

My question to you is:  She wasn't sure who trained her while she was in Japan, she didn't recall who it was.  So my question is:  Do you know who was training Sun Li in the authentication process during that month period where she testified she was in Japan?

A      I believe it was Toshiki and Taka.

Q      Okay.  And what are you basing that on?

Page 210

BY MR. PRICE:

Q        All right, I would draw your attention to Request for Production Number 240 and your Response to that, WGACA's Response to that.

A        Okay, what's your question?

Q        So 240 asks WGACA to produce documents reporting or suggesting that the police reported theft to exhibit A is fake or not authentic?

A        Where's that, 240?

Q        Number 240, produce --

A        One second.  Okay.

Right, so what's the question?

Q        And your response is that "Defendants will produce non-privileged documents that are responsive to this request."  Do you see that?

A        Yup.

Q        What non-privileged documents does WGACA have in its possession, custody or control that are responsive to this request?

A        I don't believe we have any.

Q        Then why doesn't it say we don't have any documents?

A        I just said we don't have any documents.

Q        Why doesn't your response -- why

doesn't WGACA's response to this request indicate that no non-privileged documents exist?

MR. KIDDÉ:  Counsel, it's provide -- this is in response to request for production; Mr. Bober has not authored this so I think the question is sort of moot.

BY MR. PRICE:

Q      So you, Mr. Bober, are unaware of any non-privileged documents responsive to this request that are going to be produced?

A      I'm not aware of any non-privileged documents, no.

Q      So, let's just go through these one by one.

Exhibit -- I'm sorry, Request 236, produce documents supporting or suggesting that the 2012 theft at Renato Corti factory referenced in the police report attached to Exhibit A did not occur.

WGACA's response is that it will produce non-privileged documents that are responsive to this request.

My question is, Mr. Bober, what documents does -- what non-privileged documents responsive to this request does WGACA have that supports the suggestion the 2012 theft did not

occur?

A          We only have privileged documents.

Q          Are you going to be producing those privileged documents in this litigation?

A          Ask counsel that.

Q          All right.  So let's go to 273, the next one.  Produce documents supporting --

A          273?

Q          273.

A          I don't have -- oh, wait a second.  I don't have 273 on this, I go up to 243.

Q          I'm sorry, 237.  Dyslexic.

A          I see it.

Q          "Produce documents supporting or suggesting that the 12 items detailed in the Second Amended Certification of Robin Gruber attached as exhibit B were made in a factory which made genuine Chanel products."

WGACA responds that it will produce non-privileged documents that are responsive to this request.

My question to you is:  What non-privileged documents does WGACA have that supports its suggestion that the 12 items detailed in the second amended certification of Robin Gruber

were made in a factory which made genuine Chanel product?

A    As far as I know in those 12, it's talking about those 12 items, our documentation is our authentication.

Q    So the only information, the only documentation evidence that WGACA has to support its claim that the items that are listed in Exhibit B were made in a factory that made genuine Chanel products is the 47,000 spreadsheet we looked at?

A    Well, yeah, but then it got into --

MR. KIDDÉ:  Objection --

COURT REPORTER:  I'm sorry --I'm sorry, what was that?

MR. PRICE:  He didn't give a response.

MR. KIDDÉ:  I made an objection, I'm not sure why he stopped.

THE WITNESS:  I'm not reading this.

BY MR. PRICE:

Q    I mean, it's simple, WGACA's taking the position that the 12 items in Exhibit B to the Second Amended Certification were made at the factory which made genuine Chanel products.

My question to you is what non-privileged documents does WGACA have that

supports that?

A    And I said we don't have any.

Q    Okay, thank you.

Number 238, the next one, documents supporting or suggesting that the first 11 items detailed in the spreadsheet -- I'm sorry, detailed in the Second Amended Certification of Robin Gruber attached as Exhibit B were made in the Bianchi and Nardi factory?

A    It's the same answer.

Q    Let me just ask the question.

What non-privileged documents does WGACA have in its possession, custody or control that support the suggestion that those 11 items were made in the Bianchi and Nardi factory?

A    None.

Q    Thank you.

COURT REPORTER:  Were made in the which factory?

MR. PRICE:  Bianchi, B-i-a-n-c-h-i, and Nardi, N-a-r-d-i.

COURT REPORTER:  Thank you.

BY MR. PRICE:

Q    So 239, any documents supporting or suggesting that Chanel inspected the quality and

approved the sale of the 51 items detailed in Paragraph 10 of the Declaration of Jennifer Bleys attached as Exhibit C.

WGACA indicated that it's going to be producing non-privileged documents that are responsive to the request.

My question to you is: What non-privileged documents does WGACA have that support or suggest that Chanel inspected the quality of and approved the sale of the 51 items detailed in Paragraph 9 of the Declaration of Jennifer Bleys?

A       We only have privileged documents.

Q       So WGACA has no non-privileged documents that support that, right?

A       We have privileged documents.

Q       And no non-privileged documents?

MR. KIDDÉ:  Dylan, Dylan, Dylan?

MR. PRICE:  Yeah.

KIDDÉ:  Can you hear me because I was frozen, I did not get the last -- I think I know what the question was, was that about 239?

MR. PRICE:  Yup, 239.

MR. KIDDÉ:  Okay.  All right.  And I assume I got the tail end of the response.

THE WITNESS:  Tom, privileged

documents that's all we have.

BY MR. PRICE:

Q        And you're not waving the privilege on those documents, right?

A        I don't know what that means.

Q        Well, you're not going to be producing those documents in this litigation based on privilege, correct?

A        I'm not sure.  I don't know what -- I would have to seek advice on that, I'm not an attorney.

Q        Well, now's the time to answer the question so...

A        Well, I'm going to withhold answering the question until I get advice.

COURT REPORTER:  I think Tom is frozen again.  Tom is frozen again.

MR. PRICE:  Just give him a minute.

THE WITNESS:  Are you waiting for me?

MR. PRICE:  No, we're waiting for Tom to get back on the line.

THE WITNESS:  Oh, okay.  Did we lose him?

MR. PRICE:  Yes.

THE WITNESS:  What happened, Tom?

Page 226

stolen serial number bags.  This portion of the chart refers to a different subset of bags that have been identified by Chanel.

And you understand that Chanel has identified 51 Chanel-branded items sold by WGACA, that Chanel claims are not genuine because they didn't go through this quality control inspection and weren't authorized for sale.

Do you understand that, generally?

A        Yes.

Q        And do you recognize this chart, which starts on the -- Page 2 of 5, and it continues on to Page 5 of 5.  Do you recognize this chart to be the product -- those 51 products that have been identified by Chanel?

A        Yes, I do.

Q        Along the lines of my prior questioning, as you sit here today, WGACA has no evidence that any of these 51 items that are reflected in this spreadsheet, on Exhibit 1010, were made in an authorized Chanel factory; is that right?

A        We have no evidence that 47,000 items were made at authorized Chanel factories.

Q        Okay.  And then certainly you wouldn't have that evidence as to these 51; is that right?

A        We do not.

Q        And similar to the stolen serial numbers bag -- bags that we looked at in the prior chart, WGACA, as you sit here today, cannot tell me where any of these 51 items was manufactured; is that right?

A        That's correct.

Q        And WGACA has no evidence that any of these 51 items on the chart we're looking at now, on Exhibit 1010, went through Chanel's quality control procedures, right?

A        Correct.

Q        And WGACA has no evidence, as you sit here today, that any of the 51 items reflected in this chart, on Exhibit 1010, were subject to -- were the subject of a first sale by Chanel, correct?

MR. KIDDÉ:  Objection, calls for a legal conclusion.

THE WITNESS:  Yeah, I'm not going to answer that, I wouldn't know that.

BY MR. PRICE:

Q        But Chanel has no evidence that any of these 51 items were sold by Chanel, whether to a Chanel boutique or to a third-party, right?

MR. KIDDÉ:  Dylan, just -- you crossed

over again, you said Chanel has no evidence, I believe you meant WGACA.

MR. PRICE:  My apologies, I appreciate that.  Let me back up.

BY MR. PRICE:

Q          As you sit here today, WGACA has no evidence that any of these 51 items that are on this chart depicted in Exhibit 1010 were sold by Chanel, correct?

A          Correct.

Q          And is it also true that WGACA has no records, apart from its -- the 47,000-item spreadsheet, that confirmed that these 51 items were, in fact, authenticated by WGACA?

MR. KIDDÉ:  Objection, asked and answered.

THE WITNESS:  Yeah, I -- it's in our database and it was authenticated.

BY MR. PRICE:

Q          Got it, so that's what I'm trying to get at.

WGACA's position is that if it's on the 47,000-items spreadsheet it's been authenticated but, as to any particular item on that spreadsheet, there are no other records that would reflect that

Page 229

authentication; is that right?

A        Not that I know of.

Q        Okay.  Okay.  Now I want to back up and look at the chart with the three entries that we skipped over, which is -- it's at the top, it's document 124-2 Page 2 of 2.

A        I have it.

Q        Okay.

MR. PRICE:  Is Tom still with us?

COURT REPORTER:  No.

MR. PRICE:  We lost him again?

COURT REPORTER:  Jeff, you want to take us off the record.

THE VIDEOGRAPHER:  Going off the video record, the time is 4:36 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  We're back on the video record at 4:48 p.m.

MR. PRICE:  So this is Dylan Price for Chanel.  Given the technical difficulties that we've been experiencing with Mr. Kiddé, his connection, the parties agree that we're going to suspend the deposition of Mr. Bober.

Mr. Bober has agreed to come back on a day to be mutually agreed to between the

**Page 234**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 18-cv-2253-LLS

-------------------------------x

CHANEL, INC.,

Plaintiff,

- against -

WGACA, LLC, WHAT COMES AROUND
GOES AROUND LLC d/b/a WHAT GOES
AROUND COMES AROUND, MHW
PROPERTIES, INC., WGACA WEB, LLC,
PINES VINTAGE, INC., VINTAGE
DESIGNS LTD., and WCAGA LA, LLC,

Defendants.

-------------------------------x

February 3, 2021
10:02 a.m.

Continued Videotaped Deposition of
FRANK BOBER, taken by Plaintiff, pursuant
to 30(b)(6) Notice, held via Zoom
videoconference, before Todd DeSimone, a
Registered Professional Reporter and Notary
Public of the States of New York and New
Jersey.

**Page 235**

APPEARANCES:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars
Suite 1600
Los Angeles, California 90067
        Attorneys for Plaintiff
BY:    DYLAN J. PRICE, ESQ.
          dprice@sheppardmullin.com


LEWIS BRISBOIS BISGAARD & SMITH LLP
633 West 5th Street
Los Angeles, California 90071
          Attorneys for Defendants
          WGACA, LLC, et al.
BY:    THOMAS S. KIDDÉ, ESQ.
          thomas.kidde@lewisbrisbois.com


ALSO PRESENT:

   STEVE MOLINA, Paralegal, Sheppard Mullin

   JEFF MENTON, Videographer

Page 236

F. BOBER

THE VIDEOGRAPHER: Good morning. We are going on the video record. The time is approximately 10:02 a.m. on Wednesday, February the 3rd, 2021.

This is video media disk one of the continued video-recorded deposition of Frank Bober, the designated 30(b)(6) representative. This deposition is being held remotely.

My name is Jeff Menton, I am the certified legal videographer, the court reporter is Todd DeSimone, and we are both from Veritext New York.

All counsel consented to this remote video arrangement and waived any objection to this manner of reporting.

Counsel will now state their appearances and affiliation for the record beginning with the noticing attorney, and after that the court reporter will swear the witness in.

MR. PRICE: Dylan John Price with Sheppard, Mullin, Richter & Hampton LLP for plaintiff Chanel, Inc.

Page 237

F. BOBER

MR. KIDDÉ:  Thomas Kiddé of Lewis Brisbois Bisgaard & Smith for defendants and the witness.

     *    *    *

F R A N K   B O B E R, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. PRICE:

Q.   So, Mr. Bober, this is your continued deposition.  We had a session last Wednesday, if you recall.

Did you do anything in between the end of our last deposition, the last session of the deposition on last Wednesday, and this morning to prepare for this continued part of your deposition?

A.   Yes.

Q.   And what did you do?

A.   I looked at numbers of documents, some exhibits, the interrogatories.  I spoke with Seth Weisser, the CEO of What Goes Around, and with Ambria Mische who is senior vice

F. BOBER

spreadsheet, but some of the pads, we might have bought those in Japan, but primarily we bought these items from that Petite Luxury.

Q. Okay. And what steps did WGACA take to ensure that Petite Luxury was a trusted source?

A. So Seth had the relationship, I mean, he is our CEO and he is an expert, and so we relied on him when those items were purchased.

Q. And what did Seth do to determine that Petite Luxury was a source that could be trusted?

A. I'm not sure of that.

Q. Did WGACA reach out to any other companies that had bought items from Petite Luxury to kind of do a background check so to speak?

A. I think he did talk to other people, but, again, it's not his MO to be careless about the products we buy, so this was his contact and I think he felt good about what he was buying and he ended up

F. BOBER

this side of the store, wallets on this side?

A.     Correct.

Q.     Okay.  And what section of WGACA's retail store, I think you said they might have been sold at the counter, but do you know what section of WGACA's retail store these point of sale items that were sold in the Beverly Hills store were sold in?

A.     I don't know.

Q.     How, if at all, were these items that were sold in WGACA's Beverly Hills retail store, how were they advertised to WGACA's customers?

MR. KIDDÉ:  Objection, assumes facts not in evidence.

A.     I don't know that we -- when you say "advertised," what do you mean?

Q.     Well, so, how were they described to customers on the price tags of the items?

A.     I don't know the answer to that.

F. BOBER

location was during that same time period, the 2017-2019 period?

A.    I don't remember.  It was a woman.  I don't remember her name.

Q.    Do you know why ten of these items made its way to the Beverly Hills retail store and not the Soho retail store? Was there any discussions about where those ten items would wind up?

A.    I don't know that.

Q.    Would that be a head of merchandising question or a head of retail question?

A.    I think that would be a Seth question, just because he was the one that had the relationship, and as the CEO they all reported to him, so I think he would probably know the answer to that.

Q.    Got it.  As you sit here today, are you aware of WGACA having disclosed to its retail customers at its Beverly Hills retail location that these items that were sold at that location were manufactured to serve as counter support items?

Page 364

F. BOBER

Q. Do the purchase orders, whether created by WGACA or the wholesale partner, do they contain terms?

MR. KIDDÉ: Same.

A. I'm quite sure they do.

Q. As you sit here today, can you identify any of them?

A. Well, Dillard's has a purchase order that would have on the back of it, you know, whatever terms and conditions they have. Most companies of this type, particularly the larger ones, have purchase orders with terms.

Q. Okay. As you sit here today, do you know what any of the specific terms in the purchase orders are?

A. No.

Q. And that goes for any of the wholesale clients?

A. I don't know them.

Q. Who would be familiar with the terms of the purchase orders at WGACA?

A. Any of the -- particularly Jacqueline, the administrator, she is the

Page 365

F. BOBER

director, she would -- she would potentially know the terms.

I'll bet you that nobody has turned over an order and read it. So I could say who should know it, which would be Jacqueline, and maybe I should know it, but I don't, and she doesn't, and I bet you if you lined up 100 sellers and say what's on the back of the order from a customer, they wouldn't know.

Q. Okay. But if you wanted to find out, you could go to the purchase order and find that out, right?

A. Yeah.

Q. So other than this lawsuit, has WGACA ever been sued for the violation of any intellectual property rights of the brands whose products it carries?

A. No.

Q. WGACA has never been sued for copyright infringement by any of the brands?

A. Correct.

Q. And never sued for trademark

F. BOBER

Salesforce CRM?

     A.     Correct.

     Q.     Does that CRM allow you to track through the process to the purchase, right, so, for example, you send an e-mail, someone clicks on that e-mail, gets taken to the website and ultimately makes a purchase, does the CRM provide that level of detail or information?

               MR. KIDDÉ:  Objection, it's vague.

     A.     I don't know.

     Q.     Who would be more familiar with the CRM Salesforce database that might know that?

     A.     Julian.

     Q.     I'm sorry, what was Julian's last name?

     A.     I just looked it up for you. One second.  Guevara, G-u-e-v-a-r-a.

     Q.     So whatever Salesforce's CRM system offers to its clients, you would be able to access that information, right?

     A.     Yup.

F. BOBER

Q.     So other than the CRM Salesforce program, does WGACA track the success or the performance of its e-mail campaigns in any other way?

A.     All I know is the open rates.

Q.     And that's through the Salesforce CRM, right?

A.     Correct.

Q.     How do the open rates of e-mail blasts that contain the Chanel name or trademark differ from the open rates of other e-mail blasts that don't contain the Chanel name or trademarks?

MR. KIDDÉ:  Objection, misstates his -- well, objection, it is vague, misstates evidence.

A.     I don't know.

Q.     Is that something that the CRM system would show you if you queried the right information?

A.     I would guess they would.

MR. PRICE:  Steve, could you bring up 1017, please.

A.     1017?

Page 483

F. BOBER

is from October of 2014, if somebody came into the store, they would certainly, and they asked hey, I saw the ad, I would like to see the Chanel product, we would certainly be able to show them lots of Chanel product.

Q.     I get that, and I understand that.  But, again, this ad in and of itself is not advertising any specific Chanel product, right?

MR. KIDDÉ:  The document speaks for itself.

A.     This is advertising Chanel product that we have.

Q.     And what Chanel product do you have is this advertising?

A.     We have what we carry, the bags, jewelry, belts.

Q.     Anything else?

A.     Blazers, you know, ready to wear apparel.

Q.     And so did WGACA use the Chanel trademark, these interlocking C's, to promote its breast cancer awareness month

F. BOBER

sale?

A.     I can't answer that.  I don't know.

Q.     And whose decision was it to use the interlocking C's in this advertisement?

A.     I don't know.  It is a long time ago.

Q.     And do you know what discussions WGACA's Marketing Department had concerning this e-mail blast before it was sent out?

A.     I know that we had Chanel product to sell, and so we created this ad, e-mail.

Q.     I'm sorry, were you done?

A.     "E-mail" was the last word I said.

Q.     And the breast cancer awareness sale that was going on, this wasn't limited to Chanel product, right, if a consumer used this code, this awareness code it could get a discount on any of the various brands that WGACA was selling, right?

F. BOBER

A.     I don't know the answer to that.

Q.     Is there anything in the ad that would lead you to believe that it was limited to Chanel product?

A.     Well, the interlocking C's.

Q.     Anything else?

A.     No.

Q.     Does WGACA know or have the ability to determine how many products were purchased using the awareness code that's listed on this e-mail blast?

A.     I don't know.  Maybe.  That's all I can say, maybe.

Q.     Who would know whether that was possible?

A.     Well, I'm not sure that anybody would know now, because it is almost -- or into the seventh year and I'm sure that our data is a little bit different now.  I don't even believe that Llama was invented then or was maybe just getting off -- getting on track.  So I'm not sure whether it could be quantified or not.

Page 486

F. BOBER

Q.    Has anyone to your knowledge at WGACA sought to determine that?

A.    Say that again.

Q.    Yeah.  To your knowledge, has anyone at WGACA checked to determine whether it would be possible to determine how many product types were used -- I'm sorry, were purchased using the awareness code on this e-mail blast?

A.    No.

Q.    And if, I think -- strike that.

I think you testified earlier that if you wanted to figure out the number of people that clicked on the ad, you could do that through the CRM software, right?

A.    We didn't have CRM at that time, so I don't know what we were using. I mean, it looks like we were using a program called Constant Contact, which you can see at the bottom right, which is an e-mail program not linked to any sales, just getting them out and maybe knowing the open rates, that's about it.

Q.    Does WGACA still have Constant

F. BOBER

Q.    Okay.  So why were these different stylizations of Chanel's name used in WGACA's advertisements?

A.    Well, I think that you'll see that -- it will take me a second -- I think that you'll see that that's the only one, and I think that we probably wouldn't do that any more, because that -- and we don't do that.  We don't change the mark.

Q.    You did it in that instance that I just pointed out?

A.    It looks that way.

Q.    Okay.  And why don't you do it anymore?

A.    I think we don't want to fool around with the logo of the company that you're showing.  I think that was probably a mistake.

Q.    Who designed these stylizations; do you know?

A.    I don't know who did this one. I think it's pretty old.

Q.    And can you tell me, you know, the dates on which any of these specific

F. BOBER

stylizations were first used?

A.      No.

Q.      Or when they were created?

A.      No.  But I know that they are older because many of them, or a number of them, have our old address at 155 Van Wagenen.  We haven't been there for about three years.  So they have to be at least as old as that, if not older.  They were at that address for a long time.

Q.      Okay.

MR. PRICE:  Steve, can you bring up Exhibit 1018 as well.

MR. MOLINA:  What number was that again?

MR. PRICE:  1018, please.

MR. MOLINA:  1018 is now up.

A.      All right, let me refresh. 1018, okay.

Q.      Okay.  So a couple more e-mail blasts here, right?

A.      I see them.

Q.      Okay.  And, again, we have the situation where Chanel's name is being

                    F. BOBER

decision to stop using the hashtag?

        A.      I think Seth Weisser made that

decision, and I think I was involved in

that decision as well.

        Q.      Were there any written

communications about the decision to stop

using the hashtag?

        A.      Not that I know of.

        Q.      What do you recall about the

discussions that you had with Mr. Weisser

about stopping using the WGACACHANEL

hashtag?

        A.      My recollection is that it

doesn't help us and it could just put us in

a position of potentially somehow conveying

association that we didn't have and didn't

want to have, and so we just felt it was

prudent to not use it.

        Q.      Okay.  What other hashtags,

besides the WGACACHANEL hashtag, has WGACA

used that featured the Chanel name?

        A.      I don't know the answer to

that.

        Q.      Has WGACA used the Coco Chanel

F.  BOBER

hashtag?

     A.     I don't know the answer, honestly.

     Q.     So that would be a question for the Marketing Department?

     A.     Well --

     Q.     What's left of the Marketing Department.

     A.     If we had one, it might be.

     Q.     Okay.

     A.     I don't think we have a big-time hashtag, you know, we're not using hashtags as much as we used to.  It's not as -- we didn't obviously feel it is that important.

          MR. PRICE:  Steve, could you bring up Exhibit 1020, please.

          MR. MOLINA:  1020 is now up.

     A.     Okay, let me look, 1020.

     Q.     WGACA at times in the past have used photographs from Chanel runway shows and Chanel models on its social media posts, right?

     A.     I'm sorry, say that again.

F. BOBER

A.     It is a big document.

MR. KIDDÉ:  It is overrated.

MR. PRICE:  My questions I know sometimes don't make sense but they probably really didn't make sense then.

A.     Okay.

Q.     So here we have WGACA posting old Chanel advertisements to its Pinterest page, right?

A.     It looks that way.

Q.     Okay.  And I was referring to the second page where you have an advertisement for the bath products.  Do you see that?

A.     Yup.

Q.     So clearly WGACA wasn't selling these bath products, correct?

A.     Right.

Q.     And why was WGACA, I will ask it again, because I think it needs to be clear for the record, why was WGACA posting these old Chanel advertisements to its Pinterest page?

A.     I don't know.

                    F. BOBER

posts."

So Ms. Parker testified that what this means is that WGACA can tag a product that is featured in the post and it would link back to its website listing for the product, and therefore if you are an Instagram user, if you hovered over a product, you would get the link to purchase the product in the website.

Does that -- is that consistent with your understanding of what WGACA can do?

A.      Yes.

Q.      Okay.  How does WGACA track the purchases that are made via its social media in post tagging?

A.      How does WGACA track -- I don't know the answer to that.

Q.      Who would know?

A.      I think Julian would know.

Q.      And so I take it you don't know how much revenue WGACA has generated from tagging Chanel-branded items in its Instagram posts; is that right?

F. BOBER

A.    That's correct.

Q.    Okay.  So we talked about the -- about how WGACA tracks its e-mail blasts, and it is the CRM system.  How does WGACA track or measure its performance of its social media posts?

A.    I don't know the answer to that.

Q.    Are you familiar with Google Analytics?

A.    Yeah.

Q.    Does WGACA use Google Analytics to track the performance of its social media posts?

MR. KIDDÉ:  Objection, it's vague.

A.    You know, I don't think so, but I really don't know.

Q.    Have you heard of a program called Bitly?

A.    Which one?

Q.    Bitly, B-i-t-l-y.

A.    B-i-t-l-y, B as in boy?

Q.    Yeah.

F. BOBER

A.     I have not.

Q.     So you don't know whether WGACA uses Bitly to track the performance of its social media posts?

A.     I don't.

Q.     Who would know the answer to these questions, how WGACA tracks or measures the performance of its social media marketing?

A.     I think Julian and Ambria.

MR. PRICE:  Steve, could you pull up the exhibit that is marked, it is an Excel file, and it is marked click-through data, and introduce that as the next in order, please.

A.     What am I looking for?

MR. MOLINA:  I'm introducing 1192.

(Exhibit 1192 marked for identification.)

Q.     It is 1192 I think.

A.     1192?

Q.     Uh-huh.

A.     I see it.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CHANEL, INC.,

                        Plaintiff,                         Case No. 18-cv-2253(LLS)

         v.

WGACA, LLC, WHAT COMES AROUND GOES
AROUND LLC d/b/a WHAT GOES AROUND
COMES AROUND, MHW PROPERTIES, INC.,
WGACA WEB, LLC, PINES VINTAGE, INC.,
VINTAGE DESIGNS LTD., WGACA LA, INC.,

                        Defendants.
-------------------------------------------------------------------X

| | |
|---|---|
| PROPOUNDING PARTY: | PLAINTIFF CHANEL, INC. |
| RESPONDING PARTIES: | DEFENDANTS WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC D/B/A WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC. WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., AND WCAGA LA, LLC |
| SET NO.: | THREE |
| NUMBERS: | 52-142 |

## DEFENDANTS' RESPONSES TO PLAINTIFF'S
## THIRD SET OF REQUESTS FOR ADMISSION

**PLEASE TAKE NOTICE**, that pursuant to Rules 26 and 36 of the Federal Rules of Civil

Procedure, Defendants respond to the Plaintiff's Third Set of Requests for Admission set forth

below, in writing, within the time allotted under said Rules.

## **GENERAL OBJECTIONS**

1.     Defendants object to the Definitions and Instructions in Plaintiff's Request to the

extent they seek to impose any requirements to provide discovery inconsistent with, and/or not

required by, the Federal Rules of Civil Procedure or this Court's Local Civil Rules.

4851-0883-1954.2

2.      Defendants reserve the right to supplement and/or amend these responses up to and through trial.

3.      Defendants object to Plaintiff's Request to the extent it calls for the production of privileged, confidential, proprietary and/or personal information concerning individuals and entities that are not parties to this action.

4.      Each of these general objections is incorporated by reference into the following responses.

### RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 52:**

Admit that WGACA sold WGACA Q6B01Z1IR9000 identified by Chanel Serial No. 17688191.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Defendants cannot admit or deny that Defendants sold WGACA Q6B01Z1IR9000 identified by Chanel Serial No. 17688191, but admit that Defendants believe they sold a Chanel product with WGACA SKU Q6B01Z1IR9000.

**REQUEST FOR ADMISSION NO. 53:**

Admit that WGACA sold WGACA Q6BAQP0FI4018 identified by Chanel Serial No. 17688004.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Admit

**REQUEST FOR ADMISSION NO. 54:**

Admit that WGACA sold WGACA Q6B01A3PK5003 identified by Chanel Serial No. 17688283.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Admit

**REQUEST FOR ADMISSION NO. 55:**

Admit that WGACA sold WGACA Q6B01AIK7008 identified by Chanel Serial No.

17690211.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Admit

**REQUEST FOR ADMISSION NO. 56:**

Admit that WGACA sold WGACA Q6B0WW0FKB197 identified by Chanel Serial No.

17703597.

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

Admit

**REQUEST FOR ADMISSION NO. 57:**

Admit that WGACA sold WGACA Q6BBJY1IM7002 identified by Chanel Serial No.

17706404.

**RESPONSE TO REQUEST FOR ADMISSION NO. 57:**

Admit

**REQUEST FOR ADMISSION NO. 58:**

Admit that WGACA sold WGACA Q6B0WW0FKB222 identified by Chanel Serial No.

17710109.

**RESPONSE TO REQUEST FOR ADMISSION NO. 58:**

Admit

**REQUEST FOR ADMISSION NO. 59:**

4851-0883-1954.2

Admit that WGACA sold WGACA Q6B0100FK4000 identified by Chanel Serial No. 17711485.

**RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

Admit

**REQUEST FOR ADMISSION NO. 60:**

Admit that WGACA sold WGACA Q6B0100FK4001 identified by Chanel Serial No. 17714417.

**RESPONSE TO REQUEST FOR ADMISSION NO. 60:**

Admit

**REQUEST FOR ADMISSION NO. 61:**

Admit that WGACA sold WGACA Q6BBJY1IM7000 identified by Chanel Serial No. 17714847.

**RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Admit

**REQUEST FOR ADMISSION NO. 62:**

Admit that WGACA sold WGACA Q6B0593PR0000 identified by Chanel Serial No. 17703424.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Defendants deny that WGACA sold WGACA Q6B0593PR0000 identified by Chanel Serial No. 17703424.

**REQUEST FOR ADMISSION NO. 63:**

Admit that WGACA sold WGACA Q6A0MK0F0B000 identified by Chanel Serial No. 102181841.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Admit

**REQUEST FOR ADMISSION NO. 64:**

Admit that WGACA sold WGACA Q6B01A3EX1001 identified by Chanel Serial No.

17744200.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Admit

**REQUEST FOR ADMISSION NO. 65:**

Admit that WGACA SKU No. Q6B01Z1IR9000 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Defendants object to the Request as the term "featured" is vague and ambiguous.

Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL

Trademark.

**REQUEST FOR ADMISSION NO. 66:**

Admit that WGACA SKU No. Q6BAQP0FI4018 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

Defendants object to the Request as the term "featured" is vague and ambiguous.

Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL

Trademark.

**REQUEST FOR ADMISSION NO. 67:**

Admit that WGACA SKU No. Q6B01A3PK5003 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 67:**

4851-0883-1954.2

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 68:**

Admit that WGACA SKU No. Q6B01A1IK7008 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 68:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 69:**

Admit that WGACA SKU No. Q6B0WW0FKB197 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 69:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 70:**

Admit that WGACA SKU No. Q6BBJY1IM7002 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 70:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 71:**

Admit that WGACA SKU No. Q6B0WW0FKB222 featured CHANEL Trademarks.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 71:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the items with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 72:**

Admit that WGACA SKU No. Q6B0100FK4000 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 72:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 73:**

Admit that WGACA SKU No. Q6B0100FK4001 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 73:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 74:**

Admit that WGACA SKU No. Q6BBJY1IM7000 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 74:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 75:**

Admit that WGACA SKU No. Q6B0593PR0000 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 75:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 76:**

Admit that WGACA SKU No. Q6A0MK0F0B000 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 76:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 77:**

Admit that WGACA SKU No. Q6B01A3EX1001 featured CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 77:**

Defendants object to the Request as the term "featured" is vague and ambiguous. Without waiving the foregoing, Defendants admit the item with this SKU included a CHANEL Trademark.

**REQUEST FOR ADMISSION NO. 78:**

Admit that the information recorded on WGACA 000290011 is accurate.

**RESPONSE TO REQUEST FOR ADMISSION NO. 78:**

Defendants object as to the term "accurate" as vague. Without waiving the foregoing, Defendants cannot admit or deny this Request but do admit that they believe the information to

4851-0883-1954.2

be correct but that it is possible there could be errors in the entry of data which are manually entered into the database. All items included in WGACA 000290011 were also authenticated through Defendants' authentication process prior to its sale and are genuine Chanel-branded products.

**REQUEST FOR ADMISSION NO. 79:**

Admit that the information recorded on WGACA_000290011 is kept in the ordinary course of business by WGACA.

**RESPONSE TO REQUEST FOR ADMISSION NO. 79:**

Defendants object to this Request as being vague and ambiguous. The document identified as WGACA_000290011 was created at Chanel's request and is not a document kept in the ordinary course of business.

**REQUEST FOR ADMISSION NO. 80:**

Admit that WGACA used the hashtag #WGACACHANEL without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 80:**

Defendants object to the Request as it is vague and ambiguous as it relates to "used" and hashtags. The Request is also irrelevant and nonsensical as the request ignores the functionality of hashtags for social media purposes. Neither WGACA nor any other entity needs permission from anyone to employ hashtags as part of social media activity. As explained by the American Bar Association: "A hashtag is a form of metadata comprised of a word or phrase prefixed with the # symbol. The hashtag started on Twitter in 2006 and then expanded to Instagram and Facebook in 2011 and 2013, respectively. When initially adopted, the hashtag was created as an online categorization tool by which users could identify or facilitate a search for a keyword or

topic of interest by typing # along with a word or phrase (e.g., #OOTD or #scandal). Placing a hashtag at the beginning of a word or phrase on Twitter, Instagram, and Facebook turns the word or phrase into a hyperlink attaching it to other topically related posts, making that conversation sortable by topic on the respective social media platform. If the hashtag goes viral, it becomes a trending topic, which is the ultimate goal for any social media marketing activity." The Full-Court Press on #Hashtag Trademarks, The American Bar Association, 2016 by Radiance W. Harris.

Moreover, Courts have held that hashtag "usage" is not actionable as a trademark infringement because of the nature of hashtags and their purpose in social media. "…hashtags are merely descriptive devices, not trademarks, unitary or otherwise, in and of themselves." *Eksouzian v. Albanese,* No. CV 13-00728-PSG-MAN, 2015 U.S. Dist. LEXIS 104793, at *23 (C.D. Cal. Aug. 7, 2015). *See also*, *AOP Ventures, Inc. v. Steam Distribution* 2016 U.S. Dist. LEXIS 193035 (October 11, 2016). Without waiving the foregoing, Defendants admit that one time their social media included #WGACACHANEL .

**REQUEST FOR ADMISSION NO. 81:**

Admit that WGACA used the hashtag #CHANEL without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 81:**

Defendants object to the Request as it is vague and ambiguous as it relates to "used" and hashtags. The Request is also irrelevant and nonsensical as the request ignores the functionality of hashtags for social media purposes. As explained by the American Bar Association: "A hashtag is a form of metadata comprised of a word or phrase prefixed with the # symbol. The hashtag started on Twitter in 2006 and then expanded to Instagram and Facebook in 2011 and 2013, respectively. When initially adopted, the hashtag was created as an online categorization tool by which users could identify or facilitate a search for a keyword or topic of interest by

4851-0883-1954.2

typing # along with a word or phrase (e.g., #OOTD or #scandal). Placing a hashtag at the beginning of a word or phrase on Twitter, Instagram, and Facebook turns the word or phrase into a hyperlink attaching it to other topically related posts, making that conversation sortable by topic on the respective social media platform. If the hashtag goes viral, it becomes a trending topic, which is the ultimate goal for any social media marketing activity." *The Full-Court Press on #Hashtag Trademarks*, The American Bar Association, 2016 by Radiance W. Harris.

Moreover, Courts have held that hashtag "usage" is not actionable as a trademark infringement because of the nature of hashtags and their purpose in social media. "…hashtags are merely descriptive devices, not trademarks, unitary or otherwise, in and of themselves." *Eksouzian v. Albanese*, No. CV 13-00728-PSG-MAN, 2015 U.S. Dist. LEXIS 104793, at *23 (C.D. Cal. Aug. 7, 2015). *See also*, *AOP Ventures, Inc. v. Steam Distribution* 2016 U.S. Dist. LEXIS 193035 (October 11, 2016). Without waiving the above objections, Defendants have reviewed their records and have found no indication that they have ever "used" this hashtag and therefore deny the Request.

**REQUEST FOR ADMISSION NO. 82:**

Admit that WGACA used the hashtag #HBDCOCO without permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 82:**

Defendants object to the Request as it is vague and ambiguous as it relates to "used" and hashtags. The Request is also irrelevant and nonsensical as the request ignores the functionality of hashtags for social media purposes. As explained by the American Bar Association: "A hashtag is a form of metadata comprised of a word or phrase prefixed with the # symbol. The hashtag started on Twitter in 2006 and then expanded to Instagram and Facebook in 2011 and 2013, respectively. When initially adopted, the hashtag was created as an online categorization

tool by which users could identify or facilitate a search for a keyword or topic of interest by typing # along with a word or phrase (e.g., #OOTD or #scandal). Placing a hashtag at the beginning of a word or phrase on Twitter, Instagram, and Facebook turns the word or phrase into a hyperlink attaching it to other topically related posts, making that conversation sortable by topic on the respective social media platform. If the hashtag goes viral, it becomes a trending topic, which is the ultimate goal for any social media marketing activity." *The Full-Court Press on #Hashtag Trademarks*, The American Bar Association, 2016 by Radiance W. Harris.

Moreover, Courts have held that hashtag "usage" is not actionable as a trademark infringement because of the nature of hashtags and their purpose in social media. "…hashtags are merely descriptive devices, not trademarks, unitary or otherwise, in and of themselves." *Eksouzian v. Albanese*, No. CV 13-00728-PSG-MAN, 2015 U.S. Dist. LEXIS 104793, at *23 (C.D. Cal. Aug. 7, 2015). *See also*, *AOP Ventures, Inc. v. Steam Distribution* 2016 U.S. Dist. LEXIS 193035 (October 11, 2016). Without waiving the above objections, Defendants admit that they have "used" this hashtag.

**REQUEST FOR ADMISSION NO. 83:**

Admit that WGACA used the name of Coco Chanel without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 83:**

Defendants object to the Request as it is vague and ambiguous as it relates to "used". The request also is not relevant as it is not related to any issue in this case.

**REQUEST FOR ADMISSION NO. 84:**

Admit that WGACA used the likeness of Coco Chanel without the permission of Chanel.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 84:**

Defendants object to the Request as it is vague and ambiguous as it relates to "used" and "likeness". Defendants further object to this Request as it seeks information not relevant to the claims and defenses in this action.

**REQUEST FOR ADMISSION NO. 85:**

Admit that WGACA used photographs of past Chanel runway shows without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 85:**

Objection, the Request is vague and ambiguous and not relevant to any issue in this case. Defendants cannot know the sponsorship or who is responsible for putting on any particular event as it relates to some event that is captured by a photograph. Moreover, there are no claims in this action that would render such a request relevant. As such, Defendants are unable to admit or deny the Request.

**REQUEST FOR ADMISSION NO. 86:**

Admit that WGACA used stylized CHANEL Trademarks (separate and apart from those on CHANEL-branded products and items themselves).

**RESPONSE TO REQUEST FOR ADMISSION NO. 86:**

Defendants object to this Request as it seeks information not relevant to the claims and defenses in this action. Defendants further object to this Request as the phrase "stylized CHANEL Trademarks" is vague and ambiguous.

**REQUEST FOR ADMISSION NO. 87:**

Admit that WGACA used past Chanel advertisements without the permission of Chanel.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 87:**

Defendants object to the Request as it is vague and ambiguous as to the terms "used" and "advertisement". Without waiving the above objections, Defendants respond that they have checked their records and have found no indication that they have ever "used" a Chanel advertisement and thus deny the Request.

**REQUEST FOR ADMISSION NO. 88:**

Admit that WGACA used photographs of CHANEL-branded products that WGACA does not offer for sale without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 88:**

Defendants object to this Request as it seeks information not relevant to the claims and defenses in this action and is vague and ambiguous.

**REQUEST FOR ADMISSION NO. 89:**

Admit that WGACA's stores displayed items bearing the CHANEL Trademarks (separate and apart from those being offered for sale) without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 89:**

Defendants object to this Request as it seeks information not relevant to the claims and defenses in this action and is vague and ambiguous.

**REQUEST FOR ADMISSION NO. 90:**

Admit that WGACA used the discount code COCO20 without the permission of Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 90:**

Admit.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 91:**

Admit that WGACA has no records with respect to the identity of the person who authenticated each of the items listed on WGACA_000290011.

**RESPONSE TO REQUEST FOR ADMISSION NO. 91:**

Admit.

**REQUEST FOR ADMISSION NO. 92:**

Admit that WGACA has no records with respect to the documentation of the factors underlying WGACA's authentication of the items listed on WGACA_000290011.

**RESPONSE TO REQUEST FOR ADMISSION NO. 92:**

Defendants object to this Request as intelligible, particularly as the term "factors" is vague and ambiguous.  Without waiving the foregoing objections, Defendants deny this Request.

**REQUEST FOR ADMISSION NO. 93:**

Admit that WGACA_000290011 does not contain recordings of all the individual characteristics required to authenticate each item.

**RESPONSE TO REQUEST FOR ADMISSION NO. 93:**

Defendants object to this Request as the terms "recordings" and "individual characteristics" are vague and ambiguous and as a result of such, Defendants can neither admit or deny this Request.

**REQUEST FOR ADMISSION NO. 94:**

Admit that Devyn Shaughnessy has not been employed by Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 94:**

Admit.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 95:**

Admit that Devyn Shaughnessy has not received any formal training with regard to the authentication of CHANEL-branded products.

**RESPONSE TO REQUEST FOR ADMISSION NO. 95:**

Defendants object to this Request as the phrase "formal training" is vague and ambiguous.

Without waiving the foregoing, Defendants deny that Ms. Shaughnessy has not received any training with regard to the authentication of Chanel-branded products, but admit that Ms. Shaughnessy has not received training by Chanel.

**REQUEST FOR ADMISSION NO. 96:**

Admit that Sun Li has not been employed by Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 96:**

Admit.

**REQUEST FOR ADMISSION NO. 97:**

Admit that Sun Li has not received any formal training with regard to the authentication of CHANEL-branded products.

**RESPONSE TO REQUEST FOR ADMISSION NO. 97:**

Defendants object to this Request as the phrase "formal training" is vague and ambiguous.

Without waiving the foregoing, Defendants deny that Ms. Li has not received any training with regard to the authentication of Chanel-branded products, but admit that Ms. Li has not received training by Chanel.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 98:**

Admit that Paige Rubin has not been employed by Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 98:**

Admit.

**REQUEST FOR ADMISSION NO. 99:**

Admit that Paige Rubin has not received any formal training with regard to the authentication of CHANEL-branded products.

**RESPONSE TO REQUEST FOR ADMISSION NO. 99:**

Defendants object to this Request as the phrase "formal training" is vague and ambiguous.

Without waiving the foregoing, Defendants deny that Ms. Rubin has not received any training with regard to the authentication of Chanel-branded products, but admit that Ms. Rubin has not received training by Chanel.

**REQUEST FOR ADMISSION NO. 100:**

Admit that Seth Weisser has not been employed by Chanel.

**RESPONSE TO REQUEST FOR ADMISSION NO. 100:**

Admit.

**REQUEST FOR ADMISSION NO. 101:**

Admit that Seth Weisser has not received any formal training with regard to the authentication of CHANEL-branded products.

**RESPONSE TO REQUEST FOR ADMISSION NO. 101:**

Defendants object to this Request as the phrase "formal training" is vague and ambiguous.

4851-0883-1954.2

Without waiving the foregoing, Defendants deny that Mr. Weisser has not received any training with regard to the authentication of Chanel-branded products, but admit that Mr. Weisser has not received training by Chanel.

**REQUEST FOR ADMISSION NO. 102:**

Admit that Defendants have no admissible evidence with regard to a first sale by Chanel with regard to any items identified in WGACA_000290011.

**RESPONSE TO REQUEST FOR ADMISSION NO. 102:**

Deny.

**REQUEST FOR ADMISSION NO. 103:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01Z1IR9000 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 103:**

Deny.

**REQUEST FOR ADMISSION NO. 104:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6BAQP0FI4018 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 104:**

Deny.

**REQUEST FOR ADMISSION NO. 105:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01A3PK5003 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 105:**

Deny.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 106:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B01A1IK7008 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 106:**

Deny.

**REQUEST FOR ADMISSION NO. 107:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0WW0FKB197 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 107:**

Deny.

**REQUEST FOR ADMISSION NO. 108:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6BBJY1IM7002 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 108:**

Deny.

**REQUEST FOR ADMISSION NO. 109:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0WW0FKB222 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 109:**

Deny.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 110:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0100FK4000 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 110:**

Deny.

**REQUEST FOR ADMISSION NO. 111:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0100FK4001 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 111:**

Deny.

**REQUEST FOR ADMISSION NO. 112:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6BBJY1IM7000 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 112:**

Deny.

**REQUEST FOR ADMISSION NO. 113:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0593PR0000 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 113:**

Deny.

**REQUEST FOR ADMISSION NO. 114:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6A0MK0F0B000 was made in a Chanel-authorized factory.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 114:**

Deny.

**REQUEST FOR ADMISSION NO. 115:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01A3EX1001 was made in a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 115:**

Deny.

**REQUEST FOR ADMISSION NO. 116:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01Z1IR9000 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 116:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 117:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6BAQP0FI4018 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 117:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 118:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01A3PK5003 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 118:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 119:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B01A1IK7008 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 119:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 120:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B0WW0FKB197 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 120:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to

4851-0883-1954.2

WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 121:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6BBJY1IM7002 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 121:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 122:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B0WW0FKB222 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 122:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 123:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B0100FK4000 was sold by a Chanel-authorized factory.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 123:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 124:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6B0100FK4001 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 124:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 125:**

Admit that Defendants have no admissible evidence that WGACA SKU No. Q6BBJY1IM7000 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 125:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

4851-0883-1954.2

**REQUEST FOR ADMISSION NO. 126:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B0593PR0000 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 126:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the

foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to

WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the

Request is denied.

**REQUEST FOR ADMISSION NO. 127:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6A0MK0F0B000 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 127:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the

foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to

WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the

Request is denied

**REQUEST FOR ADMISSION NO. 128:**

Admit that Defendants have no admissible evidence that WGACA SKU No.

Q6B01A3EX1001 was sold by a Chanel-authorized factory.

**RESPONSE TO REQUEST FOR ADMISSION NO. 128:**

Defendants object to this Request as it is vague and ambiguous. Without waiving the

foregoing, every item sold by WGACA, as listed on WGACA_000290011 was subject to

4851-0883-1954.2

WGACA's authentication process and is a genuine Chanel branded product and, accordingly, the Request is denied.

**REQUEST FOR ADMISSION NO. 129:**

Admit that WGACA SKU No. Q6B01Z1IR9000 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 129:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 130:**

Admit that WGACA SKU No. Q6BAQP0FI4018 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 130:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 131:**

Admit that WGACA SKU No. Q6B01A3PK5003 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 131:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 132:**

Admit that WGACA SKU No. Q6B01A1IK7008 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 132:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 133:**

Admit that WGACA SKU No. Q6B0WW0FKB197 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 133:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to

4851-0883-1954.2

WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 134:**

Admit that WGACA SKU No. Q6BBJY1IM7002 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 134:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 135:**

Admit that WGACA SKU No. Q6B0WW0FKB222 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 135:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 136:**

Admit that WGACA SKU No. Q6B0100FK4000 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 136:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 137:**

Admit that WGACA SKU No. Q6B0100FK4001 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 137:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 138:**

Admit that WGACA SKU No. Q6BBJY1IM7000 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 138:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to

4851-0883-1954.2

WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 139:**

Admit that WGACA SKU No. Q6B0593PR0000 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 139:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 140:**

Admit that WGACA SKU No. Q6A0MK0F0B000 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 140:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 141:**

Admit that WGACA SKU No. Q6B01A3EX1001 features trademarks that are substantially indistinguishable from close copies of the CHANEL Trademarks.

4851-0883-1954.2

**RESPONSE TO REQUEST FOR ADMISSION NO. 141:**

Defendants object to this Request as it is vague and ambiguous and assumes facts not in evidence. Without waiving the foregoing, Defendants admit that there is no dispute that every Chanel-branded item sold by WGACA, as listed on WGACA_000290011, was subject to WGACA's authentication process, is a genuine Chanel branded product and includes one or more genuine Chanel trademarks.

**REQUEST FOR ADMISSION NO. 142:**

Admit that the "Chanel Blk/G Chain Sunglasses" bearing WGACA SKU No. Q6A05B17KB001 are the sunglasses that the subject of the Authenticity Certificate depicted in WGACA_00029660.

**RESPONSE TO REQUEST FOR ADMISSION NO. 142:**

Defendants object to this Request on the grounds that WGACA_29660 is an authenticity certificate provided by a third party that is not affiliated with Defendants. Without waiving the foregoing, Defendants deny that the "Chanel Blk/G Chain Sunglasses" bearing WGACA SKU No. Q6A05B17KB001 are the sunglasses that the subject of the Authenticity Certificate depicted in WGACA_00029660.

Dated: December 21, 2020

        **LEWIS BRISBOIS BISGAARD & SMITH LLP**

        By: /s/ Daniel C. DeCarlo
           Peter T. Shapiro, Esq.
           Daniel C. DeCarlo, Esq.
           Thomas S. Kiddé, Esq.
           Jean M. Kim, Esq.
           *Attorneys for Defendants WGACA, LLC, What*
           *Comes Around Goes Around LLC d/b/a What Goes*

4851-0883-1954.2

*Around Comes Around, MHW Properties, Inc.,*
*WGACA Web, LLC, Pines Vintage, Inc., Vintage*
*Designs Ltd., WGACA LA, Inc.*
77 Water Street, Suite 2100
New York, New York 10005
212-232-1300


TO:     Theodore C. Max, Esq.
        Dylan Price, Esq.
        Jill Pietrini, Esq.
        Bridget Russell, Esq.
        Sheppard, Mullin, Richter & Hampton LLP
        *Attorneys for Plaintiff*
        30 Rockefeller Plaza
        New York, New York 10112
        212-653-8700
        tmax@sheppardmullin.com
        dprice@sheppardmullin.com
        jprietrini@sheppardmullin.com
        BRussell@sheppardmullin.com

4851-0883-1954.2

# CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, the foregoing document, Defendants' Responses to Plaintiffs' Third Set of Requests for Admission was served upon the attorneys for Plaintiff at the address set forth below by electronic mail:

Theodore C. Max, Esq.
tmax@sheppardmullin.com
Dylan Price, Esq.
dprice@sheppardmullin.com
Jill Pietrini, Esq.
jprietrini@sheppardmullin.com
Bridget Russell, Esq.
brussell@sheppardmullin.com



/s/Jean M. Kim
Jean M. Kim

4851-0883-1954.2

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

CHANEL, INC.,

                        Plaintiff,

        - against -

WGACA, LLC, WHAT COMES AROUND GOES
AROUND LLC d/b/a WHAT GOES AROUND
COMES AROUND, MHW PROPERTIES, INC.,
WGACA WEB, LLC, PINES VINTAGE, INC.,
VINTAGE DESIGNS LTD., WCAGA LA, LLC,

                        Defendants.

-----------------------------------------------------------------X

Case No. 18-cv-02253 (LLS)

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

| | |
|---|---|
| PROPOUNDING PARTY: | PLAINTIFF CHANEL, INC. |
| RESPONDING PARTIES: | DEFENDANTS WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC D/B/A WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC. WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., AND WCAGA LA, LLC |
| SET NO.: | ONE |
| NUMBERS: | 7-25 |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S SECOND SET OF INTERROGATORIES**

       Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants, by their

undersigned attorneys, object and respond to Plaintiff's Second Set of Interrogatories ("Plaintiff's

Interrogatories"), as follows:

**GENERAL OBJECTIONS**

       1.     Defendants object to the Definitions and Instructions set forth in Plaintiff's

Interrogatories insofar as they seek to impose any requirements to provide discovery inconsistent

with, and/or to the extent not required by, the Federal Rules of Civil Procedure or this Court's

Local Civil Rules.

4828-0838-7282.2

1

2. Defendants reserve the right to supplement and/or amend the within responses up to and including the time of trial.

3. Defendants object to Plaintiff's Interrogatories to the extent they call for the production of privileged, confidential, proprietary and/or personal information concerning individuals and entities that are not parties to this action.

4. Each of the general objections is incorporated by reference in each of the responses set forth below.

<div align="center">

**SPECIFIC OBJECTIONS AND RESPONSES**

</div>

Subject to the foregoing General Objections and conditions, which are incorporated into each Response below as if set forth fully therein, Defendants respond as follows:

**INTERROGATORY NO. 7:**

By quarter, state Defendants' gross revenue earned from the sale of products or items offered by Defendants under or bearing the CHANEL Trademarks.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants object on the grounds that this Interrogatory seeks confidential and proprietary business information.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants direct Chanel to the previously produced documents including the Profit and Loss statements from 2014-2019 and the custom report which reflects the over 47,000 sales of Chanel branded product. (*See* WGACA_29012-29015. WGACA_29189, WGACA_29928-29930, WGACA_29950). That custom report provides for the gross sales revenue for those items. (*See* WGACA_29011).

**INTERROGATORY NO. 8:**

4828-0838-7282.2

<div align="center">2</div>

State all costs and deductions claimed by Defendants from Defendants' gross revenue earned from the sale of products or items offered by Defendants under or bearing the CHANEL Trademarks.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendants object on the grounds that this Interrogatory seeks confidential and proprietary business information.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to the previously produced profit and loss statements from 2014-2019 and WGACA's custom report reflecting over 47,000 transactions of Chanel branded products sold. (*See* WGACA_29012-29015. WGACA_29189, WGACA_29928-29930, WGACA_29950). That custom report provides for the gross sales revenue for those items. (*See* WGACA_29011). Chanel is also referred to the custom report of net profits related to the sale of Chanel branded goods. See WGACA_29950.

**INTERROGATORY NO. 9:**

By product and quarter, state the number of units of products or items offered under or bearing the CHANEL Trademarks sold by Defendants.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants object on the grounds that this Interrogatory seeks confidential and proprietary business information.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

4828-0838-7282.2                                         3

Defendants direct Chanel to WGACA's custom report reflecting over 47,000 transactions of Chanel branded products sold.(*See* WGACA_29011). Defendants will not provide the number of Chanel products offered by Defendants.

**INTERROGATORY NO. 10:**

Identify all documents supporting Defendants' Second Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 10:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) for detailed arguments and references to evidence supporting this affirmative defense. As set forth in those letters, Chanel has known for years that WGACA has sold second hand Chanel items and engaged in the same activity that Chanel claimed in 2018 was wrongful. Chanel never took action against WGACA until early 2018. Immediately before filing suit, documents submitted by Chanel in discovery regarding the spring of 2017 Chanel meetings in particular, illustrate Chanel's frustration with the secondary market and in particular Chanel's anger at particularly powerful secondary market players such as WGACA, The Real Real and Farfetch. The evidence disclosed in discovery details Chanel's fraudulent and bad faith scheme to attack certain secondary market players with fraudulent claims, while partnering with at least one other secondary market participant Farfetch.

4

Moreover, the same conduct Chanel claimed as wrongful in 2018 with the filing of this lawsuit, Chanel knew was the exact same conduct engaged in by Farfetch, which Chanel made a business arrangement with including taking an equity position prior to filing this lawsuit. It is irreconcilable for Chanel to claim wrongful conduct as against WGACA while at the same time sanctioning that very conduct by "partnering" with Farfetch which was, again, engaged in the same conduct as WGACA. These facts support the affirmative defenses asserted.

**INTERROGATORY NO. 11:**

State all facts supporting Defendants' Second Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 11:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but, subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) and incorporates their response to Interrogatory 10.

**INTERROGATORY NO. 12:**

Identify all documents supporting Defendants' Third Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 12:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing

4828-0838-7282.2                                        5

objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) and incorporates their response to Interrogatory 10.

**INTERROGATORY NO. 13:**

State all facts supporting Defendants' Third Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but, subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) and incorporates their response to Interrogatory 10.

**INTERROGATORY NO. 14:**

Identify all documents supporting Defendants' Fourth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) and incorporates their response to Interrogatory 10.

**INTERROGATORY NO. 15:**

State all facts supporting Defendants' Fourth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 15:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but, subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159) and incorporates their response to Interrogatory 10.

**INTERROGATORY NO. 16:**

Identify all documents supporting Defendants' Eighth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 16:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

First, the First Sale Doctrine is not generally accepted as an affirmative defense but instead it is a substantive rule that is the burden of the trademark holder to overcome. As such it

4828-0838-7282.2                                             7

is Chanel's burden to establish that an accused items was not the subject of an authorized first sale and Chanel cannot do so here." '**[T]he exhaustion or first-sale rule is not an affirmative defense**. **Rather, it defines an area of commerce beyond the reach of trademark law.  Plaintiff bears the burden of proving that [the] Lanham Act applies to a Defendant's actions.**' " *Hi-Tech Pharms., Inc. v. Demelo*, No. 1:07-CV-1934-RWS, 2009 U.S. Dist. LEXIS 26569, at *13 (N.D. Ga. Mar. 31, 2009) (emphasis added) (citing *Taylor Made Golf Co. v. MJT Consulting Grp.*, 265 F.Supp.2d 732, 739 (N.D. Tex. 2003)).

In short, once a trademark holder makes an authorized sale of one of its product, the trademark holder thereafter loses the right to control the downstream sale by others, including those not in its authorized distribution chain.  As noted above the right to control such a sale "exhausts".  While Courts generally do not consider the First Sale Doctrine as an affirmative defense, in an abundance of caution we did assert it as one and provide an explanation of that defense here.  Because of the First Sale Doctrine, Chanel has no legal basis to claim wrongful conduct for WGACA's resale of genuine Chanel product, whether WGACA is an authorized reseller or not an authorized reseller.

Second, as for some of the documents supporting this doctrine, WGACA directs Chanel to WGACA's custom report reflecting over 47,000 transactions of Chanel branded products sold. See WGACA_29011.  Each of those products is a genuine Chanel item which was authorized by Chanel for a first sale.  The item was then resold in the marketplace which is how the item was eventually acquired by WGACA to resell.  As has been well established in this and other litigation, Chanel items enjoy a robust life in the resale market which again, is fully protected by the First Sale Doctrine.  WGACA points to the images and other representations of Chanel products that WGACA offered for sale and sold as allegedly evidence of wrongful conduct.  But each such image shows a genuine item first sold by Chanel and then resold in the secondary

market which the First Sale Doctrine permits.  Moreover, each such image illustrates WGACA's proper use of Chanel's name and trademarks in a manner fully embraced and permitted by the First Sale Doctrine and related Fair Use Doctrine.

While it is not entirely clear what Chanel's claim is, we believe Chanel has claimed that approximately 63 items were allegedly not subject to an authorized first sale.  These would include 12 items identified in a certification by Robin Gruber, for which Chanel claims such items are counterfeits (i.e. items not made in an authorized factory) and another 51 items that we believe Chanel claims never passed through Chanel's quality control protocols though again, it is not entirely clear whether Chanel claims those items were or were not part of an authorized first sale by Chanel.  To the extent that Chanel claims the 51 items were not part of an authorized first sale, Chanel has provided no documents in discovery which would reflect that fact.  We are aware, in fact of no admissible (or any) evidence that would support such a notion.  With regard to the alleged counterfeits, the items are not counterfeit and are in fact genuine.  Such has been established through the various deposition testimony of WGACA's witnesses who have testified to the authenticity process undertaken and is further established that despite over 47,000 Chanel branded items being sold not once has a customer identified one as not being genuine (nor has WGACA ever received any indication from any source that any consumer was confused by the nature of WGACA's sale as being a secondary sale independent of Chanel.  Nor has Chanel provided a single piece of evidence suggesting an incident of actual customer confusion or even any likelihood of confusion.)  Further, Chanel has provided to date no admissible evidence to prove that in fact the items are counterfeit.

Chanel has pointed to the allegation that the serial numbers affixed to the alleged counterfeit items were stolen from the Renato Corti factory in Italy.   However, as established already through this litigation and in particular with the deposition of Joseph Bravo, that position

4828-0838-7282.2                                       9

cannot be established by Chanel. Some of the documents that reflect Chanel's fraudulent advancement of this position is the inadmissible "Police Report" and the database printouts provided by Chanel which illustrate that Chanel has no admissible evidence that in fact the serial numbers were stolen or that the items alleged to be counterfeit were NOT made in a Chanel authorized factory. (*See* CHANEL_12367-12371, CHANEL_12235-12306, CHANEL_12378-12500; CHANEL_12609-12610). Mr. Bravo testified that despite the fact that allegedly 30,000 serial numbers from Renato Corti were stolen, Chanel did no investigation of the Renato Corti factory and instead accepted the bald statements from Renato Corti representatives as to the alleged facts. Despite having in its possession what Chanel claims is a police report detailing the theft, Chanel admitted that it never spoke with anyone with the police or did anything to verify if the police report was even accurate or genuine. (*See* Chanel_13002-13057). There is also a complete lack of documentation which would serve as corroborating evidence that these accused items are counterfeit. Chanel can point to no internal or external communications suggesting that Chanel ever sought to investigate an alleged theft or alert the trade, consumers or retailers of supposed counterfeits.

With regard to the alleged items never quality controlled, Chanel has offered no evidence of any kind, whether admissible or not that such items were not part of an authorized first sale by Chanel, or are not exactly what they were purported to be by WGACA when sold them. Chanel has offered statements lacking any foundation (*See e.g.,* Dkt Nos. 126, 144, Declaration of Jennifer Bleys), such as Chanel's database printouts as supposed proof that these items passed through Chanel's quality control. However, Chanel has never produced any admissible evidence to suggest that this lack of a data point in its database establishes that in fact the items did not pass through Chanel's quality control inspection or that that the items were not authorized to be sold by Chanel. No Chanel witness who can authenticate any of these alleged facts has been

identified or as yet testified in deposition in a manner that is supportive of Chanel's position. If in fact, the items were not authorized by Chanel to have been sold, Chanel has provided no documentation indicating that Chanel ever performed any investigation of that alleged fact or has explained how these items were sold and Chanel never investigated such with the factories that allegedly did not follow this quality control protocol. These claims are not supported by any admissible evidence. As such, there is a complete absence of any evidence to support the notion that any Chanel branded item sold by WGACA was not the subject of an initial first sale authorized by Chanel.

**INTERROGATORY NO. 17:**

State all facts supporting Defendants' Eighth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but, subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants incorporate their response to Interrogatory 16.

**INTERROGATORY NO. 18:**

Identify all documents supporting Defendants' Fifth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 18:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing

4828-0838-7282.2

11

objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants incorporate their response to Interrogatory 10. Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159)

**INTERROGATORY NO. 19:**

State all facts supporting Defendants' Fifth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 19:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants incorporate their response to Interrogatory 10.

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159)

**INTERROGATORY NO. 20:**

Identify all documents supporting Defendants' Sixth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 20:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants incorporate their response to Interrogatory 10.

4828-0838-7282.2                                      12

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159)

**INTERROGATORY NO. 21:**

State all facts supporting Defendants' Sixth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 21:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense.  Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: Defendants incorporate their response to Interrogatory 10.

Subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows:

Defendants direct Chanel to Defendants' letter motions. (See Dkt Nos. 120, 137, 151, 154, 159)

**INTERROGATORY NO. 22:**

Identify all documents supporting Defendants' Seventh Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 22:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense.  Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, and to the extent Defendants understand this Interrogatory, Defendants respond as follows: It is not feasible to identify all the documents that support this

defense and indeed the request itself is in bad faith as Chanel well knows it is lawful to use Chanel trademarks in association with the offer for sale and sale of Chanel branded goods by WGACA. Every listing, every advertisement and every promotion that WGACA published which was related to the sale of a Chanel branded and which included a reference to a Chanel trademark would necessarily (and by definition) support the fair use defense. It is axiomatic that WGACA, like any other reseller of a Chanel branded item, is lawfully permitted to use the Chanel trademarks in association with the offer for sale and sale of genuine Chanel items. (*See e.g.*, WGACA_28483, WGACA_28497, WGACA_28537, WGACA_28559, WGACA_25591). Chanel's trademarks were never used in any manner that was not directly supported by the Fair Use Doctrine and the First Sale Doctrine. Chanel has not identified a single instance in which WGACA has used a Chanel trademark in a manner that in any way caused actual confusion or the likelihood of confusion or deception. There is no evidence that even a single customer has ever been confused or deceived by anything WGACA has done vis-à-vis the use of Chanel trademarks.

**INTERROGATORY NO. 23:**

State all facts supporting Defendants' Seventh Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 23:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all facts but subject to the foregoing objections and without waiving same, Defendants incorporate their response to Interrogatory 22.

**INTERROGATORY NO. 24:**

Identify all documents supporting Defendants' Tenth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 24:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, Defendants asserts that all of the documents identified and produced in this case support this defense. As has been stated in prior interrogatory responses which are incorporated here, Chanel's complete failure to conduct any investigation, follow up with any law enforcement agency, or notify the public, resellers or the trade regarding the alleged wrongful conduct of Defendants, is not only evidence of Chanel's fraudulent pursuit of the claims in this case but also illustrates its failure to mitigate its damages. If in fact, as Chanel claims there are thousands of serial numbers that were stolen and countless more, apparently as alleged by Chanel, items that were never quality controlled, then Chanel has done nothing to mitigate against the resale of these items. Resellers are helpless to know that any item which from all objective measurements is an authentic Chanel item did not in fact pass through Chanel's quality control for example. Had Chanel investigated or alerted the trade (including consumers and resellers) about the alleged counterfeits and non-quality controlled items in the marketplace, resellers like WGACA could review items with that information before purchase and then subsequent resale.

**INTERROGATORY NO. 25:**

State all facts supporting Defendants' Tenth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 25:**

Defendants object to this interrogatory as invading the attorney work product privilege as it asks for counsel's strategic thought processes as to which facts and documents will be relied

upon for the Defense. Defendants object to this interrogatory as being overbroad, burdensome and oppressive in its request for an identification of all documents but subject to the foregoing objections and without waiving same, Defendants asserts that all of the documents identified and produced in this case support this defense. As has been stated in prior interrogatory responses which are incorporated here, Chanel's complete failure to conduct any investigation, follow up with any law enforcement agency, or notify the public, resellers or the trade regarding the alleged wrongful conduct of Defendants, is not only evidence of Chanel's fraudulent pursuit of the claims in this case but also illustrates its failure to mitigate its damages. If in fact, as Chanel claims there are thousands of serial numbers that were stolen and countless more, apparently as alleged by Chanel, items that were never quality controlled, then Chanel has done nothing to mitigate against the resale of these items. Resellers are helpless to know that any item which from all objective measurements is an authentic Chanel item did not in fact pass through Chanel's quality control for example. Had Chanel investigated or alerted the trade (including consumers and resellers) about the alleged counterfeits and no- quality controlled items in the market place, resellers like WGACA could review items with that information before purchase and then subsequent resale.


Dated: December 21, 2020

<div style="margin-left: 40%">

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

/s/ Dan DeCarlo
Peter T. Shapiro, Esq.
Thomas S. Kiddé, Esq. (Pro Hac Vice)
Daniel C. DeCarlo, Esq. (Pro Hac Vice)
*Attorneys for Defendants*
77 Water Street, Suite 2100
New York, New York  10005
(212) 232-1300
Peter.Shapiro@lewisbrisbois.com
Thomas.Kidde@lewisbrisbois.com

</div>

4828-0838-7282.2                                          16

Dan.Decarlo@lewisbrisbois.com

TO:    Theodore C. Max, Esq.
        tmax@sheppardmullin.com
        Dylan Price, Esq.
        dprice@sheppardmullin.com
        Hyo Jin Paik, Esq.
        hpaik@sheppardmullin.com
        Jill Pietrini, Esq.
        jprietrini@sheppardmullin.com
        Bridget Russell, Esq.
        brussell@sheppardmullin.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2020, the foregoing document, Defendants' Responses to Plaintiff's Second Set of Interrogatories was served by email upon the following party and participant:

Sheppard, Mullin, Richter & Hampton LLP
> *Attorneys for Plaintiff*
> 30 Rockefeller Plaza
> New York, New York 10112
> 212-653-8700
>
> Theodore C. Max, Esq.
> tmax@sheppardmullin.com
> Dylan Price, Esq.
> dprice@sheppardmullin.com
> Hyo Jin Paik, Esq.
> hpaik@sheppardmullin.com
> Jill Pietrini, Esq.
> jprietrini@sheppardmullin.com
> Bridget Russell, Esq.
> brussell@sheppardmullin.com

I certify that the foregoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

<div align="right">
/s/ Jean Kim
Jean Kim
</div>

4828-0838-7282.2                                        18

## **VERIFICATION**

I, Frank Bober, the undersigned, declare:

I am the Vice Chairman of WGACA, LLC and am authorized by WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., WCAGA LA, LLC, the defendants in the action entitled *Chanel, Inc. v. WGACA, LLC*, et al, Case No. 18-cv-02253 (LLS), to make this Verification on their behalf. I have read and reviewed the foregoing **DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** and am informed and believe that the contents therein are true and correct.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed on this      day of December   , 2020, in New York, New York.

_____

Frank Bober

4842-9863-3940.1

# EXHIBIT 7

1

** R O U G H   D R A F T **

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 18-cv-2253-LLS

------------------------------------x
CHANEL, INC.,

      Plaintiff,

   - against -

WGACA, LLC, WHAT COMES AROUND
GOES AROUND LLC d/b/a WHAT GOES
AROUND COMES AROUND, MHW
PROPERTIES, INC., WGACA WEB, LLC,
PINES VINTAGE, INC., VINTAGE
DESIGNS LTD., and WCAGA LA, LLC,

      Defendants.
------------------------------------x
      February 2, 2021
      10:57 a.m.

    Videotaped Deposition of MARCOS

ROSADO, taken by Plaintiff, pursuant to

Notice, held via Zoom videoconference,

before Todd DeSimone, a Registered

Professional Reporter and Notary Public of

the States of New York and New Jersey.

2

APPEARANCES:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars
Suite 1600
Los Angeles, California 90067
    Attorneys for Plaintiff
BY:  JILL PIETRINI, ESQ.
     jpietrini@sheppardmullin.com
     BRIDGET RUSSELL, ESQ.
     brussell@sheppardmullin.com

LEWIS BRISBOIS BISGAARD & SMITH LLP
633 West 5th Street
Los Angeles, California 90071
    Attorneys for Defendants
    WGACA, LLC, et al.
BY:  THOMAS S. KIDDÉ, ESQ.
     thomas.kidde@lewisbrisbois.com

ALSO PRESENT:

  JEFF MENTON, Videographer

3

M. ROSADO

THE VIDEOGRAPHER: Good morning. We are going on the video record at approximately 10:57 a.m. on Tuesday, February the 2nd, 2021. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is video media disk one of the video-recorded deposition of Marcos Rosado, the designated 30(b)(6) representative of WGACA, LLC, et al. The caption of this case is Chanel, Inc. versus WGACA, LLC, et al. This is filed in the United States District Court, Southern District of New York, case number 18-CV-2253. This deposition is being taken by attorney Jill Pietrini from the law firm of Sheppard, Mullin, Richter & Hampton LLP,

counsel for the plaintiff. This deposition is being held remotely.

My name is Jeff Menton. I am the certified legal videographer, the court reporter is Todd DeSimone, and we are both from Veritext New York.

4

M. ROSADO

All counsel consent to this remote video arrangement and waive any objections to this manner of reporting. Counsel will now state their appearances and affiliation for the record, beginning with the noticing attorney, and please also note and state your acceptance of the court reporter swearing in the witness remotely and this remote video arrangement.

Okay, go ahead.

MS. PIETRINI: Jill Pietrini for plaintiff, Chanel, Inc.

MR. KIDDÉ: Thomas Kiddé of Lewis Brisbois Bisgaard & Smith for defendants and the witness, and we consent to the remote swearing in and deposition.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear the witness in.

* * *

MARCOS ROSADO, called as a witness, having been first duly sworn, was examined and testified as follows:

5

M. ROSADO

^ EXAMINATION BY MS. PIETRINI:

Q. And you may have to speak up a little bit, Mr. Rosado, because you were pretty faint on that. Just stay closer to the microphone if you wouldn't mind.

Could you state your full name for the record, please.

A. Marcos Rosado.

Q. Do you have any nicknames?

A. No.

Q. Have you ever had your deposition taken before?

A. No.

Q. No?

testifying on behalf of the companies, and I will read them off for you, WGACA, LLC, What Goes Around Comes Around, LLC, MHW Properties, Inc., WGACA Web, LLC, Vintage Designs Ltd., and WGACA LA, Inc.?

A.    I do.

Q.    And I'm going to show you what we have marked as Exhibit 1136, which is Plaintiff Chanel's -- sorry, 1176, which is Plaintiff Chanel's Inc. Amended Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(b)(6), and it has the annotations of defense counsel.

^ (Exhibit 1136 marked for identification.)

Q.    We are showing it on the screen

9

M. ROSADO

to you.  Can you go to page 12.

MS. RUSSELL:  Mr. Rosado, if you want to go to Exhibit Share, it has been premarked.

THE WITNESS:  I'm there.

MS. RUSSELL:  Okay, thank you.

Q. Okay. If you could look at page 12, paragraph 9, Mr. Rosado.

A. Okay, I do. I have it in front of me.

Q. And so there is -- 9 says WGACA's financial information, and then it has subparts 9(a) through 9(m). Do you see that?

A. I do.

Q. And do you understand that you have been designated as the person to testify as to the various companies that I read off as to each of these categories?

A. I do. But, just for the record, I have only been employed with the company since 2017.

Q. Okay. And we will get to that in terms of how long you have been there

10

M. ROSADO

and what you do, that kind of thing.

Do you agree with defense counsel's representation that you are the person knowledgeable on these categories

identification.)

(Exhibit 1181 marked for identification.)

Q. Mr. Rosado, where is the detail for the cost of goods sold for 2018 and

66

M. ROSADO

2019? You identified the cost of the inventory, freight charges, repairs, agent fees. Where is that located in the documents you've given us for 2018 and 2019?

MR. KIDDÉ: Objection, it's vague.

A. Sorry, can you repeat the question?

Q. Okay. You testified earlier that the cost of goods includes actual cost to get the product, to purchase it, and then additional costs such as freight, duty, repairs and the agent fees. That information is provided to us in 2014 and 2015 and 2016 and 2017 but not for 2018 and 2019. Where would we find that?

A. In the general ledger.

Q. Which has not been produced to us, correct?

A. My understanding is no.

Q. Mr. Rosado, why is the detail for the cost of goods sold, which is identified in Exhibit 1178 for the years

67

M. ROSADO

2015 through 2017, purchases, freight charges, repairs, import costs, etc., why is that included for those years but not for 2018 and 2019?

A. That was the previous auditor's format for presenting the P&L, and then for 2018, with the change of auditors, that's their method of presenting the financial statements. And 2019 is an unaudited internal format which is the way that we reported internally.

Q. So 2019, which has been marked as Exhibit 1181, that is a profit and loss statement, monthly balance sheet, and statement of cash flow that the company has

prepared itself that an auditor has not prepared; is that right?

A. That is correct. That is correct.

Q. And who at the company prepared Exhibit 1181?

A. Again, this is our monthly reporting package, so the compilation of the financial statement is performed by my

68

M. ROSADO

team, with my supervision and direction, and final review by ourselves before submitting to the bank.

Q. Has the company consistently provided the monthly financial statements, which, as I understand, are in this format of 1181 to JPMorgan Chase since January 2018?

A. Yes.

Q. Each month, then, from January 2018 through November 2020 would have a three-page monthly financial summary; is that right?

A. Yes.

Q. Okay, thank you. If you could take a look at 2014, 1179, Exhibit 1179, please. Let me know when you're ready.

A. I'm ready.

Q. Under gross profit, and it is identified by number 536, it says management fees. What is that referring to? What does that include?

A. I don't know. I did not work at the company at that time.

69

M. ROSADO

Q. Did you take any actions to prepare to testify today to find out what these costs, expenses identified for 2014 are?

A. No. I took the financial statements at face value.

Q. Who would know what the management fees were for 2014?

A. I guess the person responsible for accounting at that time.

MS. RUSSELL: I'm introducing

as Exhibit 1184, this is the profit analysis that we have been referring to as the profit analysis produced by WGACA with a Bates label WGACA_0029950.

(Exhibit 1184 marked for identification.)

A.    Okay.

Q.    You've got that?

A.    Yup, I do.

Q.    If you look at Exhibit 1184, it looks like an expense that's being deducted is management fees, under professional fees, accounting, 536, and that's

70

M. ROSADO

3,072,023.59.  This is from 2014, correct?

A.    Yes.  Can you point me to the line items that you are referring to one more time?

Q.    Sure.  It is on the left side, gross profit, I'm looking at your profit spreadsheet.

A.    Okay.

Q.    On the left side it is 536,

item number.

A.    Okay.  535 and 536, yup.

Q.    Right.  So that management fee that's being deducted to arrive at gross profit is the management fee from 2014.  Do I read that correctly?

A.    Well, to be clear, gross profit is what I was referring to as gross margin. Operating profit is what would ultimately be impacted by the line item you've just referred to.

Q.    Okay.  Either way, whatever we are going to call it, this is a deduction that the company is claiming in this case?

A.    I would presume, yes.

71

M. ROSADO

Q.    But you don't know what it is, the management fees?

A.    I do not.  I don't.

Q.    Okay.  And there is an item for WGACA Japan.  What does that refer to?  And it is line 537 is the item number.

A.    Well, again, based on face

value and the title of the account, that would be the expenses related to our sourcing company in Japan.

Q.     What's the name of your sourcing company?

A.     WGACA Japan.

Q.     Okay.  So that's a separate entity?

A.     Yes.

Q.     And the WGACA Japan, that sources products for the company as a whole, not specifically for Chanel, right?

A.     Correct, total company.

Q.     Okay.  And then the interest expense, what does that refer to?  And that's number 538.

A.     Again, at face value, it is the

72

M. ROSADO

amount paid on interest on the debt that the company had outstanding.

Q.     And what are dues and subscriptions?  That's number 540.

A.     Again, I'm only speaking at

face value, I have not reviewed the details behind these accounts, but at face value the name of the account would tell me that this is for dues and subscriptions to run the business, be it the industry journal or magazine subscriptions and things like that.

Q.   And then the next one that we forgot, three, really two, 541 and 541.1, entertainment, what does that refer to?

A.   Normal travel and entertainment I would presume, you know, going out to dinner with clients, things like that.

Q.   And are you estimating or guessing about this?

A.   I'm guessing.  Like I said, this is from 2014, I did not work at the company, so anything that I can deduce from this is at face value based on the

73

M. ROSADO

financial statements that you see in front of you.

Q.   Who would be more knowledgeable

about the deductions that are included for 2014 and 2015, '16 and '17?

A. I don't know who was in charge of accounting prior to me coming on board.

Q. Did you have any discussions with Ms. Sassaman in order to prepare to testify today as to the deductions that the company is claiming?

A. No. I mean, I asked for the report and she provided it to me and I used it.

Q. Let's go over this Exhibit 1184. Tell me how you prepared it and what the various columns mean.

A. Okay. So the far left column are the profit and loss statements or statement of income or whatever different titles you may have in the different statement of incomes that were provided to you. On the far right you have the sales and gross margin for the sale of Chanel

74

M. ROSADO

products by channel, so retail, web,

Q. And the company would have office expenses regardless of whether it sold Chanel products and items?

A. Yes.

Q. And the company would have miscellaneous fees regardless of whether it

104

M. ROSADO

sold Chanel products and items?

A. Yes.

Q. And the company would also presumably pay state and federal income tax regardless of whether it sold Chanel products and items?

A. Yes.

Q. Mr. Rosado, the 46 percent that's identified for 2019 for federal -- state and federal income tax, is that the percentage of tax that the company has actually paid?

A. It is an estimate. If you look at the bullet point B in red font at the very bottom of that page, it states the basis for that 46 percent.

Q. Okay. Sorry we're old, older than you. We will try and read it for the record. As the company is an LLC, this is B, your note B, the only taxes paid at the entity level are partnership taxes for various state jurisdictions. In addition to this, the pass-through income is taxed at the partner level and the company has

105

M. ROSADO

made tax distributions to its members to pay for the taxes on pass-through income. The effective tax rate used to calculate net income after taxes is based on 37 percent federal income tax rate and 8.82 percent for New York State as of 2019.

That's what you were referring to?

A. Correct, yeah.

Q. Mr. Rosado, do you know the amount that any of the individual partners paid for tax for 2019? Again, referring to note B here.

A. Not off the top of my head, I

do not.

Q.	Have you ever seen the tax returns for any of the partners of the company?

A.	I have, yes.

Q.	And you don't recall what the tax amount was paid?

A.	No.

Q.	Do you have copies of the tax returns for the partners that are covered

106

M. ROSADO

by this note B on 2019 profit statement?

A.	Not all of them, only some of them.

Q.	Whose do you have?

A.	Seth Weisser and Michelle Sassaman and Gerard Maione.

Q.	Do those tax returns show that those three people that you just identified are paying 46 percent in taxes?

A.	I don't recall the exact effective tax rate for each of them but the --

Q.   Is the --

A.   Go ahead.

Q.   No, go ahead.

A.   No, go ahead.  I don't have anything to say.

Q.   Okay.  The 46 percent, do you know if they are paying that percentage of the income generated from the LLC in taxes?

A.   I do not know that off the top of my head.

Q.   Does WGACA pay corporate taxes?

A.   Small partnership taxes in New

107

M. ROSADO

York and California and New Jersey.

Q.   How much, when you say small partnership taxes for New York and California, how much are we talking about?

A.   It would be included in the line item taxes in the statement of income that was provided.

Q.   Okay.  So for, I'm just looking, because 2018, I can find it quickly, oh, for 2019, and this is looking

A.      Correct, yes.

Q.      And then for 2019 we only have one entity, which is the WGACA, LLC and the

115

M. ROSADO

Japan company, right?

A.      No, that P&L is only for the operating company.  The Japan expenses are part of the professional fees line item in that profit and loss statement.

Q.      Okay.  For your profit spreadsheet for 2018, we don't have the detail of what's included in the selling, general and administrative expenses; is that a fair statement?

A.      Yes.  Sorry, you said you don't have it?

Q.      Yeah, it's not identified on this chart, on your --

A.      Correct, yes.

Q.      -- profit spreadsheet, okay.

A.      That's correct.

Q.      In terms of having the numbers that back up the 21 million, where would we

find that? Because you said 2018 was just internal P&L.

A. Correct. We would have the general ledger for the operating company and the trial balances for the foreign

116

M. ROSADO

entities.

Q. Did you give both sets of auditor firms access to the company's general ledger, or someone on your behalf give access?

A. Yes.

Q. And I'm not clear in my mind when the auditors, at what intervals they were, so if you could just tell me again, when was the one auditor and when did this next auditor firm start?

A. 2015 to 2017 was one auditor, and 2018 to the present is the other auditor.

Q. MFA is the current auditor?

A. Correct.

Q. Is there a director fee that is

been introduced and marked as Exhibit 1177.

A.      Okay.  I have it open.

Q.      Okay.  What does the -- there is a cost column on that spreadsheet.  What does that include?

A.      The item cost.

Q.      That's just the amount it cost the company to purchase that particular item?

A.      Correct.

Q.      It doesn't have freight added or any of those other things that you talked about, right?

A.      Correct, it does not.

Q.      Does the cost column include the cost to refurbish or spruce up that particular product in question?

122

M. ROSADO

A.      That cost is only for the cost paid for the item alone.

Q.      And the items that have been sold here, this includes items that were sold outside the United States, right?

A.    I would presume so, since it is 2014 through 2019 and you've had selected sales outside of the United States.

Q.    Did you have any involvement in preparing what we've marked as Exhibit 1177, defendants' product spreadsheet?

A.    No.

Q.    Do you know who did prepare it?

A.    I believe that this was queried from our item database by the information technology department.

Q.    What search parameters did the IT department use?

A.    I don't know.  I didn't perform the query.

Q.    Say that again.

A.    I do not know.  I did not perform the query.

Q.    Okay.  Did you give any

123

M. ROSADO

instructions to the IT department of what was to be included in the query?

A.    No.

Q. Do you know what date Exhibit 1177, the defendants' product spreadsheet, was prepared?

A. I do not.

Q. And other than knowing that the IT department did a query for it, do you have any other information as to how that document was prepared?

A. I do not.

Q. Do you believe that the defendants' product spreadsheet is accurate?

A. I do.

Q. Are you aware of any mistakes that have been made on that spreadsheet?

A. On the spreadsheet itself? I believe there was one item that had an incorrect SKU, or not SKU, but serial number.

Q. Do you remember what that serial number or item was?

124

M. ROSADO

A. No.

Q. Did you take any steps to make sure that the information identified on the product spreadsheet was accurate?

A. No.

Q. Did you review it for accuracy before it was produced to Chanel in this case?

A. I did not.

Q. Do you know when the spreadsheet was completed?

A. I do not.

Q. Do you know when is the last time it has been updated?

A. I do not.

Q. And do you know for what time period the spreadsheet relates?

A. 2014 through 2019.

Q. So Exhibit 1177, defendants' product spreadsheet, does not include any sales made in 2020; is that accurate?

A. I believe so, yes.

Q. And what system did you say that the IT department queried to create

merchandising, this is the team in charge of, you know, purchasing and acquiring and determining which goods and products we should be acquiring for sale.

Q. Who gave the instructions to the IT department at the company on what to query to create Exhibit 1177?

A. I don't know.

Q. Is What Goes Around Comes Around relying on the product spreadsheets to establish sales of the Chanel branded products and items?

A. Yes.

Q. Is What Goes Around Comes Around relying on spreadsheets to establish the cost of goods for the Chanel branded products and items?

A. For the testimony cost, yes.

135

M. ROSADO

As I previously stated, on our final calculation provided, there is an adjustment to include additional costs related to duties, freight, repairs, agent

M. ROSADO

varied in format, and I don't believe that they are archived anywhere essentially.

Q. You don't believe what, I'm sorry?

A. That they are archived anywhere specifically.

Q. Currently what type of documentation does What Goes Around Comes Around have that tracks the effectiveness of its advertising?

MR. KIDDÉ: Objection, it's vague.

A. Internally created reports with the main data source being Google Analytics.

Q. Can you describe for me what Google Analytics is?

A. It is a platform within Google that allows you to track the performance of your digital advertising.

Q. Does Google Analytics allow the company to determine if there was a return on its investment in the particular ad?

Case 1:18-cv-02253-LSD Document 18092-7 Filed 05/25/21 Page 300 of 254

A. Not on a particular ad. I

M. ROSADO

don't know that level of detail. When I see those type of reports they are a lot more summarized.

Q. So you have actually seen Google Analytics reports of the company?

A. I have seen a byproduct. Like I said, Google Analytics, it is the a data source, it is not the only source for some of these reports.

Q. What are the other sources for the reports that you have been describing?

A. We would have financial information as far as the amount of money that was spent on advertising for that given period, as well as other traffic information for the website.

Q. But where would you get that information from? You would get some from Google Analytics, but where else do you get it from?

A. I believe the platform for the

website will provide that. But, again,
creating those reports is not my
responsibility, so I'm only assuming that

140

M. ROSADO

this is where the information is being

taken from.

Q. Do you analyze the amount that the company spends for advertising and promotion compared to the effectiveness of the actions that are taken to advertise and promote?

MR. KIDDÉ: Objection, it's vague.

A. Yes.

Q. All right. And how do you do that?

A. I look at the return on the amount spent versus the sales that were generated.

Q. What information or document would you look at to see the return on the investment of the advertising or promotion or marketing?

MS. RUSSELL: Yes. If you refresh it should be available now.

Q. And what 1017 is is a collection of advertisements or e-mail solicitations that What Goes Around Comes Around has produced to us in this case. So if you could take a look at the first one, which is What Goes Around Comes Around, October is breast cancer awareness month, have you ever seen an ad like this, or have you seen this specific ad for What Goes Around Comes Around?

A. I have not seen this specific

145

M. ROSADO

ad. Mind you, this is from 2014. I worked at the company starting 2017.

Q. I understand that. You are also the designated corporate witness on it, that's why I'm asking you the questions.

There is a statement in the middle of the advertisement that says make a purchase using code, and it has

awareness. Have you ever seen codes for advertising or purchases that the company has used before?

A.    Yeah, that's a common practice for promotions.

Q.    Okay. Does the company track the purchases that are made with a particular code?

A.    I believe recently they do. In the past they probably do not.

Q.    Do you know for sure they did not, or you just don't believe that they did?

A.    I don't know for certain.

Q.    For the time periods where you

146

M. ROSADO

have seen the company track sales by using a code, how is a company accomplishing that?

A.    How is the company accomplishing the tracking of it?

Q.    Right. What is it -- I mean, is there something, when the person puts it

in, I would presume when they make a purchase they type in awareness and there is some function of the QuickBooks or the Llama system that is tracking it?

A.    I would say Google Analytics would be the best source for that, but my understanding as a general practice in Google Analytics the detailed level of tracking, it is something that, you know, the user determines in the process.  So whether or not they track the individual code or, you know, promotions during the period, that's up to the user to determine when they set it up.

Q.    Who is the person that is most knowledgeable about the Google Analytics use for What Goes Around Comes Around?

147

M. ROSADO

A.    I would say the person in charge of our e-commerce.

Q.    What is that person's name and title?

A.    Ambria Mische, she is SVP of

merchandising.

Q.    And SVP means senior vice president?

A.    Correct, yes.

Q.    How large is the company's e-mail list for sending e-mail advertisements?

A.    I don't know that off the top of my head.

Q.    Who would be the person who would know that?

A.    The person in charge of e-commerce.

Q.    That would be Ms. Mische again?

A.    Yes.

Q.    You used the word vintage earlier.  What do you consider vintage to be?

A.    Items after a certain age.

148

M. ROSADO

Q.    What's the age?

MR. KIDDÉ:  I'm going to object that this is beyond the scope of his

used by the company?

A.    My understanding is that they use them.  I don't know all the hashtags that are used.

Q.    Does the company track any income generated from the use of a hashtag?

A.    No.

MS. RUSSELL:  I'm going to introduce an exhibit previously marked. This was previously marked as Exhibit 1019. And it should be available now.

Q.    Okay.  If you take a look at, let's look at -- take a look at the first page of the exhibit where it says please use code Coco 20 at checkout.  Does the company do anything to track the sales for a code such as that?

A.    As of most recent, I believe we do.

Q.    Say that again.  I'm sorry, I didn't hear you.

A.    As of recent, we do.  In the past, I don't believe the company did.

150

M. ROSADO

Q.    Okay.  Does the company still use any codes that have the word or name Coco in them?

A.    I personally don't keep track of what promo codes are being used.

Q.    And who would know the most in terms of how these codes are tracked within the company's financial system?

A.    Well, those are not tracked in the company's financial system.  Again, we do not track that information.

Q.    Okay.  Those are tracked by Google Analytics?

A.    Correct, they are not in the financial system.

Q.    Got it.  Okay, if you take a look at the second to the last page of this exhibit.

A.    Okay.

Q.    And you see where it says happy birthday Coco, and it says 20 percent off vintage Chanel, and then it says use code VIP Happy Bday Coco.

A.    Okay.

Case 1:18-cv-02253-LSD Document 2092-7 Filed 05/25/21 Page 208 of 254

M. ROSADO

Q.   Do you know what -- would this be something that was tracked by Google Analytics?

A.   That's a question better asked to the person that is responsible for this process.  This is not my responsibility.

Q.   If you look at the last page it has a copyright notice of 2018.  Does that indicate that the e-mail was created in 2018?

A.   I do not know.  But based on the date stamp on the top left, it would maybe tell me otherwise.

Q.   What are you looking at?

A.   Well, the fact that the copyright 2018 is on all of the images that we provided but there is a different date stamp at the top left, that would probably tell me that the copyright 2018 that you are referring to is not necessarily the creation date of that image.

Q.   Okay.  Because I can't see the

date that you're talking about, this other date, what date does it state?

152

M. ROSADO

A.    It is on the last page, for example, it says 9-29-20 on the top left.

Q.    Okay. So this e-mail could have been created in September of 2020; is that what you're saying?

A.    I'm telling you what I'm looking at, the picture. I didn't create the e-mail or the advertisement. It's not my responsibility.

Q.    I'm just trying to get, what point are you making with the September 2020 date?

A.    Well, you were asking if the copyright 2018 stamp at the bottom was an indication of when the e-mail was created, and based on the information that you put in front of me, I deduced that it probably does not correlate to the date of the creation of the advertisement, because there is different dates in the top left of

each of the individual images.

Q.	Okay.

A.	Well, actually they all say 9-29.

153

M. ROSADO

Q.	Assuming that your assumption is correct that it was September 2020, this would be a time period where the company was tracking the codes through Google Analytics; is that right?

A.	Well, again, this is an assumption based at face value. This is not my responsibility, nor do I attest as to what period these advertisements came from.

Q.	I understand why you're saying that, but that's really not the question. What I'm getting at is just temporal. If this was -- advertisement was put out in September of 2020 and it has VIP happy birthday Coco code on it, that's something that would be tracked at that time through Google Analytics, right?

MR. KIDDÉ: Objection, exceeds scope. You can answer.

A. That is a question better asked for the person responsible.

Q. Did you see any Google Analytics reports in 2020 for the company?

154

M. ROSADO

A. I did, yes.

Q. Did you see any Google Analytics reports in 2019?

A. I did.

Q. Did you see any Google Analytics reports in 2018?

A. I did not.

Q. Do the advertising and promotion expenses that have been identified on the spreadsheets, do those include payments to social media influencers?

A. Yes.

Q. Do you include that within the definition of online marketing or social media marketing?

vague, exceeds the scope.

A.      Yes, it would be part of that cost of advertisement and promotion.

MS. PIETRINI:  At this time I'm going to suspend the deposition because we obviously don't have any financial documents for 2020.  We don't have the monthly statements that the witness has identified from January 2018 through November 2020, the monthly financial statements.  We don't have the Google Analytics reports.  We know those are subject to the motion to compel that is pending before the Court right now.  And given that the claim of tax payment deductions on the profit Excel spreadsheet that we looked at today, we need the tax returns of the members, because those are relevant to that claimed deduction.  So at this point we are going to suspend the deposition.

MR. KIDDÉ:  We disagree with the basis, but we won't go into that further.  We don't agree.  You've had your

# EXHIBIT 8

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

CHANEL, INC.,                 :    CIVIL ACTION
                                :       Number
       Plaintiff,           :   18-cv-2253-LLS
                                 :

       vs.                  :
                                 :

WGACA, LLC, WHAT COMES AROUND,    :
GOES AROUND, LLC d/b/a WHAT GOES    :
AROUND COMES AROUND, MHW         :
PROPERTIES, INC., WGACA WEB, LLC, :
PINES VINTAGE, INC., VINTAGE      :
DESIGNS LTD., and WGAGA LA, LLC,   :
                                 :
       Defendants.         :

- - - - - - - - - - - - - - - - - x

       Veritext Virtual Zoom Videotaped

deposition of AMBRIA MISCHE, taken on Thursday,

January 28, 2021, held at 41 Park Avenue, New York,

New York 10016, commencing at 10:06 a.m., before

Jamie I. Moskowitz, a Certified Court Reporter and

Certified Livenote Reporter.

2

A P P E A R A N C E S:


SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
BY:  BRIDGET J. RUSSELL, ESQUIRE
1901 Avenue of the Stars - Suite 1600
Los Angeles, California 90067-6017
310.228.3700
dprice@sheppardmullin.com
Counsel for the Plaintiff


LEWIS BRISBOIS BISGAARD & SMITH LLP
BY:  THOMAS S. KIDD , ESQUIRE
633 W. 5th Street - Suite 4000
Los Angeles, California 90071
213.250.1800
thomas.kidde@lewisbrisbois.com
Counsel for the Defendants
WGACA LLC, et al


ALSO PRESENT:


CERTIFIED LEGAL VIDEOGRAPHER
Jeffrey Menton

3

E X H I B I T S

EXHIBIT NUMBER      DESCRIPTION                          PAGE

Exhibit 1161    Plaintiff Chanel, Inc.'s              13
                Notice of Deposition of
                Ambria Mische Pursuant to
                Fed.R.Civ.P.30(b(6)

Exhibit 1162    Standard Operating Procedure         72
                created 6/14/2019

Exhibit 1163    Rago Brothers                        100
                Invoice #248702

Exhibit 1164    Rago Brothers                        110
                Invoice #249795

Exhibit 1165    Rago Brothers                        112
                Invoice #249796

Exhibit 1166    Rago Brothers                        113
                Invoice #250325

Exhibit 1167    Rago Brothers                        131
                Invoice #250872

Exhibit 1168    Rago Brothers                        142
                Invoice #248702

Exhibit 1169    Document entitled                    144
                Chanel Black Caviar Zip Tote

Exhibit 1170    Document entitled                    149
                Chanel Gold and Pink Gripoix
                Stone Cuff

Exhibit 1171    Document entitled                    151
                Chanel Red Quilted Lambskin
                Chain Belt Bag Small

Exhibit 1172    Document entitled                    191
                WGACA Spreadsheet ETSY
                Chain Sunglasses

Exhibit 1173    Document entitled                    210
                Authenticity Guaranteed

4

EXHIBIT NUMBER     DESCRIPTION                          PAGE

Exhibit 1174     Defendants' Response to Claims   252
                 by Chanel as Items Identified
                 by Chanel Pursuant to Orders of
                 May 5th, 2020, June 16th, 2020
                 and August 21st, 2020

Exhibit 1175     Authentication Certificate from  260
                 What Goes Around Comes Around

5

                        REQUEST PAGE

     INSTRUCTIONS NOT TO ANSWER:

     Page  Line

     None

     REQUEST FOR PRODUCTION OF DOCUMENTS:

     Page  Line              Description

     None

     STIPULATIONS:

     Page  Line

     None

     QUESTIONS MARKED:

     Page  Line

     None

6

TABLE OF CONTENTS

Ambria Mische


Examination

By Ms. Russell....................Page 8

Reporter Certificate...............Page 272

Notice to Read and Sign............Page 273

Index of Exhibits..................Page 3

7

THE VIDEOGRAPHER:  Good morning.

We're going on the video record at approximately 10:06 a.m. on Thursday, January the 28th, 2021.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Video Media Disk 1 of the video recorded deposition Ambria Mische, the designated 30(b)(6) representative of WGACA, LLC, et al.  The caption of this case is Chanel Inc. versus WGACA, LLC et al. filed in the United States District Court, Southern District of New York.  This is Case Number 18-cv-2253. This deposition is being taken by attorney Bridget Russell from the law firm of Sheppard Mullin Richter & Hampton, LLP, counsel for the plaintiff.

This deposition is being held remotely.  My name is Jeff Menton.  I am the certified legal videographer.  The court reporter is Jamie Moskowitz.  And we are both from Veritext New York.

All counsel consent to this remote video arrangement and waive any objections to

8

this manner of reporting.

Counsel will now state their appearances and affiliation for the record beginning with the noticing attorney. And please also note and state your acceptance of the court reporter swearing in the witness remotely, and this remote video arrangement.

Please proceed.

MS. RUSSELL: This is Bridget Russell, on behalf -- from Sheppard Mullin Richter & Hampton on behalf of plaintiff, Chanel Inc., and I accept the administration of the oath via

MR. KIDD : Thomas Kidd of Lewis Brisbois, Bisgaard & Smith on behalf of the defendants and the witness. We also consent to the remote video and swearing in.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear the witness in?

AMBRIA MISCHE, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. RUSSELL:

Q      Good morning, Ms. Mische.

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

20

later, to produce some of these invoices. And he, you know, obviously found some, but not -- some from earlier days because we're talking -- I asked for ones from 2016 and 2017, and I only asked for a sample, so I just saw one or two.

Q      Okay. Anything else that you reviewed to prepare for your deposition?

A      I also had discussed -- I'm just looking at 3 real quick.

Q      And by 3, you mean the deposition topic, correct?

A      Topic, yes. Yes, Number I or Letter I in Topic 3, the instances where WGACA had determined that a Chanel branded product was not authentic, these were items that I believe were referenced by somebody else. I can't even really remember how this came about, but sunglasses that had been purchased and they didn't have authentic attributes, and I believe it was determined that I wasn't sure what happened to them, I knew that we didn't sell them.

And I looked to see if we had them somewhere in a box, and I did find them. And they were -- they were in a box label, not taken out of inventory, but I think there had been a question as

21

to whether or not we had sold them, I believe, and I wanted to see for myself, you know, to find them. Or either we had them, or we -- we either threw them away or we had them and they were in a -- in a box marked inauthentic and questionable.

Q        Okay.  Anything else that you reviewed in preparation for your deposition today?

A        Adrienne Hahn's testimony.

Q        Okay.

A        And --

Q        And by that -- I'm sorry.

You mean her deposition transcript?

A        Sorry, yeah, deposition transcript. And my own Declaration, I just went over my own Declaration that I sent kind of a while back.

Q        Why did you review Ms. Hahn's Declaration or deposition?

A        Because it was in here on my Number 3. My Number -- let's see, Number 3.

Q        On F, correct?  WGACA authentication?

Okay.  So did you review her deposition or her Declaration?

A        Oh, it's probably her Declaration.  I probably misspoke.

Q        No worries.

23

And so is that -- is that everything?

A Pretty much, yes.

Q Pretty much?

Just to be clear, is there anything else you can think of that you reviewed?

A No.

Q Okay. And what else did you do to prepare for your deposition besides review the documents you have listed?

A Nothing really. I didn't even get open Veritext Exhibit Share. I'm just very busy, so I wasn't able to, I guess, prepare much more than what I just said.

Q Okay. So were you able to speak with any employees at WGACA regarding your -- the subjects?

A Regarding the subjects, no, just to tell my staff that I wouldn't be in today.

Q So you didn't speak to Ms. Li or Ms. Shaughnessy regarding Subject 3?

A No. Subject 3, I didn't -- I didn't speak to them about this deposition, about this meeting today.

Q Okay. Did you speak with any former employees of WGACA regarding -- in order to prepare

24

for today?

A          No, I did not.

Q          Did you do anything to investigate WGACA'S -- actually, can we confirm, when did you begin working at WGACA?

A          April 18th, 2016.

Q          Did you do anything to confirm what WGACA'S practices were prior to you joining the company?

A          No.

Q          And you stated that you reviewed your prior deposition testimony, correct?

A          Briefly, yes.

Q          Did you review the exhibits or just the testimony?

A          Just the testimony.  I -- I -- I would say I glanced at it.

Q          Okay.  And you listed five documents that you looked at.

Did you select those documents to review?  Was that your decision as far as those documents?

A          They were -- they were forwarded to me from -- from our attorney to, you know, if I wanted to review them, they might be good for me to review.

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

25

Sent probably a week, maybe two weeks ago. And I just had time to look at them in the last 24 hours.

Q      Okay. Did you review any information in any of the WGACA databases?

A      No.

Q      Did you review any pleadings in this case?

A      What -- I don't know what a pleading is. I'm sorry.

Q      No worries.

Any of the documents that have actually been filed on behalf of the parties?

A      No.

Q      How long did your prep -- how long would you say that your preparation for this deposition lasted?

A      An hour and 45 minutes, if I piece it all together.

Q      Okay. And did you speak with your counsel?

A      For a -- for a short time, yes.

Q      How long would you say?

A      Fifteen minutes.

Q      Okay. And was that over Zoom?

26

A        No, just a call.

Q        And was anyone else present or on line during the call besides --

A        No.

Q        And did you review any documents after you spoke with counsel?

A        I believe -- so I -- I spoke with counsel once in the last 24 hours, and I re- -- I had -- I would say that in that hour and a half or hour and 45 minutes, I might have spoken to them, if I -- when I said that I prepared for about an hour and 45 minutes, that means that I kind of did it sporadically, so 15 minutes here, 15 minutes there.

None of the documents are particularly page turning and interesting, so I spread it out. And then I might have -- the time in which I actually talked to counsel might have been somewhere in the middle of that over a 24- to 48-hour period.

Q        Okay.  And you've stated that you didn't read any other witnesses' deposition testimony.

Has anyone given you a summation of what other of WGACA'S witnesses have testified about in this case?

A        No, actually.

27

Q        Did you speak with, for example, Ms. Li after her deposition?

A        No.

Q        Did you speak with Ms. Shaughnessy after her deposition?

A        No.

Q        Did you speak with Mr. Bober after his deposition?

A        No.

Q        Okay.  And I just want to confirm, are you going to be providing testimony regarding -- if you go down to Subject 3, there's 3G, or are you aware that that is not something that you're going to be giving testimony on?

A        I was told that everything on -- all the letters under Number 3 on Page 6 were items that I should be -- were line items I should be prepared to talk about.  Although I'm not quite sure what the questioning will be, so I'm, you know, prepared to discuss any questions you have related to any letters under Number 3.

Q        Okay.  You can probably keep that up just in case you want to look at it.  I believe you'll notice as we go through here that if -- and when I ask you to look at another exhibit, you

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

28

should be able to keep them in separate tabs here.
So hopefully that will make things easier.

A        Okay.

Q        Okay.  We're going to deal with
Topic 11 to start with.

So what is your role with respect to
the repair process?

A        Currently, more -- currently, almost
nothing.  I -- I mean, I -- I oversee what we buy
and -- and the distribution of the -- the
merchandise.  The actual physical sending out of
items to Rago is done under the opera- -- under the
Operations team, which as -- which is usually a
lower-level employee that just, you know, packs
things up and sends things out.

I have had roles in determining
what -- you know, what -- as I testified before, you
know, what should be done to a bag.  Mostly because,
as I have said in my prior testimony, there was a
time where I felt we were being charged too much by
Rago as they were, you know, doing touchups and
painting a little bit more of the bag than we needed
them to.  And really, only what we ever want is to
touch up corners.

And so I had initially had a hand in

38

on.

Q        So do you oversee the refurbishment of Chanel jewelry?

A        No.

Q        Who would oversight -- would have overseen that?

A        I actually don't know.  And that sounds strange, but I -- I can't recall.

Q        So did you -- you didn't make any effort to determine who repaired jewelry on behalf of WGACA prior to your deposition?

A        The only -- did I review?

Q        Sorry.  Strike that.  That wasn't the proper question.

You didn't make any effort to become knowledgeable regarding WGACA'S practices with respect to the repair of jewelry prior to your deposition?

A        No, I did not.

Q        And I think you mentioned belts.

So how about for other accessories, was that -- was there a separate -- does WGACA have a separate procedure for the repair of belts and non-, you know, leather accessories?

A        So we don't have like a specific

90

actually, when I tried to go a couple of pages down

it being a little difficult because it's such a big

file, but it would seem like it's an option or maybe

it's just something that because they would write

often, would auto populate based on memory in the

computer, or it could be an option.  I'm really not

sure, but it seems like a recurring theme.

Q        Okay.  But you said you're not

familiar with it -- with the -- you're not familiar

with the drop-down options that are available to

WGACA employees as far as the -- when they -- when

they detail the work requested by Rago Brothers --

or requested through Rago Brothers?  Excuse me.

A        Yeah.  No, I'm not.

Q        And you didn't -- so did you review

the repair module prior to your deposition?

A        No.

Q        Okay.

        MS. RUSSELL:  I'm going to introduce

another exhibit.  This is another prior

exhibit.

        THE WITNESS:  Should I refresh?

        MS. RUSSELL:  It's not up yet.  Hold

on.

        So this is 1086 and -- I'm sorry.

128

et cetera of a bag, that the -- the policy is to let them know that WGACA generally touches up the bags, correct?

A     Yes.  Yeah, absolutely.  We don't hide it.

Q     And so then did you do anything to prepare for your deposition to determine whether there is a -- a policy or there is a training manual that discusses how to notify potential or actual purchasers regarding repairs when asked?

MR. KIDD :  Objection, asked and answered.

BY MS. RUSSELL:

Q     Okay.  And then regarding --

COURT REPORTER:  Was there an answer?

THE WITNESS:  I said no.

MS. RUSSELL:  She said no.

BY MS. RUSSELL:

Q     And then regarding the wholesale clients, you repair bags prior to -- or WGACA specifically, repairs bags prior to, you know, providing them to wholesale clients, correct?

A     Correct.

Q     Does WGACA tell its wholesale clients, this particular bag -- or the specific repairs that

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

129

were made to bags?

A     I would assume.  I -- I -- I don't know, but I would assume so.  And I -- I can't imagine that being any dif- -- that policy being any different, but I don't work in the wholesale department in wholesale sales at all.

Q     So prior to your deposition, did you --

A     Actually, wait.  I -- I actually -- so there was one time where I was assisting our CEO, Seth, with working with a specific client, and I was showing off some -- some bags to this client via like a video call that, you know, that we had -- that I just purchased, and, you know, just to show -- show some of the bags.  And he said, Well, we're going to touch a couple of these up before we send them to you, and the client said, Oh, great.  I do remember that.  That was years ago.

But same thing, like just total transparency.  We have a very transparent culture at WGACA.  We're not doing anything wrong.  We don't like to hide anything in terms of how we do things.  So, you know, I didn't even consult Seth on that, and that was his client who ended up being a pretty big client.  And there was absolutely no push back.

Case 1:18-cv-02253-LSD Document 28-8 Filed 05/25/21 Page 234 of 254

In fact, it was like, Oh, good, and that was that and we moved forward with the sale of those bags, so...

Q      So again my question -- I wouldn't say that that was responsive.

My question was:  Whether there's a general policy regarding the informing wholesale clients as to the repairs that are performed to bags prior to selling them to the wholesale clients.

So not when a wholesale client asks about something, but whether it's WGACA'S policy to tell its wholesale clients up front the repairs that are done to specific bags that the wholesale client is purchasing?

MR. KIDD :  Objection, it's compound.

THE WITNESS:  I don't know because I don't work in wholesale.

BY MS. RUSSELL:

Q      And do -- did you -- did you, in preparation for your deposition, did you confirm with anybody in the wholesale department regarding their policies and procedures related to repairs?

A      No.

Q      Who, at the wholesale department, would be in charge of communicating those types of

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

131

things to wholesale clients?

A        Seth, our CEO.  He runs wholesale.

                MS. RUSSELL:  I'm going to introduce as exhibit -- it's loading.  Actually, I'm not sure we went over this.

                This is Exhibit 1167 that I've already marked, so we can look at it really quick.

                This is another Rago Brothers' invoice sent to WGACA with a number 250872.

                (Whereupon, Exhibit 1167 was marked for Identification.)

BY MS. RUSSELL:

Q        And you'll see the first item there is a Chanel item, and you'll see you the -- the charge there is -- is very small.

A        Yes.

Q        So does this refresh your recollection that for these types of very minor touchups, Rago Brothers would charge amounts as low as $20? $25?

A        Yes.

                MS. RUSSELL:  Moving on, I'm going to introduce as Exhibit 1168 -- sorry.  This is pulling up the wrong one.

                Can we go off the record for just a

164

Q        And if not, we can go back and forth.

Why don't you just grab 1032 to start?

A        This is the PetiteLuxury Re-Order report.

Okay.  So I -- 1032, fine.  Hold on.

Q        Just let me know when you have that up.

A        It's the invoice, right?  HOI TONG Lee.

Q        Correct.

Are -- are you familiar with this invoice?

A        No.  I'm looking at it now.

Q        You've never seen this invoice before?

A        I'm not familiar with it, no.  I wasn't -- I wasn't buying these items, and I -- I didn't buy these items.

Q        Okay.  Do you know who PetiteLuxury is?

A        I -- yeah, I know that that is where Seth had formulated some kind of relationship, and he -- really before I was even working for WGACA, and he -- he was buying items from them on a regular basis, but I -- he didn't go through me to buy those.

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

165

Q        Okay.  But -- so in preparing for your deposition, did you ask Mr. Weisser about the purchase of Chanel branded items from PetiteLuxury or HOI TONG Lee is the -- is the person involved there showing in Exhibit 1032?

A        No.

Q        Okay.  So based on what you do know, what's your understanding as to the -- how these items were authenticated?

A        I don't know.

Q        You're not aware of how -- of WGACA'S authentication policy with respect to items purchased from PetiteLuxury?

A        Exactly, yes.  No, I'm not.

Q        Okay.  Are you aware of who at WGACA authenticated, or are you aware if these items were authenticated by WGACA prior to being sold?

A        I am not.

Q        So presumably, you're also not aware of who, if anyone, would have authenticated these items?

A        Exactly.  Yes, you're right.

Q        Does WGACA have any evidence that these items were authorized by Chanel to be distributed to the public?

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

167

A        As -- as is the operational definition that -- that -- I -- I guess is your operational definition, sure.

Q        What would -- what would you define these items as?  What would WGACA define these items as.

To be clear, when I say "you," I mean WGACA.

A        Well, I -- I obviously didn't have any hand in the buying or distribution or selling of these.  This was always something that Seth owned.  And I believe he -- he gave them or sold them to our wholesale partners.  And -- and so -- I mean, in terms of like actual luxury product -- well, everything other than these, I was -- I had a hand in the buying and the selling of and the authenticating of.  This particular aspect or the point-of-sale items, I had virtually no involvement in.

Q        Okay.  Just to go back to, you know, as we stated at the beginning, you -- you understand that -- that you're giving testimony on behalf of WGACA today, correct?

A        Yes.

Q        Not just your personal knowledge,

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

168

correct?

A       Yes.

Q       And that you are supposed to be prepared to give testimony regarding WGACA, the entity's knowledge as a whole regarding the items listed in -- that you were designated for and listed in the deposition notice, correct?

A       Yes, but I can only speak to what I know, so -- but you can ask me anything.

Q       Well, I understand.

So you didn't do anything to prepare as to -- prior to your deposition, you didn't do anything to prepare to determine Chanel's -- or sorry -- WGACA'S policies regarding the authentication of these items?

A       No.

Q       Okay.  So --

MR. KIDD :  Counsel, I would point out that Mr. Bober is also designated on this particular topic and that can be addressed with him in the next session.

MS. RUSSELL:  Okay.  Understood.

Let's get to see what -- what you do know on behalf of WGACA.

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

191

A        Yeah.  I'm not aware of what this instance -- what this instance was.  I couldn't speak to it properly.

Q        Okay.

A        I -- I am not sure why we're reaching out to Kaitlyn at Christie's for a letter confirming that the sunglasses are not authentic, unless that was going to help with the case against Etsy to get our money back.  That's all I can think of.

Q        Okay.  And so it's your testimony that you know for certain that WGACA did not sell the Chanel branded chain sunglasses at issue in these emails, because you've located a box that contains the four sunglasses that were purchased from Etsy?

A        Yes.

Q        And again, the box does not have any designation related to Etsy, but they are the same type of sunglasses, correct?  The four sunglasses match the four sunglasses obtained from Etsy?

A        Yes.

MS. RUSSELL:  Okay.  I'm going to introduce a new exhibit.  This is Exhibit 1172.

(Whereupon, Exhibit 1172 was marked for Identification.)

THE WITNESS:  1172, you're

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

194

saying that -- that the Etsy sunglasses that we looked at, there was four pairs of them, would those four pairs of sunglasses have skus? Have already been given skus when they were obtained by WGACA?

A    Yeah, probably, and then they might have been marked out of stock, but the sku history would remain. I think these are the ones that were the authentic pair that were purchased on eBay.

Q    What is the basis for your speculation regarding that?

A    Because I think on the other -- well, the -- first of all, there's a serial number on here. And does that serial number -- I don't think that serial matches the side by side of the -- whole on. I just got to look real quick.

What was that -- sorry. What was that exhibit number that we were looking at with the side by side? Was that 46?

Q    I believe it was in several. I think it's also in 43 most clearly.

A    Okay. Yes. Yes. Yes. I have it.

So -- okay. So yeah. So in her notes on Exhibit 1046 on the Page 2 of 3, which is -- well, yeah, 2 of 3. Yeah. Yeah. Yeah. She's saying, "Chanel vintage 02790 model sunglasses."

195

She's referring to the authentic reference. And then in the Sold Database Guide, 02690 WGACA KBLL1. I mean, all I would have to do is look up the sku in the WGACA database and see what the vendor was on this one that has sold. Do you guys -- do you guys -- that's easy to do.

COURT REPORTER: I'm sorry?

BY MS. RUSSELL:

Q    Is that something -- if we went on a break, is that something you're capable of doing?

A    For sure.

Q    Are you willing to do that?

A    Yup.

Q    Was that a yes or a no?

A    Yes. Yes. Were you -- was the question surrounding this because you think that this is the sale of the Etsy sunglasses?

Q    That's what we're trying to confirm right now.

A    Oh, okay. No problem. Sure.

Q    We were hopeful that, you know, you would be prepared to testify as to --

(Whereupon, multiple people were speaking at the same time.)

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

197

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: We're back on the video record. The time is 4:10 p.m.

BY MS. RUSSELL:

Q    Okay. Ms. Mische, I believe we went off record to confirm the source of the item in Exhibit 1172.

Are you able to do so?

A    Yes.

Q    And what was the source?

A    eBay, a vendor on eBay, a specific vendor on eBay.

Q    And WGACA can produce records to demonstrate that?

A    Yes.

Q    Okay. Let's move on.

From the period of 2014 through the filing of this action in 2018, did WGACA have any type of policies or guidelines as to when to refer to something as vintage in its advertising and other sales -- sales offerings?

MR. KIDD : Objection, it's vague.

THE WITNESS: Not -- not that I'm aware of.

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

269

video record.  The time is 6:06 p.m.

BY MS. RUSSELL:

Q        Okay.  Ms. Mische, if you could just pull up your amended deposition notice.  That's Exhibit 1161.

A        Okay.  I'm here.

Q        I just want to confirm, again, what you did to prepare for these -- these topics.

So for the -- for Topic 3A, what did you -- did you do anything to prepare for this topic prior to your deposition?

A        No.

Q        So for 3B, did you do anything to prepare for this topic prior to your deposition?

A        No.  I already knew what it -- I already know what I know.

Q        So for 3C, did you do anything to prepare for this topic prior to your deposition?

A        No.

Q        D, same question?

A        No.

Q        I believe E, you stated that you reviewed your Declaration, correct?

A        Yes.

Q        And for F, you stated that you

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

270

reviewed the Declaration of Ms. Hahn, correct?

A    Yes.

Q    So for G, did you do anything to prepare for this topic prior to your deposition?

A    No.

Q    How about H?

A    No.

Q    And for I, I believe your testimony was that you searched for and located glasses you believed to be the Etsy glasses referenced in those documents?

A    Yes, ma'am.

Q    And then going down to Number 11, did you do anything to prepare for Topic 11A?

A    No.

Q    How about 11B?

A    No.

Q    And I believe for 11C, that would be the same answer, that you reviewed your Declaration, correct?

A    Hold on one second.  Because remember, I did say that I had looked up -- I had looked up the invoices for Rago just to see that -- you know, in 2015 and 2016 that they were handwritten.  I did do that.  But it doesn't -- it's not really -- it's

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

271

not really pursuant to C or doesn't really pertain to C.

But I had a feeling that the fact that I couldn't match all those skus up would come up and that's why I did that.  I wasn't aware that I could have worked with Rago to try and figure out those skus.  It would have made things go faster maybe, but anyways.

Q       But besides -- besides looking at your Declaration and reviewing some invoices, that's all you did to prepare for C, correct?

A       Yes.

MS. RUSSELL:  Okay.  So we are -- I'm not going to close this deposition.  I do think we have quite a few things that Ms. Mische was not prepared to testify on today.  As you noted Tom, Mr. Bober is also designated for these topics so that might be taken care of, but I'm going to keep it open nonetheless to the extent necessary to come back.  And otherwise, I think regular stipulations, correct?  30 days?

MR. KIDD :  Yup.  I think that's fine.

MS. RUSSELL:  Okay.  Thank you everyone.

MR. KIDD :  What's the -- what's the

[1/28/2021] 1/28/2021 Ambria Mische- 30(b)(6)

# EXHIBIT 9

Message

| | |
|---|---|
| **From:** | Robin Gruber [Robin.Gruber@chanelusa.com] |
| **Sent:** | 5/25/2016 5:04:19 PM |
| **To:** | bsolomon@frosszelnick.com |
| **CC:** | Jennifer Bleys [Jennifer.Bleys@Chanelusa.com] |
| **Subject:** | Fw: Chanel handbags Dillards Mall La |

## Redacted

----- Forwarded by Robin Gruber/US/CHANEL on 05/25/2016 05:02 PM -----

From: Joyce Green/US/CHANEL
To: Robin Gruber/US/CHANEL@US_CHANEL, Julien Gommichon/US/CHANEL@US_CHANEL, John
Galantic/US/CHANEL@US_CHANEL,
Date: 05/25/2016 03:53 PM
Subject: Fw: Chanel handbags Dillards Mall La

## Redacted

J

----- Forwarded by Joyce Green/US/CHANEL on 05/25/2016 03:53 PM -----

From: Nancy Costello/US/CHANEL
To: Pam Ursem/US/CHANEL@us_chanel, Evelyn Couzijn/US/CHANEL@us_chanel, Joyce Green/US/CHANEL@us_chanel
Date: 05/25/2016 03:48 PM
Subject: Fwd: Chanel handbags Dillards Mall La

CHANEL0011548



Hi this is from Dillards Mall of Louisiana in Baton Rouge. The bags were bought by Bill III during a meeting with Debra Dumas today I learned that Houston is the next event!
Sent from my iPhone

Begin forwarded message:

**From:** "Suzanne Prats" < SUZANNE.PRATS@chanelusa.com >
**Date:** May 25, 2016 at 12:43:47 PM CDT
**To:** "Nancy Costello" < Nancy.Costello@chanelusa.com >
**Subject: Chanel handbags Dillards Mall La**

Nancy

Confidential

I just meet with Brian. As you know, I was taking the escalator up to talk and saw the Chanel CC on a handbag case and then a full case of bags. I left my conversation that I had originally come concerning being notified that bags were being viewed in a stockroom and wanted to alert him of our concern.

Brian was completely aware and said that they were 1 of 3 stores approved by Bill 3 to have these handbags for an event. The bags were purchased by Dillards from "What comes around goes around" . The handbag event was 5/21 and yes he showed me a picture of a stockroom that was cleared out to presell and show clients to reserve the bag in rsvs over the past 2 weeks. They had a total of 117 bags, Louie, Gucci and Chanel . They sold 17 Chanel bags and have 18 left. Brain says that Dillards owns the inventory and they will stay in his store to sell out. The highest priced Chanel bag is a 2.55 for $3300. He said that the company who sold them the bags was very careful approving what stores Dillards was putting them in and not to have them in a market were Chanel bags were sold in an account or boutique, and catered to a higher end client. I told him that our corporate would most likely be in contact with Dillards corporate and thanked him for sharing his information.

Suzanne

Sent from my iPhone

Confidential

CHANEL0011550

# EXHIBIT 10

| From: | John Oot <john.oot@wgacany.com> on behalf of John Oot <john.oot@wgacany.com> |
| To: | Frank Bober; Seth Weisser |
| Sent: | 5/8/2018 9:47:48 PM |
| Subject: | Fwd: Legal Addendum to vendor agreement |

This is the original agreement that agreement that I spoke with you about.

Best,
John

John Oot
Senior Vice President
What Goes Around Comes Around
54 7th Avenue South
New York, NY 10014
(212) 242-4626
www.whatgoesaroundnyc.com

---------- Forwarded message ----------
From: **John Oot** <john.oot@wgacany.com>
Date: Tue, Mar 22, 2016 at 12:24 PM
Subject: Re: Legal Addendum to vendor agreement
To: Melissa Sanders <melissa.bradford@dillards.com>
Cc: Kay White <kay.white@dillards.com>, Anna Howell <anna.howell@dillards.com>, Michele Sassaman <msass@wgacany.com>, Seth Weisser <seth@wgacany.com>, Marika King <marika@wgacany.com>

Hi,

You will receive this by tomorrow.

Thank you,
John

On Tue, Mar 22, 2016 at 12:22 PM, Melissa Sanders <melissa.bradford@dillards.com> wrote:
John,
Thank you so much for sending this! Do you know when we will receive the pictures/units of the buy?
Thank you,

Melissa Bradford Sanders
Corporate Buyer
Dpt 278, 283, 286, & 288 Handbags
Dillard's Inc.
phone 501.399.7537

On Tue, Mar 22, 2016 at 11:20 AM, John Oot <john.oot@wgacany.com> wrote:
Hi,

CONFIDENTIAL

Here you go. Let me know if you have any questions.

Best,
John

On Tue, Mar 22, 2016 at 12:11 PM, Melissa Sanders <melissa.bradford@dillards.com> wrote:
John,
I am just following up on the attachment. It is imperative we get this signed so we can proceed with your set up in our system to maintain our original timeline. Is it possible you could send this back today? Also, I know we had spoken about possibly testing some of the jewelry, however, we have decided to just start with handbags. We are also needing pictures/units of the handbag buy. Can you send this as well?
Thank you,

Melissa Bradford Sanders
Corporate Buyer
Dpt 278, 283, 286, & 288 Handbags
Dillard's Inc.
phone 501.399.7537

---------- Forwarded message ----------
From: **Kay White** <kay.white@dillards.com>
Date: Fri, Mar 18, 2016 at 4:17 PM
Subject: Fwd: Legal Addendum to vendor agreement
To: John Oot <john.oot@wgacany.com>

Hi John,

The last thing. I need the below signed and emailed back.

It is an outline of our phone conversation,
FYI Business class for air is not an issue.

Melissa will also want to start getting the product on order.
Kay 501-301-3945

---------- Forwarded message ----------
From: **Kay White** <kay.white@dillards.com>
Date: Thu, Mar 17, 2016 at 10:37 AM
Subject: Legal Addendum to vendor agreement
To: John Oot <john.oot@wgacany.com>
Cc: Melissa Bradford <Melissa.Bradford@dillards.com>, Anna Howell <anna.howell@dillards.com>, Steven Duke <steven.duke@dillards.com>

Dear John please confirm your agreement or any issues with the below addendum.

We need this back by end of today.

CONFIDENTIAL

WGACA_00000037

Thank you.


Kay White
501-301-3945


--
John Oot
Vice President of Sales
What Goes Around Comes Around
(P) 212.242.4626
(F) 212.334.8022




--
John Oot
Vice President of Sales
What Goes Around Comes Around
(P) 212.242.4626
(F) 212.334.8022



CONFIDENTIAL

WGACA_00000038