### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

CHANEL, INC.,

        Plaintiff,

    vs.

WGACA, LLC, WHAT COMES AROUND
GOES AROUND LLC d/b/a WHAT GOES
AROUND COMES AROUND, MHW
PROPERTIES, INC., WGACA WEB, LLC,
PINES VINTAGE, INC., VINTAGE
DESIGNS LTD., and WCAGA LA, LLC,

        Defendants.

Civil Action No. 18-cv-2253-LLS

**DEFENDANT WGACA'S PHASE TWO
TRIAL BRIEF ON EQUITABLE RELIEF
INCLUDING CHANEL'S REQUEST FOR
A PERMANENT INJUNCTION**

.

1

**<u>TABLE OF CONTENTS</u>**

**Page**

I.   PERLIMINARY STATEMENT ................................................................... ix

II.  INTRODUCTION ................................................................................. 1

III. ARGUMENT ....................................................................................... 2

    A.   CHANELS' REQUEST FOR A PERMANENT INJUNCTION MUST BE DENIED BASED ON THE OVERALL FACTS AND CIRCUMSTANCES ........................................................................ 4

       1.   Chanel Has Not Been Harmed, Let Alone Irreparably Harmed. ............... 5

          (a)   There Was No Actual Confusion. .................................................. 7

             (i)   The Second Circuit's "Actual Confusion" Standard .......... 7

             (ii)   Chanel's Survey Expert Opinion Did Not Support Actual Confusion ........................................................... 8

       2.   The Legal Remedy Is Adequate Because Chanel has Already Been More than Compensated by the Award of Statutory Damages................. 10

          (a)   Despite The Jury's Verdict, The Evidence Established That WGACA Did Not Act Willfully. .................................................. 10

          (b)   The Physical Presentation of WGACA's Brick and Mortar Stores, As Well As Its Website, Belies Any Notion Of Willfulness. ................................................................................ 12

          (c)   WGACA Did Not Willfully Engage in Counterfeiting. ............... 13

          (d)   WGACA Lacks Willfulness on the 51 Claim. ............................. 14

          (e)   WGACA Lacks Willfulness on the Point of Sale and Gift Items. ............................................................................................ 16

          (f)   WGACA Lacks Willfulness on the False Association Claim. ............................................................................................ 17

       3.   The Balance of Hardships Weighs in Favor of WGACA. ........................ 18

       4.   A Permanent Injunction Would Not Serve the Public Interest. ............... 19

       5.   The Injunction Should Be Denied Because of Chanel's Unclean Hands. ........................................................................................... 20

          (a)   Chanel's Violation of the Court's In Limine Order is Evidence Of Unclean Hands. ...................................................... 21

          (b)   Chanel's Advancement of Joseph Bravo's False Testimony Shows Chanel's Unclean Hands. ............................................... 22

(c)   The Bravo False Lampo Slider Testimony and Chanel's Failure To Cure What Chanel Knew To Be False Testimony Shows Chanel's Unclean Hands. ............................... 22

(d)   Bravo's Testimony Where He Is Confronted With His False Testimony About The Lampo Slider Shows Chanel's Unclean Hands. ........................................................... 23

(e)   Bravo's Return on January 24, 2024 and the Recanting of His Prior Testimony Shows Chanel's Unclean Hands. ............... 24

(f)   Chanel's Effort to Prevent Gracie Ginn from Testifying Shows That Chanel's Behavior is Not Innocent. ......................... 25

(g)   Chanel Had an Affirmative Obligation to Alert the Court to the Fact that Mr. Bravo Had Offered False Testimony. .............. 25

(h)   Other False Testimony from Bravo and The Impact on Equity. ......................................................................... 27

(i)   Chanel Intends to Wrest Control of the Secondary Market. ......... 28

(j)   Chanel Admitted to Having Filed the Complaints Lacking Evidence that WGACA was Engaged in Counterfeiting. ............. 30

B.   IF THE COURT IS INCLINED TO ISSUE AN INJUNCTION, PLAINTIFF'S PROPOSED INJUNCTION IS OVERBROAD AND SHOULD BE REJECTED. ................................................................. 31

1.   The Proposed Injunction Is Far More Restrictive Than Reasonably Necessary. ................................................................. 31

2.   The Draconian Prohibitions of the Proposed Injunction Are Unjustified and Unlawful. ........................................................ 33

3.   Chanel Should be Required to Disclose the Serial Numbers Chanel Claims Were Stolen, Voided, or are Suspected of Counterfeit to Aid WGACA and Others Similarly Situated in Their Authentication Process. (Proposed Inj. 3(g)) ............................. 34

4.   The Proposed Injunction Ridiculously Requires WGACA To Obtain Permission from Chanel Before Legally Marketing Any Chanel Items. (Proposed Inj. 3(c)) ............................................. 34

5.   The Proposed Injunction Improperly Prohibits WGACA From Using Hashtags Consisting Of Or Including "Chanel." (Proposed Inj. 3(a) (v)). ........................................................................ 38

6.   The Proposed Injunction Improperly Prohibits WGACA From Using The Chanel Marks In Legitimate Advertising To Market Chanel Second-Hand Goods As Permitted By The Fair Use The Doctrine (Proposed Inj. 3(a) (i) – (iv) and (vi) - (viii) and 3(b)) .............. 39

7.    The Proposed Injunction Improperly Seeks to Enjoin Any Use Of The Name and Likeness Of Gabrielle Bonheur "Coco" Chanel When No Claim Based On Her Rights Of Privacy or Publicity Were Asserted. (Proposed Inj. 3(a) (ix)) .................................... 42

8.    Requiring WGACA to Photograph Serial Numbers and Post the Photos In Listings is Unreasonable. (Proposed Inj.  3(b)) ...................... 42

9.    The Disclaimer in the Proposed Injunction is Unnecessary, Harmful to Free Enterprise, and Misleading. (Proposed Inj. 3(b)) ........... 43

10.    The Proposed Recall and Refund Procedure of The Proposed Injunction Is An Improper Mandatory Injunction, Unreasonable And Unnecessary. (Proposed Inj. 3(d)) ................................................ 45

11.    The Proposed Injunction Improperly Restricts WCAGA's Ability to Sell Refurbished Items. (Proposed Inj. 3(e) - (f)) ................................ 48

12.    The Proposed Injunction Improperly Prohibits WGACA From Offering To Guarantee the Authenticity of Its Items. (Proposed Inj. 3(h)) .......................................................................................................... 49

13.    The Proposed Injunction Improperly Recognizes Aiding and Abetting Liability. (Proposed Inj. 3(i)) ................................................... 51

14.    The Proposed Injunction Deadline Is Too Short. (Proposed Inj. 3) .......... 52

IV.    CONCLUSION ................................................................................................. 52

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
    913 F.2d 958 (D.C. Cir. 1990) ........................................................................ 34

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*,
    307 F. Supp. 3d 260 (S.D.N.Y. 2018) .............................................................. 7

*Audemars Piquet Holding S.A. v. Swiss Watch Int'l., Inc.*,
    2015 U.S. Dist. LEXIS 3207 (S.D.N.Y. 2015) .......................................... 46, 48

*B & F Systems v. LeBlanc*,
    519 F. App'x 537 (11th Cir. 2013) .................................................................. 3

*Bayoh v. Afropunk LLC*,
    2020 WL 7318277 (S.D.N.Y. Dec. 11, 2020) ............................................ 5, 6

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
    837 F. Supp. 2d 208 (S.D.N.Y. 2011) ........................................................... 29

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*,
    2007 WL 2914452 (2d Cir. 2007) .................................................................. 13

*Canon, Inc. v. GCC Int'l Ltd.*,
    263 F. App'x 57 (Fed. Cir. 2008) .................................................................. 19

*Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co.*,
    1995 U.S. Dist. LEXIS 12849 .......................................................................... 48

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
    846 F.3d 35 (2d Cir. 2017) ............................................................................. 20

*Century Time Ltd. v. Interchon Ltd.*,
    729 F. Supp. 366 (S.D.N.Y. 1990) ................................................................. 18

*Champion Spark Plug Co. v. Sanders*,
    [331 U.S. 125] .................................................................................................. 49

*Chanel, Inc. v. RealReal, Inc.*,
    449 F. Supp. 3d 422 (S.D.N.Y. 2020) ............................................................ 50

*Cheddar Bob's Inc. v. Macsnmelts Mgmt. Co., LLC*,
    2020 WL 1323018 (E.D.N.Y. Jan. 14, 2020) ................................................. 8

*Cherry River Music Co. v. Simitar Ent., Inc.*,
    39 F. Supp. 2d 310 (S.D.N.Y. 1999).................................................................. 46, 47

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
    843 F.3d 48 (2d Cir. 2016)................................................................................... 50

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011)................................................................................. 31

*Concordia Pharms., Inc. v. Method Pharmsl, LLC*,
    240 F. Supp. 3d. 449 (W.D. Va. 2017) .................................................................. 3

*Conopco, Inc. v. 3DO, Co.*
    1999 U.S. Dist. LEXIS 20510 (S.D.N.Y. 1999) ................................................... 46

*Consumers Union of United States, Inc. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983).............................................................................. 39

*DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*,
    112 F.3d 61 (2d. Cir. 1997).................................................................................... 3

*Dellwood Foods, Inc. v. Kraftco Corp.*,
    420 F. Supp. 424 (S.D.N.Y. 1976) ...................................................................... 19

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)............................................................................................... 5

*EEOC v. Everdry Mktg. & Mgmt., Inc.*,
    348 F. App'x 677 (2d Cir. 2009) ........................................................................... 4

*EEOC v. KarenKim, Inc.*,
    698 F.3d 92 (2d Cir. 2012).............................................................................. 2, 11

*Eksouzian v. Albanese*,
    2015 WL 4720478 (C.D. Cal. Aug. 7, 2015)....................................................... 38

*Esposito v. Suffolk Cty. Cmty. Coll.*,
    2019 U.S. Dist. LEXIS 34957 (E.D.N.Y. Mar. 4, 2019) ..................................... 26

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
    696 F. Supp. 2d 368 (S.D.N.Y. 2010).............................................................. 36, 37

*Fraternity Collection, LLC v. Fargnoli*,
    2015 WL 1486375 (S.D. Miss. Mar. 31, 2015) ................................................... 38

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
    315 F. Supp. 2d 511 (S.D.N.Y. 2004).............................................................. 36, 37

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
826 F.3d 27 (2d Cir. 2016) ........................................................................ 32

*H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989) ..................................................................... 35

*Hamilton Int'l Ltd. v. Vortic LLC*,
13 F. 4th 264 Cir. 2021 .............................................................................. 49

*Hartford-Jackson, LLC v. Hound's Tree Wines, LLC*,
2022 U.S. Dist. 150412 (E.D.N.Y. 2022) ........................................... 45, 46

*Infogroup, Inc. v. DatabaseUSA.com LLC*,
2018 WL 6624217 (D. Neb. Dec. 18, 2018) ................................................ 33

*Kahala Franchising, LLC v. Real Faith LLC*,
2022 WL 1605377 (C.D. Cal. May 20, 200) .................................................. 5

*Lang v. Ret. Living Pub. Co.*,
949 F.2d 576 (2d Cir. 1991) .......................................................................... 7

*Estate of Lennon v. Screen Creations, Ltd.*,
939 F. Supp. 287 (1996 ) .............................................................................. 22

*Monster Energy Co. v. Vital Pharms., Inc.*,
2023 WL 2918724 (C.D. Cal. Apr. 12, 2023) .............................................. 51

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
269 F.3d 114 (2d Cir. 2001) .......................................................................... 8

*Olinsky & Associates PLLC v. Nutting*,
2021 U.S. Dist. LEXIS 124704 ..................................................................... 6

*PenneCom B.V. v. Merrill Lynch & Co.*,
372 F.3d 488 (2d Cir. 2004) .......................................................................... 4

*Philip Morris USA, Inc. v. Otamedia Ltd.*,
331 F. Supp. 2d 228 (S.D.N.Y. 2004) ................................................... 31, 42

*Polymer Tech. Corp. v. Mimran*,
975 F.2d 58 (2d Cir. 1992) ........................................................................ 35, 41

*In re R. M. J.*,
455 U.S. 191 (1982) ............................................................... 34, 39, 44, 51

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ............................................................................ 5

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .................................................................................. 51

*Star Indus., Inc. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005) ...................................................................... 12

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999) ................................................................ 31, 32

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*,
  851 F.3d 440 (5th Cir. 2017) ....................................................................... 7

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010)......................................................................... 41

*Two Hands IP LLC v. Two Hands Am., Inc.*,
  563 F. Supp. 3d 290 (S.D.N.Y. 2021)......................................................... 8

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953).................................................................................... 4

*Victorinox AG v. B&F Sys., Inc.*,
  709 F. App'x 44 (2d Cir. 2017) ................................................................ 31

*WE Media, Inc. v. Gen. Elec. Co.*,
  218 F. Supp. 2d 463 (S.D.N.Y. 2002).......................................................... 7

*Winter v. Natural Res. Defense Council Inc.*,
  555 U.S. 7 (2008).................................................................................... 2, 5

*World Wide Polymers v. Shinkong Synthetic Fibers Corp.*,
  694 F.3d 155 (2d Cir. 2012)....................................................................... 5, 6

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
  471 U.S. 626 (1985).................................................................................. 44

*Zip Intern. Group, LLC v. Trilini Imports, Inc.*,
  2011 WL 2132980 (E.D.N.Y. May 24, 2011) ....................................... 35

**State Cases**

*Amarant v. D'Antonio*,
  602 N.Y.S.2d 837 (App. Div. 1993) ........................................................... 4

**Constitutions**

First Amendment ...................................................................... 2, 34, 39, 44, 51

**Statutes**

15 U.S.C. § 1116(a) ......................................................................................................... 5

Lanham Act ................................................................................................. 3, 5, 29, 34, 35

Trademark Modernization Act of 2020 ........................................................................... 5

**Court Rules**

FRCP Rule 11 ................................................................................................................. 26

Rule 50(b) ...................................................................................................................... 10

**Other Authorities**

A Post-First Sale Authentication Right, 42 Loy. L.A. Ent. L. Rev. 111, 130
    (2022) ...................................................................................................................... 30

Hearing on H.R. 82 Before a S. Subcomm. of the Comm. on Patents, 78th Cong.
    62-63 (1944) ........................................................................................................... 30

https://www.whatgoesaroundnyc.com/en-us/authenticity-guarantee.html ................... 44

https://www.whatgoesaroundnyc.com/en-us/home ............................................. 12, 44

## I.      PERLIMINARY STATEMENT

Defendants WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC, d/b/a WHAT GOES AROUND COMES AROUND, MHW PROPERTIES, INC., WGACA WEB, LLC, PINES VINTAGE, INC., VINTAGE DESIGNS LTD., and WGACA LA, LLC (collectively "WGACA") hereby submit their Phase Two Trial Brief on Equitable Relief, opposing Chanel Inc.'s ("Chanel") Request for A Permanent Injunction. (Dkt. 448).[1] The Court had previously ordered that all equitable remedies including profits and injunctive relief be addressed in phase two (*See* Order re Outline of the Trial, Dkt. 369)[2] Chanel chose to brief only the equitable remedy of injunctive relief. WGACA will address the injunctive request below. We understand that the Court has now indicated via the Court's email to counsel of April 4, 2024, that there will be a live phase two trial where all equitable remedies will be considered and we intend to further brief the profit equitable remedy when appropriate with the Court's further guidance.

---

[1] After the jury issued the verdict in phase one of the trial, the court ordered Chanel to file its phase two brief regarding its requested equitable remedies in 30 days and ordered WGACA to respond to Chanel's brief 30 days thereafter (*See* Reporter's Transcript ["RT"], at pg. 2272:15 – 2273:14.).

[2] "Thereafter [meaning after the phase one verdict] the parties will present evidence to the Court…related to equitable remedies, such as disgorgement (which, since there are no lost sales requiring a proxy for measurement, is an equitable claim) and injunctive relief."  The Court then ordered Chanel to file a brief outlining what Chanel sought in equitable relief by March 7, 2024. (RT 2272-73).

## II.     INTRODUCTION

Chanel is not entitled to an injunction because the evidence illustrates that there is nothing from which Chanel needs protection.[3] Chanel foreshadowed the absurdly overbroad injunctive request that it now seeks in 2017 (just before this lawsuit was filed) when its global leadership convened for multiple meetings where Chanel wrung its hands over the burgeoning secondary market. Chanel made clear in those 2017 meetings that it views the secondary market (which Chanel does not participate in) as incompatible with its interests. Chanel recognizes that the first sale doctrine represents a substantial hurdle to Chanel's primary goal of ending sales of its vintage/second-hand products, and it embarked on this litigation as its effort to backdoor the first sale doctrine.  Chanel has already been successful in that regard by sending a chill across the entire luxury resale landscape with the verdict in phase one of this case. Up next for Chanel is an oppressive injunction which if issued as Chanel requests, will end WGACA's ability to sell second-hand Chanel goods and will serve as a harbinger to the entire industry. It is not an exaggeration that Chanel's proposed injunction would obliterate the first sale doctrine and make it virtually impossible for WGACA to sell vintage Chanel goods. Further, Chanel's business practice of refusing to share serial numbers of its handbags that get stolen or are voided creates an unrestricted ability for Chanel to sue any business or individual on the pretense of selling stolen or unauthorized items. Chanel's refusal to share its stolen and voided serial numbers would make it impossible for WGACA and other second-hand retailers to avoid future litigation by Chanel unless they stop selling Chanel goods all altogether, removing consumer choice to buy Chanel

---

[3]  As we detail here, WGACA has sold over 70,000 Chanel handbags since 2014 and at issue in this case was about 63 or about .0009 of the total Chanel handbags WGACA has sold.

second-hand. This would help Chanel achieve its anti-competitive goal of eliminating the second-hand market altogether. WGACA requests that the Court reject Chanel's overbroad injunction as violative of the First Amendment, first sale doctrine, and nominative fair use doctrine. Chanel's proposed injunction lays bare Chanel's ultimate goal: stopping the second-hand resale market of Chanel products.

## III.   ARGUMENT

Despite the jury's verdict, the question of whether an injunction should now be issued is subject to the rules of equity, and an injunction does not automatically follow. *EEOC v. KarenKim, Inc*., 698 F.3d 92, 100 (2d Cir. 2012) ("Generally, '[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.'") (quoting *Winter v. Natural Res. Defense Council Inc*., 555 U.S. 7, 32 (2008)).  Furthermore, equity can only be meted out after the Court considers all the relevant facts and circumstances of this case, including Chanel's actions and the ultimate impact on WGACA and the second-hand market and consuming public. An injunction would be an additional windfall for an already fabulously wealthy entity that has already been awarded $4 million in statutory damages.  That Chanel offered no evidence of any loss or injury because of anything WGACA did only further illuminates the inequity of handing Chanel a further tool to enable it to control the secondary market, which, as we will set forth, was Chanel's primary goal in this litigation.[4]

It is up to the Court, notwithstanding the jury verdict in phase one, to independently evaluate the evidence when assessing the equities. Furthermore, the willfulness findings of the

---

[4] The Court has already held that Chanel failed to offer any evidence of lost sales.  *See* Court's Order of December 13, 2023. Dkt. 369.

jury are merely advisory[5] and, in particular, need not be accepted by the Court in any event notwithstanding the Court's independent duty to evaluate the equities. *See DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 65 (2d. Cir. 1997) (noting that a trial court may consult with an advisory jury "so long as the court retains the ultimate responsibility for findings of fact and conclusions")).

Here, the jury issued a verdict of counterfeiting and willfulness against WGACA, even though the evidence established that at all times WGACA acted in good faith to legally market second-hand Chanel items and to avoid dealing in any inauthentic goods. Chanel points in great respect to those findings of willfulness as the foundation for its sweeping and overbroad injunctive request. The Court will recall, and as will be discussed below, the only actual evidence adduced by Chanel that any items sold by WGACA might be unauthorized were the internal records of Chanel, which were never available to WGACA prior to the commencement of this litigation.[6] The evidence showed that WGACA took necessary precautions and had every

---

[5] We noted on multiple occasions including in our Objection to the Court's jury charges that willfulness was not an element of any claim. (*See* Dkt. 401). The jury findings of willfulness are advisory as a matter of law. *B & F Systems v. LeBlanc*, 519 F. App'x 537, 540 (11th Cir. 2013) ("Because we construe the district court as having properly considered the jury finding with respect to willfulness as merely advisory…"); *see also Concordia Pharms., Inc. v. Method Pharmsl, LLC*, 240 F. Supp. 3d 449, 454-55 (W.D. Va. 2017) (noting that it is well settled that "intent" is not an element of a false advertising claim under the Lanham Act).

[6] These issues will be more fully briefed in post judgment motions. As for the serial numbers, there is no way that WGACA could have divined that the serial numbers were voided because Chanel never made that information public. The one alleged counterfeit bag (Ex. 1369) was so genuine looking that not even Chanel's alleged expert Joseph Bravo could identify objective criteria suggesting the item was counterfeit. Furthermore, there was no way for WGACA to know that Chanel has contracts with retailers prohibiting retailers from selling or giving away so-called point-of-sale display items. The subsequent willfulness findings by the jury defy all logic and are not supported by even a scintilla of evidence presented at trial. These willfulness findings speak instead to the jury being unduly prejudiced by Chanel's first witness Joyce Green's violation of the Court's order. *See infra* p. 22.

reason to believe that the Chanel products it marketed were legitimate goods. WGACA held such confidence in this belief that it guaranteed the authenticity of the products and openly marketed them in prominent brick and mortar stores and through its own websites, as opposed to the back alleys or nebulous online sources one would expect of a party who knowingly engaged in nefarious activity.

Furthermore, the Court must consider Chanel's actions and unclean hands relevant to this dispute when determining the nature of any equitable relief Chanel requests. "New York courts have long applied the maxim that one 'who comes to equity must come with clean hands.'" *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004), quoting, *Amarant v. D'Antonio*, 602 N.Y.S.2d 837, 838 (App. Div. 1993). The record is replete with instances of Chanel's underhanded actions in the pursuit of its claims, which were intended not to enforce its legitimate rights, but to stifle the market for second-hand Chanel goods.

Finally, should the Court find that any injunctive relief is warranted, such relief must be narrowly tailored and avoid curbing the legitimate rights to market genuine Chanel products. Any injunction must also address only ongoing conduct that is actually threatened. The draconian injunction proposed by Chanel goes far beyond these precepts and is clearly intended to terminate WGACA's ability to sell any Chanel goods and otherwise chill the secondary market. This would not only devastate WGACA's business, but would chill the luxury handbag second-hand industry as a whole.

    A.    **CHANELS' REQUEST FOR A PERMANENT INJUNCTION MUST BE DENIED BASED ON THE OVERALL FACTS AND CIRCUMSTANCES**

To obtain an injunction, "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation." *United States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953); *see also EEOC v. Everdry Mktg. &*

138840004.1                                                      4

*Mgmt., Inc.*, 348 F. App'x 677, 679 (2d Cir. 2009) (summary order) (finding no abuse of discretion in denying injunctive relief where the entity "no longer exists"). "The factors . . . [that] are pertinent in assessing the propriety of injunctive relief" are "**the balance of equities and consideration of the public interest.**" *Winter*, 555 U.S. at 32 (emphasis added).

Once success on the merits is established, "[a] plaintiff seeking a permanent injunction ... must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

## 1.    Chanel Has Not Been Harmed, Let Alone Irreparably Harmed.

Pursuant to the Trademark Modernization Act of 2020, a violation of the Lanham Act creates a "rebuttable presumption of irreparable harm," 15 U.S.C. § 1116(a), which does not mean that the element is automatically satisfied with the jury's verdict.  WGACA "may upon a proper showing, overcome it and demonstrate a lack of irreparable harm," including by showing delay on the part of Chanel. *Kahala Franchising, LLC v. Real Faith LLC*, 2022 WL 1605377, at *4 (C.D. Cal. May 20, 200)*see also Bayoh v. Afropunk LLC*, 2020 WL 7318277, at *3 (S.D.N.Y. Dec. 11, 2020) ("[I]f a party delays in seeking a permanent injunction, then a permanent injunction is likely not warranted").

Once litigation ensued, Chanel did not "take any action to move the case along quickly, as one might expect of a party allegedly suffering irreparable harm." *World Wide Polymers v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 161 (2d Cir. 2012). For example, despite the fact

that many of the problematic ads that Chanel relied upon pre-date 2015, Chanel NEVER

complained to WGACA about those ads before filing suit in 2018, including when Chanel

approached WGACA in 2015 to complain about a particular item that Chanel believed was

counterfeit. (Exs. 1012, 1013, 1014) Chanel also did not move for a preliminary injunction or

seek expedited discovery. The lack of urgency on Chanel's part once the lawsuit began further

supports that Chanel has not been irreparably harmed. *See id.* (affirming decision to deny a

permanent injunction where plaintiff "never sought a preliminary injunction or an expedited

discovery schedule, nor did it take any action to move the case along quickly"); *see also Bayoh*,

2020 WL 7318277, at *5 (no irreparable harm where plaintiff "requested permanent injunctive

relief in his amended complaint, [but] made no mention of that request again until his effort to

seek [defendant's] profits failed").

       Beyond just delay, however, the evidence demonstrates that Chanel suffered **no** harm, let

alone any threat of irreparable harm.  Chanel offered no evidence of loss and this Court already

found that Chanel failed to offer any evidence of lost sales.  *See* Court's Order of December 13,

2023. Dkt. 369. Chanel cited only to Joyce Green's musings (RT. 71-79, 91 and 109-111) about

how she felt that Chanel had been harmed, but Ms. Green offered no actual evidence of harm.

The lack of harm is unequivocal and the suggestion that a threat of irreparable harm exists is

pure fiction. *See Olinsky & Associates PLLC v. Nutting*, 2021 U.S. Dist. LEXIS 124704 at *14-

15 (N.D.N.Y. July 2, 2021 (holding that general statements about "damage" and "harm" were

conclusory and mere speculation).  If anything, the existence of the secondary resale market

*benefits* Chanel. Vintage Chanel handbags often increase in value which is why the handbags are

so much in demand in the secondary market.  This of course increases the allure and brand value

to Chanel. (RT 178:2-25; 206:19-207:13)

Chanel also bragged about being fabulously successful during the time when the alleged

wrongful conduct occurred. (RT 215-216- testifying that Chanel's revenues increased over $2

billion dollars just since 2018 (it was actually more like $6 billion),[7] when the lawsuit was filed,

and revenues have doubled since 2014 (about the time when Chanel first approached WGACA)

to almost $17 billion in revenue in 2023.)) Chanel is only seeking to increase its wealth by

destroying the second-hand resale market.

(a)      There Was No Actual Confusion.

(i)      The Second Circuit's "Actual Confusion" Standard

Chanel's failure to prove actual confusion suggests that there is no threat of future

confusion that needs to be addressed.  In the Second Circuit, "trademark infringement protects

only against mistaken purchasing decisions and not against confusion generally." *Lang v. Ret.*

*Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (quotations omitted). "[N]ot all confusion

counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it

must show that the confusion was caused by the trademarks, and it swayed consumer purchase."

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.,* 307 F. Supp.

3d 260, 293 (S.D.N.Y. 2018) (citation omitted).  "[E]vidence of actual confusion … must show

that the confusion was caused by the trademarks employed."  *Streamline Prod. Sys., Inc. v.*

*Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017); *see also WE Media, Inc. v. Gen. Elec.*

*Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (discrediting anecdotal evidence where it was

---

[7] Ms. Green's statement that Chanel's revenues grew $2 billion from 2018 until 2023 is also
contradicted by Chanel's own public representations.  According to Chanel's website, its
revenues in 2018 were $11 billion (when this lawsuit was filed) and swelled to $17 billion in
2022, three times the amount of revenue growth Ms. Green testified to during that time period.

unknown "whether each individual was confused by [defendant's] marketing itself or by gossip and word-of-mouth"*).* Additionally, the Second Circuit provides that **"[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion**." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (emphasis added); *see also, e.g.*, *Cheddar Bob's Inc. v. Macsnmelts Mgmt. Co., LLC*, 2020 WL 1323018, at *11 (E.D.N.Y. Jan. 14, 2020) ("conversation involved a mere inquiry, which does not constitute actual confusion"); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 306 (S.D.N.Y. 2021).

After a decade of alleged wrongdoing (and six years of litigation), Chanel could not muster a single instance of actual confusion.[8]  If WGACA had caused any confusion, certainly there would have been complaints from customers, retailers, or someone.  It is impossible to reconcile the lack of any actual confusion with the notion that WGACA may cause confusion in the future absent an injunction.

> (ii)    Chanel's Survey Expert Opinion Did Not Support Actual Confusion

Chanel sought to fill this gap in its case with a suspect opinion from a survey expert, David Franklyn, which, while ultimately permitted to be presented to the jury, caused the Court considerable hesitation. (RT 1753-1754; 2064). We renew our *Daubert* motion (Dkt 299, RT

---

[8] Chanel relied on two alleged instances of actual confusion. One was from the Australian man that Chanel boutique employee Andrea Gaudet said was confused about a discount. But he was not at all confused, as the Court noted: "he knew perfectly well that they were separate and what their function was, and no confusion about that." (RT 544: 8-25).  The other was an online chat with a Chanel representative wherein the person asked for a referral to an entity that could sell a vintage item.  The person making the inquiry specifically noted their awareness that Chanel and WGACA were different entities. (Ex. 1311, RT 509 -593).

1748:10-1749) to exclude Mr. Franklyn's testimony and ask the Court to reconsider the denial of that motion. (RT 2064). We also plan to file post-trial motions arguing the same.  Mr. Franklyn is not a survey expert.  He has no training in survey methodology, statistics, or anything else required of a survey expert.  He is nothing more than, by his own admission, a law professor who taught himself (in his mind anyway) to be a survey expert. (RT 1710). To make matters even more problematic for the reliability of Mr. Franklyn's survey, respondents gave irreconcilable responses to other questions in his survey, leading to the only viable conclusion that the respondents were guessing.[9]

Moreover, Mr. Franklyn said that his survey illustrated that survey respondents were **not** confused.  As set forth in Exhibit 1320D.001, 93% of respondents said that Chanel was the maker of the Chanel handbag that was presented to the survey respondents and only 5% of the survey participants said that WGACA was the maker or manufacturer of the handbag. (RT 1908).  Under no scenario is a 5% response rate of this type evidence of actual or even likely confusion.  Chanel's Joyce Green also testified at deposition and trial that she was unaware of any instances of actual confusion. (RT 183: 21- 187: 21).[10]  In short, there was a complete absence of evidence of actual confusion.

---

[9] "Q: So seconds apart, we have the exact same respondents saying at a 5 percent clip to question No. I  What Goes Around Comes Around is the maker of the handbag, and then a couple of seconds later we have the exact same respondents, and 23 percent are saying What Comes Round Goes Around is the maker of the handbag?  Do we have that right?  A: yes." (RT 1910). This guessing is likely the consequence of Mr. Franklyn not using a control in his survey as is the normal course in surveys done by real survey experts. (RT 1910:17-18).

[10] After reading into the trial record Ms. Green's deposition testimony from 2020 where she had failed to identify any instances of actual confusion, the following trial testimony occurred: "Q: Since November 18, 2020, have you come into contact with any information from a consumer or a retailer regarding somebody being confused…?"  A: Nothing like that, no."  (RT 187:17-21).

With the complete lack of evidence regarding actual confusion, coupled with no evidence that Chanel has actually ever been harmed (i.e. no lost sales or loss of revenue of any kind), there is no basis to conclude that Chanel will suffer any irreparable harm in the future.

**2.      The Legal Remedy Is Adequate Because Chanel has Already Been More than Compensated by the Award of Statutory Damages.**

As noted above, injunctive relief also requires a balancing of whether the legal relief awarded is sufficient.  Here, even though Chanel did not present any evidence of harm or make any effort to measure any alleged harm (because there were was no harm and thus no basis to award actual damages) the jury awarded the legal remedy of statutory damages in the shocking amount of $ 4 million.[11]  Putting aside that Chanel was not injured, the legal remedy awarded is already an enormous windfall.[12] This legal remedy is clearly more than adequate. No further injunctive relief is needed.

(a)      Despite The Jury's Verdict, The Evidence Established That WGACA Did Not Act Willfully.

Chanel argues that the legal remedies are inadequate in light of the jury's willfulness

---

[11] The Court noted in the Court's December 13, 2023 Order (Dkt. 369) that statutory damages are a legal remedy. WGACA, of course, objects to this award as being wholly unsupported by the evidence and will file a Rule 50(b) motion at the appropriate time.

[12]   The jury awarded this remedy absent what would traditionally be a case warranting such an extreme result.  There was no evidence of Chanel being harmed or WGACA benefiting from any alleged misconduct.  In the first instance, the $4 million award seemingly has no relationship to the facts of this case as such a maximum award should only be meted out in the most severe of bad conduct type cases.  Moreover, the amount of the award appears to be unprecedented in a case, like here, where the defendant has appeared and offered facts of the overall legitimacy of its business which was not in dispute.  WGACA is not some pirate or repeat bad actor.  WGACA was and is an entity that sold items that by all accounts (including Chanel's account) are impossible to detect as being counterfeit without access to Chanel's internal serial number database (RT 1310:19-22).

findings and WGACA's alleged activity after the verdict.[13]  In essence, Chanel suggests that the willfulness finding by the jury supports the notion that absent an injunction, WGACA will continue with its alleged wrongful activity.  That is a false premise, however, which requires WGACA to illustrate to the court why the evidence of willfulness was nonexistent and why WGACA need not be enjoined to prevent ongoing harm to Chanel. While the jury here found willfulness, that finding is only advisory on this court.  Regardless of the advisory nature of the jury's finding on willfulness, the Court must still evaluate independently the facts and circumstances when determining matters of equity. *EEOC v. KarenKim, Inc*., 698 F.3d 92, 100, (2d Cir. 2012).

This Court already held that WGACA had no business reason to create an association with Chanel and that WGACA's value is that it sells genuine second-hand items that consumers cannot buy from Chanel. (Dkt. 117at 2)("[WGACA] is a buyer of genuine Chanel products, which it sells second hand. Its business is not passing off counterfeits as Chanel's; it thrives because of the value its customers place on genuine Chanel products, even second hand, when they can afford to buy at a discount […]. WGACA has no institutional interest in a pattern or practice of misrepresenting its wares: its business depends on them being genuine.")  What the evidence showed is that WGACA wanted consumers to know the Chanel history, brand value and iconic nature of the items so that WGACA could sell more second-hand Chanel goods.  The intent behind WGACA's advertising and promotion was thus NOT to create an

---

[13] Chanel incorrectly contends that Seth Weisser's post-verdict comments illustrate some kind of intent to violate Chanel's rights.  Mr. Weisser is entitled to continue to maintain that WGACA did nothing wrong and it intends to continue defend this case.  Moreover, the sale of the 3 Corti items that Chanel points to as indicating willfulness is anything but and such is explained in Mr. Weisser's declaration submitted with this brief. (*See* Weisser Dec. ¶¶8-10).

affiliation/sponsorship perception between WGACA and Chanel (there was no such perception), but rather to illustrate the value of Chanel to motivate consumers to buy iconic Chanel items that were not actually available for sale by Chanel.  Chanel and WGACA, it was acknowledged, are not direct competitors—each does not sell what the other sells.

        (b)      The Physical Presentation of WGACA's Brick and Mortar Stores, As Well As Its Website, Belies Any Notion Of Willfulness.

The physical layout of WGACA's brick and mortar stores demonstrates that WGACA did not willfully infringe on Chanel's trademark. (Seth Weisser Declaration ("Weisser Dec.") ¶ 19, Ex. 185). Exhibit 185 illustrates the entrance of one of the New York stores.  It features a prominent sign for WGACA with a clear pronouncement that WGACA sells vintage items from a number of luxury brands.  The interiors of the stores are similarly laid out with countless indicia of other brands, indicating that WGACA is not affiliated with Chanel or any of the other brands. *(Id.)*

WGACA's website also shows a variety of different brands on its homepage. And as with its physical stores, WGACA prominently sells the wares of Chanel's **direct competitors**, further belying any notion of willful infringement.  WGACA's website also includes a direct disclaimer that WGACA "IS NOT AN AUTHORIZED RESLLER NOR AFFILIATED WITH ANY OF THE BRANDS [IT] SELLS." (Weisser Dec. ¶¶ 14-15, *See* https://www.whatgoesaroundnyc.com/en-us/home).

These are not the actions of an entity trying to blur the lines. *See Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 389 (2d Cir. 2005) (holding that there is good faith "even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an **intent to promote confusion or exploit good will or reputation.**") (emphasis

added); *see also Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2007 WL 2914452, at *3 (2d Cir. 2007) (a "junior user's knowledge of the mark may still be consistent with good faith unless the evidence indicates an intent to promote confusion or exploit good will or reputation" (internal quotation marks omitted)).

(c)      WGACA Did Not Willfully Engage in Counterfeiting.

That the jury found willfulness on the counterfeiting[14] claim illustrates the jury's lack of proper application of the facts and the influence of Chanel's violation of the Court's in limine order not to discuss the Summary Judgment Order. That violation led to the Court nearly granting a mistrial and threatening Chanel witness Joyce Green with contempt.  (RT 121-136). Consider, it was graphically illustrated in phase one that the item that Chanel accused of being counterfeit, Exhibit 1369, was virtually identical to Exhibit 200[15], which Chanel confirmed was a genuine Chanel handbag.[16]  It was fully developed during phase one of the trial—and indeed Chanel argued this as well—that in order to authenticate with certainty that a Chanel handbag is genuine (i.e. not counterfeit) it is necessary to verify its serial number through Chanel's ORLI system. (Bravo Testimony, Jan. 24, 2024, RT 1304:8-19; 1310:19-13).   But, as Chanel also readily acknowledged, no one other than Chanel has access to the serial number records. (RT 1276:1-3).  Far from willful, the counterfeiting claim is the very definition of innocence— namely, no one, not even Chanel, could tell that the Corti items were allegedly counterfeit

---

[14] It is WGACA's contention that WGACA sold no counterfeit goods and that the jury's finding to the contrary was not supported by the evidence.

[15] (*See* Ginn Dec. ¶15).

[16] As we set forth below, Chanel, through Mr. Bravo, initially claimed that Ex. 200 bore elements suggesting Ex. 200 was counterfeit (RT 1304-1307).  Mr. Bravo later recanted that testimony and confirmed that Ex. 200 was genuine.  (RT 1313: 6-9).

without access to Chanel's database.[17]  To hold WGACA liable for willfulness ignores the facts

and rewards Chanel for not notifying WGACA (and others) about the Corti issue.

(d)  WGACA Lacks Willfulness on the 51 Claim.

Chanel's 51 claim is that because Chanel does not have a record of a particular serial

number assigned to a specific product in its database, any Chanel item in the marketplace that

bears one of those serial numbers is by definition infringing, because, in Chanel's view, that item

was never first sold by Chanel.  There were 51 such items at issue and they are identified

through the ORLI records that are part of Exhibit 51.  This claim only arose after Chanel

received in discovery in 2020 WGACA's spread sheet of over 47,000 records of Chanel sales

(that spread sheet was later updated showing over 70,000 Chanel sales records).  Chanel

identified 51 handbags in that spreadsheet that met this fact pattern, namely, WGACA sold

handbags that contained serial numbers created and allotted by Chanel to be associated with

--------

[17] RT 1505-1515 contained Chanel's explanation, including to the Court's questions, as to why Chanel chose not to inform the public or WGACA about the problematic serial numbers.  The explanation never made sense.  But also, consider that Joseph Bravo testified that Chanel sent to the factory, the EXACT amount of hardware components the factory needed and no more to fulfill orders made by Chanel to the factor.  As such, if a Chanel handbag had original hardware components it **cannot** be counterfeit per Mr. Bravo. (RT 1260:11- 1261: 4: "Q: And then Chanel also provides the authorized factory with the precise number of components that the factory needs to make those bags…A [yes] Q: …**so, for example, that's how you know, Mr. Bravo, that if there's original hardware on a bag, that it was made in a Chanel factory, because it has original hardware, right? A: yes**".)  And we know that Ex. 1369 (the handbag the jury concluded was counterfeit) had original hardware because that is exactly what Mr. Bravo said.  Namely, when detailing what was indicative of Ex. 1369 being counterfeit, he *never* identified any hardware components as being non-original (except for the slider which he later recanted (RT 729, 380-382)) and the zipper pull.  Mr. Bravo confirmed that it was "impossible" for a handbag to have ANY original hardware AND be counterfeit. (RT 729:24-730:7). Despite these unequivocal admissions from Chanel, the jury still not only found Ex. 1369 to be counterfeit but WGACA a willful counterfeiter.  The evidence presented leads only to the conclusion that WGACA was not a willful counterfeiter (or a counterfeiter period).

14

Chanel handbags but, for reasons that Chanel cannot explain, were never ultimately associated with an actual handbag in Chanel's database.  From this, Chanel claimed the 51 items were thus infringing because they were never first sold by Chanel (because had they first been sold by Chanel, Chanel would have a record of the sale in its database). This claim is particularly perplexing because Chanel admits the following:

(1): The 51 claim consists of serial numbers that Chanel created for the very purpose of being assigned to a Chanel handbag.  These are not fake serial numbers.  These are authorized Chanel serial numbers. (*See* Ex. 51-the Orli database records showing the creation and allotment of each of the 51 serial numbers and the dates that each was created, allotted (i.e. delivered to the factory) and voided. Both Mr. Bravo and Jennifer Bleys explained the information contained in Exhibit 51, RT:1265-1273 for Mr. Bravo's explanation)).

(2)  Exhibit 51 confirmed that each of these serial numbers were in fact allotted (delivered) to a factory that makes handbags with the intent that the serial numbers be used with Chanel handbags made by the factory to which the serial numbers were allotted.

(3) These serial numbers were then "neutralized" (i.e. cancelled/voided) sometimes nearly 20 years after allotment, for reasons that Chanel cannot explain.  Chanel has no idea why these numbers were voided/neutralized. (Ex. 51 and *see* RT 1276-1277). Chanel does not know if the numbers were stolen or were mishandled/lost or why this issue was not caught in association with Chanel's frequent audits of its factories. (RT 1276-1277)

(4) In sum, Chanel has no explanation for how this phenomenon occurred or why there are Chanel handbags in the marketplace that bear Chanel created and allotted serial numbers but for which Chanel has no record of actually selling.  Of note, Chanel denied that the most obvious explanation is the correct one, namely, there was an error in recording the information related to

15

the items that bear these numbers.[18]

(5) We learned during phase one that for a substantial period of time, at least one of Chanel's factories, namely the Corti factory, was allowed to have Corti employees have access to the Orli database which could explain the anomaly, but Chanel refused to acknowledge that such could be the cause. (RT 745:3-25)

Remarkably, the jury specifically found these sales to be willful infringements (Dkt. 407, question 7) (jury verdict form).  But WGACA cannot be a willful infringer when WGACA could not possibly have known that Chanel items it bought in the open market and then sold were items never identified in Chanel's internal database as having been sold by Chanel.  The finding of willfulness is completely devoid of support and, again, can only be explained by Chanel's poisoning of the jury early in this case through Ms. Green's inflammatory and false testimony that violated the Court's in limine order.

        (e)        WGACA Lacks Willfulness on the Point of Sale and Gift Items.

The issue with the point-of-sale and gift items is similarly impossible to reconcile with willfulness.  The evidence is that WGACA purchased these items from a vendor (Ex. 1032) and that WGACA could not possibly have known what Chanel's internal rules are or were with regard to what Chanel considers items that should not be sold or gifted.  Chanel admitted that the items are genuine, i.e. that they were made with Chanel's approval and were intended to be

---

[18] Ms. Bleys testified also that Chanel has no idea why the serial numbers allotted had to be voided nor why it took so long in many instances to void the numbers in Chanel's system. (RT 1421-1422). Chanel's Joseph Bravo said the same: "Q: Mr. Bravo, it was the norm for the factory to use the serial number [allotted to it] within four to six weeks. A: yes. Q: So over the course of 17 annual audits, why was this issue [the issue of the serial number not being voided despite annual audits of the factories] never noticed until 2009?  A: I don't- I ignored that.  I don't know." (RT 1274:14-21. RT 1276:20-22)

displayed and used at Chanel retail locations. (RT 150-152).  However, Chanel further claimed

that it has contracts with its retail partners that prohibit the retail partners from selling or giving

these items away and thus the items were necessarily infringing (because they were never first

sold or given away by Chanel) albeit completely genuine.  Those sale/give away restrictions,

however, were unknown to all except Chanel and its retailers.  There is no way that WGACA or

anyone else could known when presented with such items for sale in the marketplace that Chanel

had never authorized those items for sale or to be given away.  Even if such sales could

constitute infringement (they do not), the sales do not touch in any fashion on the Second

Circuit's definition of what it means to be a willful or bad faith actor.

        (f)      WGACA Lacks Willfulness on the False Association Claim.

The ads that Chanel claims create a false association are email blasts that were sent to

WGACA's email list well before this lawsuit was filed, as far back as 2013 and through 2017.

(Exs. 1017, 1018, 1019, 1020, 1128, 1129, 1131, 1132, 1189, 1254, 1277, 1279, 1338, 1377, and

1340).  At no time prior to 2018, including the 2015 exchange between Chanel and WGACA

regarding a Corti serial number (Exs. 1012-1014), did Chanel offer any criticism of these email

blasts even though it was obviously well aware of WGACA's activity in 2015.  Moreover, even

after 2015 and before Chanel filed suit in 2018, Chanel never raised any concerns to WGACA

about this advertising.  Chanel can't plausibly claim that it was not keeping a close eye on

WGACA and the evidence is contrary to such.  For example, WGACA was a key focus of

Chanel's 2017 global meetings where Chanel was evaluating the secondary market. (Dkt. 332)

(WGACA' Opposition to Chanel's MIL No. 4).

When Chanel sued WGACA in 2018 (without ever having sent a cease-and-desist letter

regarding any false association claims), WGACA took steps to address Chanel's concerns.  For

example, it discontinued the use of #WGACACHANEL and stopped using images of Coco

Chanel and wishing her a happy birthday as a promotional endeavor. (Weisser Dec. ¶ 14).  It also

added a disclaimer on its website pages that further alerted consumers that WGACA is not

affiliated with any of the brands that WGACA sells. (*Id*. at ¶¶ 14-15). There is, essentially, no

evidence from 2018 until 2023 of any behavior by WGACA that is problematic in Chanel's view

regarding false association.  In 2023, WGACA did use various hashtags to promote the Karl

Lagerfeld Met Gala event that contained Chanel's name, but these were (1) not confusing or

misleading but were in fact simply descriptive (Exs. 1321-1323; Parker Testimony, Jan. 22,

2024, RT 976-977 "It's a discovery feature that is pretty much across every single social media

platform so that you can type in a word and discover whatever that is, your interest is. So hashtag

food, hashtag apple. It's just a discovery tool.") and also (2) were done mistakenly. (Weisser

Testimony, Jan. 31, 2024, RT 1866-1870; 1885-1886).  The social media marketers for a single

event thus used the hashtags because they were unaware of the policy that was put in place in

2018 after the lawsuit was filed.  Further, and as discussed *infra*, hashtags are merely functional

tools that do not generally act as trademarks and as was testified to by Shannon Parker and

which was not contradicted by anyone from Chanel, hashtags are used in social media as simply

directions to consumers.  They are functional tools; guideposts that don't act as trademarks but

simply as digital road signs. (Parker Testimony, Jan. 22, 2024, RT 976-977).

**3.      The Balance of Hardships Weighs in Favor of WGACA.**

Where, as here, the party asserting the intellectual property rights has been slow to

protect those rights, the balance "tips" in favor of the other. *See, e.g.*, *Century Time Ltd. v.*

*Interchon Ltd.*, 729 F. Supp. 366, 368 (S.D.N.Y. 1990). Here, and as detailed above, no evidence

of harm was presented at trial and Chanel delayed in seeking any relief because it was, in fact,

suffering no harm. In contrast, the burden of an injunction upon WGACA would be immense.

**4.     A Permanent Injunction Would Not Serve the Public Interest.**

An injunction would not serve the public interest here because the injunction would effectively prevent WGACA from selling second-hand Chanel products without Chanel's permission and would also chill other second-hand companies in the market, causing them to likely stop selling Chanel products altogether. Chanel would essentially reach its anticompetitive goal of eliminating the second-hand market for its goods. The public interest is served by market competition. *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008) (explaining that the "public benefits from lower prices resulting from free market competition"). This Court has held that in considering whether to issue an injunction, "any reduction in competition must be considered against the public interest." *Dellwood Foods, Inc. v. Kraftco Corp.*, 420 F. Supp. 424, 428 (S.D.N.Y. 1976).

At trial, Chanel admitted that they have handy, the serial numbers of their handbags that get stolen or are voided but they could not provide a compelling reason as to why they refuse to share these numbers with the public. (Jennifer Bleys Testimony, RT 1505-1513, "Court: Why didn't Chanel publish publicly a list of the stolen numbers so anybody could know that a bag bearing that number wasn't real, didn't exist in Chanel's universe?"). If Chanel had provided WGACA with the 30,000 stolen serial numbers from Corti as part of its cease-and-desist letter sent in 2015, the subject of which was a bag Chanel thought was a Corti bag with a stolen serial number (it was not), WGACA could have put measures in place earlier to prevent Chanel bags with these stolen serial numbers from being sold. WGACA simply did not know and could not have possibly known that the handbags had stolen serial numbers without Chanel sharing that information with them. Instead, Chanel chose not to share the stolen serial numbers with

WGACA (or anyone else) when the theft occurred in 2012, or even in 2015 when it sent the cease-and-desist letter, but instead it set WGACA up for failure and filed this lawsuit three years later in 2018. The great danger in Chanel's practice in refusing to share its stolen and voided serial numbers is even if the second-hand market follows all laws and protocols set in place perfectly, it is only a matter of time until Chanel files another lawsuit against a second-hand retailer, alleging we are selling unauthorized or stolen goods. Thefts at Chanel boutiques and factories are common and they will continue to happen in the future. WGACA or other second-hand retailers cannot possibly know which Chanel handbags are stolen or are not authorized to be sold without Chanel sharing that information with them. The only option would be for WGACA and other second-hand retailers to stop selling Chanel altogether. Chanel's proposed injunction would lead to an unjust outcome and cause endless future litigation, further burdening the court system. Chanel's real concern is therefore not with public confusion because its refusal to share stolen and voided serial numbers with the public only hurts consumers. Chanel's real concern is to prevent the second-hand market from selling Chanel goods and the injunction should therefore be rejected.

5.       **The Injunction Should Be Denied Because of Chanel's Unclean Hands.**

One of the factors the Court must consider is whether Chanel has unclean hands. Under that doctrine, "the equitable powers of this court can never be exerted on behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.,* 846 F.3d 35, 56, (2d Cir. 2017) (internal quotation marks, brackets, and citations omitted).  Chanel's hands are far from clean.

(a)     Chanel's Violation of the Court's In Limine Order is Evidence Of

Unclean Hands.

The Court granted WGACA's *in limine* motion to prohibit Chanel from arguing that

WGACA had been adjudged liable for anything at the summary judgment stage. (Dkt. 370,

Court Order Granting WGACA's MIL No. 6; Court Order at hearing on January 3, 2024.)  It

took all of one witness for Chanel to violate the order and it did so in the most egregious manner.

Joyce Green took the stand as Chanel's first witness on January 9, 2024, and testified to the

following (Green Testimony, Jan. 9, 2024, RT 119:24-120:7):

> Q. And it's your opinion——as you expressed in your direct, it's your opinion that the various advertisements and promotions that Mr. Max showed you, that they're confusing the public, correct?
>
> A. They are using our trademark in unauthorized ways. They are creating an affiliation with Chanel that does not exist. And when they are selling items that are not Chanel product and have been found to sell counterfeits, it is damaging to Chanel the brand and does erode trust and confidence by our clients.

This Court found that Ms. Green and Chanel had violated the Court's orders of

December 13, 2023 and January 3, 2024. (RT 121-136).  The Court contemplated granting

WGACA's mistrial motion (RT 122:18) and threatened Ms. Green with contempt, going so far

as to draft but not sign a contempt citation. (RT 130:8-131:6-136).  The Court noted that Ms.

Green had been alerted to the Court's orders and the Court concluded that Ms. Green

"knowingly" violated the order. (RT 123:17-24).  This is yet another example of Chanel's

extreme behavior that cannot be squared with the principles of equity.[19]  This per se unclean

---

[19] This violation coupled with Chanel's other conduct irretrievably prejudiced the jury, and we will be moving for a new trial based on this and other grounds at the appropriate time.  We would also ask that the Court consider reconsidering now our mistrial motion and granting such now.

138840004.1                                          21

hands and Chanel's behavior in this regard (much like Mr. Bravo's false testimony) infected the entire trial and the jury's perception of WGACA.

      (b)    Chanel's Advancement of Joseph Bravo's False Testimony Shows Chanel's Unclean Hands.

"A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (1996 ) (citations omitted). Chanel's advancement of Joseph Bravo's false testimony on a critical fact, coupled with its failure to alert the court when Chanel knew that Mr. Bravo provided false testimony, violated a host of rules.  As we detail here, not only did Chanel completely fail in its obligation to the Court regarding the handling of what Chanel knew was false testimony, Chanel also sought to silence the person—Gracie Ginn—who discovered that Mr. Bravo's testimony was false. (*See* Dkt. 386).

      (c)    The Bravo False Lampo Slider Testimony and Chanel's Failure To Cure What Chanel Knew To Be False Testimony Shows Chanel's Unclean Hands.

Joseph Bravo was Chanel's star witness on the counterfeiting claim.  He testified on four separate days: January 12, 17, 18 and 24, 2024. Mr. Bravo initially testified to the elements that he believed confirmed that Ex. 1369 was counterfeit.  That handbag had been one that WGACA had secured in inventory after learning in 2020 that Chanel took the position that it was counterfeit.  In a highly orchestrated moment, Mr. Bravo testified that the back of a zipper slider in Ex. 1369 contained the word "Lampo," which confirmed that Ex. 1369 was a counterfeit because the back of the slider should have had the "CC" logo. (Bravo Testimony, Jan. 12, 2024,

22

RT 375:9-15).  At the end of Mr. Bravo's January 12, 2024 testimony, Chanel's counsel

summarized Mr. Bravo's testimony regarding the Lampo slider as key to Mr. Bravo's certainty

that Ex. 1369 was counterfeit. (RT at 375:16-383:6)).  At that point, Chanel's counsel then asked

the Court to permit the bag to be handed to the jury.  It was a dramatic moment: the jury handing

off the bag to the next juror with each juror studying it after just hearing Mr. Bravo's

testimony.[20]

Of note, WGACA expert Gracie Ginn was in court and heard the Lampo slider testimony

for the first time (Mr. Bravo never provided that testimony in his deposition). (Gracie Ginn

Declaration ("Ginn Dec.") ¶ 11; RT 685: 17-21.  Thereafter, Ms. Ginn investigated Mr. Bravo's

claim about the slider and determined that Mr. Bravo's testimony was false. (Ginn Dec. ¶¶ 11-

14). She provided a picture of the slider (Exhibit 195) and found a demonstrative (Exhibit 197)

that she had previously prepared that illustrated the falsity of Mr. Bravo's testimony. (Ginn Dec.

¶¶ 12-13). We have, with this brief, submitted a declaration from Ms. Ginn where she explains

the process she went through to investigate Mr. Bravo's false testimony. (Ginn Dec. ¶¶ 11-15).

After thorough inspections, Ms. Ginn determined that Exhibit 1369 is an authentic Chanel

handbag because it has all the features of an authentic Chanel handbag and contains no physical

features to indicate that it is a counterfeit handbag. (Ginn Dec. ¶¶ 14-15).

> (d)    Bravo's Testimony Where He Is Confronted With His False
>
> Testimony About The Lampo Slider Shows Chanel's Unclean
>
> Hands.

---

[20] This of course followed another dramatic moment with Chanel's first witness Joyce Green
discussed below in which she told the jury that WGACA was already found to be a counterfeiter.

It was on January 18 that Mr. Bravo was first cross examined. During cross examination on January 18, Mr. Bravo continued to insist that his prior testimony was "100% accurate". (RT: 696:18-22). However, he was then provided with Exhibits 195 and 197. (Ginn Dec. ¶¶ 12-13). Chanel objected and while the exhibits were not admitted because of the need to have Ms. Ginn authenticate them, Mr. Bravo and Chanel of course reviewed them. **This is critical**: as of January 18, 2024, Chanel and Mr. Bravo KNEW that we knew that Mr. Bravo's earlier testimony about the Lampo slider was false because Exhibits 195 and 197 proved it. (Ginn Dec. ¶¶ 11-15). Chanel also knew that we could prove that Mr. Bravo had falsely testified once we called Ms. Ginn to the stand. Further, during cross examination on January 18, 2024, we confirmed that Chanel had records that would in fact confirm what was written on the back of the slider. [21]

      (e)      Bravo's Return on January 24, 2024 and the Recanting of His Prior Testimony Shows Chanel's Unclean Hands.

As noted, even if Chanel is given a pass for Mr. Bravo's false testimony on January 12, 2024 (though it is difficult to envision how the testimony was just an innocent mistake when Chanel had access to records that would have confirmed that the Lampo slider story was false), certainly after Mr. Bravo was confronted with Exhibits 195 and 197 on January 18, Mr. Bravo and Chanel knew that Mr. Bravo's testimony about the Lampo slider was false. In the cross examination of Mr. Bravo on January 18, we urged him to review Chanel's records before his

---

[21] Mr. Bravo agreed that specification sheets in Chanel's archives would confirm what the factory was provided in terms of zipper sliders and what, therefore, would be written on the back of the slider for Ex. 1369. (RT 696). Chanel and Mr. Bravo therefore admitted that it always had in its possession objective evidence that would inform this critical fact.

next appearance in court. (RT 722).  Six days passed between January 18 and Mr. Bravo's fourth

appearance in court on January 24, 2024 when he recanted. (RT 1307:2-1308:11). Why did

Chanel not immediately investigate whether Mr. Bravo's testimony was accurate? Why did Mr.

Bravo take the stand on January 24, 2024 but wait hours before recanting? (He took the stand at

RT 1252 and did not recant until RT 1307).  Why did Chanel NEVER advise the Court that Mr.

Bravo's January 12 and 18, 2024 testimony on the "Lampo" story was false, including

immediately after his false testimony on January 18 when Chanel learned through Exs. 195 and

197 that Mr. Bravo had testified falsely on such a critical item?  Regardless of why, from

January 12 until January 24 - or 12 days - the jury was allowed to believe this falsity, to the

prejudice of WGACA.

        (f)     Chanel's Effort to Prevent Gracie Ginn from Testifying Shows
That Chanel's Behavior is Not Innocent.

Chanel was on notice at least as early as January 18, 2024, that Mr. Bravo's January 12,

2024 testimony about the Lampo slider was false (though we contend that Mr. Bravo's testimony

on January 12, 2024 was not an innocent mistake).  But again, not only did Chanel not advise the

Court (and the jury) that Mr. Bravo had offered false testimony, but Chanel also went a step

further and actually sought to suppress Ms. Ginn from even testifying.  (Dkt. 386).  On the very

day that Mr. Bravo recanted his "Lampo" testimony (Jan. 24, 2024), Chanel moved to exclude

Ms. Ginn as a witness. (*See* Dkt. 386).  As with this entire sordid episode, Chanel's affirmative

motion to exclude the witness Chanel knew had exposed Mr. Bravo's false testimony evidences

Chanel's bad faith and unclean hands.

        (g)     Chanel Had an Affirmative Obligation to Alert the Court to the
Fact that Mr. Bravo Had Offered False Testimony.

Even if we assume that Chanel did not know when Mr. Bravo testified on January 12, 2024, that his testimony was false, Chanel should have alerted the Court as soon as Chanel learned that Mr. Bravo had proffered false testimony. Chanel never explained why Mr. Bravo falsely testified to this critical fact when there were documents readily available to educate Mr. Bravo as he was preparing to testify in a federal trial. (RT 696).  From an equity standpoint, Chanel should not benefit from the false testimony. The law is clear that lawyers and parties have a duty of candor to the court.  *See* New York Rules of Professional Conduct and the *ABA Model Rules of Professional Responsibility* 3.3(a)(3), "… If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."  While this brief is not a motion for sanctions under FRCP Rule 11 or the Court's inherent authority to issue sanctions for behavior that interferes with the administration of justice, the principles underlying those bodies of law are applicable here as an application to equity.  Neither Chanel nor its lawyers ever offered a *mea culpa* and took no reasonable steps to mitigate against Mr. Bravo's presentation of false evidence including disclosure to the tribunal. Chanel did the opposite as it moved to silence Mr. Bravo's whistle blower Gracie Ginn.  Chanel should have alerted the Court as soon as Chanel learned that Mr. Bravo had proffered false testimony so that the Court could have considered the appropriate remedy.   But Chanel instead allowed the false testimony to remain for at least 12 days before Mr. Bravo was forced to recant. This conduct violated Chanel's duty of candor to the Court.[22]  This behavior constitutes the type

---

[22] *Esposito v. Suffolk Cty. Cmty. Coll.,* 2019 U.S. Dist. LEXIS 34957, at *3 (E.D.N.Y. Mar. 4, 2019) ("Beyond the powers expressly conferred by rule and statute, federal courts have the inherent power to sanction a party for conduct which abuses the judicial process. *Skywark v.*

of wrongful conduct that equity cannot reward.  We will never know the impact on the jury had

the Court admonished Chanel in front of the jury and instructed the jury that Mr. Bravo had

proffered false testimony.  Chanel made sure that never happened.

(h)     Other False Testimony from Bravo and The Impact on Equity.

While the Lampo slider testimony may have been the most egregious of Mr. Bravo's

false testimony, it was not the only false testimony he offered. (Ginn Dec. ¶¶ 14-15).  In his

January 24, 2024, testimony he was presented with Exhibit 200, which was a genuine Chanel

handbag that was virtually identical to Exhibit 1369. (Ginn Dec. ¶¶ 5-6, Exhibits 200 and 1369).

Mr. Bravo first falsely testified that the Exhibit 200 had elements indicating it was counterfeit.

(RT 1305-1307)[23]. Remarkably, his testimony about the supposed counterfeit indicia of Exhibit

200 matched his testimony about the indicia that illustrated to Mr. Bravo that Exhibit 1369 (the

Corti bag) was counterfeit.  (Bravo Testimony, Jan. 12, 2024, RT 375:9-383:6)[24] . The Court

allowed a short break during Mr. Bravo's testimony on January 24 so that Mr. Bravo and Chanel

---

*Isaacson*, 1999 U.S. Dist. LEXIS 23184, 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999). Included in those powers is the authority to sanction frauds on the court, which occur when "a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn v. Mem'l Sloan—Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y.2002) (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)); *see also Hargrove v. Riley*, 2007 U.S. Dist. LEXIS 6899, 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007); *Shangold v. Walt Disney Co.*, 2006 U.S. Dist. LEXIS 748, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006); *Intelli-Check, Inc. v. TriCom Card Techs., Inc.*, 2005 U.S. Dist. LEXIS 38196, 2005 WL 3533153, at *11 (E.D.N.Y. Dec. 22, 2005); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y.2002).")
[23] (Bravo Testimony, Jan. 24, RT 1305:14 - 1306:3 (pointing to "The color of the thread, of the stitching of the CC, which is a different color of the thread," "signs of wear and . . . the color of the interior flap," and "the zipper").
[24] (Bravo Testimony, Jan. 12, 2024, RT 376:18-377:23 (pointing to the "color of the thread on the CC logo" and the "zipper pull").

could look up the serial number for handbag Exhibit 200 in the ORLI system and determine

whether Exhibit 200 is genuine.  This became necessary because Mr. Bravo testified that while

he had noted that Exhibit 200 had indicia of counterfeiting, he would need to access the serial

number in the ORLI system to confirm as much. (RT 1310: 19-22). Mr. Bravo returned after the

break, and a few minutes after having testified that Exhibit 200 had indicia of counterfeiting,

admitted that Exhibit 200 was genuine, thus rendering his testimony about counterfeit indicia for

Exhibit 200 obviously false. (RT 1312:25-1313: 9).  Making matters even worse, when asked

why Mr. Bravo had just minutes earlier said the opposite (i.e. that Ex. 200 had elements of

counterfeiting), he claimed to not remember that testimony. (RT 1313:10-1314:13). Ms. Ginn

conducted a detailed side-by-side inspection of the two handbags, Exhibit 1369 (alleged

counterfeit Chanel bag) and Exhibit 200 (uncontested authentic Chanel bag) and documented her

findings in her declaration and in Exhibit 211. (Ginn Dec. ¶15, Exhibit 211). Ms. Ginn

ultimately determined that the features Mr. Bravo suggested were not authentic about Exhibit

1369 were also present in Exhibit 200 and that both bags are authentic. (*Id.*) Chanel relied upon

and advanced the testimony of Mr. Bravo as its star witness on counterfeiting and his testimony

was infected with false statements which demonstrate Chanel's unclean hands.

       (i)      Chanel Intends to Wrest Control of the Secondary Market.

The radical injunction proposed by Chanel is nothing more than a transparent attempt to

wrest control of the secondary market, a plan that Chanel has been contemplating since at least

2017. The year before filing this lawsuit in 2018, Chanel had closely studied the second-hand

luxury resale market and had several meetings to strategize against what it determined to be a

threat to the company that would cause it to lose sales and lead to "cannibalization" of the

market for its products. (Dkt. 332, Exhibit 2). While Chanel fought the disclosure of pertinent

documents in discovery, it was ultimately forced to turn over damning internal documents from strategy initiatives in 2017. As part of its strategy on the secondary market, Chanel convened critical meetings in New York and Deauville, France, where Chanel examined what it internally called "the Second Hand Project" which was an extensive review of the secondary market. In these meetings, documents show, top executives and teams met to specifically discuss and evaluate issues such as Chanel's absence of any "control" over the second-hand market, creating over exposure, cannibalization which would threaten Chanel's business model. (Dkt. 332, Exhibit 2). After this extensive review, Chanel chose to stay out of the secondary market. (*See* No. 33 from the Joint Pre-Trial Order, Dkt. No. 323). Chanel instead chose to attack the secondary market as is evident by its initiation of lawsuits against WGACA and the ReaReal in 2018. (Dkt. 332, Exhibit 3).

Chanel claims that only it and it alone can authenticate Chane products.  What this means is that Chanel wants to prevent the resale of Chanel items without its approval.  Chanel is essentially asserting a post-first sale authentication right. But there is no such right. The Second Circuit recognizes this and applies the "first sale" trademark doctrine.  *Bel Canto Design, Ltd. v. MSS Hifi, Inc*., 837 F. Supp. 2d 208, 222-23 n.1 (S.D.N.Y. 2011). This means that "the right of a producer to control distribution of its trademarked product does *not* extend beyond the first sale of the product." *Id*. at 222 (citation omitted) (emphasis added). Nothing in the Lanham Act contradicts the first sale doctrine: "The Lanham Act does not give mark holders the right to control subsequent, non-authorized resales, as long as the product sold is genuine." *Id*. Furthermore, the Lanham Act's legislative history demonstrates an affirmative desire *not* to give mark holders rights to control their marked goods on resale.  Drafters of the legislation considered the very rights Chanel now asserts to be a power Congress should not, and ultimately

did not, give.  Trade-Marks: Hearing on H.R. 82 Before a S. Subcomm. of the Comm. on

Patents, 78th Cong. 62-63 (1944) (describing post-resale rights as an "unprecedented grant of

power" that would "seriously interfere with [the] legitimate activities" of resellers); *accord*

Betina A. Baumgarten, One Too Many Sticks for the Trademark Bundle? The Unintended

Consequences of Luxury Brands' Push for A Post-First Sale Authentication Right, 42 Loy. L.A.

Ent. L. Rev. 111, 130 (2022) (discussing legislative history). The Court should not permit

Chanel to try to accomplish this improper, anticompetitive goal by means of this injunction.

> (j)     Chanel Admitted to Having Filed the Complaints Lacking
>
> Evidence that WGACA was Engaged in Counterfeiting.

Chanel filed three complaints in this Action- all in 2018. (Dkt. 1, 26 and 64).  In each

complaint, Chanel alleged that WGACA engaged in counterfeiting. *See* para 8 to each such

complaint among other paragraphs.  However, Chanel had no evidence of counterfeiting, which

became a source of contention during discovery, ultimately leading to a hearing on March 27,

2020. (Dkt. 95-1). During that hearing, as the Court pressed Chanel on the lack of counterfeiting

evidence, Chanel's counsel admitted that Chanel filed the complaints without having evidence of

counterfeiting. "We do not have that evidence." (Dkt. 95-1, 12:3).  As a means to escape the

Court's inquiry about why Chanel had alleged counterfeiting without any evidence, Chanel's

counsel improperly said, "We did not bring a counterfeiting claim…" As of March 2020, Chanel

had not yet received WGACA's sales records in discovery, so it did not have the records related

to the Corti sales, the 51 sales, or the 779 item sales.  After Chanel received those records,

Chanel promptly reversed course and used the counterfeiting claim as the core of their case.

Chanel's behavior in this regard cannot be aligned with good faith or clean hands.  The

entire premise of the counterfeiting case brought in 2018 was an admitted fiction.  That,

following a fishing expedition in discovery, Chanel discovered a few dozen supposedly problematic bags out of over 70,000 items (the Corti evidence), —does not excuse Chanel's inequitable and bad faith conduct as outlined here.

**B.   IF THE COURT IS INCLINED TO ISSUE AN INJUNCTION, PLAINTIFF'S PROPOSED INJUNCTION IS OVERBROAD AND SHOULD BE REJECTED.**

**1.    The Proposed Injunction Is Far More Restrictive Than Reasonably Necessary.**

If the Court determines that a permanent injunction should issue in this case (it should not), it should reject Chanel's proposed injunction order because it is impermissibly overbroad and overreaching. "An injunction is overbroad when it seeks to restrain the defendant[] from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011).

The Second Circuit has made clear on many occasions that an injunction cannot prevent a party "from engaging in [even] illegal conduct that was not fairly the subject of litigation." *See, e.g.*, *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 51 (2d Cir. 2017); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299-300 (2d Cir. 1999). Here, among other things, Chanel's proposed injunction is overbroad, because it "exceed[s] the jury's findings of infringement." *Starter Corp.,* 170 F. 3d at 299-300; *see also Victorinox AG*, 709 Fed. App'x at 51 (finding injunction overbroad where it prevented defendants from "the use of design elements and indicia associated with [Victorinox], such as the cross and shield device," in addition to preventing use of the "trademark for two elongated oval-shaped red scales with curved edges").

Chanel repeatedly refers to cases providing that under certain circumstances courts have "authority to enjoin actions otherwise lawful when such action is deemed ... necessary to correct the evil effects of unlawful conduct." *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d

228, 246 (S.D.N.Y. 2004).  As discussed further below, those cases do not apply here. The key point here is that such extreme measures of prohibiting legally protected conduct must be avoided and may be invoked only if absolutely necessary in light of the established conduct of the defendant.  "A district court may abuse its discretion where a permanent injunction in a trademark case is too broad, i.e., not narrowly tailored to fit specific legal violations because the district court should not impose unnecessary burdens on lawful activity. Further, in trademark infringement cases, permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future. . . ." *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 299 (2d Cir. 1999) (internal quotation marks and citations omitted).

Once the right to an injunction is determined, the injunction must be narrowly tailored in light of all equitable factors and designed only as restrictive as necessary to **reasonably** protect the plaintiff from infringing activity. *See Guthrie Healthcare Sys. v. ContextMedia, Inc.,* 826 F.3d 27, 46, 47 (2d Cir. 2016) ("[An injunction should not impose unnecessary burdens on lawful activity," "[o]nce the senior user has proven entitlement to an injunction, the scope of the injunction should be governed by a variety of equitable factors—the principal concern ordinarily being providing the injured senior user with **reasonable protection** from the junior user's infringement.") (emphasis added) (citation omitted).

Thus, the doctrine that the Court has authority to impose a broad injunction that goes so far as to prohibit obviously lawful conduct has no application in this case.  This is not a case involving a blatant counterfeiter engaged in the intentional distribution of imitation goods or a retailer buying blatantly counterfeit goods. As has been fully discussed above, the evidence establishes that WGACA acted in good faith and built its reputation and success by establishing itself as a trustworthy purveyor of authentic luxury items. The only evidence presented that any

items sold by WGACA might possibly be unauthorized versions are Chanel's internal records, which were never available to WGACA.

2.      **The Draconian Prohibitions of the Proposed Injunction Are Unjustified and Unlawful.**

Chanel argues (at 22) that, despite the overly broad prohibitions built into its proposed permanent injunction, such measures are reasonable to ensure that WGACA "does not continue to come very close to the line between fair use and mark infringement." (citation and ellipsis omitted).   In support, Chanel cites *Infogroup, Inc. v. DatabaseUSA.com LLC*, 2018 WL 6624217 at *25 (D. Neb. Dec. 18, 2018), which states that "the defendants have proven unable— or more likely, unwilling—to carefully toe the line between fair use and mark infringement. So, the Court concludes that the appropriate scope of injunctive relief is to move that line to a place where it is easier for the defendants to see."

Chanel's position completely ignores the actual facts of this case. As previously stated, the only evidence that suggests that any Chanel items sold by WGACA were not authorized are (1) the internal records of Chanel showing that certain serial numbers were listed as voided or stolen and (2) Chanel's internal agreements with retailers pertaining to the use of the "display items."  It is undisputed that WGACA was ignorant of the theft of the Renato Corti serial numbers until mid-2020 when it learned of such during this litigation; it was ignorant of the issues as to the 51 items with voided serial numbers until this litigation; and it was ignorant of Chanel's prohibition of the sale or distribution of the 779 point of sale items until this litigation. These facts, in and of themselves, rebut any claim of bad faith and willful conduct as we detailed above.  The jury's advisory determination that WGACA's conduct was willful is devoid of any supporting evidence and thus should be ignored.

If Chanel had chosen to make this information available to retailers in the second-hand

market, the circumstances surrounding the sale of these items could have been avoided.  Thus, WGACA has not engaged in the overt counterfeiting conduct present in other cases where the courts have imposed the extreme terms of the injunction Chanel proposes here.  The extreme injunction proposed by Chanel goes far beyond what is necessary and is clearly intended to terminate WGACA's ability to sell any Chanel goods. This would not only devastate WGACA's business, but would chill the second-hand industry as a whole.   Chanel's proposed injunction also would violate WGACA's First Amendment rights to engage in lawful, truthful commercial speech. *See In re R. M. J.*, 455 U.S. 191, 203 (1982) ("Truthful advertising related to lawful activities is entitled to the protections of the First Amendment."); *see also, e.g., ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990) (reversing Lanham Act injunction that "suppresse[d] more speech than protecting [Lanham Act] interests require[d]").

**3.      Chanel Should be Required to Disclose the Serial Numbers Chanel Claims Were Stolen, Voided, or are Suspected of Counterfeit to Aid WGACA and Others Similarly Situated in Their Authentication Process. (Proposed Inj. 3(g))**

Chanel argues that WGACA cannot be heard to complain that an absolute prohibition on the sale of counterfeit or infringing Chanel products is commercially unreasonable or unduly harsh. However, Chanel has done nothing to reduce the probability of an inadvertent, wholly innocent sale of an unauthorized item, such as by giving notice of the serial numbers that have been voided, stolen, or are otherwise suspect. Companies like WGACA have no access to this information unless Chanel makes it available.  As such, Chanel is contributing to the possibility of an unknowing sale of an item it claims should not be on the market.  Chanel cannot fairly request an injunction that WGACA cannot comply with absent information that Chanel does not disclose.

**4.      The Proposed Injunction Ridiculously Requires WGACA To Obtain Permission from Chanel Before Legally Marketing Any Chanel Items. (Proposed Inj. 3(c))**

Chanel's proposed permanent injunction prohibits WGACA from, among other things, advertising, offering for sale, or selling any CHANEL-branded items without first obtaining permission from authorized personnel at Chanel or having documentary evidence that the item was first sold by Chanel.  It is commercially untenable to expect WGACA to obtain the original proof of purchase from every source of the vintage items it obtains. (*See* Weisser Dec. ¶ 13). Chanel customers from years ago cannot be expected to have saved all receipts for their purchase of Chanel handbags or other items, and to have them available when they choose to sell or pass on the item.   Therefore, because consumers cannot provide this information, WCAGA would be in the position where it would be required to seek and await permission from Chanel before being able to market any authentic product bearing the Chanel trademark.

There is no justification for this proposed requirement which would completely undermine WGACA's entire business and create a logistical morass forcing WGACA to regularly seek permission from a hostile actor intent on ending WGACA's second-hand sales of Chanel all together.  This is not hyperbole: Chanel has stated unequivocally that it is Chanel's view that only Chanel can authenticate a Chanel item. (RT 293:18-294:8).  Authorization from Chanel is not, and should not, be required to resell genuine Chanel goods.  *Zip Intern. Group, LLC v. Trilini Imports, Inc*., 2011 WL 2132980, *3 (E.D.N.Y. May 24, 2011) (quoting *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992)) ("trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."); *see also H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc*., 879 F.2d 1005, 1023 (2d Cir. 1989) ("[T]he unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation.").

It is undisputed that WGACA has sold over 70,000 Chanel branded items since 2014.

Only about 63 handbags have been identified as potentially non-genuine (and as fully briefed above, even those are most certainly not infringing). Yet the restriction would give Chanel carte blanche authority to obstruct any sale and would impose an insurmountable procedural barrier to the basic process of WGACA's lawful retail business. Such a restriction has been held to be too excessive. *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F. Supp. 2d 511, 524 (S.D.N.Y. 2004) ("[w]ere the Court to permit Soren to sell Gucci merchandise only if he notified Gucci of the source of those goods, the Court recognizes the strong possibility that such relief would effectively bar Soren from ever selling authentic Gucci merchandise -- a sanction the Court has already stated is too severe and inconsistent with this country's notions of free enterprise and vigorous competition.")

Chanel cites selected portions of *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368 (S.D.N.Y. 2010), to justify this highly restrictive injunctive relief.  However, the facts that prompted that court to enter the injunction in no way resemble those here, and exemplify the repeated egregious conduct that courts rely on when imposing extreme restrictions. First, the supposed Fendi products there were suspiciously "new" and obtained from offshore importers at "off brand prices." Second, Fendi had already notified Filene's that products from those sources were counterfeit and while Filene's falsely assured Fendi that the handbags were "being pulled" from all stores, it still continued to sell them. *Id*. at 374. Third, one of the suppliers for the bags said they came from Fendi factories but refused to identify such and, when asked to execute an agreement with Filene's, the supplier tellingly redacted those portions which stated it had the legal right to sell the products and that the products did not infringe any third party's rights. *Id*. at 375.  Finally, despite the redaction, Feline's then took no

further steps to authenticate the genuineness of the goods. *Id.*[25]  The willful actions of Filene's in purchasing ostensibly new Fendi bags at "off brand prices" under these circumstances is hardly similar to the facts of this case.

Here, WGACA purchased used Chanel items for resale, inspected them for authenticity, saw actual Chanel serial numbers assigned to the products, and had no reason to believe they were not genuine. In fact, even Chanel's employees and experts could not identify any differences between the items and those they know to be genuine as we detailed above.  Again, Chanel's only basis for claiming that any Chanel items sold by WGACA were not authorized are the internal records listing certain serial numbers as voided or stolen, and Chanel's internal agreements with retailers regarding use of the "display items."  Although it could have, Chanel does not make this information public and WGACA could not have known about it. Thus, WGACA has not engaged in the heinous counterfeiting conduct present in other cases where the courts have imposed extreme injunctions.

The other cases cited by Chanel in support of its extreme injunction are also distinguishable and demonstrate the overwhelming fraudulent and repeated conduct the court was addressing in those instances.  In *Gucci Am., Inc.*, *supra*, 315 F. Supp. 2d 511, the court ordered the reseller to buy goods from only authorized Gucci retailers after the reseller had been held in contempt for repeatedly violating a prior injunction. *Id.* at 514. *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corporation* is distinguishable for similar reasons. 689 F. Supp. 2d 585, 602 (S.D.N.Y. 2010), *Slep-Tone Entm't Corp. v. Gorrel* is distinguishable because

---

[25] The defendants were also sanctioned by the court for failure to produce documents noting that they displayed "an evident pattern of non-production of documents, coupled by false assurances that [defendants] had produced all of [their] documents." *Id.* at 378.

that case involves a defendant who actually made counterfeit products. 2011 U.S. Dist. LEXIS 169055, *3 (D. Ariz. Feb. 28, 2011).  And *Mionix, LLC v. ACS Tech*., was not even a counterfeiting case, but involved a licensing agreement.  2018 WL 4042729, at *10 (D. Colo. Aug. 24, 2018).  None of Chanel's cited cases come close to matching the facts of this dispute.

5.      **The Proposed Injunction Improperly Prohibits WGACA From Using Hashtags Consisting Of Or Including "Chanel." (Proposed Inj. 3(a) (v))**

The Proposed Injunction further seeks to preclude WGACA from using hashtags that include "chanel". (PI, ¶3 (a)(v)).  Throughout the litigation, Chanel has misrepresented the import of hashtags in ecommerce.[26] "A 'hashtag' is a form of metadata comprised of a word or phrase prefixed with the symbol '#.'" *Eksouzian v. Albanese*, 2015 WL 4720478, at *8 (C.D. Cal. Aug. 7, 2015) (quoting the USPTO's Trademark Manual of Examining Procedure ¶ 1202.18). Hashtags "merely facilitate categorization and searching within online social media (*i.e.*, social media participants are directed to search a certain subject by typing, *e.g.*, 'hashtag ABC' where ABC is the subject…)" *Id.*…which merely indicates and categorizes the post's subject." *Id.*  Hashtags are "merely descriptive devices, not trademarks, unitary or otherwise, in and of themselves." *Id.* Shannon Parker, a witness Chanel called and embraced, affirmed this functional aspect of hashtags in social media.  RT 976-977 ("It's just a discovery tool.").  The Court's injunction should not prohibit activity that is purely functional.[27]

---

[26] Chanel (at p. 21) misunderstands *Fraternity Collection, LLC v. Fargnoli*, 2015 WL 1486375 (S.D. Miss. Mar. 31, 2015).  Chanel claims the case "held" that hashtags bearing the name of the markholder were infringing, when actually the case was at the motion to dismiss stage and merely held that a hashtag using a competitor's name "could" be deceptive.  *Id.* at 4.

[27] In an abundance of caution, WGACA intends to refrain from using the hashtag "#giveawayfromchanel" while reserving all rights with respect to the jury's liability finding and any injunction ruling.

6.    **The Proposed Injunction Improperly Prohibits WGACA From Using The Chanel Marks In Legitimate Advertising To Market Chanel Second-Hand Goods As Permitted By The Fair Use The Doctrine (Proposed Inj. 3(a) (i) – (iv) and (vi) - (viii) and 3(b))**

As previously noted, the proposed injunction is over broad and includes a litany of restrictions seeking to limit WGACA from advertising Chanel products in any context. The proposed injunction goes so far as to prevent WGACA from using the Chanel mark to advertise its "general business" (PI, ¶3 (a)(i)), thereby precluding WGACA from even advising the public that it has Chanel products for sale—lawful commercial speech protected by the First Amendment. *See In re R. M. J.*, 455 U.S. at 203. Even if WGACA's advertisements using Chanel's name created a likelihood of consumer confusion (and they do not), the proper relief is not an injunction forbidding the word "Chanel" from all of WGACA's advertising.  The Second Circuit considers such bans as violative of the First Amendment.  *Consumers Union of United States, Inc. v. Gen. Signal Corp*., 724 F.2d 1044, 1053 (2d Cir. 1983).  "The First Amendment demands use of a disclaimer" instead.  *Id.*  As discussed elsewhere, WGACA currently provides such a disclaimer.  Advising the public as to the identity of the brands offered for sale does not, as Chanel erroneously claims, indicate some affiliation or relationship other than that WGACA is a purveyor of a myriad of luxury brands, including Chanel.  Indeed, the signage on WGACA's retail stores, as well as its website, lists ALL of the luxury brands that are available. (Ex. 185).

WGACA has, in an abundance of caution and while reserving all rights to contest the jury's liability finding, decided not to use the Chanel marks in what Chanel terms "WGACA Stylized Font" or "Chanel Stylized Font." (PI, ¶3, a(ii)). But WGACA disagrees with Chanel's characterizations of WGACA's use of both Chanel's and WGACA's fonts.   Chanel claims (at 13-14) that WGACA uses "Chanel" in both WGACA's font and Chanel's font.  This is false. The example Chanel gives (at p.14) of WGACA using "Chanel" in WGACA's font shows two

entirely different fonts.  The example Chanel gives (at 13) of WGACA using Chanel's font is simply an objection to the use of the "sans serif" font.  "Sans serif" is one of the most common font types. Chanel cannot claim trademark protection over a font. WGACA uses the same font across its website to identify other brands.

WGACA also maintains that any requirement not to use the word "Chanel" in a larger font than WGACA's own marks is not necessary given that WGACA's full name, "What Goes Around Comes Around," appears at the top of every webpage and above the sub-pages prominently linking to other brands, all exceeding the length of the word "Chanel." (PI, ¶3 (a)(iii)).

The Proposed Injunction also seeks to extend to matters that were not a part of claims alleged in the Second Amended Complaint including photographs from Chanel runways and marketing campaigns irrespective of the copyright ownership. (PI, ¶3 (a)(iv)). With an appropriate license of the copyrighted material, WGACA should not be precluded from using licensed images. The Complaint contains no claim for copyright infringement seeking to enjoin the use of copyrighted material.

Similarly, Chanel seeks to prevent WGACA from using artwork (termed "displays" or "props") that includes the Chanel mark. (PI, ¶3 (a)(vi)).  The use of artwork cannot be an infringement let alone a false association, and the outsized perfume bottle WGACA acquired, as art, does not create a false association any more than the famous Campbell Soup Can art of Andy Warhol.

Chanel also seeks to prevent the use of the term "Chanel" in "discount codes" (PI, ¶3 (a)(vii)) and to prohibit any Chanel items to be displayed "alone ". (PI, ¶3 (a)(viii)).  This makes no sense as a seller must be permitted to display the item that it has for sale without including

other items as well (which is what Chanel is suggesting must be done via the injunction).   *See Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 103 (2d Cir. 2010) ( "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product.") (citation omitted); *see also Polymer Tech.,* 975 F.2d at 61-62 ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner" (footnote omitted)).

The decisions cited by Chanel to justify this over-reaching injunction relate merely to the entry of a preliminary or permanent injunction and do not support the extent to which Chanel seeks to hamstring WGACA's sales. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, was an action by the Dallas Cowboys Cheerleaders seeking to prevent a third party from distributing or exhibiting a pornographic film entitled "Debbie Does Dallas" wherein the main character wears a "strikingly similar" uniform to that of the Dallas Cowboy Cheerleaders.  604 F.2d 200 (2d Cir. 1979). The defendants' clear intent was to refer to the well-known attire worn by the Dallas Cheerleaders (found to be a trademark) and to suggest the latter had "sponsored or otherwise approved" its use in the film, establishing a likelihood of confusion.  Similarly, in *BayCare Health Systems v. BayCare Health Management Corp.*, the defendant used the plaintiff's federally registered "BAYCARE" mark for defendant's own healthcare services. 2020 U.S. Dist. LEXIS 14630 (M.D. Fla. 2020).  The defendants defaulted and the injunction prohibited defendants from using the plaintiff's mark for their healthcare services.  Neither decision is germane here.

Chanel (at 18) justifies the foregoing restrictions by claiming that it is entitled to enjoin

otherwise lawful conduct because it is "necessary to correct the evil effects of unlawful conduct". The decisions cited for this premise similarly do not pertain to the facts. *Philip Morris USA* involved a defendant which refused to comply with the judgment and continued to sell cigarettes through specified domain names and which affirmatively stated it would not adhere to the judgment in the future. No such conduct is evident in this action and there is no basis for the Court to enjoin WGACA from otherwise lawful conduct in the sale of Chanel items.  Taken at face value, Chanel's premise is that simply the sale of its items somehow suggests an affiliation or sponsorship.  That position, if accepted, would gut the first sale doctrine.

7.   **The Proposed Injunction Improperly Seeks to Enjoin Any Use Of The Name and Likeness Of Gabrielle Bonheur "Coco" Chanel When No Claim Based On Her Rights Of Privacy or Publicity Were Asserted. (Proposed Inj. 3(a) (ix))**

Section 3(a) (ix) of the proposed permanent injunction prohibits WGACA from using the name, image, or likeness of Gabrielle Bonheur "Coco" Chanel. Such an injunction would be improper because this case did not involve any claim for violation of Coco Chanel's (or her estate's) right of privacy or rights of publicity.[28] No claim based on Coco Chanel's rights of publicity was asserted in the operative Complaint. (*See* Second Amended Complaint, Dkt # 64). Thus, no finding of any misuse of her name or likeness could have been made by the jury. There is, therefore, no basis to enter an injunction in this case barring the use.

8.   **Requiring WGACA to Photograph Serial Numbers and Post the Photos In Listings is Unreasonable. (Proposed Inj.  3(b))**

---

[28] Chanel repeatedly and improperly during phase one of the trial implicated WGACA's use of Coco Chanel's name and image including suggesting that Chanel owns her rights of publicity and that WGACA's failure to seek permission from Chanel for such use was relevant.  We don't know what rights if any Chanel actually owns vis-à-vis Coco Chanel's rights of publicity, (or what defenses might lie for such a claim as the claim was never presented) but what we do know is that Chanel never made a claim for a violation of Coco Chanel's rights of publicity.

Section 3(b) of the proposed injunction would require WGACA to post "a photograph of the CHANEL-branded item's Chanel Serial Number as it appears on the accompanying Authenticity Card, Authenticity Plate and/or the label affixed to the actual CHANEL-branded item" for any CHANEL-branded item being offered for sale. Chanel's request would create an extreme logistical, operational, and expensive step in listing a Chanel item for sale.   These serial numbers are extremely hard to photograph based on very challenging locations within the product.  It also could actually damage the bag for the same reasons. The time to take high quality images is almost impossible to fully measure as the type of set up to obtain this image is extreme.

The posting of serial numbers is also not helpful to consumers.  Chanel does not even provide these on their own website. Furthermore, many Chanel items, like the display and gift items noted above do not even have serial numbers.  (Weisser Dec. ¶ 20).  Chanel thus seems to be prohibiting resale carte blanche, which again is a violation of the first sale doctrine. As for the authenticity cards, consumers do not typically retain those kinds of items. This makes Chanel's demand yet another couched attempt to destroy the second-hand resale market.  (Weisser Dec. ¶ 16).

**9.     The Disclaimer in the Proposed Injunction is Unnecessary, Harmful to Free Enterprise, and Misleading. (Proposed Inj. 3(b))**

Section 3(b) of the proposed injunction also requests that WGACA prominently place and conspicuously feature an unnecessary and disturbingly provocative disclaimer stating that: "WHAT GOES AROUND COMES AROUND HAS NOT BEEN AUTHORIZED BY CHANEL TO SELL THIS ITEM. THIS ITEM HAS NOT BEEN AUTHENTICATED BY CHANEL."  Firstly, there is no legal requirement that Chanel authorize WGACA to sell an item, yet the proposed disclaimer implies and tends to mislead the public into believing that such

permission is required.   Furthermore, the statement that the item has not been authenticated by

Chanel is untrue, given that the item is a vintage Chanel item previously distributed by Chanel

and is authentic. Despite this, the proposed disclaimer implies that the product is somehow not

genuine and affirmatively acts to discourage a purchase and interferes with free enterprise and

WGACA's business prospects.

WGACA's web pages already prominently contain a disclaimer stating: "WHAT GOES

AROUND COMES AROUND LLC, IS NOT AN AUTHORIZED RESELLER NOR

AFFILIATED WITH ANY OF THE BRANDS WE SELL." (Weisser Dec. ¶¶ 14-15, *See*

https://www.whatgoesaroundnyc.com/en-us/home). Furthermore, when guaranteeing the

authenticity of the products it sells, WGACA clearly states on its website:

> "Our proprietary multi-tiered authentication process ensures that pieces are
> evaluated three times before the item is available for sale. Any piece
> purchased at What Goes Around Comes Around or one of our retail
> partners has been carefully selected, inspected, and is guaranteed
> authentic."

(Weisser Dec. ¶¶ 6-7, *See* https://www.whatgoesaroundnyc.com/en-us/authenticity-

guarantee.html). Thus, the public is already made aware that WGACA acts independently from

the brand houses and itself has evaluated the items for authenticity using a proprietary process.

There is no statement or implication that the item has been inspected and further authenticated by

the brand houses, such as Chanel.  There is thus no need for the over-the-top additional disclaimer

that Chanel would impose, which would violate WGACA's First Amendment rights by compelling

speech.  *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 650

(1985) ("compulsion to speak may be as violative of the First Amendment as prohibitions on

speech").  Even if the Court determines that a disclaimer is necessary, any "restrictions … may be

no broader than reasonably necessary to prevent the deception." *In re R.M.J.*, 455 U.S. at 203.  The

language in Chanel's proposed disclaimer goes well beyond what is "reasonably necessary" to prevent any likelihood of confusion. Chanel's disclaimer is clearly intended to discourage any purchaser and disparage WGACA, as opposed to providing accurate information. The requirement should not be imposed.

**10.  The Proposed Recall and Refund Procedure of The Proposed Injunction Is An Improper Mandatory Injunction, Unreasonable And Unnecessary. (Proposed Inj. 3(d))**

Besides the egregious restrictions and obligations noted above[29], Chanel also seeks a provision (PI, ¶3 (g)) requiring that WGACA "refund and recall" what is described as "any infringing items using or bearing CHANEL Marks"[30] **including but not limited to** (a) the pouch identified with Chanel Serial No. 10218184 (which remains in WGACA's  inventory and was introduced at trial as Exhibit 1374); (b) the bags sold by WGACA bearing the serial numbers that were stolen from Renato Corti in 2012, but which Chanel refused to reveal to the public (one of which is in WGACA's inventory and was produced at trial as Exhibit 1369); (c) the 51 bags that have serial numbers voided by Chanel (Ex. 1010) regarding which Chanel has never advised the public; and (d) the 779 "Point of Sale" items.

The cases cited by Chanel for this draconian demand are premised on conduct which far exceeds any found herein. At the outset, a "recall" in a trademark infringement action is considered an "extreme remedy." *Hartford-Jackson, LLC v. Hound's Tree Wines, LLC*, 2022

---

[29]  As set forth in Seth Weisser's Declaration, while WGACA continues to maintain that its sale of the Corti items was lawful and that those items are not counterfeit, WGACA nonetheless has put in place safeguards to prevent the purchase and sale of any Corti items. (Weisser Dec. ¶ 11).
[30]   The proposed permanent injunction itself includes no limitation as to the dates of sale of any items subject to the demanded recall although the motion erroneously states it is from the date of "inception of the lawsuit" (Motion, p. 25).

U.S. Dist. 150412 (E.D.N.Y. 2022) (citing *Conopco, Inc. v. 3DO, Co.* 1999 U.S. Dist. LEXIS

20510, (S.D.N.Y. 1999)).  As a result, ordering a product recall "requir[es] greater justification

than an injunction alone." *Id.* (citing *Audemars Piquet Holding S.A. v. Swiss Watch Int'l., Inc.*,

2015 U.S. Dist. LEXIS 3207, *13 (S.D.N.Y. 2015)).

In considering a recall, the Court must consider (1) the defendant's good faith or bad

faith; (2) the likelihood of diversion of customers from plaintiff to defendant; (3) the extent of

the burden entailed in a recall including breadth of distribution and shipping costs; and (4) the

probability that the plaintiff would benefit from such an order. *Id.* (citing *Cherry River Music

Co. v. Simitar Ent., Inc.*, 39 F. Supp. 2d 310, 322 (S.D.N.Y. 1999)).

As set forth herein, it is undisputed that WGACA was ignorant of the theft of the Renato

Corti serial numbers until mid-2020 in the course of this litigation; it was ignorant of the issues

as to the 51 items with voided serial numbers until this litigation; it was ignorant of Chanel's

prohibition of the sale or distribution of the 779 point of sale items until this litigation.[31]  These

facts, in and of themselves, rebut any claim of bad faith and willful conduct.

The likelihood of diversion also weighs in favor of WGACA.  This Court noted in its

Summary Judgment Order that "it is undisputed that Chanel and WGACA are not direct

competitors, the presumption of injury will not apply." (Dkt. 276 at 52). Consumers looking to

purchase from WGACA do so in large part online (while Chanel does not offer any handbags

---

[31]   Chanel's claims of "bad faith" come down to the issue in 2015 wherein Chanel claims
WGACA sold a counterfeit bag after receipt of a cease and desist letter, but as Paige Rubin
testified, the bag identified in the ad had a different serial number, which she memorialized in
photographs of the bag and the serial number. (Rubin Testimony, Jan. 23, 2024, RT 1114:9-
1122). Chanel also references the sale of three Corti bags after the commencement of the
litigation, but such were sold in error as recounted by Mr. Weisser. (Weisser Dec. ¶¶ 8-10).

online) and are seeking to purchase an item that is not full price.  All of the bags from WGACA identified above are second-hand and, with the exception of two still in WGACA's inventory, were sold some years ago. There also can be no diversion with regard to the point-of-sale items since Chanel has always maintained that it does not sell these items.

As to the burden in performing such a "recall," the items that would be subject to a recall were sold over time and some through WGACA's wholesale customers including retailers such as Banana Republic, Von Maur, and the GAP. (Weisser Dec. ¶ 17).  This would make it virtually impossible to trace the ultimate purchaser. (*Id.*) If it relates to the 51 with voided serial numbers, Chanel itself has no idea how these ended up without information being entered and why such were not voided years ago.  Many of these items were sold as far back as 2014. (*Id.* at ¶ 18). The point-of-sale items were similarly sold as far back as 2016 and the Corti bags sold over time from 2014 to 2020. (Weisser Dec. ¶ 18).

The decisions cited by Chanel do not warrant a recall.  In *Technimed SRL v. Kidz-Med, Inc.*, the defendant was, at one time, a distributor of plaintiff and entered into a settlement agreement allowing it the exclusive right to sell the plaintiff's thermometers to certain retailers. 763 F. Supp. 395 (S.D.N.Y. 2011). Nevertheless, the defendant proceeded to introduce its own product, with packaging with the same color scheme and slogans as plaintiff and proceeded to promote defendant's products by claiming such were related to plaintiff's,. The court also noted that, unlike here, the defendant's products competed **directly** with those of plaintiff and at a far lower price point.

Similarly, *Cherry River Music Co., supra*, involved the defendant's use of copyrighted music despite knowing that it had lost the ability to obtain a compulsory license for the music, with the result that it had shipped substantially all of the music.  Here, far and away the majority

of the items at issue were sold well before the litigation or the belated revelation by Chanel of the issues with certain serial numbers as well as the restrictions as to the point-of-sale items.

*Audemars Piguet Holding S.A. v. Swiss Watch International, Inc.*, is similarly inapplicable. 2015 U.S. Dist. LEXIS, 3207 (S.D.N.Y. 2015). That decision found that a previous finding that two styles of watch trade dress were counterfeit was erroneous, thereby obviating the trebling of the original award. The decision did, however, address two additional models of defendant's watches, which it found to be infringing and the sale of which would be enjoined. However, while the original designs required a recall as defendant continued to provide such to retailers after receipt of a cease and desist letter as to the specified models and the initiation of the action, **no recall was ordered for the additional designs for which no prior notice was given**. Similarly here, there was no notice to WGACA as to the various serial number issues and point-of-sale restrictions until in the midst of the litigation.[32] Therefore, Chanel's "recall" request should be rejected.

## 11. The Proposed Injunction Improperly Restricts WCAGA's Ability to Sell Refurbished Items. (Proposed Inj. 3(e) - (f))

Sections 3(e) – (f) of the proposed injunction prohibits WGACA from (e) Advertising, offering for sale, or selling any CHANEL-branded items which have been materially altered or changed, including, but not limited to, items that have a combination of original and non-original Chanel parts; and (f) Advertising, offering for sale, or selling any genuine CHANEL-branded items that have been repaired, restored, or refurbished without fully disclosing the nature of the

---

[32] The court in *Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co.*, 1995 U.S. Dist. LEXIS 12849, at *41 n.16 commented that a recall had been granted in a handful of reported unfair competition cases, and, then, only when there was egregious conduct by the defendant or when motivated by additional public policy considerations, such as a threat to child safety.

repair, restoration, or refurbishment, and the identity of the person who repaired, restored, or refurbished the item.

Prohibiting the sale of any Chanel item that has been modified, even though the modification is disclosed, is excessive. Firstly, these provisions have nothing to do with prohibiting the distribution of non-genuine goods. The general public and companies have a right to market refurbished or repaired used goods, so long as they make the proper disclosures. *See Hamilton Int'l Ltd. v. Vortic LLC,* 13 F. 4th 264, 267, 2d Cir. 2021) ( "The Supreme Court in *Champion Spark Plug Co. v. Sanders,* [331 U.S. 125, 128-31(1947)] held that in the context of refurbished goods, the likelihood of consumer confusion is determined by looking to the disclosures a second-hand dealer provides to purchasers.")  Thus, WGACA and any second-hand reseller has the right to sell refurbished goods, so long as the proper disclosures are made. In the case where some repairs are made, or non-original parts have been incorporated, a reasonable disclosure that the product has been refurbished, or that non-original parts are included should be sufficient. There is no basis to bar the sale outright.  Furthermore, in the context of the many types of repairs or refurbishment that can be made, ranging from touching up small blemishes or scratches, to replacing torn or missing parts, an across-the-board or vague standard for the disclosure is untenable. Finally on this point, Chanel identifies no legitimate basis for requiring disclosure of specific individuals who refurbish products, and doing so would be highly invasive of such individuals' privacy and would unfairly discourage them from working for or with WGACA.

**12.     The Proposed Injunction Improperly Prohibits WGACA From Offering To Guarantee the Authenticity of Its Items. (Proposed Inj. 3(h))**

Chanel improperly requests that the Court enjoin WGACA from "certifying, guaranteeing, or otherwise making any advertising claims, representations, or statements

regarding the genuineness of any CHANEL-branded items advertised or sold by WGACA or

WGACA's ability to authenticate CHANEL-branded items that are not documented, such as a

receipt showing a sale of the item by Chanel or an authorized Chanel retailer or a genuine

Chanel Authenticity Card." WGACA uses a rigorous multi-step authentication process to ensure

only genuine items are purchased and sold. (Ginn Dec., ¶¶17-10). In its attempt to persuade the

Court to order an overbroad injunction preventing WGACA from guaranteeing the authenticity

of its products, Chanel cites (at p. 26) a number of cases that are inapplicable or do not stand for

what Chanel claims they stand for. Chanel cites *Chanel, Inc. v. RealReal, Inc*., 449 F. Supp. 3d

422, 444 (S.D.N.Y. 2020), to argue that where a reseller advertises that every Chanel item it sells

is genuine and that every item has gone through an authentication process, the sale of potentially

infringing or counterfeit items makes this advertising claim literally false. First, the *RealReal*

case was at the motion to dismiss stage.  Second, WGACA advertises the authenticity of its

goods as follows: "This item is guaranteed authentic *by What Goes Around Comes Around*"

(emphasis added) and further "[a]ny piece purchased at What Goes Around Comes Around or

one of our retail partners has been carefully selected, inspected and is guaranteed authentic."

WGACA's advertising is therefore not false and it is in fact true. WGACA put forth evidence at

trial that it does carefully select, inspect, authenticate its products and the jury's verdict has no

bearing on WGACA's own guarantee of authenticity.

Chanel relies on *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH,* 843

F.3d 48, 65 (2d Cir. 2016) to argue that courts can enjoin parties from making false claims. In

that case, the court affirmed the district court's finding that a specific statement on defendant's

product packaging for a pregnancy test was false and thus held that an injunction prohibiting that

specific statement was appropriate. That is not the case here. First, WGACA's statements as to

its authentication process and guarantee of authenticity is perfectly true and not false. The proposed injunction thus would bar legitimate commercial speech in violation of the First Amendment. *See In re R. M. J.*, 455 U.S. at 203; *accord Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011). Second, the jury's finding of infringement or counterfeiting on a small number of WGACA's products does not have any bearing on WGACA's statements that it carefully selects, inspects, and authenticates its products and guarantees their authenticity. The fact that a jury found there was a small subset of the items that were found to be infringing or counterfeits in the past does not mean that WGACA cannot guarantee authenticity of its items going forward.

Chanel also cites *Monster Energy Co. v. Vital Pharms., Inc.,* 2023 WL 2918724, at *9 (C.D. Cal. Apr. 12, 2023), which actually supports WGACA's position that Chanel's proposed injunction prohibits truthful future advertising. In that case, the court narrowed the scope of the injunction requested because the proposed injunction "seems to prohibit future advertising even if truthful." *Id*. at *10. The court went on to say, "[t]he Court is mindful of its obligation to prevent Defendants from misleading the public in the future with its deceptive ads. But [the Court] can fulfill that obligation while protecting Defendants' First Amendment rights—and simultaneously increase the informed and reliable decisionmaking that honest advertising can provide." *Id*. (citations omitted). Here, WGACA's statements regarding its authentication process are truthful and any prohibition of such speech would be unlawful and violate the First Amendment.

### 13.   The Proposed Injunction Improperly Recognizes Aiding and Abetting Liability. (Proposed Inj. 3(i))

Chanel asks that WGACA be enjoined from "assisting, aiding, or abetting" any person or business entity engaging in any of the listed activities. But Chanel failed to make arguments about, or even reference, this request. Because Chanel has "not cited, nor has our research disclosed, any

case imposing aiding and abetting liability under the Lanham Act," the Court should reject this aspect of the injunction. *Elec. Lab'y Supply Co. v. Cullen*, 977 F.2d 798, 807 (3d Cir. 1992).

**14.     The Proposed Injunction Deadline Is Too Short. (Proposed Inj. 3)**

The proposed injunction imposes a maximum fifteen-day deadline for compliance. This is an impossible deadline. None of Chanel's requested actions can be accomplished within 15 days, let alone all of them. If the Court is inclined to grant an injunction, we would request 60 days to put in place any injunctive measures.

**IV.     CONCLUSION**

Based on the foregoing, WGACA requests that the Court deny Chanel's request for a Permanent Injunction.

DATED: April 8, 2024                     **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: _____

Daniel C. DeCarlo, Esq.
Thomas S. Kiddé, Esq.
Sasha Shariati, Esq.
Peter T. Shapiro
77 Water Street, Suite 2100
New York, NY 10005
212-232-1300
Dan.Decarlo@lewisbrisbois.com

Yale Galanter
Galanter Law, P.A.

*ATTORNEYS FOR DEFENDANTS*