UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------

| | | |
|---|---|---|
| CHANEL, INC., | | 18 Civ. 2253 (LLS) |
| | Plaintiff, | |
| vs. | | |
| | : | **DECLARATION OF THEODORE C.** |
| | | **MAX IN SUPPORT OF PLAINTIFF** |
| WGACA, LLC, WHAT COMES AROUND | : | **CHANEL, INC.'S MOTION FOR** |
| GOES AROUND LLC d/b/a WHAT GOES | | **ATTORNEYS' FEES AND COSTS** |
| AROUND COMES AROUND, MHW PROPERTIES, | : | |
| INC., WGACA WEB, LLC, PINES VINTAGE, INC., | | |
| VINTAGE DESIGNS LTD., and WCAGA LA, LLC, | : | |
| | | |
| | : | |
| Defendants. | | |
| | : | |

------------------------------------------------------------------

THEODORE C. MAX hereby declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a partner with the law firm Sheppard Mullin Richter & Hampton LLP

("Sheppard Mullin"), attorneys for plaintiff Chanel, Inc. ("Plaintiff" or "Chanel") and I am fully

familiar with the facts and circumstances herein.  I make this declaration in support of Chanel's

application for an award of attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d) and 15

U.S.C.§ 1117.  I have been lead counsel on this matter since its inception in 2018 and have

personal knowledge of the matters set forth herein, unless otherwise stated.

**Facts Relevant to this Motion**

2.      Plaintiff Chanel is an iconic fashion company founded by and named after Gabriel

Bonheur "Coco" Chanel.  Chanel's famous high fashion designs, handbags and small leather

goods, eyewear, fragrance and beauty products bearing its famous and distinctive and federally

registered trademarks (the "Chanel Trademarks") have been featured in widespread media and

advertising since the 1920s and are coveted by consumers within the United States, including

within this District.

3.      This action was brought by Chanel on March 14, 2018 to protect its Chanel Trademarks against the infringing actions of defendants WGACA, LLC, WHAT COMES AROUND GOES AROUND LLC d/b/a WHAT GOES AROUND COMES AROUND, WGACA WEB, LLC, and WCAGA LA, LLC (collectively, "Defendants" or "WGACA"). Chanel brought claims for trademark infringement and counterfeiting under Section 32 of the Lanham Act (15 U.S.C. § 1114), unfair competition and false designation of origin, and false association and false advertising under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) arising out of the defendants' false advertising, false association with Chanel and offering for sale and selling counterfeit and infringing CHANEL-branded items.

4.      This case was hotly contested and involved extensive discovery.  WGACA served eighteen sets of Requests for Production comprising a total of 251 requests, nine sets of Interrogatories comprising a total of 24 interrogatories, and two sets of Requests for Admission comprising a total of 15 requests and Chanel served eleven sets of Requests for Production totaling 243 requests, two sets of Interrogatories comprising 25 interrogatories, and two sets of Requests for Admission comprising 51 requests.

5.      WGACA took a total of eighteen depositions of Chanel current and former employees and expert witnesses, many of whom were deposed multiple times: WGACA took three depositions of Joseph Bravo; two depositions each of Joyce Green, Robin Gruber, Adrienne Hahn, and Lora Moffatt; and one deposition each of Professor David Franklyn (Chanel's survey expert), Andrea Gaudet (former Chanel employee), Jennifer Bleys (former Chanel employee), Pier Luigi Roncoglia (Chanel's Italian counsel), Claudio Girardi (General Manager of Renato Corti factory), Nihdi Kohli, and Andrew Safir (Chanel's disgorgement expert).

6.    Chanel took a total of nineteen depositions of WGACA current and former employees, third-party witnesses and trial experts, some of which were taken as fact and Rule 30(b)(6) witnesses: Chanel took three depositions of Frank Bober; two depositions each of Vlada Drukh (former WGACA employee), Ambria Mische, and Marcos Rosado; and one deposition each of Shannon Parker, Henry Kahrs (WGACA's disgorgement expert), Sun Li, Melissa Pittaoulis (WGACA's survey expert), Page Rubin (former WGACA employee), Devyn Shaughnessy (former WGACA employee), Anthony Rago (third-party witness), Tyler Prone, Gracie Ginn, and Seth Weisser (WGACA's co-founder and Chief Executive Officer).

7.    Beginning on January 9, 2024, this Court held a jury trial in this action (the "Phase I Trial"), which continued for eighteen days.  During the Phase I Trial, Chanel called thirteen witnesses: six present or former Chanel employees, survey expert David Franklyn, and six current or former employees of WGACA, including Seth Weisser, WGACA's co-founder and Chief Executive Officer, Frank Bober, Shannon Parker, Page Rubin, Sun Li (whose testimony was read into evidence), and Devyn Shaughnessy.  On January 31, 2024, Chanel rested its case and WGACA unsuccessfully moved for judgment as a matter of law.

8.    Even though WGACA had stated in its opening that it would put on a vigorous defense, on February 1, 2024, WGACA rested its case without calling any witnesses or even questioning Mr. Weisser.  In closing, WGACA's counsel offered the jury no explanation as to why WGACA decided to not call any witnesses.

9.    On February 6, 2024, the jury unanimously found for Chanel on each and all of its claims, concluding that WGACA is liable to Chanel for: (1) Willful trademark infringement, false association and unfair competition based upon WGACA's unauthorized use of Chanel's trademarks and other indicia of Chanel; (2) Willful trademark infringement based upon

-3-

WGACA's creation and use of various hashtags containing "Chanel" or "Coco Chanel" to advertise and market products on social media; (3) Willful trademark infringement based upon WGACA's sale and offering for sale of non-genuine CHANEL-branded products, including: (a) 13 handbags bearing voided stolen Chanel Serial Numbers from Renato Corti, (b) one handbag bearing the pirated Chanel Serial Number 10218184, (c) 51 handbags bearing voided Chanel Serial Numbers, (d) 779 CHANEL-branded point of sale items, and (e) materially altered or repaired CHANEL-branded products; (4) Willful trademark infringement based upon WGACA's sale of counterfeit CHANEL-branded products; and (5) Willful false advertising. (*See* ECF 407.) With regard to the counterfeiting claims, the jury awarded $4,000,000 in statutory damages.

10.     The Court then scheduled a second trial (the "Phase II Trial"), bifurcated at WGACA's request, this time before the Court, rather than a jury, in order for the parties to litigate the appropriate equitable remedies in light of the jury's verdict.  At the request of the Court, WGACA and Chanel submitted briefing in advance of the Phase II Trial. (*See* ECF 448, 453, 462, 474, 481, 483.)

11.     The Phase II trial began on July 15, 2024 and spanned five days.  At the Phase II Trial, Chanel called only one witness: Dr. Andrew Safir, a financial expert witness, to testify concerning WGACA's revenue and profits earned both from its sale of CHANEL-branded products that are subject to disgorgement and from WGACA's false advertising, as well as to provide rebuttal testimony.  WGACA called three witnesses in opposition, its Chief Financial Officer, Marcos Rosado, its Chief Executive Officer, Seth Weisser, and its financial expert witness, Henry Kahrs.  During the Phase II Trial, WGACA repeatedly and purposefully tried to relitigate the Phase I Trial and introduce evidence to contradict the evidence presented to the jury in the Phase I Trial which supported the unanimous jury determinations.

12.    Following the Phase II Trial, the parties submitted Post-Trial briefing on August 30, 2024 (ECF 496, 497) and, subsequently upon the request of the Court, submitted letter briefs regarding the scope of equitable relief.  (*See* ECF 500, 501.)  On February 26, 2025, the parties appeared for a conference before the Court with respect to language in the Proposed Judgment. Later that day, the Court issued the Final Judgment dated February 26, 2025 (ECF 505) in favor of Chanel in the amount of $4,012,730 (the "Judgment").

13.    Chanel now seeks to recover attorneys' fees in the total amount of $6,715,376.58 and disbursements billed to Chanel in the amount of $560,978.97, for a total recovery of $7,276,355.55. These amounts do not include, and Chanel does not seek to recover, fees related to various categories, including attorneys who did not work on the case for significant periods and services that ultimately did not contribute to the Final Judgment and Chanel has removed these charges.  Legal billing rates were discounted as a courtesy by Sheppard Mullin to its client, Chanel.  As is set forth below, such rates have been found reasonable for an award of attorneys' fees in this District.

14.    This application primarily includes amounts billed to and paid by Chanel for: (a) services rendered in investigation of Defendants' trademark infringement and preparation of the Complaint and First Amended and Second Amended Complaint; (b) services rendered in successfully opposing WGACA's motion to dismiss; (c) services rendered relating to discovery and discovery disputes in this case; (d) services rendered relating to preparation of Chanel's motion for partial summary judgment (which was granted in the main by the Court on March 28, 2022) and in opposing Defendants' motion for summary judgment (which opposition was successful with the exception of Defendants' motion to dismiss Chanel's ancillary New York General Business Law claims); (e) services rendered relating to Pretrial Preparation and

preparing Chanel's Motions in Limine and opposing WGACA's Motions in Limine; (f) services rendered relating to Chanel's preparation for and the successful prosecution of Phase I of this case; (g) services rendered relating to Phase I post-trial motions; (h) services rendered relating to preparation for and litigating the Phase II trial and post-trial motions, including services rendered relating to the motions in support of equitable relief[1] and the rendering of the Final Judgment. Care was taken to manage this case efficiently and cost-effectively.  As a result, the primary work on this case was done by the team of three partners, six additional attorneys, and legal assistants.

15.     Submitted herewith as **Exhibit 1** are copies of the eighty-six invoices Sheppard Mullin submitted to Chanel over the period from December 2017 through December 2024, which Chanel has paid in full.  Included in each invoice is a detailed listing by timekeeper of the work done on the date shown and the amount of time spent on that date by that timekeeper.  This listing (entitled "Fee Detail" on the Sheppard Mullin bills) is generated from the contemporaneous time records entered into the applicable program by or on behalf of each timekeeper.  In addition, a summary is included at the end of each bill, showing the name and title of each timekeeper, the total hours worked by that timekeeper during that billing period, the timekeeper's hourly billing rate and the extended amount (hours x rate).  Sheppard Mullin's bills also include a detailed listing of the disbursements paid by the firm and being charged to Chanel as part of the bill.  Annexed hereto as **Exhibit 2** is a summary of the total hours worked, and total fees charged for each timekeeper for all invoices.  A number of entries describing the work

---

[1] With regard to the Phase II Trial, given that the total amount of the disgorgement of WGACA's profits awarded following the pre-trial briefing, the Phase II trial, and post-trial briefing, was a fraction of the total amount sought by Chanel, I have adjusted the total amounts for the months of March through August 2024 and deducted $700,000, which is approximately two-thirds, from the total amount charged for services during those months.

performed have been redacted in part to protect against the disclosure of privileged attorney-client communications and/or attorney work product (and any disclosure of such information in the unredacted portions of these entries is inadvertent). Chanel respectfully believes that enough detail is provided by the remaining unredacted entries for the Court to evaluate the charges, but, if requested, we will submit unredacted bills for in camera review at the Court's request. Where applicable, the respective bank account numbers and taxpayer I.D. numbers the respective bank account numbers and taxpayer I.D. numbers have been redacted from the Sheppard Mullin and the third-party providers bills.

16.    Reproduced below is a portion of this summary, with the information for the principal members of the Chanel team:

| Name | Title | Law School Graduation | Hourly Rate(s) | Total Hours | Total Fees |
|------|-------|------------------------|----------------|-------------|------------|
| Theodore C. Max | Partner | 1983 | $730/$675/$775 | 3,394.5 | 2,351,513.50 |
| Jill M. Pietrini | Partner | 1988 | $675/$775 | 1,231.8 | 889,033.75 |
| Dylan J. Price | Partner | 2008 | $650/$775 | 2,289.2 | 1,557,060.00 |
| Bridget J. Russell | Special Counsel | 2012 | $643.50 | 1,283.8 | 787,634.13 |
| Tyler E. Baker | Associate | 2011 | $625/$675 | 388 | 245,185.00 |
| Khirin Bunker | Associate | 2019 | $643.50/$650 | 206.7 | 133,555.50 |
| Hyo Jin Paik | Attorney | 2011 | $295/$375 | 1,712.6 | 560,094.50 |
| James Salem | Attorney | 2016 | $405/$432 | 428 | 181,207.35 |

## **THE RATES ARE REASONABLE**

17.    Sheppard Mullin's rates and totals are reasonable, considering the experience and expertise of counsel, the prevailing market rates for lawyers in this District, the magnitude of the claims in this case, and the highly contested and protracted proceedings.  I respectfully submit that the rates charged by Sheppard Mullin are entirely reasonable with respect to this action, as are the hours worked and the costs incurred, as discussed in detail below.

18.    The rates charged in this matter are commensurate with or below market rates. *See Am. Exch. Time LLC v. Tissot S.A.*, No. 17-cv-4737 (VM) (OTW), 2022 WL 17414348 at *6 (S.D.N.Y. Dec. 5, 2022) (in Lanham Act case, finding hourly rates of $795/895 for "a partner with nearly 30 years of experience" and $595 for an attorney with 15 years of experience to be reasonable); *TufAmerica, Inc. v. Diamond*, No. 12-cv-3529 (AJN), 2016 WL 1029553 at *5 (S.D.N.Y. Mar. 9, 2016) (internal citations omitted) (in Copyright case, finding Sheppard Mullin partner rate of $675 reasonable; "[n]ot only are these rates below the partners' customary hourly rates, but they are also in the range of fees recently authorized for similarly experienced attorneys in this district.").

Sheppard Mullin has access to Thomson Reuters Financial Insights, a database that collects, *inter alia*, billing information for timekeepers at law firms in the U.S.  This information can be queried, culled, and sorted based on a variety of factors, including location, practice group, peer group, and type of timekeeper. The information in the database dates back to 2021. We queried average standard rates charged by firms in the AmLaw 100 in New York, New York practicing trademark and copyright law for certain types of timekeepers, which resulted in the following results:

| AmLaw 100 NY Litigation | | | | |
|---|---|---|---|---|
| Title/Experience | 2021 | 2022 | 2023 | 2024 |
| Partners (1-19 yrs exp) | $934 | $990 | $1,075 | $1,160 |
| Partners (20+ yrs exp) | $1,121 | $1,187 | $1,294 | $1,384 |
| Associates (1st-4th yr) | $606 | $639 | $692 | $760 |
| Associates (4th yr+) | $774 | $824 | $895 | $977 |
| Paralegals | $355 | $376 | $407 | $443 |

| Amlaw 100 NY IP - Copyright & Trademarks | | | | |
|---|---|---|---|---|
| Title/Experience | 2021 | 2022 | 2023 | 2024 |
| Partners (1-19 yrs exp) | $876 | $962 | $1,059 | $1,136 |
| Partners (20+ yrs exp) | $982 | $1,003 | $1,077 | $1,159 |
| Associates (1st-4th yr) | $564 | $653 | $662 | $723 |
| Associates (4th yr+) | $736 | $782 | $846 | $893 |
| Paralegals | $336 | $358 | $396 | $433 |

19.     I have reviewed each of the detailed time entries and have excluded time entries relating to aspects of this matter or research concerning issues which did not ultimately play a role in this litigation, and have made a conscious effort to ensure that the fees and costs are attributable to the claims and issues upon which Chanel has prevailed in this matter.

**Experience and Expertise of Counsel for Chanel**

20.     Chanel has been represented by Sheppard Mullin in this matter since its inception. As lead counsel, I have worked with and supervised a team of attorneys, paraprofessionals and support staff.  Our legal services have included the drafting and review of documents, including the complaints and other pleadings, propounding and responding to discovery requests and conducting discovery, extensive motion practice, including summary judgment and in limine motions, Phase I and Phase II Trials, and making and defending post-trial motions in support of the Final Judgment.

21.    As lead counsel, I devoted approximately 3,394.5 hours to this matter since 2017. I am a seasoned litigator with extensive intellectual property experience and have specialized in trademark and copyright litigation before numerous federal courts including within the Second Circuit and before the United States Patent and Trademark Office and United States Trademark Trial and Appeals Board.  I previously served as the Editor-in-Chief and United States Articles Editor for The Trademark Reporter and have been fortunate to be recognized by Chambers, *Managing IP Magazine*, Best Lawyers in America, *World Trademark Review*, Super Lawyers, and Legal 500.  I graduated from Hobart College, *summa cum laude, with High Honors* and New York University School of Law with a Juris Doctor and since then have devoted the majority of my practice to intellectual property matters and, in particular, litigating trademark and copyright cases.  I received and maintained an AV (the highest rating) by the peer-rated Martindale-Hubbell Law.  I have authored numerous articles on trademark law including "Total Recall: A Primer On A Drastic Form of Equitable Relief," 84 The Trademark Reporter 325 (1994); and "Dilution Act May Limit Commercial Parodies", The National Law Journal (May 20, 1996); "Trademarks in the Veldt: Do Virtual Lawyers Dream of Electric Trademarks," 101 The Trademark Reporter 282 (January-February 2011); "Coloring Outside the Lines in the Names of Aesthetic Functionality: Qualitex, Louboutin, and How the Second Circuit Saved Color Marks for Fashion," The Trademark Reporter (September-October 2012).  I lecture on a number of various timely and important copyright and trademark issues before various intellectual property groups and organizations, including PLI, INTA and Strafford.  I have represented plaintiffs and defendants in numerous trademark matters before this Court.  My hourly rate for this matter was billed at $730 initially and then discounted as a courtesy for Chanel from 2018 to $675 per hour through 2023 and increased in January 2024 to $775.   My biography is attached as **Exhibit 3**.

22.    Jill Pietrini also served as counsel for Chanel in this case.  Ms. Pietrini devoted approximately 1,279.3 hours to this matter.  Ms. Pietrini is a highly-experienced intellectual property litigator and highly respected member of the intellectual property legal community.  Ms. Pietrini graduated from the University of California, Berkeley in 1983 and received her Juris Doctor degree from Santa Clara University School of Law in 1988.  She began practicing intellectual property law in 1988 and has litigated numerous trademark-related actions in federal courts and the Trademark Trial & Appeal Board.  Her practice encompasses the full breadth of intellectual property law, with focus on trademarks, copyrights, and unfair competition.  Ms. Pietrini has lectured on intellectual property law and expert source for the media, including major print publications and national broadcast outlets, and has testified as an expert witness on trademark law in federal court.  Ms. Pietrini has been named on multiple occasions a "Litigation Star" by Benchmark Litigation, an IP Star by Managing IP Magazine, Best Lawyers in America by Best Lawyers and has received an AV rating in the Martindale-Hubbell.  Ms. Pietrini's biography is attached as **Exhibit 4**.  Ms. Pietrini's hourly rate was billed at $675 per hour through 2023 and increased in January 2024 to $775.

23.    Dylan Price also served as counsel for Chanel in this case and devoted approximately 2,387.9 hours to this matter.  Mr. Price is a partner in the Business Trial and Entertainment, Technology and Advertising Practice Groups in the firm's Century City office.  Mr. Price's intellectual property practice includes representing clients in disputes involving copyright, trademark, and right of publicity claims, and helping intellectual property owners police their intellectual property rights.  He has handled or been involved with multiple trials in his years practicing.  Mr. Price graduated from University of Michigan, 2005, *with distinction and honors* as an undergraduate and the University of California, Hastings, 2008, *cum laude* as a

Juris Doctor. Mr. Price's biography is attached as **Exhibit 5**. Mr. Price's hourly rate was billed at $650 and then increase to $675 per hour through 2023 and increased in January 2024 to $775.

24. Ms. Pietrini, Mr. Price, and I were assisted on this matter by the following counsel and associates, listed in alphabetical order:

(a) **Tyler E. Baker:** Tyler Baker is an associate at Sheppard Mullin who worked on this case and devoted 398.2 hours to this matter. Mr. Baker is a senior associate in the firm's Intellectual Property Practice Group who specializes in trademark, copyright, and false advertising matters. He has significant intellectual property litigation experience, including trying several cases to jury verdicts. Mr. Baker graduated as an Echols Scholar from University of Virginia and *cum laude* from Georgetown University Law Center. Mr. Baker's biography is attached as **Exhibit 6**. Mr. Baker's hourly rate was billed at $ 625 per hour through 2023 and increased in January 2024 to $ 675.

(b) **Khirin A. Bunker:** Khirin A. Bunker is an associate in the Business Trial Practice Group at Sheppard Mullin who devoted approximately 208.3 hours to this matter. Mr. Bunker has extensive complex business litigation experience, including with several intellectual property cases for Chanel. Mr. Bunker graduated from the University of California, Riverside, Phi Beta Kappa, as an undergraduate and University of Southern California Law School, Order of Coif as a Juris Doctor. Mr. Bunker's biography is attached as **Exhibit 7**. Mr. Bunker's hourly rate was billed at $ 643.50 per hour through 2023 and increased in January 2024 to $ 650.

(c) **Hyo Jin Paik:** Hyo Jin Paik is an attorney in the Business Trial Practice Group at Sheppard Mullin who devoted approximately 1,756.5 hours to this matter. Ms. Paik has litigated intellectual property cases in federal court involving copyright, trademark and publicity claims and managing intellectual property portfolios. Ms. Paik graduated from Syracuse University,

*cum laude* as an undergraduate, Syracuse University Maxwell School of Citizenship and Public Affairs and Yonsei University for Masters degrees, and Syracuse University Law School, *cum laude* as a Juris Doctor.  Ms. Paik's biography is attached as **Exhibit 8**.  Ms. Paik's hourly rate was billed at $ 295 per hour through 2023 and increased in January 2024 to $375 per hour.

(d)    **Bridget J. Russell:**  Bridget J. Russell is a Special Counsel in the Business Trials Practice Group at Sheppard Mullin who devoted approximately 1,656 hours to this matter.  Ms. Russell has extensive experience litigating entertainment and intellectual property cases in federal court.  Ms. Russell graduated from University of Southern California, cum laude, as an undergraduate and University of Southern California, Entertainment Law Certificate, Business Law Certificate as a Juris Doctor.  Ms. Russell's biography is attached as **Exhibit 9**.  Ms. Russell's hourly rate was billed at $ 643.50 per hour through 2023 and increased in January 2024 to $ 649.95.

(e)    **James M. Salem:**  James M. Salem is an attorney in the Business Trial Practice Group at Sheppard Mullin who devoted approximately 428.3 hours to this matter.  Mr. Salem has litigated intellectual property cases in federal court involving copyright and trademark claims.  Mr. Salem graduated from Macaulay Honors College at Hunter College, *magna cum laude* as an undergraduate, and New York University Law School, Jacobson Leadership Program in Law and Business Scholar as a Juris Doctor.  Mr. Salem's biography is attached as **Exhibit 10**.  Mr. Salem's hourly rate was billed at $405 per hour through 2023 and increased in January 2024 to $ 432.

25.    The above-described attorneys were assisted by several paraprofessionals, members of Sheppard Mullin's e-Discovery team, and Managing Clerks Office.  Sheppard Mullin's e-Discovery team was led by Lauren E. Doucette and included Stacey Crocker and

Steven Molina, and was involved in all technical aspects of Chanel's document production, including collection, processing, analysis and production of ESI, implementing and maintaining the litigation database for the ESI produced by Chanel, WGACA, and third-parties, and dealing with vendors. Sheppard Mullin's e-Discovery team was charged at average rates ranging from $220-369/hr. Sheppard Mullin's paralegal team included Monica Danner, Lisa Rodriguez, William Z. Gutman and Adelle L. Jones, all of whom have decades of combined experience both in intellectual property matters and litigation. Sheppard Mullin's paralegals were involved in assisting with depositions, various motions, and both phases of the trial. The paralegals were charged at average rates ranging from $346-387/hr. Mr. Vineet Dua, a member of Sheppard Mullin's Trial Support Team, assisted in Court with all technical aspects at the Phase I and Phase II trials and was charged at the average rate of $380-409/hr. Sheppard Mullin's Managing Clerk's Office assisted with all filings in this case and the management of the case docket. Mr. Bradley Rank and Ms. Leigh Ann Tencza were charged at the average rate of $295-375/hr.

**This Case Is An "Exceptional Case"**

26.    As the Court knows, this case has spanned nearly seven years and has been a highly contentious litigation, in large measure due to WGACA's refusal to acknowledge basic facts which were made plain from WGACA's documents produced in discovery and filed in this case. Even at Phase I of the trial, WGACA willfully defied undisputed facts and required Chanel to establish the facts at trial.

27.    For example, on June 26, 2015, Chanel put WGACA and its Chief Executive Officer, Seth Weisser, on notice, by a cease and desist letter, that WGACA was advertising a counterfeit CHANEL-branded bag bearing the voided Chanel Serial Number 17688191 (the "191 Serial Number"), stating "no legitimate Chanel bag has ever been made with the serial

number you posted." (ECF 446-1; *see also* (Trial Ex. 1402; ECF 429 [Trial Transcript ["TT"] at 1539:2-1542:22].) WGACA responded to Chanel that the 191 Serial Number posted in the advertisement was the result of "a typo or data entry error" and that the actual Chanel Serial Number on the bag was instead a totally different number, 17267828 (the "828 Number"). (ECF 446-2-3.)

28.    WGACA took the position throughout this case that no counterfeit CHANEL-branded handbag bearing the 191 Serial Number was ever sold by WGACA and that the bag that was the subject of the cease and desist letter had the 828 Serial Number. (ECF 446-3; 446-15 (TT 792:23-793:1); 446-17 (TT 1120:12-22); 446-18 (TT 1485:11-15).)

29.    This position was contradicted by WGACA's sales records produced in discovery (ECF 446-4) and documents that WGACA prepared in the case (ECF 239-22), which chronicle that the counterfeit CHANEL-branded handbag bearing the 191 Serial Number was in fact, contrary to WGACA's misrepresentations, sold by WGACA on July 29, 2015, weeks after Chanel warned WGACA that "no legitimate Chanel bag has ever been made" with that number. The same documents also reflect that the Chanel bag which bore the 828 Serial Number had already been sold by WGACA on February 12, 2015, months before WGACA falsely claimed to Chanel that the counterfeit bag with the 191 Serial Number bore the 828 Serial Number. The sworn testimony of WGACA employees, including its Vice Chairperson, Frank Bober, who testified as a Rule 30(b)(6) witness on behalf of WGACA, also laid bare WGACA's fiction:

> Q. So is WGACA taking the position in this lawsuit that it did not sell a bag bearing Chanel serial number 17688191 on July 29th, 2015?
>
> A. Why would we take such a position?
>
> Q. I'm asking you.
>
> A. Well of course not. Obviously we did sell it.

(ECF 267-3, at 4; *see also* ECF 446-17; 423, TT at 1219:2-7 .)[2]

30.     At trial, WGACA doubled down on its falsehood, taking the position instead that the counterfeit handbag identified by Chanel in the cease and desist letter did not bear the 191 Number *or* the 828 Number, but some new number that was missing a digit.  (ECF 423, TT at 1163:24-1164:2.)  In addition to being contrary to WGACA witness testimony and documents, WGACA's false position also was contradicted by Chanel through a demonstration of the possible universe of Chanel Serial Numbers, which demonstrated that WGACA's new falsehood relating to the Chanel Serial Number for the counterfeit bag identified in the cease and desist letter was likewise without merit.  (ECF 429, TT 1541:23-1546:13; Trial Exs. 1402-1406.)

31.     In defiance of the facts laid out in its own sales records and documents, WGACA continued to dissemble about the counterfeit handbag bearing the voided 191 Serial Number throughout Phase I of the trial, which needlessly prolonged and protracted this litigation.  As Chanel's former employee, Jennifer Bleys, testified at Phase I, Chanel would never have needed to bring this lawsuit and tax the Court's and its own resources if WGACA had been truthful and cooperated from the beginning.  (ECF 429 at 1485:3-4 ( "[W]e wouldn't have brought a lawsuit."); *see* ECF 429 at 1484:10-1485:15.)

32.     In 2015, after WGACA's dissembled in its response to Chanel's cease and desist letter, Chanel requested that WGACA post photos of Chanel Serial Numbers to avoid any future typo or data entry errors. WGACA responded that the extra cost was prohibitive but that WGACA would be happy to do so "if we are able to include on [WGACA's] website that we

---

[2] Attached as **Exhibit 11** is a true and correct copy of a letter submitted to the Court on Aug. 30, 2024, which attached a USB containing the video clips of deposition testimony played by Chanel at trial.  Video of this testimony can be found at Video Clip 42 and was played at the Phase I Trial on January 23, 2024.  (*See* ECF 423, TT at 1219:2-7.)

partner with Chanel to ensure authenticity of these items, as value added for our customer."
(ECF 446-2).  Chanel's counsel responded by directing WGACA to take care to not to create any
false association or false advertising: "It is your obligation to ensure you are not falsely
representing your relationship with Chanel, including any suggestion that Chanel has guaranteed
the authenticity of the goods you are selling or that Chanel has partnered with your company to
guarantee the authenticity of any products that you are selling. . . . [P]lease be advised that under
no circumstances may you state that you are partnered with or otherwise affiliated with Chanel
or create any false impression of such a relationship." (ECF 446-1-2).  WGACA's CEO
responded to Chanel's request and stated internally: "Very funny. So legal."  (ECF 446-3.)  After
receiving this notice, WGACA took steps to create further false associations with Chanel,
including adopting the hashtag #WGACAChanel, which WGACA's Frank Bober conceded was
likely to cause confusion.  (**Exhibit 12** at 512:2-13, 518:10-:19; *see also* ECF 446-15 (TT 799:7-
10).)[3]

33.     WGACA's unreasonable conduct during this litigation also encompassed
WGACA continuing to infringe and violate the Lanham Act following the cease and desist letter,
throughout the litigation, and even following the jury's verdict in Phase I.[4]  Specifically, even
though WGACA was made aware of the range of the voided Chanel Serial Numbers at issue
during this litigation and Chanel communicated that such Serial Numbers were never associated
with any genuine CHANEL-branded handbag, WGACA continued to willfully infringe and sold

---

[3] Attached as **Exhibit 12** is a true and correct copy of excerpts from the deposition transcript of
WGACA's 30(b)(6) deposition taken on Feb. 3, 2021.
[4] As was demonstrated by WGACA's sales records, even after WGACA was served with the
complaint in this matter, WGACA continued to sell infringing CHANEL-branded point-of-sale
items that were neither genuine Chanel products nor authorized for sale by Chanel.  (ECF 239-
40; Trial Exhibit 1137.)

3 more counterfeit CHANEL-branded handbags bearing voided Chanel Serial Numbers *during the pendency of the case*.  In addition, WGACA also continued to infringe Chanel's trademarks by creating false associations between WGACA and Chanel from 2015, before and during the pendency of the case.  (ECF 439 at 2190:3-6, 2194:23-2195:21; Trial Ex. 1314; ECF 498-33; ECF 498-30 – 32.)  Following the jury's unanimous verdict, WGACA's CEO in a press statement and at the Phase II Trial willfully defied and rejected the jury's legitimacy and rulings, contending that WGACA had never sold infringing or counterfeit CHANEL-branded items and claiming that "WGACA has always had a rigorous authentication process and has never in the history of the company sold a non-genuine or counterfeit product."  (ECF 446-22).

34.    Months after the jury verdict, Chanel also discovered that a boutique on cruise ships was advertising, in conjunction with WGACA, "CHANEL LUXURY VINTAGE," blatantly infringing Chanel Trademarks by using signage which mimicked Chanel branding. (ECF 461, 461-1.)  WGACA claimed this was a "partner" company and took no action to prevent this ongoing infringement, in spite of the jury's verdict. (ECF 461; 462, p. 21-22.)

35.    WGACA's refusal to acknowledge the truth regarding its offering for sale and willful sale of the counterfeit CHANEL-branded handbag bearing the 191 Serial Number and its rejection of Chanel's admonition against creating a false association with Chanel typify WGACA's bad faith.  This case has involved extensive discovery, frequent disputes necessitating the Court's intervention, a motion to dismiss and a summary judgment motion, and, at the request of WGACA, two trials to both a jury and the Court.  Of particular significance on

this application, WGACA's own actions – again and again – forced Chanel to incur greatly-increased attorneys' fees as compromise became impossible on almost every issue.[5]

36.    In addition to WGACA protracting and prolonging this case from the beginning by taking the position that WGACA has "never in the history of the company sold a non-genuine or counterfeit product," WGACA likewise unreasonably complicated and extended this litigation by repeatedly claiming that Chanel brought this action "as a pretext to advance business interests that have nothing to do with protecting its legitimate intellectual property interests" to stop WGACA from selling second hand Chanel items.  (*See* ECF No. 200 at 1-2; *see also* ECF No. 157 at 5 ["Chanel made up out of whole cloth a pretextual rationale for filing this lawsuit, namely, that it was being injured (or would be likely injured) by the alleged false advertising by WGACA of its sale of 'vintage' and 'genuine' secondhand Chanel goods."]; ECF Nos. 151 at 3, 137 at 1, 74 at 4 [each repeating similar argument]; ECF 332 at 3-4 ["Chanel has decided to inhibit [the secondary] market by targeting and intimidating its participants through pretextual lawsuits" and that "Chanel set out to pummel WGACA and drive it out of the second hand business to the detriment of consumers who want to buy second hand Chanel goods from reputable sellers like WGACA.]"; ECF 353 at 5-7.)  Neither of these positions had a shred of merit from the beginning of the case, yet WGACA continued to advance such factually meritless and legally baseless positions over and over for years.  As Chanel established, the jury recognized, and WGACA's continuing sales of infringing CHANEL-branded items and false

_____

[5] Most recently, when the Court had requested that the parties discuss a compromise on the scope of injunctive relief, Chanel proposed a compromise that WGACA refused to consider but instead refused to depart from the draft injunctive language which the Court acknowledged was "overly burdensome for [Chanel]" and added to Chanel's burden by adding a notice and takedown provision. (*See* ECF 504, 503.)

associations demonstrate, WGACA has a history of selling counterfeit and infringing CHANEL-branded items and creating false associations since 2015 throughout the pendency of the case.

As the Court's ruling granting Chanel's motion *in limine* makes clear, WGACA's "pretext" argument was, from the beginning, legally baseless in a trademark enforcement action such as this. Notably, at no time was any evidence introduced to support WGACA's pretext theory, and indeed, the unanimous verdict was a strong and direct refutation of any such theory. WGACA's repeated and baseless arguments about its false "pretext" theory unreasonably and vexatiously multiplied the proceedings, starting from its unsuccessful Motion to Dismiss (ECF 52 at 7 ["The heart of the instant action is Plaintiff's attempt through the courts to prevent competition from a company that seeks to sell used products of Plaintiffs, as well as producers of other luxury consumer goods."]) to motions relating to discovery disputes (*see, e.g.*, ECF 120 at 2; ECF 136; ECF 159 at 2) (WGACA unsuccessfully moved for documents relating to Chanel's license of technology for the store of the future from Farfetch twice) and through trial (ECF 439, TT 2146:18-2147:5), to Chanel's motion *in limine* (ECF 316, 353, 361). As was borne out by the jury's verdict, Chanel did not bring this case based upon any "pretext" but instead brought this case to protect unknowing consumers from the false advertising and sale of infringing CHANEL-branded items as genuine Chanel products and to stop WGACA from creating a false association between Chanel and WGACA

37.    At times, WGACA's failure to abide by the Court's Orders prolonged and complicated the proceedings. For example, the Court's scheduling order required that opening expert reports be served on or before March 15, 2021 and expert discovery would be completed by June 18, 2021. (Dkt. 217.) On January 17, 2024, after the Phase I trial was well underway, WGACA designated its employee Gracie Ginn as an expert trial witness, notwithstanding the

fact that Ms. Ginn had apparently been employed on and off by WGACA for over five years. WGACA did not identify Ms. Ginn on WGACA's Rule 26 Disclosures prior to the Phase I Trial. (*See* **Exhibit 13**.)[6]   WGACA also neglected to identify Ms. Ginn in WGACA's Supplemental Response To Claims By Chanel, Inc. As To Items Identified By Chanel Pursuant To Orders Of May 5, 2020, June 16, 2020 And August 21, 2020, which identified "Frank Bober, Seth Weisser, Ambria Mische, Devyn Shaughnessy and Sun Li" as the witnesses who might support WGACA's defenses regarding the authenticity of certain Chanel-branded items in this action. Chanel had the opportunity to depose each of these witnesses identified by WGACA during discovery.  Chanel was forced to move to exclude Ms. Ginn on January 24, 2024, (ECF 386), but on January 31, 2024, day sixteen of the Phase I Trial, WGACA reneged and decided not to call Ms. Ginn after all, mooting Chanel's motion.  (ECF 435, TT 2032:8.)

38.    On April 8, 2024, WGACA filed the Declaration of Gracie Ginn as part of its post-trial filings.  (ECF 454, 456.)  On May 9, 2024, the Court asked the parties at the Phase II pretrial conference to identify the witnesses and WGACA identified Ms. Ginn as an expert witness for the Phase II Trial.  (See Dkt. 467.)  Chanel deposed Ms. Ginn on June 24, 2024.  On July 8, 2024, more than three years after the close of expert discovery, more than five months after the jury's verdict, and less than a week before the commencement of the Phase II Trial on July 15, 2024, WGACA sought leave to serve another expert report of and call Graham Wetzbarger.  (Dkt. 473.)  Chanel had no choice but to oppose WGACA's request and ask the Court to exclude Mr. Wetzbarger (ECF 477), which relief the Court granted. (ECF 486, Phase II TT at 16:24-18:8.)WGACA's neglect to follow the Court's deadlines regarding Ms. Ginn and

---

[6] Attached as **Exhibit 13** is a true and correct copy of WGACA's initial disclosures served on Dec. 4, 2018 and supplemental and second supplemental disclosures served on Jan. 17, 2019 and Oct. 3, 2019, respectively.

Mr. Wetzbarger and their expert reports imposed a burden on the Court and Chanel that would not have occurred had WGACA followed the deadlines set by the Court.

39.    WGACA also failed to abide by the Court's Orders and the Federal Rules of Civil Procedure by failing to produce documents, including complete sales records and photographs, regarding a vinyl CHANEL-branded handbag bearing Chanel Serial Number 17744200 (the "Vinyl Handbag") that was identified as counterfeit based upon the Chanel Serial Number, complicating and prolonging the litigation. On May 5, 2020, the Court issued an order requiring that Chanel identify all CHANEL-branded handbags that it believed were non-genuine and WGACA put forward any evidence or defense with respect to such items or it would be barred from producing such evidence. (ECF 104.) WGACA deposed Chanel's witness, Joseph Bravo, about the Vinyl Handbag during discovery and, after discovery was closed, Chanel and WGACA filed motions for summary judgment, including preparing and filing Rule 56.1 statements and counterstatement. Chanel moved for summary judgment with regard to the Vinyl Handbag and, on March 28, 2022, the Court issued its Order, which granted summary judgment as to that bag. (ECF No. 276.) ***Nearly two years*** later, on January 23, 2024, weeks into the Phase I jury trial, WGACA produced photographs of the Vinyl Handbag taken in 2019 that WGACA had neglected to produce but were clearly responsive. Based on the previously undisclosed 2019 photographs, Chanel did not pursue further its claim with regard to the Vinyl Handbag. WGACA's failure to produce discovery which had been requested and required pursuant to the Court's Order and Federal Rules not only delayed the Phase I trial but also required the parties and the Court to litigate discovery and summary judgment issues related to the Vinyl Handbag that need not have taken up Chanel or the Court's time.

**Counsel's Time Records**

40.     It is the practice of Sheppard Mullin for all attorneys and paralegals to record their time on a daily basis.  Time charges are recorded in tenths of an hour or increments of six minutes.  Entries reflect the date work was done, a brief description of the work, the time worked and the cost charged to the client.  Time records are maintained as computerized records kept in the ordinary course of business and it is the ordinary course of these firms' businesses to maintain such records.  Descriptions which contained privileged information and time charges and disbursements that are not sought herein have been redacted.  Chanel has also removed certain time entries for which Chanel is not seeking reimbursement of attorneys' fees.  For clarity, entries which are only partially redacted are redacted for privilege, whereas entries redacted in their entirety (including timekeepers names and amounts) are not the subject of this application, and such entries are not included in the total fees requested.  The time records detail the work that is summarized above.

**Total Attorneys' Fees and Costs and Disbursements**

41.     The total fees that should be reimbursed by WGACA, as reflected in the attached billing statements, amount to $6,715,376.58, inclusive of the aforementioned discounts.

42.     The total disbursements expended on this case that should be reimbursed by WGACA amount to $560,978.97, which includes: i) ESIH hosting costs in the amount of $197,910.44; ii) ESIH processing costs in the amount of  58,514.75; iii) Lexis research fees in the amount of $13,556.70; and iv) Westlaw research fees in the amount of $290,997.08.

43.     Chanel submits that its costs and attorneys' fees of $7,276,355.55 were reasonable given the extensive discovery and contentious approach WGACA has taken to litigation.

For the foregoing reasons, Plaintiff Chanel respectfully requests that the Court grant Plaintiff Chanel's request for attorneys' fees and costs.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 12th day of March, 2025.

New York, New York

*/s/Theodore C. Max*
Theodore C. Max

.